IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CACHÉ, INC., et al.,[1] | ) | Case No. 15-10172 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF ANTHONY DIPIPPA IN SUPPORT OF FIRST DAY MOTIONS

I, Anthony DiPippa, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Executive Vice President and Chief Financial Officer of each of the above-captioned debtors and debtors in possession (the "Debtors" or, collectively, "Caché or the "Company").  I have served in that capacity for each of the Debtors since August 7, 2013, and am familiar with their day-to-day operations, business, and financial affairs.

2.      I have over 18 years of experience in finance with leading companies, including W.B. Mason, Godiva Chocolatier, Dun and Bradstreet and Procter & Gamble.  Since February 2010, I was Chief Financial Officer of W. B. Mason, a $1.2 billion office products and furniture company.  Prior to W. B. Mason, from July 2005 to January 2010, I held the position of Vice President, North America Finance at Godiva Chocolatier.  I received a Bachelor of Arts from The University of Virginia and an MBA from the University of Nebraska.

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Caché, Inc. (8181); Caché of Las Vegas, Inc. (9821); and Caché of Virginia, Inc. (9725).  The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

3.     I submit this declaration (the "Declaration") in support of the Debtors'

petitions and "first day" motions and applications, described further below (collectively, the

"First Day Motions").[2]  Except as otherwise indicated, all statements in this Declaration are

based upon my personal knowledge, my review of the Debtors' books and records, relevant

documents and other information prepared or collected by the Debtors' employees, or my

opinion based on my experience with the Debtors' operations and financial condition.  In making

my statements based on my review of the Debtors' books and records, relevant documents and

other information prepared or collected by the Debtors' employees, I have relied upon these

employees accurately recording, preparing or collecting any such documentation and other

information.  If I were called to testify as a witness in this matter, I could and would competently

testify to each of the facts set forth herein based upon my personal knowledge, review of

documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

4.     Based on my personal knowledge, and through my review of the Debtors'

books, records and other information, I believe that the relief sought by the Debtors in the First

Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession

during the course of their respective Chapter 11 cases (the "Cases").

5.     Part I of this Declaration describes the business of the Debtors and the

developments that led to their filing for relief under chapter 11 of title 11 of the United States

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of these chapter 11 cases.

**PART I**

**A.    Overview and History of the Debtors**

6.      Caché is an omni-channel women's lifestyle specialty retailer with a large, devoted customer base, an exclusive market niche, and presence in top malls across the United States.

7.      The Company's retail operations are supported by an e-commerce business found at www.cache.com.  The Company targets women ages 25-55 with a boutique shopping experience for stylish and fashion-conscious women and an aspirational product line consisting of evening wear, event and day dresses designed for special occasions and daily glamour, casual sportswear and accessories.

8.      Caché's sportswear embodies a mix of contemporary, fitted separates accented with stylish detailing.  The Company also offers its customers a variety of accessories to complement their social occasion dressing.  Caché's hallmark is its personal boutique shopping setting with a product line consisting of social and special occasion dresses, related casual sportswear and accessories, primarily sold under the Caché brand.

9.      As of January 30, 2015, the Company operated 218 stores.  Of these, 169 stores are located in leading malls and 49 are non-mall based stores in 40 states nationwide, Puerto Rico and the U.S. Virgin Islands.  Caché's headquarters is located in New York, NY.  In June 2014, the Company completed a consolidation of three distribution centers into one third

3

party distribution center managed by UPS Supply Chain Logistics, in Hebron, KY. The distribution center building is owned and operated by UPS.

**B.**   **The Company's Products**

10.   Caché offers women unique, trend-right fashion apparel and accessories with a focus on style, fit and quality along with a strong value proposition. Currently, more than 95% of the products are offered under the Caché label. The Company's exclusive product assortment includes day dresses, social and special occasion dresses as well as casual sportswear and accessories. Caché's assortment provides its customers a comprehensive day-into- evening look. Caché's product assortment is carefully curated to meet the events and lifestyle needs in a woman's life and is designed to appeal to style-conscious women looking for unique, trend-right fashions that allow her to demonstrate her individual style. While special occasion dresses are Caché's hallmark, its sportswear and casual dress assortments serve as complementary product lines. Caché's sportswear embodies a mix of contemporary, fitted separates accented with stylish detailing.

11.   Caché also maintains a co-branded credit card program with U.S. Bank, which had approximately 68,848 holders as of September 30, 2014.

12.   For fiscal year 2014, the Company forecasts net sales of $208.7 million. For the year-to-date period ended September 27, 2014, dresses accounted for 56%, sportswear for 38% and accessories for 6% of Caché's net sales.

13.   The Company utilizes, in the aggregate, approximately 2,512 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and

4

administrative positions. Of that workforce, approximately 846 are full-time employees, while approximately 1,666 are part-time employees, although the Company increases the number of seasonal part time employees during the holiday selling season.

## C.    The Debtors' Corporate Structure and Governance

14.    Caché is a publicly-held Delaware corporation traded on the NASDAQ Stock Market exchange under the ticker symbol CACH.   Caché of Las Vegas, Inc. and Caché of Virginia, Inc. are wholly-owned subsidiaries of Caché, Inc.  Currently, the top institutional investor in the Company is MFP Investors LLC.  The Company issued 31,052,478 shares of common stock as of January 29, 2015 (exclusive of any treasury shares).

15.    The Company's Board of Directors is comprised of the Company's Chief Executive Officer, Jay Margolis, and four independent directors: Gene Gage, Robert Grayson, Charles Hinkaty and J. David Scheiner.

## D.    Capital Structure

16.    As of September 27, 2014, the Company's unaudited consolidated financial statement, as reported in its SEC Form 10-Q for the quarter ended September 27, 2014, reflected total assets valued at $53,740,000, of which $3,637,000 consisted of accounts receivable and $27,474,000 consisted of net inventory.

17.    Prepetition Secured Obligations.  On September 19, 2014 the Company entered into a credit agreement ("Prepetition Loan Agreement") with Salus Capital Partners, LLC. The credit facility ("Credit Facility") provided the Company with a line of credit of $30.0 million for short term borrowings and letters of credit with a sublimit of $3.0 million. Any

borrowings under the Credit Facility are due and payable on September 19, 2017, at which time

the facility terminates. The Credit Facility replaced a $25 million revolving credit facility with

Wells Fargo Bank that was dated as of July 25, 2013.

18.     As of the Petition Date, approximately $16.43 million remains outstanding

under the Prepetition Loan Agreement, plus additional amounts on account of accrued and

unpaid interest, fees, costs and charges.  Subject to certain validly perfected prior liens (*i.e.*,

Permitted Prior Liens), the obligations under the Prepetition Loan Agreement are secured by a

first priority, senior lien on substantially all personal property of the Debtors, including the

Debtors' intellectual property assets (principally trademarks and trade names).

19.     <u>Trade Payables</u>.  As of January 3, 2015, the Debtors' accounts payables

amounted to approximately $11,358,000.

**E.     Management**

20.     On February 5, 2013, the Company's board appointed Jay Margolis, a

retail veteran and former Chief Executive of Limited Brands' Apparel Group, as Chairman and

CEO.  Mr. Margolis has an extensive track record in retail including turnarounds at Express and

Limited Stores and is recognized as a leading retail merchant within the industry. He also has

had a variety of senior roles at Reebok, Esprit, Tommy Hilfiger and Liz Claiborne, and sits on

the board of Boston Beer Company.

21.     Mr. Margolis and the other members of senior management were hired in

2013 as part of a sweeping overhaul of the management team.  The other members of the

management team are (1) Jane Inman, Executive Vice President and Chief Officer of Stores, who

6

joined in April 2012, (2) Jennifer Ehrenfeld, Senior Vice President of Design, who joined in

September 2013, (3) Rich Owen, Executive Vice President of Supply Chain, who joined on April

1, 2013, and (4) Donna Edbril, who joined as General Counsel in January 2014.

## F.    Operations and Financial Performance

22.    During the period from 1999 to 2006, prior management undertook an

aggressive store roll out program, increasing the store count from 169 to 306.  Numerous of the

new locations proved to be unprofitable and the Company's management performed an extensive

review of its stores.  As a result, numerous locations have been closed since 2006.  As noted

above, the Debtors currently operate 218 stores.

23.    Historically, dresses command higher and consistent product gross

margins. The prior management team emphasized sportswear which was less profitable and

which forced the Company to engage in promotional pricing and market to a more price

conscious consumer.  Current management has refocused its promotional strategy to emphasize

new collections and full price selling, upgrading product design and fabrication, introducing

exclusive dresses by noted designers, and expanding accessories lines.

24.    In 2012, net retail sales totaled $195,349,177 and net online sales totaled

$26,142,771.  In 2013, net retail sales totaled $193,738,064 and net online sales totaled

$21,586,810.  For 2014 year-to-date (through October 10, 2014), net retail sales were

$140,727,163 and net online sales were $15,521,360.

25.    Net income has declined from $2.1 million in fiscal year 2011 to net losses

of $12.1 million in fiscal year 2012 and $34.4 million in 2013.  The forecasted net loss for fiscal

year 2014 was $32.7 million.  EBITDA has declined commensurately, from positive $10.5 million in fiscal year 2011 to negative $6.7 million in fiscal year 2012 and negative $16.1 million in fiscal year 2013, and a forecasted negative $23.8 million of EBITDA in fiscal year 2014.

**G.     Circumstances Leading to the Chapter 11 Cases and Goals of Chapter 11 Cases**

26.     As discussed above, during the past decade the Company undertook two initiatives that proved unsuccessful.  One was the increase in the Company's footprint, from 169 to 306 stores, which produced numerous underperforming locations.  Another was the reorientation of the Company's product lines away from the Company's core, higher margin business of designing and fabricating high-end dresses and related accessories and into the lower margin casual sportswear business.

27.     Although Caché's most recent merchandise collections have been well received, a persistently weak environment for specialty retailers has impeded its merchandise-based turnaround initiative. Approximately fifty percent (50%) of Cache's stores generate positive cash flow, and the Company's significant operating losses have steadily drained it of liquidity.  In June 2014, this problem was exacerbated when the Company lost over $3 million in financing support from its factors.  In addition, many vendors have placed the Company on "COD" or "CIA" terms, imposing even greater liquidity constraints.

28.     On or about August 7, 2014, the Board engaged an investment banking firm, Janney Montgomery Scott LLC, to evaluate its strategic alternatives, including a possible merger, sale or other form of business combination, as more fully set forth in the *Declaration of Daniel Shea in Support of the Debtors' Motion for Orders (i)(a) Authorizing Entry Into Agency*

8

*Agreement, (b) Authorizing Bidding Protections, (c) Authorizing Bidding Procedures and Auction and (d) Scheduling Sale Hearing and Approving Notice Thereof, (ii) Authorizing (a) Sale of Assets and (b) Store Closing Sales and (iii) Granting Related Relief.*

29.      On January 27, 2015, the Company received a letter from NASDAQ informing the Company that NASDAQ has determined to delist the shares of the Company due to the Company's failure to submit an acceptable compliance plan and that the Company's failure to submit the compliance plan review fee required by NASDAQ Listing Rule 5810(c)(2)(A) serves as an additional basis for delisting the Company's shares.

30.      The Company is currently in default of its obligations under approximately fifty commercial real property leases.  While the Company obtained either written or verbal forbearance agreements with many of these landlords through February 7, 2015, certain forbearance agreements have expired and those landlords will be able to pursue expedited lease termination remedies.  Moreover, at this time, the Company does not believe that it will have sufficient liquidity to make the payments provided under the forbearance agreements to avoid lease terminations upon expiration of the standstills.

31.      In connection with contingency planning for a potential Chapter 11 filing, the Company and its representatives contacted nationally known liquidators capable of handling a company-wide store closing process and requesting proposals from each to serve as a stalking horse purchaser of the Debtors' assets, as more fully set forth in the *Declaration of Mark Renzi In Support of the Debtors' Motion for Orders (1)(A) Authorizing Entry Into Agency Agreement, (B) Authorizing  Bidding Protections, (C) Authorizing Bidding Procedures And Auction, and (D)*

9

*Scheduling Sale Haring and Approving Notice thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales And (III) Granting Related Relief.* The Company and its representatives will assist in conducting a process whereby all potential interested financial and strategic buyers will be contacted and, upon execution of appropriate confidentiality agreements, such potential buyers will be given access to a data room assembled by the Company to enable interested parties to conduct due diligence.

32.   In order to proceed with a transaction as expeditiously as possible, the Debtors have filed on the date hereof the *Debtors' Motion for Orders (i)(a) Authorizing Entry into Agency Agreement, (b) Authorizing Bidding Protections, (c) Authorizing Bidding Procedures and Auction and (d) Scheduling Sale Hearing and Approving Notice Thereof, (ii) Authorizing (a) Sale of Assets and (b) Store Closing Sales and (iii) Granting Related Relief* (the "Bidding Procedures and Sale Motion") seeking, among other things, approval of an agency agreement (the "Agency Agreement") with SB Capital Group, LLC and Tiger Capital Group, LCC (together, the "Stalking Horse"), subject to higher and better offers.[3]

33.   The Bidding Procedures and Sale Motion seeks authority, in part, to conduct an auction for the sale of the Debtors' assets, either on a going-concern basis or via chain-wide store closing sales and liquidation.  It is also anticipated that the Debtors would seek

---

[3] The Company either has filed or expects to shortly file its *Debtors' Motion for an Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property* in the event that a successful bidder at the Debtors' auction does not purchase the Debtors' assets as a going concern.

10

to separately sell certain intellectual property assets to the extent the Debtors are not sold on a going-concern basis at auction.

34.    The Bidding Procedures and Sale Motion also seeks to grant bidding protections to the Stalking Horse, establish bidding procedures for an auction and conduct a hearing on the request to conduct store closing sales and liquidate their inventory pursuant to the Agency Agreement, or to consummate an alternative transaction of the successful bidder. The Debtors believe that the store closing sales, or the consummation of a higher and better transaction, will maximize value for the Debtors' estates while minimizing the administrative expenses incurred in these Chapter 11 cases.

35.    After filing their petitions, the Debtors intend to operate their businesses in the ordinary course while pursuing all options for maximizing value.  In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically

## PART II

### First Day Motions and Applications

36.    In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

37.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

11

information and belief, and I believe that the type of relief sought in each of the First Day

Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors'

assets for the benefit of their estates and creditors.

**A.**  **Debtors' Motion for Order Directing Joint Administration**
 **of Related Chapter 11 Cases**

38.   The Debtors in these Cases are affiliated entities.  I am informed by

counsel that the joint administration of the Cases will permit the Clerk of the Court to utilize a

single general docket for these Cases and combine notices to creditors of the Debtors' respective

estates and other parties in interest, which will result in significant savings to the estates.

Accordingly, I believe that the relief requested in the joint administration motion is in the best

interests of the Debtors' estates;

**B.**  **Application of Debtors for Order Under 28 U.S.C. § 156(c)**
 **Authorizing and Approving the Retention of and Appointing**
 **Kurtzman Carson Consultants LLC as Noticing, Claims and Balloting Agent**

39.   The Debtors seek to authorize and approve the retention and appointment

of Kurtzman Carson Consultants, LLC ("KCC") as claims and noticing agent in these Cases (the

"KCC Application") to assume full responsibility for the maintenance, processing, and docketing

of proofs of claim, filed in the Cases, and such other services as the Debtors may request to the

extent set forth in the services agreement attached to the KCC Application.  I am also informed

that KCC has acted as the claims and noticing agent in numerous cases of comparable size in this

and other judicial districts, including, in this district and has substantial experience acting in such

12

capacity.  The Debtors anticipate that there will be thousands of entities to be noticed in the

Cases.  In view of the number of anticipated claimants and the complexity of the Debtors'

businesses, I believe that the appointment of KCC as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

C.    **Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107, and 1108
      Authorizing (I) Maintenance of Certain Existing
      Bank Accounts, (II) Continued Use of Existing Checks and Business Forms,
      (III) Continued Use of Existing Cash Management System, and (IV) Continued
      <u>Performance of Intercompany Transactions</u>**

　　　　40.    The Debtors seek an order authorizing the (i) the maintenance of certain

existing bank accounts including the authority to pay routine prepetition banking fees owed to

financial institutions, (ii) the limited continued use of existing checks and business forms, (iii)

the continued use of the existing cash management system of the Debtors, and (iv) continued

performance and funding of intercompany transactions (the "<u>Cash Management Motion</u>").

　　　　41.    The Debtors' cash management system (the "<u>Cash Management System</u>")

is a network of bank accounts that facilitates the timely and efficient collection, management,

and disbursement of funds used in the Debtors' business.  The Cash Management System

consists of an integrated network of bank accounts maintained at Bank of America ("<u>BofA</u>"), JP

Morgan Chase ("<u>JP Morgan</u>"), Wells Fargo ("<u>Wells Fargo</u>"), and numerous other local banks

used by individual stores operated by the Debtors (collectively, the "<u>Banks</u>").  Due to the

Debtors' extensive retail operations, the Debtors' Accounts (as defined in the Cash Management

Motion and shown on Exhibit A thereto) include various store bank accounts (the "<u>Store Bank</u>

<u>Accounts</u>").

42.      Revenue from the sale of goods to customers at the Debtors' retail locations, other than credit card payments, are manually deposited into the Store Bank Accounts and then swept daily into the Debtors' master depository account at Wells Fargo.  In the aggregate, daily receipts from each of the Store Bank Accounts and then swept into the master depository account have historically ranged from $50,000 to $500,000.

43.      The Store Bank Accounts are comprised of two separate groups. Approximately 86 Stores use local banks into which the Debtors deposit cash and check collections on a daily basis and which are then manually transferred into the master depository account (the "Manual Store Bank Accounts").  Approximately 153 Stores deposit cash and check receipts into three accounts maintained only at BofA and Wells Fargo (the "Automated Store Bank Accounts") that are automatically swept into the master depository account.  Daily cash and check deposits to each Manual Store Bank Account or the Automated Store Bank Accounts generally do not exceed more than $10,000 per day per Store.

44.      All point of sale credit card payments from Mastercard, Visa, American Express, and Discover are processed by the applicable credit card company.  The proceeds derived from sales are then transferred by the credit card companies to the master depository account, after the credit card companies' deduction of their transaction fees and any setoff of chargebacks (usually resulting from the return and refund of merchandise from prior credit card sales).  Average daily credit card settlement deposits to the master depository account range from $400,000 to $2,500,000.

14

45.     On a daily basis, the Debtors request and receive their daily cash needs through the presentment of a borrowing base certificate to Salus. Salus processes this request by transferring funds to an account maintained at Wells Fargo (the "Concentration Account"). The Concentration Account is used to process the Debtors' daily disbursements, which are all made from either one of two disbursement accounts. Because the Concentration Account is funded on an as-needed basis to pay the Debtors' daily expenses, the average daily balance in this account has ranged from approximately $10,000 to $150,000. Disbursements made by check are processed through a zero-balance disbursement account at Wells Fargo (the "Disbursement Account"). Disbursements made to fund the Debtors' payroll obligations are also made through an account located at Wells Fargo (the "Payroll Account").

46.     Maintenance of the Accounts will greatly facilitate the Debtors' operations in Chapter 11. As noted on Exhibit B attached to the Cash Management Motion, all cash and check payments from the Debtors' customers are deposited into the master depository account through the Manual Store Bank Accounts and the Automated Store Bank Accounts. Continuing the Debtors' Cash Management System without interruption is vital to the success of these Cases. The Cash Management System is an efficient mechanism whereby the Debtors are able to transfer their revenues toward the payment of their obligations.

47.     Accordingly, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

15

**D.    Motion of the Debtors for Entry of an Order:(I) Authorizing the Debtors to (A) Pay Wages, Salaries, and Other Compensation, Payroll Withholdings and Benefits Contributions, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses; and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing**

48.    The Debtors seek an order (a) authorizing, but not requiring the Debtors to (i) pay and/or honor and remit prepetition wages, salaries, and certain other compensation, payroll withholdings and benefits contributions, (ii) maintain employee medical and similar benefits, (iii) pay reimbursable employee expenses, and (iv) pay prepetition payroll and benefits administrative fees and expenses, subject to caps shown below; and (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing (the "Wages Motion").

49.    The Debtors utilize, in the aggregate, approximately 2,512 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). Of that workforce, approximately 846 are full-time Employees, while approximately 1,666 are part-time Employees. The Debtors have also retained the services of two independent contractors (each, an "Independent Contractor").

50.    To minimize the personal hardships that the Employees (both those who have been terminated and those that are being retained) will suffer if its prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations and the administration of the estates, the Debtors, by this Motion, seek authority, in their sole

16

discretion, to: (i) pay unpaid prepetition claims for wages, salaries, non-insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees (both those who have been or may be terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations (defined in the Wages Motion) to the proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Related Administrators (as defined in the Wages Motion); (iv) honor and maintain certain Employee related benefits (as more fully set forth in Section C of the Wages Motion) offered by the Debtors (collectively, the "Benefits"); (v) reimburse certain unpaid business Expense Reimbursement Obligations (defined in the Wages Motion) incurred prepetition by Employees; and (vi) pay all costs incident to the foregoing as set forth in detail in the Wages Motion.

     51.    The Debtors' average aggregate bi-weekly gross payroll including wages and salaries (collectively, "Wages") and Withholding Obligations (as defined in the Wages Motion) is approximately $2.2 million (although there are fluctuations, for example, during holiday periods). The Employees are paid in arrears, on a bi-weekly basis, typically every other Wednesday, with direct deposits or checks issued on the Wednesday after the close of each pay period. The Debtors' last payroll was made on January 28, 2015 (prior to the commencement of these Cases), covering Wages earned from January 11, 2015, through January 24, 2015. The next payday is scheduled for February 11, 2015, covering the pay period January 25, 2015, through February 7, 2015, with (subject to Court approval) the Debtors' funding of direct deposits to be authorized on February 10, 2015, direct deposits made to Employees' bank

accounts on February 11, 2015, and most live checks to be delivered to Employees at company

headquarters on February 11, 2015, and to Employees at store locations on February 12, 2015.

52.      The Debtors believe they owe an estimated $1,460,282.26 in gross earned

but unpaid prepetition Wages for Employees and Independent Contractors (including applicable

Withholding Obligations other than Payroll Related Tax Obligations) which would be paid as

part of the February 11, 2015 payroll.

53.      In the ordinary course of business, the Debtors routinely withhold from

Wages, and also owe in connection with Wages, certain amounts required to be transmitted to

taxing authorities, including, without limitation, employer payroll taxes and Employees' portions

of FICA and unemployment taxes (collectively, the "Payroll Related Tax Obligations").  The

Payroll Related Tax Obligations are remitted by an administrator, ADP.  In the ordinary course,

the Debtors also withhold contributions to the Debtors' health, vision, dental benefit plans and

other insurance plans, 401(k) contributions and 401(k) loan repayments, employee medical

contributions, and other similar accounts, and withholdings for garnishment, or child support or

similar obligations pursuant to court order or law (the "Benefits Withholdings" and, together

with the Payroll Related Tax Obligations, the "Withholding Obligations").  The Debtors estimate

that the Employer portion of Payroll Tax Related Obligations, accrued as of the Petition Date,

total approximately $535,675.12, and the Employee portion of Payroll Tax Related Obligations,

accrued as of the Petition Date, total approximately $136,414.59, which amount should be

withheld as part of the Withholding Obligations and remitted to the proper taxing authorities.

54.    The Debtors employ ADP ("ADP") as their payroll tax administrator to process and transfer payroll tax related amounts from a given payroll to the appropriate taxing authorities.  As part of each payroll, the Debtors initiate a wire to ADP with the applicable amounts typically on the Tuesday before the Wednesday payday, and ADP proceeds to make payments to the taxing authorities after receipt of the funds from the Debtors.  ADP's compensation is approximately $5,000 on a bi-weekly basis, and is paid in arrears.  The Debtors estimate that, as of the Petition Date, they owed ADP approximately $5,000.

55.    The Debtors provide eligible Employees, in the ordinary course of business, with certain Benefits, including, but not limited to (a) medical, dental and vision insurance, (b) workers' compensation, (c) vacation time and other paid time off, and (d) other miscellaneous employee benefits, each as described in further detail in the Wages Motion.

56.    In sum, the Debtors seek authority, in their sole discretion, to continue to honor and implement the employee related policies and practices as described in the Wages Motion and pay Unpaid Wages, Worker Compensation, and the various Benefits as described in the Wages Motion, including the estimated amounts set forth below:

| | |
|---|---|
| Unpaid Wages (including any "floating" payroll wage checks issued prepetition) | $1,475,000 |
| Employer Withholding Obligations | $590,000 |
| Employee Withholding Obligations | $151,000 |
| 401k Employer Match Obligations | $36,000 |
| Medical Plan Obligations | $63,000 |
| Life Insurance and Disability Insurance | $12,000 |

19

| Vision Plans | $2,150 |
|---|---|
| Expense Reimbursement Obligations | $240,000 |
| Payroll Related Administrators | $5,000 |
| 401(k) Auditor | $21,000 |
| Store Bonuses (excluding previously issued floating checks) | $175,000 |

provided that no Employee will be paid a total distribution of more than the $12,475 statutory priority cap on account of prepetition Wages, any prepetition bonuses, and accrued Paid Time Off (if applicable).

57.     The Employees are critical components to the success of these Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

58.     Accordingly, I believe that the relief requested in the Wages Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**E.      Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order (I) Authorizing The Payment of Debtors To Pay Prepetition Sales, Use And Franchise Taxes and Similar Taxes And Fees And (II) Authorizing Banks And Other Financial Institutions To Receive, Process, Honor And Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing**

59.     The Debtors seek an order (i) authorizing, but not directing, the Debtors to pay certain prepetition taxes, including, sales and use taxes, franchise taxes, and similar taxes

20

and fees in the ordinary course of business, as the Debtors, in their sole discretion, deem

necessary; and (ii) authorizing banks and financial institutions to receive, process, honor and pay

all checks and transfers related thereto (the "Taxes Motion").

60.     In the ordinary course of business, the Debtors collect and pay taxes,

including, but not limited to, sales and use taxes, franchise taxes, and certain other business

license fees, to various taxing authorities in multiple jurisdictions (the "Taxing Authorities")

61.     The Debtors collect and remit sales, use and related taxes ("Sales and Use

Taxes") to the Taxing Authorities in 41 states, Puerto Rico and the US Virgin Islands, and/or

certain municipal or governmental subdivisions or agencies of those states in connection with the

sale of their products in those states and also provided through the Debtors' 218 locations across

the United States.  Generally, the Debtors collect and remit Sales and Use Taxes to the applicable

Taxing Authority on a monthly basis.  Prior to the Petition Date, the Debtors transferred

approximately $675,000 in unremitted Sales and Use Taxes to the applicable Taxing Authority.

62.     The Debtors are required to pay franchise taxes (the "Franchise Taxes") to

certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction.

Certain states may refuse to qualify a debtor to do business in a state or recognize a name

change, merger or other activity if franchise taxes have not been paid.  As of the Petition Date,

the Debtors estimate that they currently owe approximately $181,344 in unremitted Franchise

Taxes.

63.     The Debtors are required to pay various taxes and fees for business

licenses, annual reports, various permits, and other similar types of taxes and fees (the "Business

21

Fees") in order to continue conducting their businesses pursuant to state and local laws. The

Business Fees are computed in a variety of ways, but are generally a flat rate. The Debtors remit

the required amounts for the Business Fees on a monthly, quarterly, or annual basis, depending

on the requirements of the particular Taxing Authority or governmental authority. The majority

of the Business Fees incurred by the Debtors relate to license and business privilege taxes due

and owing for the Debtors' 218 locations located across the United States. As of the Petition

Date, the Debtors estimate that they currently owe approximately $12,018 in unremitted

Business Fees.

      64.     In sum, the Debtors seek authority to remit Prepetition Tax Obligations in

an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared[4]

and amounts that may be subsequently determined on audit to be owed a particular Taxing

Authority or party who ordinarily collect the Prepetition Tax Obligations) not to exceed

$215,000 (the "Prepetition Tax Obligations Cap"), without prejudice to the Debtors' rights to

contest the amounts of any Prepetition Tax Obligations on any grounds they deem appropriate

      65.     The Court should grant the relief requested in the Taxes Motion because:

(i) portions of the Prepetition Tax Obligations are not property of the estate; (ii) portions of the

Prepetition Tax Obligations are entitled to priority status pursuant to section 507(a)(8) of the

Bankruptcy Code; (iii) the Taxing Authorities or the parties who ordinarily collect the

Prepetition Tax Obligations may file liens, initiate audits, or otherwise proceed against Debtors

---

[4] The Debtors request authority to reissue any amounts paid by check prepetition that have not cleared as of the
    Petition Date and are dishonored.

for unpaid Prepetition Tax Obligations and such actions will result in unnecessary expense and distraction from the Debtors' efforts to maximize the value of their estates.

66.    Accordingly, I believe that the relief requested in the Taxes Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**F.    Debtors' Motion for an Order Authorizing, But Not Directing, Payment of Certain Prepetition Claims of Shipping Obligations in the Ordinary Course of Business**

67.    The Debtors seek an order (i) authorizing, but not directing, the Debtors to pay certain prepetition claims of shippers, freight forwarders, and common carriers (collectively, the "Shippers"), and (ii) authorizing financial institutions to receive, process, honor and pay all checks issued and electronic payment requests made relating to the foregoing (the "Shippers Motion").

68.    The Debtors seek the authority to continue to pay, in the ordinary course of business, certain prepetition claims of the Debtors' Shippers who have (or may have) non-bankruptcy law remedies available to secure payment of their claims.  The Debtors propose to pay such claims, when, in the Debtors' sole discretion, such creditors' exercise of such remedies would unduly disrupt the Debtors' business.  Accordingly, the Debtors request the authority, but not the obligation, to pay up to $1,000,000.00 on account of such claims (the "Shipping Charges")

69.    The Debtors' business depends on the daily process of importing and shipping its clothing products to stock the Debtors' stores.  Annually, the Debtors acquire merchandise with an approximate retail value of over $380 million to stock the Debtors' stores.

23

The Debtors acquire the merchandise primarily from foreign manufacturers in Asia (the "Foreign Merchandise") with a smaller quantity acquired from domestic manufacturers (the "Domestic Merchandise", together with the Foreign Merchandise, the "Merchandise").

70.     Under some non-bankruptcy laws, shippers and warehousemen may have liens on the goods in their possession, which secure the charges or expenses incurred in connection with the transportation or storage of the goods.  The Debtors owe the Shippers approximately $1,000,000.00 for prepetition shipping, custom duties, and storage.  However, in the event that such charges remain unpaid, the Shippers likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.  As noted above, the value of the Merchandise that is in transit with the Shippers substantially outweighs the Shipping Charges.  The Debtors anticipate that the Shippers will demand immediate payment from the Debtors.

71.     The value of the Merchandise that is in transit with the Shippers substantially outweighs the Shipping Charges.  The Debtors anticipate that the Shippers will demand immediate payment from the Debtors.  Even absent a valid lien, the Shippers' mere possession (and retention) of the Debtors' goods and supplies could severely disrupt the Debtors' operations and efforts to maximize the value of their estates for the benefit of their creditors.

72.     In sum, the Debtors seek to prevent the breakdown of a portion of their supply and delivery network by requesting authority to pay the amount of the Shipping Charges to the Shippers that the Debtors determine are necessary or appropriate to (a) obtain release of

24

critical or valuable goods, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Shippers to continue to carry goods and make timely delivery. I believe that the relief requested in the Shippers Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**G.    Motion For Entry Of An Order Authorizing The Debtors To Honor Certain Prepetition Obligations To Customers And To Otherwise Continue Certain Customer Programs In The Ordinary Course Of Business**

73.    The Debtors seek an order a) authorizing, but not obligating, the Debtors to maintain and administer customer-related programs as described in the Motion (collectively, the "Customer Programs") and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice in the Debtors' sole discretion (the "Customer Programs Motion").

74.    The Debtors are a mall-based boutique shopping experience for fashion-conscious women that operate under the name "Caché" and offer glamorous, confident, contemporary styles that inspire passionate loyalty from the women who wear them

75.    Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' sale efforts. In addition, the Debtors must maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to purchase the Debtors' products during the Debtors' sale process.

76.    Specifically, the Customer Programs generally relate to the Debtors' programs in which they offer gift cards, refunds and exchanges, programs by which customers can purchase merchandise through the redemption of loyalty points, Caché Visa credit card

purchases, and coupons and other promotional offers to their customers.  The Debtors believe

that their ability to continue the Customer Programs and to honor their obligations thereunder in

the ordinary course of business is necessary to retain their reputation for reliability, to meet

competitive market pressures, and to ensure customer satisfaction, thereby retaining current

customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the

benefit of all the Debtors' stakeholders

77.     Accordingly, I believe that the relief requested in the Customer Programs

Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**H.     Motion of the Debtors for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utility Providers Adequately Assured of Future Performance, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief**

78.     The Debtors seek interim and final orders (a) prohibiting the Utility

Providers (defined below) from altering, refusing or discontinuing service; (a) deeming the

Utility Providers adequately assured of future performance; (b) establishing procedures for

determining additional adequate assurance of future payment; and (i) grantin related relief (the

"Utilities Motion")

79.     In connection with the operation of their businesses and management of

their properties, the Debtors have relationships with various utility companies and other

providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision

of telephone, gas, electricity, water, waste disposal and related services (the "Utility Services").

26

The Utility Providers include, without limitation, the entities set forth on the list (the "Utility Services List") attached as Exhibit A to the Utilities Motion.

80.     The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and cash available to the Debtors through their debtor in possession financing facility, will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice.

81.     In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (the "Adequate Assurance Deposit") equal to fifty percent (50%) of the Debtors' estimated cost of their monthly utility consumption to each Utility Provider which the Debtors intend to continue to utilize during the course of these cases and which may be adjusted by the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Provider.

82.     The Debtors estimate that their average monthly payments to the Utility Providers aggregate approximately $311,710.  Accordingly, the Debtors estimate that the Adequate Assurance Deposits, in the aggregate, will total approximately $155,855.  This amount, which is equal to approximately two weeks of the Debtors' estimated average postpetition monthly aggregate cost of utility services, will be held in a newly created and segregated account (the "Deposit Account").

83.     The Adequate Assurance Deposit will be held in the segregated account

for the duration of these chapter 11 cases.  The Debtors submit that the Adequate Assurance

Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance

with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitutes

sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the

Bankruptcy Code.

84.     Uninterrupted Utility Services are essential to the Debtors' ongoing

business operations.  The Debtors' operations require electricity for lighting, gas for heating,

water, waste management and disposal, and telephone and internet services.  Should any Utility

Provider refuse or discontinue service, even for a brief period, the Debtors' business operations

could be severely disrupted, and such disruption would jeopardize the Debtors' ability to operate

their business.  It is essential that the Utility Services continue uninterrupted during the chapter

11 cases.

85.     Accordingly, I believe that the relief requested in the Utilities Motion is

both necessary and in the best interests of the Debtors' estates and their creditors.

**I.      Motion of the Debtors for Order under Sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 (A) Authorizing the Debtors to (I) Maintain and Renew Existing Insurance Policies; (II) Continue Insurance Premium Financing Programs, (III) Pay Insurance Premium Financing Obligations Arising Thereunder, and (B) Authorizing Financial Institutions to Honor All Obligations Related Thereto**

86.     The Debtors seek entry of an order (i) authorizing the Debtors to (a)

maintain and renew existing insurance policies and pay all policy premiums and brokers' fees

28

arising thereunder or in connection therewith, (b) continue insurance premium financing programs, and (c) pay insurance premium obligations arising thereunder or in connection therewith; and (ii) authorizing financial institutions to honor all obligations related thereto (the "Insurance Premium Financing Motion").

87.    In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, inter alia, commercial general liability, umbrella liability, shipping and cargo, property, excess property, flood, foreign liability, fiduciary liability, directors' and officers' liability, network security/privacy and workers' compensation (collectively, the "Policies"). These Policies are essential to the preservation of the Debtors' business, and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business. The Debtors make monthly installment payments directly to the applicable insurance carriers on a monthly basis on all of their Policies (the "Direct-Pay Policies") other than the Financed Policies discussed in the Insurance Premium Financing Motion. The aggregate monthly amount remitted for the Direct-Pay Policies is approximately $34,164.00 per month.

88.    The Debtors currently have one active prepetition Insurance Premium Finance Agreement (the "PFA") with an insurance financier, First Insurance Funding (the "Insurance Financier") in order to finance the cost of the insurance premiums for certain insurance policies. Specifically, the PFA covers the Debtors' workers' compensation, general liability, marine, umbrella, employment practices liability, crime, directors and officers, excess

29

directors and officers, and directors and officers fiduciary liability Policies (the "Financed Policies") that the Debtors carry to cover potential liability created by their operations

89.     Pursuant to the PFA, the Insurance Financier agreed to pay each insurance carrier the entire premium on the Financed Policies.  In return, the Debtors paid the Insurance Financier a down payment and ten (10) monthly installments with respect to the Financed Policies.  The interest rate as set forth in the PFA is 3.990% per annum.  The aggregate monthly installment amount paid on account of the PFA is $134,710.64 per month, which includes applicable brokers' fees.  The PFA expires on July 27, 2015.

90.     The Policies are essential to the Debtors' business and the Debtors believe that it is in the best interests of the estates to continue to pay the amounts due under the Policies and the PFA regardless of whether a given payment became due prior to or after the Petition Date.  Unless the Debtors are authorized to continue to pay pursuant to the Policies and PFA on a monthly basis, the Insurance Financier will have the right to cancel the Financed Policies and will be entitled to recover the unearned premiums from its collateral.  The termination of the Policies would leave the Debtors' estates at risk of catastrophic loss if an unforeseen event occurred.

91.     Accordingly, I believe that the relief requested in the Insurance Premium Financing Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

DOCS_DE:197863.1 11903/001

J.    **Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§  105, 361, 362, 363, 364 and 507 for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Use Cash Collateral; (3) Grant Liens and Provide Superpriority Administrative Expense Status; (4) Grant Adequate Protection; (5) Modify the Automatic Stay; and (6) Schedule a Final Hearing**

92.    The Debtors seek authority to obtain credit and incur debt (the "DIP Loan") on an interim basis under the DIP Credit Agreement, which is described in detail in the DIP Motion filed concurrently herewith.[5]  The Debtors seek an emergency interim hearing (the "Interim Hearing") on the DIP Motion for the Court to consider entry of an interim order, which authorizes the Debtors to (a) borrow under the DIP Loan Documents,[6] on an interim basis, up to an aggregate amount of $9.53 million, (b) partially satisfy the Debtors' obligations under the Prepetition Loan Agreement[7] from postpetition receipts,[8] and (c) use cash collateral on an interim basis in accordance with the Approved Budget (defined below).[9]  The Debtors also seek to schedule a final hearing on the DIP Motion within thirty (30) days of the entry of the interim order.

93.    The Debtors have provided a budget to the DIP Lender, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the DIP Lender ("Approved Budget").  The budget has been formulated

---

[5]    The proposed DIP Credit Agreement is attached as Exhibit B to the DIP Motion.

[6]    Capitalized terms used in this section shall have the meanings ascribed to them in the DIP Motion.

[7]    The Prepetition Loan Agreement is by and among Salus Capital Partners, LLC, as administrative agent and collateral agent ("Prepetition Agent"), for Salus CLO 2012-1, Ltd., and all other lenders from time to time a party thereto ("Prepetition Lenders"), and the Debtors, as borrowers.  The Prepetition Loan Agreement had a maturity date of September 19, 2017.

[8]    As of the Petition Date, approximately $16.43 million remains outstanding under the Prepetition Loan Agreement, plus additional amounts on account of accrued and unpaid interest, fees, costs and charges.

[9]    A summary of the Approved Budget is attached as Exhibit C to the DIP Motion.

31

to provide the Debtors with the minimum liquidity required to prudently operate their business and meet their anticipated postpetition operating and restructuring expenses. The amount that the Debtors seek to borrow pursuant to the Interim Order reflects the payment of expenses that, in the Debtors' business judgment, are necessary to avoid immediate and irreparable harm to the estates.

94.     The approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with immediate and ongoing access to the funds necessary to pay their current and ongoing operating expenses, including postpetition salaries and vendor costs, among other disbursements. Unless these expenditures are made, I believe the Debtors will be forced to immediately cease operations, which would (i) result in irreparable harm to their business, (ii) destroy going concern value, and (iii) deny the Debtors the opportunity to maximize value.

95.     Following the Petition Date, the Debtors' postpetition receipts will be applied against the balance of the Prepetition Loan Agreement. As a result, the Debtors project the need to borrow up to $9.53 million under the DIP Facility to meet operating and other disbursements under the Approved Budget during the period from the entry of the Interim Order until a Final Hearing. In light of the reserve requirements established under the DIP Facility, however, the Debtors require, and the Agent has agreed, that the $22 million maximum amount of loan commitments be made available for borrowing upon entry of the Interim Order, even though actual disbursements under the DIP Facility will not exceed $9.53 million. Because the Debtors' Cash Collateral is earmarked for repayment of the balance due under the Prepetition Loan Agreement, I believe the borrowing under the DIP Credit Agreement is vital to preserve and enhance the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. In addition, the availability under the DIP Credit Agreement will provide confidence

32

to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby aiding in the administration of the Cases and promoting a successful opportunity for the Debtors to generate maximum value from their assets. Accordingly, I believe the timely approval of the relief requested herein is imperative.

96.     I also understand that the Debtors satisfy the requirements of the Bankruptcy Code to obtain the DIP financing because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates. Prior to the Petition Date, the Debtors and their advisors approached several parties to solicit proposals for prospective postpetition financing. In early January, the Debtors contacted two especially suitable parties and described the operating needs of the Debtors and the existing capital structure and assets of the companies. Neither of these parties submitted an indication of interest. In addition, as the terms and conditions of the proposed DIP Facility with Salus coalesced, the Debtors' advisors again contacted additional possible lenders to determine whether such parties could offer financing on alternative or improved terms. None of these additional parties expressed an interest in supplying financing to the Debtors.   I believe that the Debtors' efforts to obtain credit have been impacted by the fact that all or substantially all of the Debtors' assets are currently encumbered.

97.     Despite these invitations for third party financing, the Debtors' rapidly diminishing liquidity, coupled with the imminent expiration of certain lease forbearance arrangements, led the Debtors to conclude that the Prepetition Lender presented the best likelihood of a definitive financing commitment within the available time period.

98.     I believe that the conduct of the Debtors' business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing

33

under the DIP Credit Agreement.  The Debtors are unable to obtain (i) adequate unsecured credit, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates and (y) a junior lien on encumbered assets, or (iii) secured credit from sources other than the DIP Lender on terms more favorable than the terms of the DIP Credit Agreement.  The only immediately feasible source of secured credit available to the Debtors is the DIP Credit Agreement.

99.    After considering all of the Debtors' alternatives, I believe that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors.   Moreover, the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

100.    Further, the other terms and conditions of the DIP Credit Agreement were negotiated in good faith and at arm's-length with all parties represented by experienced counsel.

101.    Finally, I believe that the authorization to obtain the DIP Credit Agreement and use of Cash Collateral pending a Final Hearing will preserve the value of the Debtors' business only if authorization is granted immediately.  In this instance, the Debtors must have immediate use of the funds provided under the DIP Credit Agreement to the extent contemplated herein to pay their ongoing operational expenses and to maximize the value of their estates.  Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these cases in an orderly and efficient manner.  In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates.

*[Remainder of page intentionally left blank]*

DOCS_DE:197863.1 11903/001

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 4, 2015

_____
Anthony DiPippa
Executive Vice President and Chief Financial Officer