IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CACHÉ, INC., et al.,[1] | ) | Case No. 15-10172 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION FOR ENTRY OF AN ORDER:**
**(I) AUTHORIZING DEBTORS TO (A) PAY WAGES,**
**SALARIES, AND OTHER COMPENSATION, PAYROLL WITHHOLDINGS AND**
**BENEFITS CONTRIBUTIONS, (B) MAINTAIN EMPLOYEE MEDICAL AND**
**SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES; AND**
**(II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL**
**INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT**
**REQUESTS MADE BY DEBTORS RELATING TO THE FOREGOING**

The above-captioned debtors and debtors in possession ("Caché" or the "Debtors"), hereby move (the "Motion") the Court for entry of an order, substantially in the form annexed hereto as **Exhibit A**; (a) authorizing, but not requiring the Debtors to (i) pay and/or honor and remit prepetition wages, salaries, and certain other compensation, payroll withholdings and benefits contributions, (ii) maintain employee medical and similar benefits, (iii) pay reimbursable employee expenses, and (iv) pay prepetition payroll and benefits administrative fees and expenses, subject to caps shown below; and (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Caché, Inc. (8181); Caché of Las Vegas, Inc. (9821); and Caché of Virginia, Inc. (9725). The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating

their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

5.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of Anthony DiPippa in Support of First Day Motions* (the "DiPippa Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

### Debtors' Employees

6.      The Debtors utilize, in the aggregate, approximately 2,512 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees").[3] Of that workforce, approximately 846 are full-time Employees, while approximately 1,666 are part-time Employees. The Debtors have also retained the services of two independent contractors (each, an "Independent Contractor").[4]

7.      To minimize the personal hardships that the Employees (both those who have been terminated and those that are being retained) will suffer if its prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DiPippa Declaration.
[3] Substantially all of the Employees are paid their Wages through a bank account maintained by Debtor Caché, Inc.
[4] One Independent Contractor performs public relations and other special projects and receives approximately $7,000 plus expenses twice per month. A second Independent Contractor performs information technology services and is paid approximately $2,500 weekly.

and the administration of the estates, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages, salaries, non-insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees (both those who have been or may be terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations (defined below) to the proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Related Administrators (as defined below); (iv) honor and maintain certain Employee related benefits (as more fully set forth in Section C below) offered by the Debtors (collectively, the "Benefits"); (v) reimburse certain unpaid business Expense Reimbursement Obligations (defined below) incurred prepetition by Employees; and (vi) pay all costs incident to the foregoing as set forth in detail below.

### Debtors' Compensation and Benefits Programs

### A.    Unpaid Wages and Withholding Obligations

1. Employee Wages

8.    The Debtors' average aggregate bi-weekly gross payroll including wages and salaries (collectively, "Wages") and Withholding Obligations (defined below) is approximately $2.2 million (although there are fluctuations, for example, during holiday periods). The Employees are paid in arrears, on a bi-weekly basis, typically every other Wednesday, with direct deposits or checks issued on the Wednesday after the close of each pay period. The Debtors' last payroll was made on January 28, 2015 (prior to the commencement of these Cases), covering Wages earned from January 11, 2015, through January 24, 2015. The next payday is scheduled for February 11, 2015, covering the pay period January 25, 2015,

through February 7, 2015, with (subject to Court approval) the Debtors' funding of direct deposits to be authorized on February 10, 2015, direct deposits made to Employees' bank accounts on February 11, 2015, and most live checks to be delivered to Employees at company headquarters on February 11, 2015, and to Employees at store locations on February 12, 2015.

9.      The Debtors believe they owe an estimated $1,460,282.26 in gross earned but unpaid prepetition Wages for Employees and Independent Contractors (including applicable Withholding Obligations (discussed below) other than Payroll Related Tax Obligations) which would be paid as part of the February 11, 2015 payroll.[5]

10.      Based on the foregoing, the Debtors seek authority to pay the total amount of unpaid Wages for Employees up to a total aggregate amount of $1,475,000.

2.  Employer Tax Obligations and Withholding Obligations

11.      In the ordinary course of business, the Debtors routinely withhold from Wages, and also owe in connection with Wages, certain amounts required to be transmitted to taxing authorities, including, without limitation, employer payroll taxes and Employees' portions of FICA and unemployment taxes (collectively, the "Payroll Related Tax Obligations"). The Payroll Related Tax Obligations are remitted by an administrator, ADP as discussed below. In the ordinary course, the Debtors also withhold contributions to the Debtors' health, vision, dental benefit plans and other insurance plans, 401(k) contributions and 401(k) loan repayments, employee medical contributions, and other similar accounts, and withholdings for garnishment, or child support or similar obligations pursuant to court order or law (the "Benefits

---

[5] No Employee is owed more than $12,475 in unpaid Wages as of the Petition Date.

Withholdings" and, together with the Payroll Related Tax Obligations, the "Withholding Obligations"). The Debtors estimate that the Employer portion of Payroll Tax Related Obligations, accrued as of the Petition Date, total approximately $535,675.12, and the Employee portion of Payroll Tax Related Obligations, accrued as of the Petition Date, total approximately $150,659.14, which amount should be withheld as part of the Withholding Obligations and remitted to the proper taxing authorities.

12.     The Debtors seek authority to withhold any and all Withholding Obligations from the paychecks and remit such amounts to the applicable governmental entities and other third parties, and to pay and remit the appropriate Payroll Related Tax Obligations owed by the Debtors, in the ordinary course of business.

**B.     Payroll/Benefits Related Administrators**

13.     The Debtors employ ADP ("ADP") as their payroll tax administrator to process and transfer payroll tax related amounts from a given payroll to the appropriate taxing authorities. As part of each payroll, the Debtors initiate a wire to ADP with the applicable amounts typically on the Tuesday before the Wednesday payday, and ADP proceeds to make payments to the taxing authorities after receipt of the funds from the Debtors. ADP's compensation is approximately $5,000 on a bi-weekly basis, and is paid in arrears. The Debtors estimate that, as of the Petition Date, they owed ADP approximately $5,000. The Debtors seek authority to pay any prepetition amounts owed to ADP, up to $5,000 in the ordinary course of business.

**C.     Debtors' Employee Benefits and Employee Programs**

14.     The Debtors provide eligible Employees, in the ordinary course of business, with certain Benefits, including, but not limited to (a) medical, dental and vision insurance, (b) workers' compensation, (c) vacation time and other paid time off, and (d) other miscellaneous employee benefits, each as described below.

**1.     Medical & Dental Plans**

15.     Approximately 846 of the Debtors' Employees (together with their participating dependents) receive medical benefits through the Debtors.  For medical and dental coverage, eligible Employees are offered health maintenance organization (HMO) or preferred provider organization (PPO) coverage under the Debtors' self-insured Medical and Dental Plan administered by Aetna (the "Medical Plan").  The Debtors pay Aetna approximately $63,000 in total monthly administration fees in advance each month.  Prior to the Petition Date, typically for each payroll period, covered Employees paid approximately 30% of the monthly owed premium based on the applicable plan selected.  The Debtors do not believe that any amounts are owed by the Debtors to Aetna as of the Petition Date, but out of an abundance of caution, the Debtors are seeking authorization to pay any and all prepetition amounts that may be owed to Aetna relating to the Debtors' medical insurance policies (the "Medical Plan Obligations"), up to $63,000.

**2.     Vision Plans**

16.     The Debtors offer a voluntary vision plan to Employees administered by National Vision Associates ("National") (the "Vision Plan").

17.     Vision Plan coverage is paid for by the participating Employees. Typically, participating Employees pay in the aggregate approximately $900.00 bi-weekly in vision insurance contributions.  While funded by the participating Employees, the Debtors pay ADP the total monthly premium in advance each month, and such payment is offset by the Employees' payroll contributions.

18.     The Debtors do not believe that, as of the Petition Date, any amounts were owed to National in respect to insurance coverage.  However, out of an abundance of caution, the Debtors are seeking authorization to pay any such prepetition claims and/or forward the appropriate prepetition Withholding Obligations to National up to a maximum of $2,150.00.

**3.     Life & Disability Insurance**

19.     The Debtors provides eligible Employees with (i) premium-based life insurance ("Life Insurance") and long-term disability insurance ("Disability Insurance"), both through Aetna, and (ii) access to voluntary short-term disability insurance, accidental death & dismemberment insurance, supplemental long-term disability insurance and supplemental life insurance (also through Aetna) (collectively, the "Voluntary Insurance Programs").

20.     All premiums for the Life Insurance, Disability Insurance and Voluntary Insurance Programs –totaling approximately $4,999.57 bi-weekly – are paid for by the Debtors. While the Debtors are responsible for payment for the Life Insurance and Disability Insurance (approximately $3,795.44 of the $4,999.57 bi-weekly total), the balance relating to the Voluntary Insurance Programs is subsequently offset by applicable Employees' premium payments.

21.     The Debtors do not believe that, as of the Petition Date, any amounts were owed in respect to the Life Insurance, Disability Insurance and Voluntary Insurance Programs. However, out of an abundance of caution, the Debtors seek authority to pay such amounts in the ordinary course, up to a maximum of $12,000.00.  Further, the Debtors seek authority to continue to offer the Life Insurance, Disability Insurance, and Voluntary Insurance Programs postpetition in the ordinary course of business, in the Debtors' discretion.

**4.      Workers' Compensation**

22.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors.  For Employees other than Employees in Ohio, Washington, Puerto Rico and the Virgin Islands (discussed further below), the Debtors maintain a workers' compensation benefits program through Crum & Forster (the "Crum WC Program").  The Crum WC Program provides benefits to all Employees in each of the states in which the Debtors operate for claims arising from or related to the Employee's employment with the Debtors (together with any premiums, fees and/or other charges payable to Crum & Forster, the "WC Obligations").  Under the Crum WC Program, Crum & Forster acts as a third party administrator and provides guaranteed insurance coverage at the statutorily-required level for the states in which the Debtors operate.  The Debtors pay Crum & Forster approximately $729,735 per coverage year, in monthly installments through a Premium Finance Agreement with First Insurance Funding.  The Debtors do not believe that, as of the Petition Date, any amounts were owed to Crum & Forster on account of the Crum WC Program.

23.     With respect to Employees in Ohio, the Debtors have state-mandated compensation insurance fund coverage (the "Ohio Program"). Under the Ohio Program, the Debtors' premiums are generally based on the number of Employees insured during each policy year. The Debtors made payment in January 2015 to the Bureau of Workers' Compensation ("BWC"), for the period January to July 2015. The Debtors will make payment to the BWC, for the period August to December 2015, in July 2015. The Debtors pay approximately $22,000 per year to the BWC.

24.     With respect to Employees in Washington, the Debtors have workers' compensation insurance fund coverage similar to the situation in Ohio (the "Washington Program." With respect to the Washington Program, the Debtors made a quarterly payment in December 2014 to the Washington Department of Labor and Industry (the "Washington Agency"), for the period January, 2015 to March, 2015. The Debtors will make another quarterly payment to the Washington Agency, for the period April to June, 2015, in April, 2015. The Debtors pay approximately $2,500.00 per quarter to the Washington Agency.

25.     With respect to Employees in Puerto Rico, the Debtors have workers' compensation insurance fund coverage similar to the situation in Ohio and Washington (the "Puerto Rico Program," In respect to the Puerto Rico Program, the Debtors made their annual payment in July 2014 to the Puerto Rico Industrial Commission (the "Puerto Rico Agency"), for the period August, 2014 to July, 2015. The Debtors will make another annual payment to the Puerto Rico Agency, for the period August, 2015 to July, 2016, in July, 2015. The Debtors pay approximately $3,000.00 per year to the Puerto Rico Agency.

26.    With respect to Employees in the U.S. Virgin Islands, the Debtors have workers' compensation insurance fund coverage similar to the situation in Puerto Rico (the "Virgin Islands Program," respectively, and together with the Crum WC Program, the Ohio Program, the Washington Program and the Puerto Rico Program, the "Workers' Compensation Programs"). With respect to the Virgin Islands Program, the Debtors made their annual payment in February 2014 to the Government Insurance Fund of the Virgin Islands (the "Virgin Islands Agency"), for the period February, 2014 to January, 2015. The Debtors will make another annual payment to the Virgin Islands Agency, for the period February, 2015 to January, 2065, in February 2015. The Debtors pay approximately $5,000.00 per year to the Virgin Islands Agency.

27.    In sum, the Debtors do not believe there are any pre-petition amounts owed under the Workers' Compensation Programs, and seek authorization to, in their sole discretion, pay any prepetition claims arising from or relating to their workers' compensation related obligations for the current and prior coverage years (collectively, the "Workers' Compensation Obligations"), up to the amounts specified above. The Debtors submit that the continuance of their Workers' Compensation Programs is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition in the ordinary course of business.

### 5.    Vacation and other PTO

28.    The Debtors seek authorization to honor eligible Employees' accrued vacation time, sick, paid holiday and other leave policies and practices in the ordinary course of

business (collectively, "Paid Time Off"). The Debtors generally do not allow Employees to "cash-out" any accrued Paid Time Off, including any vacation time, except when mandated under applicable state law.

29.    Generally, vacation time is provided to eligible Employees and accrual rates vary based on years of service, while up to six (6) sick days can be accrued by an eligible Employee depending on years of service. More specifically, the vacation day accrual rates are generally as follows:

| Months/Years of Service | Number of Vacation Days |
| --- | --- |
| 1-6 months | 0 days |
| 7 months | 5 days |
| 8-12 months | 1 day accrued after each additional month until 1st anniversary |
| 1-5 years | 10 days per year |
| 5 years but less than 10 | 15 days per year |
| 10+ years | 20 days per year |

30.    The Debtors seek authorization, in their discretion, to honor eligible Employees' accrued vacation time, sick, paid holiday and other Paid Time Off policies and practices in the ordinary course of business; provided, however, the Debtors do not seek authority to provide any cash-out of prepetition accrued Paid Time Off, except when mandated under applicable state law.

6. **401(k) Savings Plan**

31.     The Debtors maintain a 401(k) plan for the benefit of Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. The Debtors historically paid 25% of up to 3% of a participant's deferral in employer matching contributions to the 401(k) Plan. As of the Petition Date, there are accrued but unfunded matching contributions with respect to the 401(k) Plan in the approximate amount of $36,000. Currently, the Debtors utilize Mass Mutual as the administrator of the 401(k) Plan and there are no amounts owed to Mass Mutual for its services as of the Petition Date. Beginning on February 2, 2015, the Debtors will utilize T. Rowe Price as the administrator. T. Rowe Price also serves as the 401(k) Plan trustee. T. Rowe Price will collect money from the expense ratios in the funds, which is typically around one half percent of the assets in the plan. All other 401(k) Plan related fees are paid with funds out of the 401(k) Plan, other than the audits (discussed below).

32.     The Debtors pay approximately $19,000 each year for an audit of the 401(k) Plan. An audit for plan year 2013 was recently completed and filed in 2014. The Debtors request authority to pay the auditor, CBIZ Mahoney Cohen & Company ("401(k) Auditor"), on account of any prepetition claims, up to $21,000.

33.     The Debtors remit 401(k) Plan contributions and loan repayments (collectively, "401(k) Contributions") to the appropriate parties. Failure to timely remit 401(k) Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended, resulting in potential personal liability for a debtor's officers for such amounts. The

Debtors believe that there are certain unremitted 401(k) Contributions totaling approximately $36,000.

34.    The Debtors believe that maintaining the 401(k) Plan at this point is important to maintaining Employee morale.  Accordingly, the Debtors seek authority to continue, in their sole discretion, the 401(k) Plan and pay and/or remit (as applicable) any related prepetition amounts described above as may be necessary, including the forwarding of 401(k) Contributions.

**7.    Business Expense Reimbursements**

35.    The Debtors customarily reimburse eligible Employees (primarily management and personnel who purchase merchandise for the Debtors or otherwise incur mileage charges) who incur business related expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses, including common carrier, air travel, car rental and car mileage, lodging, meal charges, and telephone charges, sample merchandise purchases, certain operational expenses, and miscellaneous other allowed business expenses (the "Expense Reimbursement Obligations").  The majority of Expense Reimbursement Obligations are charged to American Express corporate credit cards provided by the Debtors and are paid by the Debtors in the ordinary course; some Employees submit expense reports and are reimbursed by the Debtors.

36.    It is difficult for the Debtors to determine the exact amount of Expense Reimbursement Obligations that has accrued as of the Petition Date since the expenses incurred by Employees on behalf of the Debtors throughout the year vary.  Employees typically charge

approximately $80,000 to $150,000 per month to the Debtors' credit cards and as of January 23, 2015, approximately $21,450 was owed to Employees for unreimbursed expenses not charged to the corporate credit cards. Additionally, there may be some delay between when an Employee (who does not charge the expense to a corporate credit card) incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the Debtors seek authority to pay, in their discretion, any prepetition Expense Reimbursement Obligations, up to a total amount of $240,000 and to continue to honor Expense Reimbursement Obligations incurred postpetition in the ordinary course of business.

**8.     Debtors' Employee Bonus Programs**

37.    In the ordinary course of business and as an important component to their wages and compensation structure, certain Employees are eligible to receive bonuses based on defined criteria. Generally, such bonuses are calculated based on sales metrics and/or other operations-related criteria. The Debtors' prepetition bonus plans (collectively, the "Bonus Programs") include the following[6]:

(1)    **Store Bonus Program:** This bonus program's objective is to provide the Debtors' store managers, co-managers, assistant managers, full and part time sales associates and district managers (who are not officers or insiders of the Debtors) special incentive to perform at optimum levels so as to maximize sales volume at the Debtors' stores. These discretionary bonuses ("Store Bonuses") may be earned monthly through achievement of

---

[6] The descriptions above are general summaries only, subject to the specific terms, conditions and criteria of each Bonus Program. Generally, each Bonus Program is discretionary and may be terminated, and the terms and conditions thereof are subject to change by the Debtors.

the monthly sales plan; the bonus recipient must be, among other things, employed during the entire month to receive the monthly Store Bonus. As of the Petition Date, approximately $174,206.84 is owed in Store Bonuses for the month of December 2014, which is expected to be paid as part of the February 11, 2015 payroll. The Debtors believe approximately $90,000 is accrued in Store Bonuses for the month of January 2015, which is expected to be paid in March 2015. The Store Bonus Program is important to incentivizing the applicable retail associates and district managers to optimize store performance, redounding to the benefit of the Debtors' overall business enterprise.

(2)    **Quarterly Bonus Program:** Top performing sales associates and district managers are also eligible for a quarterly bonus ("Quarterly Bonuses") based on their store meeting 95% of the quarterly store plan and their own individual sales. The Quarterly Bonuses are paid in the first month following the end of a quarter. The Debtors had accrued Quarterly Bonuses obligations of approximately $22,500 for December 2014 that were paid to the relevant Employees as part of the January 28, 2015 payroll. The next quarterly bonus will be paid in April based upon the store's and associate's 1st quarter results.

(3)    **Inventory Bonus Program:** The Inventory Bonus program rewards the store manager, co-manager and assistant manager for controlling the inventory in their respective stores (the "Inventory Bonuses"). Store managers, co-managers and assistant managers who have worked during the inventory period in their current positions (and within the same store) are eligible for the Inventory Bonus, which is paid twice a year, in January and August, dependent upon shrink percentage. The Debtors estimate accrued Inventory Bonus

obligations of approximately $130,000 for the third quarter of 2014 that will be paid to the relevant Employees as part of the March, 2015 payroll.

### 9.    Equity Incentive Plans and Other Executive Payments

38.    Prior to the Petition Date, the Debtors had in place certain equity incentive plans including a Restricted Stock Award Agreement (the "Equity Plan"). Further, the Debtors have certain contractual severance pay obligations that may be owed to certain executives (collectively, "Insider Severance Obligations"). The Debtors seek no specific relief at this time with respect to the Equity Plan and any Insider Severance Obligations, but reserve their rights to file additional pleadings relating to such matters.

### 10.    Merchandise Discount Benefit

39.    As an employee benefit, the Debtors offer a 40% merchandise discount for all Employees. This employee benefit does not entail any cash outlay, and the Debtors request authority to continue with such benefit in the ordinary course, in the Debtors' sole discretion. In addition, when a store achieves 100% or higher of store plan, every sales associate working at least 15 hours in the calendar month is eligible to purchase three regular priced items at 60% off the regular merchandise price. If the store achieves 105% or greater of the store plan, every sales associates is eligible to purchase five regular priced items at 60% off the regular merchandise price.

### D.    Summary

40.    The Debtors seek authority, in their sole discretion, to continue to honor and implement the employee related policies and practices as described above and pay Unpaid

Wages, Worker Compensation, and the various Benefits as described above, including the

estimated amounts set forth below:

| | |
|---|---|
| Unpaid Wages (including any "floating" payroll wage checks issued prepetition) | $1,475,000 |
| Employer Withholding Obligations | $590,000 |
| Employee Withholding Obligations | $151,000 |
| 401k Employer Match Obligations | $36,000 |
| Medical Plan Obligations | $63,000 |
| Life Insurance and Disability Insurance | $12,000 |
| Vision Plans | $2,150 |
| Expense Reimbursement Obligations | $240,000 |
| Payroll Related Administrators | $5,000 |
| 401(k) Auditor | $21,000 |
| Store Bonuses (excluding previously issued floating checks) | $175,000 |

provided that no Employee will be paid a total distribution of more than the $12,475 statutory

priority cap on account of prepetition Wages, any prepetition bonuses, and accrued Paid Time

Off (if applicable).

### Relief Requested[7]

41.     Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay, remit or honor,

in their sole discretion:

> (a)     the Unpaid Wages, including any associated payroll processing related obligations and any prepetition amounts owed under the Non-Insider Bonus Programs;

---

[7] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

(b)     all Withholding Obligations;

(c)     the Expense Reimbursement Obligations;

(d)     all prepetition obligations under the Benefits;

(e)     all Workers' Compensation Obligations, including those obligations incurred in or relating to the prepetition period and liquidated postpetition;

(f)     prepetition Paid Time Off, as to the extent required by applicable law but only to the extent of the statutory priority cap; and

(g)     any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein.

The Debtors represent that they will not pay any amounts in excess of the caps for a particular category of prepetition claim identified herein without further order from this Court.

42.     To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

**Basis for Relief**

43.     Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing.  Bankruptcy Code

section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

44.     The relief requested in this Motion is supported by the well-established

"necessity of payment" doctrine.[8] The "necessity of payment" doctrine, which has been

embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to

reorganization is essential to the continued operation of the [business] during reorganization,

payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry.*

*Co.*, 657 F.2d 570, 581 (3d Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737

(Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New*

*England Ry. Co.* with approval).  Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174

(Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence

of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims

where such payment is essential to the continued operation of the debtor." *Id*. at 176.  In that

case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages,

salaries, medical benefits, and business expense claims.  Judge Lifland relied on his equitable

powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment"

doctrine to authorize such payments, recognizing that the debtor had to make the payments in

order to retain its current employees and maintain positive employee moral--two factors that he

deemed critical to the rehabilitation of an operating debtor.  *Id*. at 176-77 (*citing* H.R. Rep. No.

---

[8]  The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

595 95th Cong. 1st Sess. 16 (1977)).  Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

45.     This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation.  *See, e.g., In re Debs Stores Holding LLC*, Case No. 14-12676 (KG) (Bankr. D. Del. Dec. 5, 2014); *In re Ablest, Inc.,* Case No. 14-10717 (KJC) (Bankr. D. Del. April 2, 2014); *In re iBAHN Corporation,* Case No. 13-12285 (PJW) (Bankr. D. Del. Sept. 9, 2013; *.In re Revstone Industries, LLC,* Case No. 12-13262 (BLS) (Bankr. D. Del. Jan. 10, 2013); *In re Digital Domain Media Group, Inc., et al.,* Case No. 12-12568 (BLS) (Bankr. D. Del. Oct. 22, 2012); *In re Prince Sports, Inc., et al.,* Case No. 12-11439 (KJC) (Bankr. D. Del. May 2, 2012); *In re Summit Business Media Holding Co.*, Case No. 11-10231 (PJW) (Bankr. D. Del. Jan. 28, 2011).

46.     The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these chapter 11 cases.

47.     Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance,

and sick leave pay" earned within 180 days before the Petition Date are afforded priority

unsecured status to the extent of $12,475 per Employee. The Debtors do not seek to pay Unpaid

Wages to any Employee in excess of $12,475. When combined, Sections 507(a)(4) and

507(a)(5) of the Bankruptcy Code entitle the Unpaid Wages to priority treatment. To confirm a

chapter 11 plan, the Debtors must pay priority claims in full. *See* 11 U.S.C. § 1129(a)(9)(B)

(requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions,

including vacation, severance, and sick pay earned by an individual, and (b) contributions to an

employee benefit plan). Thus, granting the relief sought herein affects only the timing of

payments to Employees, and does not negatively affect recoveries for general unsecured

creditors. Indeed, the Debtors submit that payment of Employee claims at this time enhances

value for the benefit of all interested parties.

48.    Many Employees live from paycheck to paycheck and rely exclusively on

receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses. These Employees may be exposed to significant financial and

healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid

Wages and Benefits, and the expenses associated therewith, in the ordinary course of the

Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued

Unpaid Wages and Benefits described above, Employee morale and loyalty will be jeopardized at

a time when support by the remaining Employees is critical.

49.    The Payroll Related Tax Obligations and certain other amounts either

voluntarily or involuntarily withheld from Employee paychecks do not constitute property of the

Debtors' estates and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the applicable Employees may face legal action due to the Debtors' failure to submit these payments.

50.    Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the estates given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, and the withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

51.    Generally, the Employees are critical components to the success of these chapter 11 cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to

maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

**B.**    <u>**Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004**</u>

52.    Finally, pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 21 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Robertson Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

53.    To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
<u>Processing Fees Associated with Payment of Employee Wages and Benefits</u>**

54.    The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors to Employees and/or on account of

any Benefits, whether such checks were presented or fund transfer requests were submitted prior

to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient

postpetition funding to pay promptly all Unpaid Wages and honor Benefits, to the extent

described herein, on an ongoing basis and in the ordinary course of business. Nothing contained

in this Motion, however, shall constitute a request for authority to assume any agreements,

policies, or procedures relating to Unpaid Wages and Benefits. Further, the Debtors seek to

retain the discretion to decide which Unpaid Wages and Benefits they will pay and honor, and

nothing in this Motion shall be deemed an admission by the Debtors that any Unpaid Wages and

Benefits will in fact be paid or honored.

55.     Finally, the Debtors request authority to pay all of the processing fees

associated with payment of the Unpaid Wages and Benefits as described in this Motion.

### Notice

56.     The Debtors will provide notice of this Motion to the following parties, or

their counsel, if known: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30)

largest unsecured creditors on a consolidated basis; (c) the Debtors' prepetition and postpetition

lenders; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002. As the

Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the

Debtors will serve copies of the Motion and any order entered respecting the Motion as required

by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested,

no other or further notice need be given.

**No Prior Request**

57.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Court should authorize, but not require, the Debtors to pay and honor all of the Unpaid Wages and Benefits described in this Motion, including prepetition wages, salaries, non-insider bonuses, and other compensation, benefits withholdings, payroll and benefits administrative fees, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated: February 4, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com
            crobinson@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession