IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CACHÉ, INC., et al.,[1] | ) | Case No. 15-10172 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 FOR AUTHORIZATION TO: (1) INCUR SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (2) USE CASH COLLATERAL; (3) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (4) GRANT ADEQUATE PROTECTION; (5) MODIFY THE AUTOMATIC STAY; AND (6) SCHEDULE A FINAL HEARING**

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases hereby move this Court (the "Motion"), pursuant to sections 105, 361, 362, 363, 364, and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 4001-2 of the Local Rules for the United States Bankruptcy Court of the District of Delaware (the "Local Rules"), for entry of an interim order permitting the Debtors to obtain credit on an expedited basis, substantially in the form attached hereto as **Exhibit A** (the "Interim Financing Order"), and ultimately, at a final hearing to be set by the Court (the "Final Hearing"), a final order as set forth herein (the "Final Financing Order").

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Caché, Inc. (8181); Caché of Las Vegas, Inc. (9821); and Caché of Virginia, Inc. (9725).  The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

## Concise Summary of DIP Credit Agreement

1.      Pending the Final Hearing and entry of the Final Financing Order, the Debtors request authority to obtain credit and incur debt (the "DIP Loan") on an interim basis under that certain *Debtor-in-Possession Credit Agreement*, dated as of February 4, 2015, attached hereto as **Exhibit B** (the "DIP Credit Agreement"), excluding applicable exhibits and schedules.[2]

2.      Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2, the following are the material provisions of the DIP Credit Agreement and the Interim Financing Order:[3]

| | |
|---|---|
| **Borrowers**: | Each of the Debtors, consisting of Caché, Inc. ("Caché" or "Parent") and its subsidiaries Caché of Las Vegas, Inc. ("CLV") and Caché of Virginia, Inc. ("CV"). *See* DIP Credit Agreement at page 1 and Schedule 1.01. |
| **Guarantors**: | Each of the entities named on Schedule 1.02 (none at present). |
| **DIP Lender**: | Salus Capital Partners, LLC ("Salus" or the "Agent"), or an affiliate or designee, as administrative and collateral agent, and as a lender (the "DIP Lender"). The DIP Lender reserves the right to syndicate the DIP Facility (defined below) to additional lenders in its permitted discretion. *See* DIP Credit Agreement at page 1 and Schedule 2.01. |

---

[2]    All capitalized terms that are not expressly defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement and any associated loan or collateral documents memorializing the financing thereunder with terms that substantially conform to the DIP Credit Agreement (collectively, the "DIP Loan Documents").

[3]    The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Financing Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Financing Order.  In the event there is any conflict between this Motion and the DIP Credit Agreement or Interim Financing Order, the DIP Credit Agreement or Interim Financing Order, as applicable, will control in all respects.

| | |
|---|---|
| **DIP Facility:** | A senior secured, first priority, debtor- in-possession revolving credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $22 million for the period from and including the Petition Date to the date upon which the Debtors receive the Initial Guaranty Payment (as defined in the Sale Agency Agreement referenced below) and $12 million thereafter. The availability of revolving advances under the DIP Facility will be governed by reference to a Borrowing Base, as defined in the DIP Credit Agreement, and such availability will be limited to the amount by which the Borrowing Base exceeds the then outstanding revolving advances. *See* DIP Credit Agreement at Section 2.01(a). Generally speaking, the Borrowing Base under the DIP Credit Agreement consists of a percentage of the Debtors' eligible credit card receivables, eligible inventory and eligible intellectual property, less certain reserves.[4] *See* DIP Credit Agreement at Section 1.01. |
| | As noted below, the Debtors' postpetition receipts will be applied against the balance of the Prepetition Credit Agreement (defined below). Hence, the Debtors project the need to borrow up to $9.53 million under the DIP Facility to meet operating and other disbursements over the period from the entry of the Interim Financing Order until a Final Hearing. In light of the reserve requirements established under the DIP Facility, however, the Debtors require, and the Agent has agreed, that the full $22 million initial maximum amount of loan commitments be made available for revolving advances under the DIP Facility upon entry of the Interim Financing Order, even though actual disbursements under the DIP Facility will not exceed $9.53 million. At present, the Debtors do not anticipate that borrowings under the DIP Facility will, following the entry of a Final Financing Order, exceed this amount. |
| **Use of Cash Collateral:** | Authorizing the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, according to an Approved Budget (as defined below) on the terms and conditions set forth in the Interim Financing Order and the DIP Loan Documents (as defined in the DIP Credit Agreement). *See* Interim |

---

[4]   The reserves consist of amounts established by the DIP Lender from time to time in its discretion and also include the outstanding amount, from time to time, of the obligations under the Prepetition Loan Agreement (which obligations will be reduced, following entry of the Interim Order, by the application of postpetition receipts). The reserves are described with greater particularity in the definition of "Availability Reserves" under the DIP Credit Agreement. *See* DIP Credit Agreement at Section 1.01. The Debtors will provide borrowing base collateral reporting to the Agent on a periodic basis and upon every advance under the DIP Facility.

3

Financing Order at ¶ 11.  Salus has an interest in cash collateral pursuant to that certain *Credit Agreement,* dated as of September 19, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement").[5]

**Use of DIP Loan:**

Proceeds of committed loans under the DIP Facility shall be used (i) to support the working capital and general corporate purposes of the Debtors and the payment of postpetition operating and other expenses arising in the Debtors' chapter 11 cases (including DIP Lender charges, professional fees and other costs incurred by the Debtors and their estates), (ii) to fund the payment of other obligations of the Debtors (including payment of prepetition claims of certain critical vendors), subject to approval of the Bankruptcy Court, and (iii) pursuant to the Final Financing Order, to satisfy the balance of the Debtor's obligations under the Prepetition Credit Agreement and pay related transaction fees and expenses,[6] in each case according to an Approved Budget.  *See* DIP Credit Agreement at Section 6.11; Interim Financing Order at ¶ 10.

**Prepetition Repayment:**

Pursuant to the Interim Financing Order, all cash proceeds received by the Debtors on or after the Petition Date will be applied against the obligations outstanding under the Prepetition Credit Agreement until paid in full.  The remaining obligations outstanding under the Prepetition Credit Agreement (if any) will be paid in full from a borrowing under the DIP Facility upon entry of the Final Financing Order.  *See* DIP Credit Agreement at Section 2.04; Interim Financing Order at ¶ 3.

**Termination Date:**

The Debtors shall repay any outstanding loans made and other fees, costs or charges incurred under the DIP Loan on the earliest of (the "Termination Date"): (i) one year from the Petition Date ("Maturity Date"), (ii) the date of the acceleration of the DIP Loan following an Event of Default (as defined below) under the DIP Credit Agreement; (iii) either the Final Reconciliation Settlement Date (or the equivalent definition in any other agency agreement) as defined in the Sale Agency Agreement or, if a going concern sale for the Debtors is consummated,  the closing date of such a

---

[5]  The Prepetition Loan Agreement is by and among Salus, as administrative agent and collateral agent (in such capacities, "Prepetition Agent"), for Salus CLO 2012-1, Ltd., and all other lenders from time to time a party thereto (collectively, "Prepetition Lenders"), and Caché, CLV and CV, as borrowers (collectively, the "Prepetition Borrowers").  The Prepetition Loan Agreement had a maturity date of September 19, 2017.

[6]  As of the Petition Date, approximately $16.43 million of principal obligations remain outstanding under the Prepetition Loan Agreement plus additional amounts on account of accrued and unpaid interest, fees, costs, and charges.

sale; and (iv) the effective date of a confirmed plan of reorganization in the Debtors' chapter 11 cases. *See* DIP Credit Agreement at Section 1.01.

**Interest:**

Interest on borrowings under the DIP Facility will be payable monthly in arrears at a rate per annum equal to (i) the Adjusted LIBO Rate (as defined in the DIP Credit Agreement) plus (ii) 5.50%. The initial interest rate under the DIP Loan is anticipated to be 7.50%. All interest and fees shall be based on a 360-day year and actual days elapsed. *See* DIP Credit Agreement at Sections 2.07 and 2.09.

**Default Rate:**

After the occurrence and during the continuance of an Event of Default, interest on borrowings under the DIP Loan will be increased by 3.0%. *See* DIP Credit Agreement at Sections 1.01 and 2.07(b).

**DIP Fees:**

Closing Fee. Upon the occurrence of the Closing Date (defined in the DIP Credit Agreement to mean the date on which the Agent makes an initial advance to the Debtors under the DIP Facility), the Debtors shall pay the Agent a closing fee of $300,000. The closing fee shall be fully earned on the Closing Date and shall not be subject to refund or rebate. *See* DIP Credit Agreement at Section 2.08(a).

Maintenance Fee. The Debtors shall pay the Agent a DIP Facility maintenance fee payable in monthly installments of $10,000 until the Maturity Date. The entire maintenance fee of $120,000 shall be fully earned on the Closing Date and shall not be subject to refund or rebate. Any unpaid balance of the maintenance fee is due and payable at the Termination Date. *See* DIP Credit Agreement at Section 2.08(b).

Commitment Fee. The Debtors shall pay the Agent a commitment fee calculated on a per annum basis equal to 0.35% times the actual daily amount by which the Aggregate Commitments exceed the Total Outstandings. The "Aggregate Commitments" under the DIP Facility is $22 million for the period from and including the Petition Date to the date upon which the Debtors receive the Initial Guaranty Payment and $12 million thereafter and the "Total Outstandings" is the aggregate outstanding principal amount of loans on any date. The Commitment Fee shall be due and payable monthly in arrears on the first day after the end of each month. *See* DIP Credit Agreement at Section 2.08(d).

Exit Fee.  Upon the Termination Date (whether by virtue of the consummation of a 363 sale, a plan of reorganization, maturity, acceleration of the time for payment of the DIP Obligations (as defined below)  or otherwise), the Debtors shall pay the Agent an exit fee of $200,000. *See* DIP Credit Agreement at Section 2.08(c).

**DIP Collateral**:

All obligations of the Debtors under the DIP Facility (the " DIP Obligations"), will, pursuant to sections 364(c)(2) and (3) and section 364(d)(1) of the Bankruptcy Code, be secured by (i) a fully perfected first priority security interest in all assets of each Debtor, including all proceeds thereof (the "DIP Collateral"), and (ii) a fully perfected second priority security interest in those assets of each Debtor that are subject to preexisting validly perfected and unavoidable liens senior to the liens securing the obligations under the Prepetition Credit Agreement ("Prepetition Permitted Liens"), subject, in each case, to the Carve Out (as defined below).

The DIP Collateral shall, upon entry of a Final Financing Order (except with respect to section 549 of the Bankruptcy Code), include any claims, defenses, causes of action or rights of the Debtors arising under chapter 5 of the Bankruptcy Code (including all proceeds thereof, the "Avoidance Actions").    The liens described in this paragraph are referred to as the "DIP Liens." *See* Interim Financing Order at ¶ 6(a)(xvi).

In addition, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Lender will receive a superpriority administrative expense claim (the "DIP Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve Out. *See* DIP Credit Agreement at Section 5.27(b); Interim Financing Order at ¶ 8.

**Adequate Protection**:

Salus, as the Prepetition Agent, has consented to the Debtors' use of cash collateral pursuant to the Approved Budget (with the variances permitted under the DIP Credit Agreement) on the terms and conditions set forth in the Interim Financing Order.   As adequate protection to Salus for any diminution in the value of its interests in the Debtors' property resulting from priming liens, the use of the Prepetition Collateral, borrowings under the DIP Facility, or the Carve Out, Salus will, subject to the terms of the Interim Financing Order: (a) maintain its prepetition liens on the DIP Collateral, junior and subordinate to the Carve Out, the DIP Liens and the Prepetition Permitted Liens; (b) receive replacement liens on, and security interests in, the DIP Collateral (including,

6

upon entry of a Final Financing Order (except with respect to Section 549 of the Bankruptcy Code), the Avoidance Actions), subject only to the Carve Out, the DIP Liens and the Prepetition Permitted Liens; and (c) receive an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors ("Adequate Protection Superpriority Claim"), subject only to the Carve Out and the DIP Superpriority Claim. *See* DIP Credit Agreement at Section 5.27(b); Interim Financing Order at ¶¶12 and 13.

**Carve Out:**          The DIP Credit Agreement provides for a Carve Out for: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and Section 3717 of title 31 of the United States Code, (b) Allowed Professional Fees of Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice (net of any retainers maintained by such Case Professionals), limited to the budgeted amounts set forth in the Approved Budget as of any applicable date of determination (for the avoidance of doubt, amounts incurred in any week in excess of the Approved Budget may be added to amounts incurred in any prior or subsequent weeks under the Approved Budget), which budgeted amounts shall be funded into the Professional Fee Escrow Account weekly pursuant to the Approved Budget, and (c) $200,000 for Allowed Professional Fees of Case Professionals following the delivery of a Carve Out Trigger Notice, which amount under clause (c) shall be funded into the Professional Fee Escrow Account by the Agent promptly upon the delivery of a Carve Out Trigger Notice. No portion of the Carve Out, nor any cash collateral or proceeds of the Loans may be used in violation of the Interim Order or the Final Order. The Professional Fee Escrow Account shall be used to make disbursements to Case Professionals in the amounts and at the times authorized by the Bankruptcy Court and for no other purpose. Any amounts on deposit in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders in the Chapter 11 Case shall be returned to the Agent, which amounts shall be applied to the Obligations in the order prescribed in Section 8.03 of the DIP Credit Agreement. *See* Interim Financing Order at ¶ 30(a).

**Challenge Period:**          The Challenge Period means (i) with respect to a party-in-interest other than the Statutory Committee for unsecured creditors, the period from the Petition Date until the date that is seventy five (75) calendar days after the entry of this Interim Order and (ii) with respect to the Statutory Committee for unsecured creditors, the

7

period from the date such committee is formed until the date that is sixty (60) calendar days thereafter. *See* Interim Financing Order at ¶ 33(a).

**Bankruptcy Milestones:**

By no later than one Business Day following the Petition Date, the Debtors shall file a motion (the "Sale Order Motion"), requesting (i) an order from the Bankruptcy Court approving bidding procedures relating to a Permitted Sale and approving the Stalking Horse Bid with respect thereto, including the bidding protections set forth therein, and (ii) an order from the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code authorizing the Debtors to consummate a Permitted Sale and, if applicable, authorizing the "going out of business" sales at the Debtors' store locations pursuant to the Stalking Horse Bid.

By no later than February 17, 2015, the Bankruptcy Court shall have entered an order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Sale Order Motion and approving the Stalking Horse Bid.

By no later than February 27, 2015, the Debtors shall have completed an auction for a sale of substantially all of the assets of the Debtors.

By no later than March 3, 2015, the Bankruptcy Court shall have entered an order (the "Sale Order"), approving the sale under the Sale Order Motion ("Approved Sale") and, if applicable, authorizing the "going out of business" sales at the Debtors' store locations pursuant to the Sale Agency Agreement or such other agency agreement entered into by the Debtors.

**Financial Covenants:**

In addition to the specific affirmative and negative covenants set forth in the DIP Credit Agreement, the Debtors' operations will not vary from the Approved Budget by more than 10% calculated on a cumulative and rolling three-week basis. *See* DIP Credit Agreement at Section 7.15.

**Defaults and Remedies:**

Usual and customary for facilities of this type, as set forth in the DIP Credit Agreement, including but not limited to: (i) events related to the Chapter 11 cases, including (without limitation) failure to meet the foregoing Bankruptcy Milestones; (ii) any Loan Party filing a motion to liquidate substantially all of any Loan Party's assets, other than in connection with the Sales Agency Agreement; (iii) taking actions otherwise materially adverse to the Agent or its interests in the Collateral; (iv) filing a plan of

8

reorganization without the Agent's consent; (v) dismissal or conversion of the chapter 11 cases; (vi) the appointment of a chapter 11 trustee or examiner with expanded powers to operate the Debtors' business; (vii) except as may be contemplated under the Sale Agency Agreement, the granting of a superpriority claim or lien on the DIP Collateral that is superior to the DIP Lenders' claims or liens granted by the Interim Financing Order or the Final Financing Order; (viii) failure to pay principal, interest, and fees under the DIP Facility; (ix) entry of the Final Financing Order shall not have occurred within thirty (30) days after the Petition Date; (x) entry of an order granting relief from the automatic stay to permit a party to proceed against the DIP Collateral or terminate a material agreement; (xi) failure of the Bankruptcy Court to, within forty-five (45) days after the Petition Date, grant an order extending the time period of the Debtors to assume or reject unexpired leases of real property to a date that is two hundred ten (210) days from the Petition Date; (xii) the termination of the Sale Agency Agreement; (xiii) a material adverse effect shall occur; and (xiv) the Debtor shall fail to observe or perform when due any covenant, condition or agreement contained in any of the DIP Loan Documents, the Interim Financing Order, the Sale Order, or the Final Financing Order (collectively, "Events of Default"). *See* DIP Credit Agreement at Section 8.01.

Subject to the Interim Financing Order and Final Financing Order, if any Event of Default occurs and is continuing, the Agent may: (i) terminate the Commitments of each Lender to make Committed Loans; and (ii) declare the unpaid principal amount of all outstanding Loans and all interest accrued and unpaid thereon to be immediately due and payable.

The Agent may Credit Bid and purchase at any public or private sale all or any portion of the DIP Collateral. *See* DIP Credit Agreement at Sections 2.16 and 8.02(b).

**Indemnification**:      The Debtors shall indemnify the DIP Lender and related parties from any claims in connection with the transactions contemplated by the DIP Loan Documents except to the extent that such claims resulted from the gross negligence or willful misconduct of an indemnified party. *See* DIP Credit Agreement at Section 10.04.

3.    The Debtors further request that the Court (i) set an emergency interim hearing (the "Interim Hearing") on the Motion for the Court to consider entry of the Interim

Financing Order, which authorizes the Debtors to (x) borrow under the DIP Loan Documents, on an interim basis, up to an aggregate principal amount not to exceed $9.53 million, (y) partially satisfy the Debtors' obligations under the Prepetition Credit Agreement from postpetition receipts, and (z) use cash collateral on an interim basis in accordance with the Approved Budget, (ii) schedule the Final Hearing on the Motion within thirty (30) days of the entry of the Interim Financing Order to consider entry of the Final Financing Order authorizing the balance of the borrowings under the DIP Loan Documents and authorizing the Debtors to use cash collateral in accordance with the Approved Budget on a final basis, and (iii) approve notice procedures with respect thereto.

        4.      Notice of the Interim Hearing has been given to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to the Prepetition Agent, (iii) other parties with liens of record on assets of the Debtors as of the Petition Date, and (iv) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. The Debtors submit that such notice was good and sufficient under the circumstances, and no other or further notice is or shall be required.

### Jurisdiction and Venue

        5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for proceedings on this Motion is proper in this district pursuant to 28 U.S.C. § 1409.

6. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1 and 4001-2.

## Background

### Overview and History of the Debtors

7. Caché is an omni-channel women's lifestyle specialty retailer with a large, devoted customer base, an exclusive market niche, and flagship presence in top malls across the United States.

8. The Company's retail operations are supported by an e-commerce business found at www.cache.com. Caché also maintains a co-branded credit card program with U.S. Bank, which had approximately 68,848 holders as of September 30, 2014. The Company targets women ages 25-55 with a boutique shopping experience for stylish and fashion-conscious women and an aspirational product line consisting of evening wear, event and day dresses designed for special occasions and daily glamour, casual sportswear and accessories.

9. Caché's sportswear embodies a mix of contemporary, fitted separates accented with stylish detailing. The Company also offers its customers a variety of accessories to complement their social occasion dressing. Caché's hallmark is its personal boutique shopping setting with a product line consisting of social and special occasion dresses, related casual sportswear and accessories, primarily sold under the Caché brand.

11

DOCS_SF:86924.8

10.     As of January 30, 2015, the Company operated 218 stores.  Of these, 169 stores are located in leading malls and 49 are non-mall based stores in 40 states nationwide, Puerto Rico and the U.S. Virgin Islands.  Caché's headquarters is located in New York, NY.  In June 2014, the Company completed a consolidation of three distribution centers into one third party distribution center managed by UPS Supply Chain Logistics, in Hebron, KY.  The distribution center building is owned and operated by UPS.

11.     For fiscal year 2014, the Company forecasts net sales of $208.7 million. For the year-to-date period ended September 27, 2014, dresses accounted for 56%, sportswear for 38% and accessories for 6% of Caché's net sales.

12.     The Company utilizes, in the aggregate, approximately 2,512 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions. Of that workforce, approximately 846 are full-time employees, while approximately 1,666 are part-time employees, although the Company increases the number of seasonal part time employees during the holiday selling season.

**B.      The Prepetition Credit Agreement**

13.     Prior to the Petition Date, the Prepetition Borrowers entered into the Prepetition Credit Agreement with the Prepetition Lenders pursuant to which the lenders extended revolving credit to the Prepetition Borrowers on the terms set forth therein.

14.     As noted above, as of the Petition Date, approximately $16.43 million of principal obligations remain outstanding under the Prepetition Loan Agreement plus additional amounts on account of accrued and unpaid interest, fees, costs, and charges.

15.     Subject to certain validly perfected prior liens (*i.e.*, Prepetition Permitted Liens), the obligations under the Prepetition Credit Agreement are secured by a first priority, senior lien on substantially all personal property of the Debtors, including the Debtors' intellectual property assets (principally trademarks and trade names).

**C.     Reasons Leading to the Necessity for a Chapter 11 Filing**

16.     During the past decade, the Company undertook two initiatives that proved unsuccessful.  One was the massive increase in the Company's footprint, from 169 to 306 stores, which yielded numerous underperforming locations.  Another was the reorientation of the Company's product lines away from its core, higher margin business of designing and fabricating high-end dresses and related accessories and into the lower margin casual sportswear business.  The Company has suffered significant losses as a result of these missteps.

17.     Although Caché's most recent merchandise collections have been well received, a persistently weak environment for specialty retailers has impeded its merchandise-based turnaround initiative.  In the meantime, approximately 25% of the Company's store locations are unprofitable, and the Company's significant operating losses have steadily drained it of liquidity.  In June 2014, this problem was exacerbated when the Company lost over $3 million in financing support from its factors.  In addition, many vendors have placed the Company on COD or CIA terms, imposing even greater liquidity constraints.

18.     On or about August 7, 2014, the Board engaged an investment banking firm, Janney Montgomery Scott LLC to evaluate its strategic alternatives, including a possible merger, sale or other form of business combination.  On December 4, 2014, the Company

13

announced that it had received an inquiry from a third party regarding a potential sale of the Company, which is being handled by Janney Montgomery Scott, LLC.

19.     On January 2, 2015, the Company was notified by Nasdaq that it is not in compliance with the continued listing requirement for the Nasdaq Global Select Market requiring a minimum Market Value of Publicly Held Shares of $5,000,000. The notification letter does not impact the Company's listing on the Nasdaq Global Select Market at this time.

20.     The Company is currently in default of its obligations under approximately fifty commercial real property leases. While the Company obtained either written or verbal forbearance agreements with many of these landlords through February 7, 2015, certain forbearance agreements have expired and those landlords will be able to pursue expedited lease termination remedies. Moreover, at this time, the Company does not believe that it will have sufficient liquidity to make the payments provided under the forbearance agreements to avoid lease terminations upon expiration of the standstills.

21.     The Company intends to utilize these Chapter 11 cases to expeditiously enter into a stalking horse purchase agreement or other strategic transaction to maximize their value. Janney Montgomery Scott, LLC will assist in conducting a process whereby all potential interested financial and strategic buyers will be contacted and, upon execution of appropriate confidentiality agreements, such potential buyers will be given access to a data room assembled by the Company to enable interested parties to conduct due diligence.

22.     Due to the above described missteps and continued, severe deterioration in the Debtors' cash flow, and to help ensure that day-to-day operations can continue, that

14

administrative expenses in these chapter 11 cases are paid, and that an orderly process can be implemented to create an ongoing path for the Debtors and their employees, the Debtors determined that it was in the best interest of the Debtors, their estates, and their creditors to commence the Chapter 11 Cases.

**Relief Requested**

23.    The Debtors require financing and authority to use cash collateral to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs. The Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Credit Agreement. After considering all alternatives, the Debtors have concluded in the exercise of their business judgment that the loan facility provided under the DIP Credit Agreement represents the best working capital financing available to them. Hence, the Debtors request approval of the DIP Credit Agreement and authority to use cash collateral to maintain their going concern operations and maximize the value of their estates.

**A.    Efforts to Obtain DIP Financing**

24.    Prior to the Petition Date, the Debtors and their advisors approached several parties to solicit proposals for prospective postpetition financing. In early January, the Debtors and their advisors contacted two especially suitable parties and described the operating needs of the Debtors and the existing capital structure and assets of the companies. Neither of these parties, however, submitted an indication of interest. In addition, as the terms and

15

conditions of the proposed DIP Facility with Salus coalesced, the Debtors and their advisors again contacted additional lender parties to determine whether such parties could offer financing on alternative or improved terms. None of these additional parties expressed interest.

25.     Despite these invitations for third party financing, the Debtors' rapidly diminishing liquidity, coupled with the imminent expiration of certain lease forbearance arrangements, led the Debtors to conclude that the Prepetition Lenders presented the best likelihood of a definitive financing commitment within the available time period.

26.     In considering their options to sustain their postpetition operations, the Debtors also recognized that the obligations owed to the Prepetition Lenders are secured by substantially all of the Debtors' property and that such liens would either have to be primed in order to obtain postpetition financing or the Debtors would need to locate a lender willing to extend credit that would be junior to the liens of the Prepetition Lenders. Borrowing from another postpetition lender that required security senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied.

27.     In light of the risks involved, the fees and expenses that would be incurred, and the economics offered by the proposed DIP Lender, the Debtors determined that the proposed DIP Credit Agreement, and the repayment of the amounts outstanding under the Prepetition Credit Agreement, was the best financing available under the extremely exigent circumstances presented.

28.     Furthermore, the Debtors, in conjunction with their advisors, determined that the financing terms and pricing set forth in the DIP Credit Agreement are consistent with recent comparable DIP financing arrangements.  The Debtors believe that the proposed terms of the DIP Credit Agreement, hence, are consistent with current capital market conditions for financing of this type.

29.     The Debtors negotiated the proposed DIP Credit Agreement with the DIP Lender at arms' length and in accordance with their sound business judgment.  As set forth in the *Declaration of Anthony DiPippa in Support of First Day Motions* ("DiPippa Declaration"), the DIP Credit Agreement has been entered into by the Debtors and the DIP Lender without collusion, as a result of vigorous, well-advocated negotiation and with each of the parties represented by independent counsel and advisors.

30.     Last, the Debtors' budget has been crafted to provide the Debtors with the minimum liquidity required to prudently operate their business and meet their anticipated postpetition operating and non-recurring expenses.  The amounts that the Debtors seek to borrow under the Interim Financing Order reflect the payment of expenses that, in the Debtors' business judgment, are necessary to avoid immediate and irreparable harm to the estates pending the Final Hearing.

**B.     Implementation of DIP Credit Agreement**

31.     The Debtors and the DIP Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Credit Agreement. The DIP Credit Agreement permits the Debtors to draw immediately up to $9.53 million after

entry of the Interim Financing Order and pending entry of the Final Financing Order.[7]  This amount is anticipated to permit the Debtors to meet their operating and administrative obligations during the initial stage of these chapter 11 cases.

32.    The Debtors have provided a budget to the DIP Lender, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the DIP Lender (as amended from time to time, the "Approved Budget"). A summary of the Approved Budget is attached hereto as **Exhibit C**.  In addition, the Debtors will periodically deliver an updated thirteen-week budget in form and substance reasonably acceptable to the DIP Lender (as well as a variance report at the times contemplated by the DIP Credit Agreement).  The Debtors believe that the Approved Budget is achievable and will enable them to operate their business without the accrual of unpaid administrative expenses.

C.    **Liens and Claims**

33.    Pursuant to the Interim Financing Order and, upon entry of the Final Financing Order, the loans and obligations under the proposed DIP Credit Agreement will:

a)    Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a fully perfected first priority lien on all DIP Collateral that is not otherwise subject to a lien and all proceeds thereof, subject to the Carve Out;

b)    Pursuant to section 364(d)(1)(A), be secured by a fully perfected first priority, senior priming lien on all DIP Collateral that is

---

[7]    As previously discussed, the Debtors' postpetition receipts will be applied against the balance of the Prepetition Loan Agreement.  As a result, the Debtors anticipate drawing up to $9.53 million under the DIP Facility from the entry of the Interim Financing Order through a Final Hearing.  The reserves established under the DIP Facility, however, necessitate that the full $22 million of loan commitments be made available upon entry of the Interim Financing Order, even though actual borrowings under the DIP Facility will not exceed $9.53 million.

DOCS_SF:86924.8

subject to the existing liens securing the obligations of the Debtors to the Prepetition Lenders thereof, subject to the Prepetition Permitted Liens and the Carve Out; and

c) Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by fully perfected second priority liens on all DIP Collateral that is subject to the existing Prepetition Permitted Liens and all proceeds thereof, subject to the Carve Out.

34.   Furthermore, pursuant to the Interim Financing Order and, upon entry of the Final Financing Order, the loans and obligations under the proposed DIP Credit Agreement will, pursuant to section 364(c)(1) of the Bankruptcy Code, receive and be entitled to a superpriority administrative expense claim over all costs and expenses of the kinds specified in, or ordered pursuant to sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision under the Bankruptcy Code, subject to the Carve Out.

35.   Upon entry of the Final Financing Order, the DIP Collateral will include the Avoidance Actions (except that, upon entry of the Interim Financing Order, the DIP Collateral will include rights and causes of action under Section 549 of the Bankruptcy Code).

**D.    Provisions to be Highlighted Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2**

36.   The Debtors believe that the following provisions of the proposed DIP Credit Agreement must be highlighted pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2:

a)   **Repayment of Prepetition Secured Debt**.   The DIP Loan provides for the progressive repayment of the Debtors' obligations under the Prepetition Credit Agreement.   Initially (following entry of the Interim Financing Order), the outstanding borrowings under the prepetition loan will be reduced by the application of postpetition receipts (mostly comprised of the proceeds, pursuant to section 552(b) of the Bankruptcy Code, of prepetition collateral granted to the Prepetition Lenders).   Subsequently (upon entry of

the Final Financing Order), the remaining amount due under the Prepetition Credit Agreement will be reduced by borrowing under the DIP Credit Agreement. *See* DIP Credit Agreement at page 7; Interim Financing Order at ¶ 3.

b)    **Binding Estates to Validity, Perfection or Amount of Prepetition Secured Debt**.  The Debtors will waive and release any and all claims arising from or related to the Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of obligations under the Prepetition Credit Agreement or the liens on or security interests in the assets of the Debtors securing the obligations under the Prepetition Credit Agreement, including without limitation, seeking to equitably subordinate or avoid the liens securing the obligations under the Prepetition Credit Agreement; *provided, however*, the foregoing waiver and release will be subject to the rights of a statutory committee appointed in these chapter 11 cases, or of any other party in interest with requisite standing, to challenge the claims, liens, priority, and actions or inactions of the Prepetition Lenders within the deadlines established by the Interim Financing Order (*i.e.,* 60 days after the formation of a statutory committee, and 75 days after the Petition Date for another party in interest). *See* Interim Financing Order at ¶ 33.

c)    **Waiver of Rights Under Section 506(c)**.  The proposed waiver of the estates' rights under section 506(c) of the Bankruptcy Code will be effective only <u>after</u> notice to parties in interest and entry of the Final Financing Order granting such relief.  *See* Interim Financing Order at ¶ 36.

d)    **Limitations Regarding Proposed Plan of Reorganization**.  The DIP Credit Agreement and Interim Financing Order provide that the Debtors shall not propose or support any plan of reorganization or entry of any confirmation order that is not conditioned upon the payment in full on or prior to the effective date of such plan of all of the Debtors' obligations under the DIP Credit Agreement. *See* DIP Credit Agreement at Section 8.01(f)(ii); Interim Financing Order at ¶ 40.

e)    **Limitations Regarding Alternative Financing**.  The DIP Credit Agreement and Interim Financing Order provide that the Debtors shall not seek to prime the security interests and DIP Liens provided to the DIP Lender under this Interim Financing Order and the Final Financing Order, except as may be contemplated under the Sale Agency Agreement, by offering a subsequent lender or a

party in interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code, except in connection with a refinancing that contemplates the payment in full of the Debtors' obligations under the DIP Credit Agreement.  *See* DIP Credit Agreement at Section 2.16; Interim Financing Order at ¶ 7.

f)      **Modification of the Automatic Stay**.  The Interim Financing Order provides that the automatic stay under section 362(a) of the Bankruptcy Code will be modified (a) upon an Event of Default under and according to the terms and conditions of the DIP Credit Agreement, and (b) to permit the automatic attachment and perfection of any DIP Liens. *See* Interim Financing Order at ¶ 16.

g)      **Indemnification**.  The DIP Credit Agreement provides that the Debtors shall indemnify the DIP Lender, its officers, directors, attorneys, advisors, agents, employees, representatives, and affiliates (each an "Indemnitee") against, and hold each Indemnitee harmless from, any claims in connection with (i) the DIP Loan Documents, (ii) the DIP Loan or the use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, provided that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee. *See* DIP Credit Agreement at Section 10.04.

h)      **Carve Out**.  The obligations, liens and claims of the Agent and the Prepetition Agent are subject to the following expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and Section 3717 of title 31 of the United States Code, (b) Allowed Professional Fees of Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice (net of any retainers maintained by such Case Professionals), limited to the budgeted amounts set forth in the Approved Budget as of any applicable date of determination (for the avoidance of doubt, amounts incurred in any week in excess of the Approved Budget may be added to amounts incurred in any prior or subsequent weeks under the Approved Budget), which budgeted amounts shall be funded into the Professional Fee Escrow Account weekly pursuant to the Approved Budget, and (c) $200,000 for Allowed Professional Fees of Case Professionals following the delivery of a Carve Out Trigger Notice, which amount under clause (c) shall be funded into the Professional Fee Escrow Account by the Agent promptly upon the delivery of a Carve Out Trigger Notice. *See* Interim Financing Order at ¶ 30(a).

21

i)    **Lien on Avoidance Actions**.  Under the Interim Financing Order, the DIP Liens shall attach only to the proceeds of actions under section 549 of the Bankruptcy Code.  Under the Final Financing Order, the DIP Liens shall attach to all Avoidance Actions.  The Debtors believe that the lien on the Avoidance Actions is necessary and appropriate under the circumstances of these chapter 11 cases.  The anticipated proceeds of the sale of the Debtors' assets and other recoveries have reasonably informed the DIP Lender's demand to include these causes of action as additional collateral.  Interim Financing Order at ¶ 8.

j)    **Automatic Perfection**.  Under the Interim Financing Order, the DIP Liens shall attach to the DIP Collateral and be automatically perfected without further notice or filings by the Debtors or the Agent, although the Agent shall be authorized, in its discretion, to file such documentation as Agent may reasonably request in order to effect the completion of the financing arrangements contemplated under the DIP Credit Agreement.  DIP Credit Agreement at Section 6.17; Interim Financing Order at ¶ 17.

## E.    Events of Default

37.    The DIP Credit Agreement contains customary events of default for loan agreements of this type.  They include, but are not limited to, the following:

a)    entry of an order dismissing any of the Debtors' chapter 11 cases or converting any of the Debtors' chapter 11 cases to a chapter 7 case;

b)    entry of an order appointing a chapter 11 trustee in any of the Debtors' chapter 11 cases;

c)    except as may be contemplated under the Sale Agency Agreement, entry of an order granting any other party a superpriority claim or lien equal or superior to those granted to the DIP Lender;

d)    entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to the DIP Lender (in the judgment of the DIP Lender) and without the prior written consent of the DIP Lender, the DIP Loan, the Interim Financing Order or the Final Financing Order approving the DIP Loan;

e)    entry of an order in any of the Debtors' chapter 11 cases appointing an examiner having enlarged powers to operate or manage the financial affairs of any of the Debtors;

f)    entry of an order in any of the Debtors' chapter 11 cases under sections 506(c) or 552(b) of the Bankruptcy Code against the DIP Lender regarding the DIP Loan adverse to its rights and remedies under the DIP Loan or any Bankruptcy Court order;

g)    failure of Debtors to pay principal, interest, fees, or other amounts owing in connection with the DIP Loan when due;

h)    the Debtors engaging in or supporting any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the liens on or security interests in the assets of the Debtors securing the DIP Loan;

i)    entry of the Final Financing Order shall not have occurred within thirty (30) days after the entry of the Interim Financing Order;

j)    entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any DIP Collateral having a value of $250,000 or more; and

k)    the filing of a motion by the Debtors seeking approval of a disclosure statement and a plan of reorganization, or the entry of an order confirming a plan of reorganization, that does not require repayment in full in cash of all obligations under the DIP Loan on the effective date of such plan.

## F.    Waivers of Rights

38.    In addition to the aforementioned limitations on the right to challenge the claims and liens of the Prepetition Lenders, the Debtors will waive any and all claims arising from or related to the Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the Prepetition Credit Agreement or the liens on or security interests in the assets of the Debtors securing the Prepetition Credit Agreement, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Credit Agreement; *provided, however*, the foregoing waivers will be subject to the right of the statutory committee of unsecured creditors (or other party in interest) to investigate and bring any such claims

23

against, and, with respect to the claims held by, the Prepetition Lenders within 60 days after the date of formation of the committee (or, for any other party in interest, within 75 days after the Petition Date).

**G.    Indemnification**

39.    The Debtors agree to indemnify and hold the Agent and its affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the transactions contemplated hereby provided however, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of or resulting from the gross negligence or willful misconduct of any indemnified party. In all such litigation, or the preparation therefore, the Agent shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel.

**H.    Use of Cash Collateral and Proposed Adequate Protection**

40.    The proceeds of collateral and the cash and other amounts on deposit or maintained in the Debtors' bank accounts constitute the cash collateral of the Prepetition Agent, subject to its security interests (to the extent valid and perfected), in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral").

41.     To the extent its interests in property of the Debtors' estates are secured by valid and perfected liens as of the Petition Date, the Prepetition Agent is also entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in such collateral under the Prepetition Credit Agreement to the extent there is any diminution in value of such collateral from and after the Petition Date.

42.     The Prepetition Agent has consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Approved Budget, subject to the approval and entry of the Interim Financing Order and the adequate protection liens and claims discussed below.

43.     As adequate protection for any diminution in value, the Prepetition Agent will:  (i) maintain its liens on the DIP Collateral, junior and subordinate to the Carve Out and the DIP Liens; (ii) be granted replacement liens on, and security interests in, the DIP Collateral, subject only to the Carve Out and the liens on, and security interests in, the DIP Collateral granted to the DIP Lender under the DIP Loan and the Orders, as the case may be, and any valid and perfected preexisting Prepetition Permitted Liens; and (iii) be granted an administrative claim under section 507(b) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve Out and to the DIP Superpriority Claim granted to the DIP Lender.

**I.      Carve Out**

44.     The professional fees and expenses incurred by professional persons employed by the Debtors or a statutory committee in the chapter 11 cases (including, any

DOCS_SF:86924.8

expenses of the members of such statutory committee) ("Professional Expenses") may be paid to the extent authorized in the Approved Budget and subject to entry of a customary order of the Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such Professional Expenses.

45.    The DIP Liens and the DIP Superpriority Claim (and the postpetition liens, superpriority claims and adequate protection liens and claims granted to the Prepetition Agent) will be subject to a carve out (the "Carve Out"), for the purpose of, and in an amount not to exceed: (A) accrued but unpaid Professional Expenses incurred prior to the Carve Out Trigger Event under the DIP Credit Agreement (*i.e.*, the occurrence of an Event of Default or the completion of a sale under the Sale Agency Agreement), *provided that*, the Carve Out shall not exceed the amounts set forth in the Approved Budget for such items through such date (including any unused amounts for Professional Expenses that are rolled forward or backward under such Approved Budget), plus (B) $200,000 for the payment of Professional Expenses following the Carve Out Trigger Event under the DIP Credit Agreement, plus (C) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court.

46.    The Interim Financing Order includes provisions providing that the Debtors will periodically fund a segregated account -- the Professional Fee Escrow Account – at the times and in the amounts specified in the Approved Budget.  Amounts on deposit in the Professional Fee Escrow Account shall be used to satisfy Professional Expenses that are allowed and authorized to be paid as provided herein and by the Bankruptcy Court and for no other purpose.

DOCS_SF:86924.8

**The DIP Credit Agreement and Use of Cash Collateral Should Be Authorized**

47.    Approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with immediate and ongoing access to the funds necessary to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.  Unless these expenditures are made, the Debtors will be forced to immediately cease operations, which would (i) result in irreparable harm to their business, and (ii) deny the Debtors the opportunity to maximize value.

48.    Because the Debtors' postpetition Cash Collateral is earmarked for application against the balance of the Prepetition Credit Agreement, the borrowing under the DIP Credit Agreement is critically necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases.  In addition, the availability under the DIP Credit Agreement will provide confidence to the Debtors' vendors, thereby aiding in the administration of the Cases and promoting a successful reorganization.  Accordingly, the timely approval of the relief requested herein is imperative and should be approved.

A.    **Debtor-in-Possession Financing**

(i)    Approval Under Section 364(c) of the Bankruptcy Code

49.    Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for

27

benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with

respect to postpetition credit, courts "permit debtors in possession to exercise their basic business

judgment consistent with their fiduciary duties.").

      50.    Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estates that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

      51.    In satisfying the standards of section 364(c) of the Bankruptcy Code, a

debtor need not seek credit from every available source, but should consider other sources of

credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *See, e.g.,*

*Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th

Cir. 1986) (trustee had demonstrated by good-faith effort that credit was not available without

senior lien by unsuccessfully contacting other financial institutions in immediate geographic

area; "the statute imposes no duty to seek credit from every possible lender before concluding

that such credit is unavailable"); *Ames Dept. Stores*, 115 B.R. at 40 (finding that debtor

demonstrated the unavailability of unsecured financing where debtor approached several lending

institutions).

52.     Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices ... explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property ... because there is no property in the estate which is not already subject to a lien.").

53.     The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

54.     The Debtors believe that any effort to maximize the value of the estates is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Credit Agreement and the use of Cash Collateral. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections

29

364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Credit Agreement.  The only source of secured credit available to the Debtors (other than the use of Cash Collateral pledged to the repayment of the Prepetition Credit Agreement), is the DIP Credit Agreement.

55.    The Debtors believe that their efforts to obtain credit except as provided under the DIP Credit Agreement have been impacted both by the extraordinary exigencies of this filing and by the fact that all or substantially all of the Debtors' assets are encumbered. Any alternative financing proposals would have entailed the "priming" of the Prepetition Lenders' "blanket" liens, which the Debtors concluded would likely necessitate the consent of such lenders.

56.    After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors.  Moreover, the Debtors and their advisors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

30

57.    The Debtors further submit that the other terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

58.    Finally, the gradual repayment of the amounts outstanding under the Prepetition Credit Agreement that is contemplated by the DIP Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates. On an interim basis, the proceeds of the collateral of the Prepetition Lender will be used to reduce the amount outstanding on the Prepetition Credit Agreement. The full repayment of the Prepetition Credit Agreement will only occur following entry of the Final Financing Order.

59.    The Debtors believe that repayment of the Prepetition Credit Agreement is permissible and appropriate and should be approved by the Court. First, the validity, enforceability and priority of the liens granted by the Debtors under the Prepetition Credit Agreement are subject to the "challenge" rights of a statutory committee. Hence, insofar as the satisfaction of the Prepetition Credit Agreement is premised upon the validity of the blanket liens granted by the Debtors under the Prepetition Credit Agreement, a committee will have an opportunity to examine the propriety of such repayment. Second, based on recent borrowing base estimates under the terms of the Prepetition Credit Agreement, the Debtors believe that the

31

current amount outstanding under such agreement is less than the value of the aggregate collateral securing such obligations. Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender when the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured. *In re Beker Indus. Corp.*, 58 B.R. 725, 742 (Bankr. S.D.N.Y. 1986) (recognizing that unsecured creditors do not object to cross collateralization when the lender's prepetition claim is fully secured by a perfected first priority lien). Similarly, the proposed repayment does not affect the priority of payment since the collateral cannot be primed to pay administrative claims. *Hartford Underwriters Ins. Co. v. Union Planters Bankr, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that an administrative expense claim allowable under section 503(b) of the Bankruptcy Code may not prime the claims held by a creditor having a perfected, first priority lien against all of the debtor's assets).

60.    Hence, there should be no prejudice from the proposed repayment to other creditors of these estates because the Prepetition Lender already asserts security interests in the assets that the Debtors propose to pledge to the (same) DIP Lender that is providing the funds to satisfy the Prepetition Credit Agreement under the DIP Credit Agreement.

(ii)    Approval Under Section 364(d) of the Bankruptcy Code

61.    When a debtor is not able to obtain financing pursuant to the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain such financing that is secured by a "priming lien" that is senior or equal to existing liens against property of the estate. 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code governs financing that is secured by a priming lien and provides that a court may authorize a debtor to obtain such debt provided that

(i) the debtor is not able to obtain credit otherwise and (ii) the lien being primed is adequately protected.

62.    In the context of section 364(d), collateral only requires adequate protection to the extent that a priming lien will result in a decrease in the value of such entity's interest in the subject property. *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (quoting *In re Sharon Steel Corp.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (citing *In re 495 Central Park Ave. Corp.*).    What constitutes adequate protection is decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Becker Indus. Corp.*, 58 B.R. 725, 236 (Bankr. S.D.N.Y. 1986).

63.    The Debtors satisfy the standard under section 364(d) of the Bankruptcy Code.  Here, the Prepetition Lender has consented to the relief requested herein; moreover, its interests in the DIP Collateral are protected by the adequate protection relief proposed herein. As adequate protection, Salus, as the Prepetition Agent, will (a) maintain liens on the DIP Collateral, junior and subordinate to the Carve Out and the liens securing the DIP Loan; (b) be granted replacement liens on, and security interests in, the DIP Collateral, subject only to the

Carve Out and the liens on, and security interests in, the DIP Collateral granted to the DIP

Lender under the DIP Loan and the Orders, as the case may be, and any valid and perfected

preexisting liens held by third parties; and (c) will be granted an administrative claim with

priority over all administrative expense claims and unsecured claims against the Debtors, subject

only to the Carve Out and to the superpriority claims granted to the DIP Lender under the DIP

Credit Agreement.

64.    In light of the foregoing, the DIP Credit Agreement is vital to maximizing

the value of the Debtors' estates.    Consequently, without access to the DIP Loan and the

continued use of Cash Collateral, the Debtors and their estates would suffer immediate and

irreparable harm because they could not continue to operate.

**B.    Use of Cash Collateral**

65.    The Debtors' use of property of the estates is governed by section 363 of

the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated
> under section . . . 1108 . . . of this title and unless the court
> orders otherwise, the trustee [or debtor-in-possession] may
> enter into transactions, including the sale or lease of
> property of the estates, in the ordinary course of business,
> without notice or hearing, and may use property of the
> estates in the ordinary course of business without notice or
> hearing.

11 U.S.C. § 363(c)(1).

66.    The Bankruptcy Code establishes a special requirement, however,

regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable

instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever

acquired in which the estates and an entity other than the estates have an interest . . .." 11 U.S.C.

§ 363(a).  Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell

or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances

exist:

> (A) *each* entity that has an interest in such cash collateral
> consents; or (B) the court, after notice and a hearing,
> authorizes such use, sale, or lease in accordance with the
> provisions of this section.

11 U.S.C. § 363(c)(2).

      67.    Here, the Prepetition Agent consents to the Debtors' use of Cash

Collateral on the terms set forth in the Approved Budget and this Motion.

### Interim Authorization

      68.    The authorization to obtain the DIP Credit Agreement and use of Cash

Collateral pending a Final Hearing will preserve the value of the Debtors' business only if

authorization is granted immediately.

      69.    Local Rule 4001-2(b) specifically contemplates that it might be necessary

to grant interim authorization to obtain postpetition financing or use of cash collateral because of

the business exigencies of individual cases. *See also* 11 U.S.C. § 102(1) (defining "after notice

and a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in

the particular circumstances of a given case).

      70.    In this instance, the Debtors must have immediate use of the funds

provided under the DIP Credit Agreement and the Cash Collateral to the extent contemplated

herein to pay their ongoing operational expenses and to maximize the value of their estates.

Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these cases in an orderly and efficient manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates.

71.    The Debtors seek authorization on an interim basis to borrow up to $9.53 million under the DIP Credit Agreement and to use Cash Collateral for the purposes set forth in the Approved Budget (including repayment of amounts outstanding under the Prepetition Credit Agreement) pending the Final Hearing. Initially, the Debtors' postpetition Cash Collateral will be applied against the balance of the Prepetition Credit Agreement. Thus, the Debtors project the need to borrow up to $9.53 million under the DIP Facility to meet expenses under the Approved Budget from the entry of the Interim Financing Order through the Final Hearing. As a consequence of the reserves required by the DIP Facility, however, the full $22 million of loan commitments must be made available for borrowing upon entry of the Interim Financing Order, even though actual disbursements under the DIP Facility will not exceed $9.53 million.

72.    Based on the foregoing, the Debtors submit that interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

### Notice

73.    The Debtors have provided notice of the Motion and the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee, (ii) counsel to the Prepetition Agent, (iii)

other parties with liens of record on assets of the Debtors as of the Petition Date, and (iv) the

Debtors' thirty (30) largest unsecured creditors on a consolidated basis, as identified in their

chapter 11 petitions.  The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be given.

74.     Upon entry of the Interim Financing Order, the Debtors shall give notice

of the request for entry of a Final Financing Order to: (i) the U.S. Trustee, (ii) counsel to the

Prepetition Agent, (iii) parties with liens of record on assets of the Debtors as of the Petition

Date, (iv) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, as

identified in their chapter 11 petitions; and (v) all other parties requesting notice pursuant to

Bankruptcy Rule 2002.

**<u>No Prior Request</u>**

75.     No previous application for the relief sought herein has been made by the

Debtors to this or any other court.

DOCS_SF:86924.8

WHEREFORE, the Debtors respectfully request that the Court permit the Debtors to obtain credit pursuant to the DIP Financing Agreement and further: (i) approve the entry of the Interim Financing Order attached to this Motion, authorizing the DIP Credit Agreement and use of Cash Collateral on an interim basis pending the Final Hearing; (ii) schedule a Final Hearing on this Motion for approval of the DIP Credit Agreement and use of Cash Collateral on a final basis; (iii) permit final approval of the DIP Credit Agreement and use of Cash Collateral following the Final Hearing; and (iv) grant such further relief as is just and proper.

Dated: February 4, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:      ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             jfried@pszjlaw.com
             crobinson@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession

DOCS_SF:86924.8