IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CACHÉ, INC., et al.,[1] | ) | Case No. 15-10172 (MFW) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**Proposed Procedures Hearing Date: February 17, 2015 at TBD**
**Proposed Procedures Objections Due: February 13, 2015 at 4:00 p.m. Eastern Time**

**DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO
AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS,
(C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND
(D) SCHEDULING SALE HEARING AND APPROVING NOTICE
THEREOF; (II) AUTHORIZING (A) SALE OF ASSETS AND
(B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession herein (collectively, the

"Debtors") hereby move (the "Motion") this Court for entry of orders (i) (a) authorizing the entry

into that certain Agency Agreement, dated as of February 3, 2015 (the "Agency Agreement"),

attached hereto as **Exhibit A**[2] (which is inclusive of the Sale Guidelines (the "Sale Guidelines"),

attached hereto as **Exhibit B**), with a contractual joint venture composed of SB Capital Group,

LLC and Tiger Capital Group, LLC (together, the "Stalking Horse"), (b) authorizing bidding

protections for the Stalking Horse, (c) authorizing the bidding procedures and related auction and

(d) scheduling a sale hearing and approving notice thereof (the "Bidding Procedures Order") and

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Caché, Inc. (8181); Caché of Las Vegas, Inc. (9821); and Caché of Virginia, Inc. (9725). The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

[2] The form of Agency Agreement attached hereto is filed without exhibits. The Debtors intend to supplement this filing with exhibits as appropriate.

(ii) authorizing (a) sale of Assets (defined below) and (b) store closing sales and (iii) granting

related relief (the "Approval Order"). In support of the Motion, the Debtors represent as follows:

**Jurisdiction**

1.    The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection

with this Motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

2.    The statutory predicates for the relief requested herein are sections 105(a),

363, 364, 365, 503, 507 and 554 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

A.    **General Background**

3.    On the date hereof (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently

herewith, the Debtors have filed a motion with this Court requesting joint administration of the

Debtors' chapter 11 cases (the "Cases") for procedural purposes only. The Debtors are operating

their business and managing their properties as debtors and debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the

appointment of a trustee or an examiner in these cases, and no official committee has yet been

appointed by the Office of the United States Trustee.

      4.     The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating their chapter 11 filings, is set forth in

detail in the *Declaration of Anthony DiPippa in Support of First Day Motions* (the "DiPippa

Declaration") filed concurrently herewith and fully incorporated herein by reference.[3]

      5.     The Debtors have filed this Motion seeking authority, in part, to conduct

an auction for the sale of the Debtors' (i) inventory, (ii) furniture, fixtures and equipment,

(iii) intellectual property, (iv) accounts receivable and cash on hand in the stores or other closing

locations, (v) real property leases and (vi) customer lists (each, an "Asset Class" and collectively,

the "Assets"), either on a going-concern basis or via chain-wide store closing sales (the "Store

Closing Sales") and liquidation. The Store Closing Sales process would result in the liquidation

of the Debtors inventory and furniture, fixtures and equipment. It is also anticipated that the

Debtors would seek to separately sell certain intellectual property assets to the extent the Debtors

are not sold on a going-concern basis at auction.

      6.     In furtherance of the Debtors' efforts to maximize the value of the Assets

in a sales process, the Debtors are also seeking authority, in part, to enter into an agency

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DiPippa Declaration.

agreement for a Store Closure Sales process that would serve as the stalking horse bid which would be subject to higher and/or better bids at an auction.

**B.    Facts Specific to the Relief Requested**

7.    In August 2014, the Debtors engaged Janney to perform a review of strategic alternatives and to advise the Debtors regarding financial matters.

8.    From August 7, 2014 to August 21, 2014, Janney reviewed strategic financial alternatives and produced a report for the Debtors' Board which recommended evaluating the financial terms of their existing asset-backed line of credit, filing a universal shelf registration statement, rationalizing the Debtors' store base and exploring strategic options as it relates to a sale of the business.  Subsequently the Debtors' board authorized Janney to commence a dual track process wherein in Janney would pursue both a capital raise and conduct a market check to better understand if there were financial and/or strategic parties interested in pursuing an acquisition of the Debtors.

9.    From August 21, 2014 to January 13, 2015, Janney helped the Debtors launch both a capital raise and going concern sale process.

Capital Raise

10.    Janney commenced outreach to potential investors on November 11, 2014. In all, Janney contacted 74 potential investors. Thirty-two of these potential investors received Material Non Public Information ("MNPI") and agreed to be restricted in trading the Debtors' securities.  Of these, eight investors met with the Debtors' management. The Debtors received

one draft term sheet on November 18, 2014. In the exercise of its business judgment, the

Debtors did not approve the transaction.

<u>Going Concern Sale</u>

11.     Janney commenced outreach to potential acquirers on October 23, 2014.

Janney contacted 117 potential purchasers and distributed a non-confidential executive summary

to 99 potential purchasers. The Debtors executed Non-Disclosure Agreements with 30 potential

purchasers and sent a Confidential Information Memorandum to 30 Parties. Twenty-one

potential purchasers received bid instructions. The Debtors received one indication of interest on

January 16, 2015.

12.     On December 4, 2014, the Debtors announced its review of strategic

alternatives. Beginning January 14, 2015, through the filing, at the request of the Board, Janney

is in the process of commencing a sale of all or a portion of the Debtors' assets.

13.     Janney commenced its outreach to potential purchasers on January 14,

2015 and contacted 31 parties. Nine potential purchasers received an asset purchase agreement;

however, the Debtors did not receive any bids as of January 26, 2015.

14.     Additional factual background relating to the Debtors' decision to file this

Motion is contained in the DiPippa Declaration. The Debtors' pre-petition secured lenders

support the Debtors' pursuit of maximizing value at a potential auction including the entry by the

Debtors into the Agency Agreement with the Stalking Horse or other agreement put forward by

the successful bidder after an auction and all of the relief requested herein.

15.     As mentioned above, the Debtors believe that it is crucial that they commence the Store Closing Sales (or close a going-concern Alternative Transaction) on their proposed timeline in order to maximize value for the Debtors' estates and all stakeholders while minimizing administrative expenses. Further, pursuant to their postpetition financing agreement, the Debtors have agreed that by no later than March 3, 2015 they will have obtained an order approving a Permitted Sale as defined in their financing agreement. The Agency Agreement provides that the Store Closing Sales will commence on the first business day after the entry of the Approval Order, but not later than March 4, 2015 (the "Sale Commencement Date"). The Debtors propose to commence the Store Closing Sales immediately following the Sale Hearing or otherwise close a sale of the Assets to a going-concern buyer.

16.     The details of the pre-petition marketing process and the solicitation of bids from nationally-recognized liquidators to serve as a stalking horse buyer are described in detail in the *Declaration of Daniel Shea in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* attached hereto as **Exhibit C** (the "Shea Declaration") and the *Declaration of Mark Renzi in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II)*

*Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* attached hereto as **Exhibit D** (the "Renzi Declaration").

17.    As a result of this process, the Debtors, in consultation with their Secured Lenders, determined that the Stalking Horse bid represented the highest and best offer as of the date hereof, subject to a future auction, and thus that it was in the best interests of the Debtors, their estates, creditors and other parties-in-interest to enter into the Agency Agreement. As part of the consideration for entry into the Agency Agreement, the Debtors request authority to pay the Stalking Horse a break-up fee and provide for an expense reimbursement that will be payable to the Stalking Horse in certain circumstances where the Stalking Horse is not the successful bidder after an auction.

18.    Pursuant to the Agency Agreement, the Stalking Horse will serve as the Debtors' exclusive agent to (a) sell all of the merchandise (the "Merchandise") located at all of the Debtors' retail locations and, if requested by the Stalking Horse, through e-commerce platforms (the "Sale") and (b) dispose of any owned fixtures, furnishings and equipment (the "Owned FF&E") in the Debtors' retail locations, distribution center and corporate offices (together with the Sale, the "Transaction").

19.    The significant terms of the Agency Agreement are as follows:[4]

---

[4] This summary is provided in accordance with Rule 6004-1(b)(iv) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") and is qualified in its entirety by reference to the provisions of the Agency Agreement and the Sale Guidelines. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Agency Agreement and the Sale Guidelines. To the extent there exists any inconsistency between this summary and the provisions of the Agency Agreement and the Sale Guidelines, the provisions of the Agency Agreement and the Sale Guidelines, as applicable, shall control.

| Provision | Description of Provision |
|---|---|
| Sale<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse shall be retained as the Debtors' exclusive agent for the limited purpose of (a) selling the Merchandise located in the Debtors' 218 retail store location(s) identified on Exhibit A-1 to the Agency Agreement, less the Excluded Stores, for a minimum of 148 and a maximum of 163 retail store locations (each, except the Excluded Stores, individually a "Store", and collectively, less the Excluded Stores, the "Stores") and the third party warehouse location identified on Exhibit A-2 attached to the Agency Agreement ( "3PL"), through the Stores, and (b) selling all of the Owned FF&E located in the Stores and the Debtors' corporate offices, by means of a "going out of business," "store closing", "sale on everything", "everything must go", or similarly themed sale.<br><br>"Merchandise" means all new first quality (other than as expressly set forth below), finished goods inventory that is owned by the Debtors, customarily sold to customers in the ordinary course of the Debtors' business and located in the Stores on the Sale Commencement Date (or, with respect to Returned Merchandise, 3PL Merchandise and In-Transit Merchandise, received at the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) 3PL Merchandise, On-Order Merchandise, and In-Transit Merchandise received in the Stores within forty-five (45) days after the Sale Commencement Date (the  "Merchandise Receipt Deadline"); (iv) Display Merchandise; and (v) Defective Merchandise (to the extent the Debtors and the Stalking Horse can mutually agree on the Cost Value applicable thereto).  Notwithstanding the foregoing, "Merchandise" shall not include (1) goods that belong to sublessees, licensees, or concessionaires of the Debtors; (2) goods held by the Debtors on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Additional Agent Merchandise; (5) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores and 3PL; and |

| Provision | Description of Provision |
|---|---|
| | (6) 3PL Merchandise, On-Order Merchandise, and In-Transit Merchandise that does not arrive in the Stores on or prior to the Merchandise Receipt Deadline.<br><br>*See* Agency Agreement Sections Recitals & 5.2(a). |
| Guaranteed Amount<br><br>*Local Rule 6004-1(b)(iv)* | As a guaranty of the Stalking Horse's performance, in addition to the payment of Expenses (as provided for in Section 4.1), Stalking Horse guarantees that the Debtors shall receive an amount (the "<u>Guaranteed Amount</u>") equal to eighty two (82%) (the "<u>Guaranty Percentage</u>") of the aggregate Cost Value of Merchandise. The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by the Debtors, in consultation with the Lender, and Stalking Horse, (B) of the aggregate Cost Value of 3PL Merchandise, On-Order Merchandise and/or In-Transit Merchandise counted in the manner and at the times provided in Section 5.1(b) hereof as determined in accordance with the inventory counting procedures set forth herein, (C) the aggregate amount of Gross Rings (as adjusted for shrinkage per the Agreement), (D) the aggregate Cost Value of Display Merchandise included in the Sale; and (E) the aggregate Cost Value of Returned Merchandise included in the Sale and not otherwise included in the Inventory Taking. The Cost Value of such Merchandise is estimated to be between $13,500,000 and $15,000,000.<br><br>*See* Agency Agreement Sections 3.1(a), 3.1(c). |

| Provision | Description of Provision |
|---|---|
| Sharing Amount<br><br>*Local Rule 6004-1(b)(iv)* | To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, plus (y) Expenses of the Sale, plus (z) an amount equal to six percent (6%) of the sum of the aggregate Cost Value of the Merchandise included in the Sale and the gross proceeds of the sale of Additional Agent Merchandise (exclusive of sale taxes) (the amount set forth in clause (z), the "Agent's Fee" and the sum of clauses (x), (y) and (z) being collectively defined as the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared sixty-five percent (65%) to the Debtors (Debtors' share of Proceeds beyond the Sharing Threshold is the "Sharing Amount") and thirty-five percent (35%) to the Stalking Horse.<br><br>*See* Agency Agreement Section 3.1(b). |
| Transfer of Remaining Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | Provided that no Event of Default has occurred and continues to exist on the part of the Stalking Horse, all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("<u>Remaining Merchandise</u>") shall become the property of the Stalking Horse, free and clear of all liens, claims, interests and encumbrances of any kind or nature (including, without limitation, any liens in favor of the Lender); <u>provided</u>, <u>however</u>, the proceeds realized upon a sale or other disposition of the Remaining Merchandise shall constitute Proceeds hereunder for purposes of, *inter alia*, calculating the Sharing Amount (if any) due the Debtors.<br><br>*See* Agency Agreement Section 3.2. |
| Agent's Fee<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse's fee is equal to six percent (6%) of the sum of the aggregate Cost Value of the Merchandise included in the Sale and the gross proceeds of the sale of Additional Agent Merchandise (exclusive of sale taxes).<br><br>*See* Agency Agreement Section 3.1(b). |

| Provision | Description of Provision |
|---|---|
| Payment Date<br><br>*Local Rule 6004-1(b)(iv)* | On the first (1st) business day after entry of the Approval Order, the Stalking Horse shall pay to the Debtors the Initial Guaranty Payment. The balance of the Guaranteed Amount, if any, shall be paid by the Stalking Horse by wire transfer of immediately available funds to the Debtors' Designated Account on the earlier of: (x) the second (2nd) business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by the Debtors, in consultation with the Lender, and the Stalking Horse (the "Final Inventory Report"), and (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, the Stalking Horse shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount).<br><br>*See* Agency Agreement Section 3.3. |
| Additional Stalking Horse Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse shall be entitled to include in the Sale supplemental merchandise procured by the Stalking Horse which is of like kind, and no lesser quality than Merchandise located in the Stores (the "Additional Agent Merchandise").<br><br>*See* Agency Agreement Section 8.9. |
| Sale of Owned FF&E<br><br>*Local Rule 6004-1(b)(iv)* | With respect to Owned FF&E, the Stalking Horse shall, at the Debtors' election (the "FF&E Sale Option"), either (i) sell the Owned FF&E strictly on a commission basis (the "FF&E Commission Option"), or (ii) sell the Owned FF&E on a guaranteed fee basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to the Debtors, Lender and Stalking Horse agreeing on a mutually acceptable FF&E/asset listing.<br><br>*See* Agency Agreement Section 15(a). |

| Provision | Description of Provision |
|---|---|
| Cost Value of Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | The Guaranty Percentage has been fixed based upon the the Debtors' representation that the aggregate Cost Value of the Merchandise is not less than $13,500,000 and not greater than $15,000,000.<br><br>See Agency Agreement Section 3.1(c). |
| Store Closing Sales Expenses<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will pay all Expenses of the Sale. In addition, the Debtors may be liable for budgeted expenses incurred in connection with the Sale of FF&E, in the event that they elect to execute the FF&E Commission option.<br><br>*See* Agency Agreement Sections 4 and 15. |
| Releases<br><br>*Local Rule 6004-1(b)(iv)(C)* | The Agency Agreement and Approval Order do not provide for any releases. |
| Record Retention<br><br>*Local Rule 6004-1(b)(iv)(J)* | The Agency Agreement does not contemplate the transfer of the Debtors' books and records to the Stalking Horse. |
| Relief from Bankruptcy Rule 6004(h)<br><br>*Local Rule 6004-1(b)(iv)(O)* | As set forth herein, the Debtors seek relief from the stay requirements of Bankruptcy Rule 6004(h). |

| Provision | Description of Provision |
|---|---|
| Sale Period<br><br>*Local Rule 6004-1(b)(iv)* | The Sale shall commence at each of the Stores on the first business day after the entry of the Approval Order, but not later than March 4, 2015 (the "Sale Commencement Date"). The Stalking Horse shall complete the Sale and vacate the premises of each Store in favor of the Debtors or their representative or assignee on or before May 31, 2015 (the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term". The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of the Debtors, in consultation with the Secured Lenders, and the Stalking Horse or (b) accelerated by the Stalking Horse, in which case the Stalking Horse shall provide the Debtors with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). If the Stalking Horse fails to provide the Debtors (who shall forward such notice to the Lender) with timely notice of an acceleration of the Sale Termination Date for a Store, the Stalking Horse shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice. |
| Bidding Protections<br><br>*Local Rule 6004-1(b)(iv)(D),*<br>*6004-1(b)(iv)(G) and 6004-*<br>*1(c)(i)(C)(2)* | Subject to approval of the Bankruptcy Court in the Bidding Procedures Order, in consideration for the Stalking Horse having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of the Debtors and to compensate the Stalking Horse as a stalking-horse bidder, in the event that this Agreement is terminated pursuant to Section 16.10(a) (as a result of the Debtors' failure to use diligent, commercially reasonable efforts to cause the Sale Commencement Date to occur as soon as practicable after the entry of the Approval Order), Section 16.10(e)(iii) (as a result of the Debtors' failure to use diligent, commercially reasonable efforts to cause the Approval Order to be entered prior to March 3, 2015), Section 16.10(c)(ii), Section 16.10(c)(iii) or Section 16.10(d)(i), the Debtors shall pay and the Stalking Horse shall receive, (1) a breakup fee equal to $225,000 (the "Break-Up Fee") plus (2) reimbursement of customary, reasonable documented third-party fees, costs and |

| Provision | Description of Provision |
|---|---|
|  | expenses, including legal fees, incurred by the Stalking Horse in connection with this transaction in an aggregate amount not to exceed $100,000 (the "Cash Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections"); plus (3) reimbursement of the reasonable costs, fees, and expenses actually incurred and paid by the Stalking Horse in acquiring signage and other advertising and promotional material in connection with the Sale (excluding any cost of capital incurred in connection therewith), in an aggregate amount not to exceed $325,000 (the "Signage Costs Obligations"); provided however that, in the event of a termination prior to February 20, 2015, the Stalking Horse shall not be entitled to any reimbursement for Signage Costs Obligations; plus (4) reimbursement to the Stalking Horse for (and assumption of, including without limitation replacement of all letters of credit delivered by the Stalking Horse to an applicable vendor) all written commitments of the Stalking Horse identified in writing (such written identification to be accompanied by copies of the applicable purchase orders and underlying details relating to such purchase orders such that the relevant goods are readily identifiable) to purchase Additional Agent Merchandise (the "Purchase Order Obligations" and, together with the Signage Costs Obligations, the "Bid Reimbursements" and, together with the Cash Expense Reimbursement, the "Expense Reimbursement"); provided that the Stalking Horse shall be entitled to such reimbursement and assumption only with respect to (A) commitments identified on or prior to the later of (I) February 24, 2015 and (II) the date that is two (2) business days prior to the Auction and (B) additional commitments identified prior to the Auction relating to Additional Agent Merchandise with an aggregate actual cost not exceeding $375,000; provided further that, solely with respect to any termination pursuant to Section 16.10(c)(iii), the Bid Reimbursements shall be obligations for which the Stalking Horse shall look solely to the Successful Bidder to satisfy and discharge and that, under such circumstances, the Debtors shall not have any obligations with respect to the Bid Reimbursements) in connection with this Agreement and the transactions contemplated hereby and (ii) in the event that this Agreement is |

| Provision | Description of Provision |
|---|---|
| | terminated pursuant to Sections 16.10(a) (except as set forth above), 16.10(e)(iii) (except as set forth above), 16.10(c)(i), 16.10(c)(iv) or 16.10(d)(iv), the Expense Reimbursement alone.<br><br>*See* Agency Agreement Section 16.11. |
| Merchandise Returns / Gift Certificates / Membership Program<br><br>*Local Rule 6004-1(b)(iv)* | All sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same. The Stalking Horse shall accept and honor coupons during the Sale Term, if any, as well as groupons and the Debtors' employee discount terms as are in effect immediately prior to the commencement of the Sale Term. The Debtors shall reimburse the Stalking Horse in cash for all amounts related to coupons, as well as groupons and the Debtors' employee discount terms, during each weekly sale reconciliation; provided that, the Debtors shall only be obligated to reimburse the Stalking Horse for the Debtors' coupons, as well as groupons and the Debtors' employee discount terms, honored by the Stalking Horse during the first thirty (30) days of the Sale.<br><br>During the first thirty (30) days of the Sale (the "Pre-Sale Merchandise Return Period"), the Stalking Horse shall accept returns of Merchandise sold by the Debtors prior to the Sale Commencement Date in accordance with the Debtors' return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise").<br><br>During the first thirty (30) days of the Sale Term, the Stalking Horse shall accept the Debtors' gift cards, gift certificates, merchandise credits and other similar Debtor-issued credits, if any. The Debtors shall reimburse the Stalking Horse in cash for gift card, gift certificate, merchandise credit, and other similar Debtor-issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation |

| Provision | Description of Provision |
|---|---|
|  | *See* Agency Agreement Sections 8.2., 8.5 and 8.6. |

| Provision | Description of Provision |
|---|---|
| Superpriority Claims and Liens<br><br>*Local Rule 6004-1(b)(iv)* | Subject to the Stalking Horse having satisfied its obligation to tender payment of the Initial Guaranty Payment and to deliver the Letter of Credit, any amounts owed by the Debtors to the Stalking Horse shall be granted the status of superpriority claims senior to all other superpriority claims, including, without limitation, to the superpriority claims of the DIP Lender; <u>provided</u> that until the Debtors receive payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to the Debtors, any superpriority claim granted to the Stalking Horse (other than any such claim for the Bid Protections and Bid Reimbursements), shall be junior and subordinate to the security interests and superpriority claims of the DIP Lender (as well as any "carve out" provided for in the Debtors' debtor-in-possession financing agreements) but solely to the extent of the amount of the unpaid portion of such amounts and such other amounts due to the Debtors.<br><br>Upon payment of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit, the Debtors grant to the Stalking Horse first priority, senior security interests in and liens (subject to certain subordination provisions) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Stalking Horse's commission regarding the sale or other disposition of Merchant Consignment Goods; (v) in the event the Debtors elect the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the Stalking Horse's FF&E Commission; (vi) the Stalking Horse's percentage share of Proceeds in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing to secure the full payment and performance of all obligations of the Debtors to the Stalking Horse.<br><br>*See* Agency Agreement Sections 2(b)(xii) and 16.12. |

| Provision | Description of Provision |
|---|---|
| Use of Proceeds<br><br>*Local Rule 6004-1(b)(iv)(H)* | It is contemplated that, pursuant to the proposed DIP financing arrangements between the Debtors and the DIP Lender, all amounts pursuant to the Agency Agreement and the Approval Order for which the Debtors are entitled to payment shall be paid over by the Debtors to the DIP Lender (as such term is defined in the proposed Interim DIP Order). |

## C.    The Proposed Bidding Procedures and Auction

20.    Although the Debtors have entered into the Agency Agreement with the Stalking Horse, the Debtors are continuing their marketing efforts to attract competing bidders for an auction with the aim of selecting the highest and/or best bid at auction, including the potential for a going-concern buyer to be selected as the winning bidder. Accordingly, the Debtors and their advisors will seek to hold an auction at 10:00 a.m. prevailing Eastern Time on February 26, 2015 (the "Auction"), pursuant to the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 ("Bidding Procedures"). As indicated previously, it is anticipated that the Debtors would seek to also sell certain intellectual property assets to the extent the Debtors are not sold on a going-concern basis at auction.

21.    Accordingly, the Debtors have proposed the following timeline:[5]

| Action | Date |
|---|---|
| Bid Procedures Hearing | February 17, 2015 |
| Submission Deadline for Qualified Bids | Two business days prior to |

---

[5] The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to maximize the value of the Transaction.

|  | Auction |
|---|---|
| Auction | February 26-27, 2015 |
| Transaction Approval Hearing | March 3, 2015 |
| Estimated Closing Date of Transaction | March 4, 2015 |

22.    The significant terms of the Bidding Procedures are as follows:[6]

| Provision | Description of Provision |
|---|---|
| **Delivery of Financial Information and Confidentiality of Debtor Information**<br><br>*Local Rule 6004-1(c)(i)(A)(1), 6004-1(c)(i)(A)(2), and 6004-1(c)(i)(A)(3)* | Each entity, other than the Stalking Horse, that wishes to participate in the bidding process (a "Potential Bidder") must deliver the following:<br><br>(a) a written disclosure of the identity of each entity, including involvement in any joint venture, that will be bidding (or participating in a bid) on the Assets or certain Asset Classes;<br><br>(b) adequate assurance information, including (a) adequate information (in the Debtors' reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;<br><br>(c) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and<br><br>(d)    a *bona fide* non-binding letter of intent or expression of interest with respect to a purchase of the Assets or certain Asset Classes which shall describe, among other things, the cash, financing commitments, or other sources of consideration that the Potential Bidder will use to |

---

[6] This summary is provided in accordance with Rule 6004-1(c)(i) of the Local Rules and is qualified in its entirety by reference to the provisions of the Bidding Procedures. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Bidding Procedures. To the extent there exists any inconsistency between this summary and the provisions of the Bidding Procedures, the provisions of the Bidding Procedures shall control.

| Provision | Description of Provision |
|---|---|
| | consummate the proposed transaction, which of the Debtors' Assets or certain Asset Classes are proposed to be acquired in the proposed transaction, and any conditions to consummating the proposed transaction including any required internal approvals, syndication requirements, or other contingencies or approvals. |
| **Non-Binding Indication of Interest**<br><br>*Local Rule 6004-1(c)(i)(A)(4)* | Qualified Bidders must include a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the back-up bidder (the "Back-Up Bidder"); *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the date that is three business days after the commencement of the Store Closing Sales or, if a going-concern bid is the Successful Bid, until the closing of the Sale. |
| **Qualified Bids Deadline**<br><br>*Local Rule 6004-1(c)(i)(B)(1)* | Bidders must submit their bid by 4:00 p.m. prevailing Eastern time two business days prior to the Auction. The Debtors will notify all Qualified Bidders by not later than two business days after the Bid Deadline as to whether or not any bids constitute Qualified Bids with respect to any Asset Class and whether such Qualified Bidder's bid constitutes a Qualified Bid. |
| **Qualified Bids Form**<br><br>*Local Rule 6004-1(c)(i)(B)(2)* | Qualified Bids must include a duly authorized and executed copy of the Agency Agreement or Alternative Transaction Agreement (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (a) the Agency Agreement and (b) the proposed Approval Order. |
| **Good Faith Deposit**<br><br>*Local Rule 6004-1(c)(i)(B)(3)* | Qualified Bids must be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid (as quantified by the Debtors) (the "Deposit"). A Successful Bidder that breaches any of its obligations under the applicable Successful Bidder Agreement shall forfeit its Deposit, which shall become property of the Debtors' estates without any further order of the Bankruptcy Court. The forfeiture of the Deposit shall be in addition to any other rights, claims and remedies that the Debtors and their |

| Provision | Description of Provision |
|---|---|
| | estates may have against such Successful Bidder. |
| **Qualified Bids and Qualified Bidders**<br><br>*Local Rule 6004-1(c)(i)(B)(4)* | A bid will be considered a qualified bid only if the bid is submitted by a Qualified Bidder and complies with all of the following:<br><br>(a) states with specificity the Asset Classes such Qualified Bidder offers to purchase, in cash, (which shall consist of at least the Asset Classes described in the non-binding letter of intent submitted by such Qualified Bidder) and the liabilities and obligations to be assumed by the Qualified Bidder upon the terms and conditions set forth in an agency agreement based on the form of Agency Agreement submitted by the Stalking Horse, as modified to reflect such Qualified Bidder's proposed transaction or in an asset purchase agreement (an "Alternative Transaction Agreement");<br><br>(b) discloses any connection or agreements with the Debtors, the Stalking Horse, any other known Potential Bidder and/or any officer, director or equity security holder of Cache, Inc.;<br><br>(c) contains written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the bid;<br><br>(d) includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Agency Agreement or Alternative Transaction Agreement;<br><br>(e)    includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale;<br><br>(f)    includes an acknowledgement and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the |

| Provision | Description of Provision |
|---|---|
| | Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Agency Agreement or Alternative Transaction Agreement; and (d) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid; |
| | (g)    is accompanied by a letter (a) stating with specificity the Assets or Asset Classes such Qualified Bidder wishes to bid on and the liabilities and obligations to be assumed by such Qualified Bidder, (b) specifying all material terms of the bid that are substantially the same as or better than those of the Stalking Horse bid, to the extent the bid is on the same Asset Class as the Stalking Horse bid, (c) stating that its offer is a bona fide offer that it intends to consummate if it is selected as the Successful Bidder and (d) stating that such Qualified Bidder has not engaged in any collusion with respect to the bidding process; |
| | (h)    contains such other information as is requested by the Debtors in their business judgment; and |
| | (i)    is received prior to the Bid Deadline. |
| **No Shop or No Solicitation**<br><br>*Local Rule 6004-1(c)(i)(C)(1)* | Neither the Agency Agreement nor the Bidding Procedures limit the Debtors' ability to solicit higher or otherwise better bids. |
| **Break Up Fee and Expense Reimbursement**<br><br>*Local Rule 6004-1(c)(i)(C)(2)* | If the Court approves a Successful Bidder, other than the Stalking Horse, to ultimately consummate the Transaction, the Stalking Horse will be entitled to a Break-Up Fee, Cash Expense Reimbursement, Signage Costs Obligations and Purchase Order Obligations as set forth on pages 12 and 13 hereinabove. |
| **Bidding Increments**<br><br>*Local Rule 6004-1(c)(i)(C)(3)* | For the Asset Classes of Merchandise and Owned FF&E, to the extent that there is more than one Qualified Bid for such Asset Class, all initial overbids beyond the Stalking Horse bid (i) must exceed the Stalking Horse bid by an amount at least equal to one percent (1%) of the Cost Value (as defined in the Agency Agreement) of the |

| Provision | Description of Provision |
|-----------|--------------------------|
| | Merchandise (as determined by Debtors in their reasonable discretion) plus cash in the amount of the Break-Up Fee and the Cash Expense Reimbursement (each as defined in the Agency Agreement) (as quantified by the Debtors) and (ii) agree to (A) payment of the Purchase Order Obligations (as defined in the Agency Agreement) (either through direct reimbursement to the Stalking Horse for goods that have been paid for and received, and/or assumption of obligation (including replacement of any letter of credit delivered by the Stalking Horse to an applicable vendor)) and payment to the respective vendors for goods that have not yet been received and (B) payment of the Signage Cost Obligations (as defined in the Agency Agreement) (either through direct reimbursement to the Stalking Horse and/or assumption of obligation and payment to the vendor(s)). Bidding at the Auction will continue in increments of at least 0.10% (each successive bid, an "Inventory Overbid"). An Inventory Overbid shall remain open and binding on the Qualified Bidder(s) in accordance with its terms until and unless the Debtors accept an alternate Qualified Bid as the Highest or Best Asset Bid for the Asset Class (or for a group of Asset Classes containing the Asset Class). During the course of the Auction, the Debtors shall, after submission of each Inventory Overbid, promptly inform each participant which Inventory Overbid reflects, in the Debtors' view, the highest or otherwise best offer.<br><br>For each Asset Class other than inventory and Owned FF&E, to the extent that there is more than one Qualified Bid for a particular Asset Class, the Auction shall commence with bidding on such Asset Class at the amount equal to the Highest or Best Asset Class Bid applicable to such Asset Class. Bidding on such Asset Class will continue in increments of at least $50,000, or such other amount as determined by the Debtors in their business judgment (each successive bid, an "Asset Class Overbid"). An Asset Class Overbid shall remain open and binding on the Qualified Bidder(s) until and unless the Debtors accept an alternate Qualified Bid as the Highest or Best Asset Class Bid on such Asset Class. During the course of the Auction, the Debtors shall, after submission of each Asset Class Overbid, promptly inform each participant which Asset Class Overbid reflects, in the Debtors' view, the highest or otherwise best offer for such Asset Class. When |

| Provision | Description of Provision |
|---|---|
| | bidding on individual Asset Classes for which more than one Qualified Bid was received concludes, the Debtors, after consultation with the Committee and the Secured Lenders, shall determine a highest or otherwise best bid with respect to each Asset Class (each highest or best bid after conclusion of the auction, the "Winning Asset Class Bid"). To the extent a particular Asset Class did not receive more than one Qualified Bid (and accordingly, was not subject to the auction procedures set forth above in this paragraph), the Highest or Best Asset Class Bid shall be deemed to be the Winning Asset Class Bid for such Asset Class, subject to the provisions of these Bidding Procedures. In all events, the Debtors shall not be required to accept any bids made with respect to Assets in those Asset Classes that are not subject to the Agency Agreement (i.e. Asset Classes other than Merchandise and Owned FF&E).<br><br>If there is a Highest or Best Asset Bid, after determination of each Winning Asset Class Bid, the Debtors shall hold an auction for the Assets.  If the Winning Asset Class Bids, in the aggregate, or a Qualified Bidder for the Assets, are selected as the Highest or Best Asset Bid, then bidding will start at the aggregate consideration for the Winning Asset Class Bids or such Qualified Bidder's bid, plus 0.10%. Bidding at the Auction will continue in increments of at least 0.10% (each successive bid, an "All Assets Overbid").  A bidder seeing to purchase the Assets subject to the Agency Agreement as part of an All Assets Overbid must agree to (A) payment of the Purchase Order Obligations (either through direct reimbursement to the Stalking Horse for goods that have been paid for and received, and/or assumption of obligation (including replacement of any letter of credit delivered by the Stalking Horse to an applicable vendor)) and payment to the respective vendors for goods that have not yet been received and (B) payment of the Signage Cost Obligations (either through direct reimbursement to the Stalking Horse and/or assumption of obligation and payment to the vendor(s)).  An All Assets Overbid shall remain open and binding on the Qualified Bidder(s) until and unless the Debtors accept an alternate Qualified Bid(s) as the Highest or Best Asset Bid.  During the course of the Auction, the Debtors shall, after submission of each All Assets Overbid, promptly inform each participant, which All Assets |

| Provision | Description of Provision |
|---|---|
| | Overbid reflects, in the Debtors' view, the highest or otherwise best offer.  For the avoidance of doubt, Asset Class bidders may make joint All Assets Overbids |
| **Break Up Fee and Expense Reimbursement at Auction**<br><br>*Local Rule 6004-1(c)(i)(C)(4)* | The Stalking Horse will not receive a "credit" equal to the Break Up Fee or Expense Reimbursement at the Auction, but the Debtors reserve the right, in their business judgment, to take such amounts into account in determining which bid is the highest and best bid for the Transaction. |
| **Modification of Bidding Procedures**<br><br>*Local Rule 6004-1(c)(i)(D)* | The Bid Deadline may be extended by the Debtors in consultation with the Stalking Horse and each of the Notice Parties.  The Debtors retain the right, upon consultation with the Secured Lenders and the Committee, to waive or modify the terms of the Bidding Procedures when determining which bids (other than the Agency Agreement, which shall constitute a Qualified Bid) may be deemed Qualified Bids. |
| **Closing with Alternative Backup Bidders**<br><br>*Local Rule 6004-1(c)(i)(E)* | If an Auction is conducted, the Qualified Bidder(s) with the second highest or otherwise best Qualified Bid at the Auction for the Assets or for any Asset Class, as determined by the Debtors in the exercise of their business judgment, and upon consultation with the Secured Parties, will be required to serve as the Back-Up Bidder and keep such bid open and irrevocable until the date that is three business days after the commencement of the Store Closing Sales or, if a going-concern bid is the Successful Bid, until the closing of the Sale; provided that the Stalking Horse shall be required to serve as Back-Up Bidder only subject to the terms and conditions set forth in its bid (including, without limitation, any outside dates, milestones or termination events).  Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the applicable Back-Up Bidder will be deemed to be the new Successful Bidder for the Assets or applicable Asset Class, and the Debtors will be authorized but not required, to consummate the Sale with such Back-Up Bidder without further order of the Bankruptcy Court.  The Back-Up Bidder shall be required to close within three (3) business days following receipt of notice from the Debtors of the Successful Bidder's failure to close, provided, however, that in the event the Stalking Horse is the Back-Up Bidder, the Stalking Horse shall be required to close only if such |

| Provision | Description of Provision |
|-----------|--------------------------|
|           | closing occurs prior to March 4, 2015. |

23.     The Debtors believe that conducting the Auction is critical to the integrity

of their search process for the highest and/or best bid.  Accordingly, within three (3) business

days of entry of the Bidding Procedures Order, the Debtors will serve a notice (the "Auction

Notice"), attached as Exhibit 2 to the Bidding Procedures Order, by first class mail upon:  (i) the

Office of the United States Trustee for the District of Delaware, (ii) counsel to the DIP Lender

and the prepetition lenders, (iii) the Office of the United States Attorney for the District of

Delaware, (iv) counsel to the Creditors' Committee, (v) all parties who are known to assert any

lien, claim, interest or encumbrance in or upon any of the Assets, (vi) all lessors of leases for the

Stores, (vii) all applicable federal, state, and local taxing authorities having jurisdiction over any

Store or any of the Assets, including, without limitation, the Internal Revenue Service, (viii) all

governmental entities known by the Debtors to have an interest in regulating the Sale, (ix) the

state attorney general in each state in which the Debtors operate a Store, (x) all parties identified

by the Debtors as potentially interested purchasers, (xi) the Stalking Horse and (xii) all other

applicable parties in interest, including all entities on the general case service list as of the date of

entry of the Bidding Procedures Order (collectively, the "Notice Parties").  In order to maximize

notice, the Debtors are providing notice of this Motion to (a) the U.S. Trustee, (b) the Debtors'

prepetition and postpetition secured lenders, (c) any parties known by the Debtors to be

potentially interested in participating in the proposed auction and (d) the 30 largest unsecured

creditors of the Debtors, upon filing of the Motion.

24.     Any bidder that desires to make a bid will deliver written copies of its bid

to (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market

Street, 17th Floor, Wilmington, Delaware 19801, Attn:  Laura Davis Jones and David M.

Bertenthal; (b) Cache, Inc., 256 West 38th Street 2nd floor, New York, NY  10018, Attn: Mark

Renzi; (c) the Debtors' investment banker, Montgomery Scott LLC, 575 Lexington Avenue, 15th

Floor, New York, NY 10022, Attn: Daniel Shea; (d) Salus Capital Partners, LLC, 197 First

Avenue, Ste 250, Needham, MA 02494 Attn: Kyle C. Shonak; (e) co-counsel to Salus Capital

Partners, LLC, Choate Hall & Stewart, Two International Place, Boston, MA 02110, Attn: John

F. Ventol; (f) co-counsel to Salus Capital Partners, LLC, DiConza Traurig Kadish, LLP, 630

Third Avenue – 7th Floor, New York, NY 10017, Attn:  Maura I. Russell, Esq.; and (g) counsel

to the Official Committee of Unsecured Creditors,  so as to be received not later than 4:00 p.m.

prevailing Eastern time on February 24, 2015 (the "Bid Deadline").

25.     Any objections to the Motion should be in writing, state the basis of such

objection with specificity, be filed with the Court in compliance with the Bankruptcy Rules and

the Local Rules and served upon the following (the "Bid and Objection Notice Parties"): (a)

proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street,

17th Floor, Wilmington, Delaware 19801, Attn:  Laura Davis Jones and David M. Bertenthal; (b)

the Debtors' investment banker, Janney Montgomery Scott, 575 Lexington Avenue, 15th Floor,

New York, NY 10022, Attn:  Daniel Shea; (c) co-counsel to the prepetition lender and DIP

lender, Choate Hall & Stewart, Two International Place, Boston, MA 02110, Attn:  John F.

Ventola; (d) co-counsel to the prepetition lender and DIP lender, DiConza Traurig Kadish, LLP,

630 Third Avenue – 7th Floor, New York, NY 10017, Attn: Maura I. Russell, Esq.; (e) counsel

for any committee appointed in these chapter 11 cases; (f) the U.S. Trustee, 855 King Street,

Suite 2207, Wilmington, Delaware 19801, Attn: David L. Buchbinder; (g) SB Capital Group,

LLC, 1010 Northern Blvd., Suite 340, Great Neck, NY 11021, Attn: Robert Raskin; (h) Tiger

Capital Group, LLC, 340 N. Westlake Boulevard, Suite 260, Westlake Village, CA 91362, Attn:

Dan Kane; and (i) counsel to the Stalking Horse: Wachtell, Lipton, Rosen & Katz, 51 West 52nd

Street, New York, NY 10019, Attn: Scott K. Charles; Neil M. Snyder.

### Relief Requested

26.      By this Motion, the Debtors seek the entry of two orders:

(a)      the Bidding Procedures Order substantially in the form attached hereto as **Exhibit E**, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, (a) authorizing entry into Agency Agreement, (b) authorizing Bidding Protections, (c) authorizing Bidding Procedures and setting the time, date and place of the Auction and (d) approving the form of Auction Notice and (ii) setting a hearing (the "Sale Hearing"), to be held on March 3, 2015, to consider the entry of the Approval Order; and

(b)      following the Sale Hearing, the Debtors request the entry of the Approval Order substantially in the form attached hereto as **Exhibit F**, pursuant to Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rule 6004, approving (i) the Agency Agreement and any Agency Transaction Agreement or other successful overbid with the parties submitting the highest or otherwise best bid at the Auction (each a "Successful Bidder") and (ii) the Transaction in relation to the Store Closing Sales (or such other higher or better bid) and waiving the Debtors' compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales.

### Basis For Relief Requested

**A.      Authorizing Entry into Agency Agreement, Bidding Protection and Bidding**

**Procedures and Auction**

27.    Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

28.    Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale of substantially all of the Debtor's assets satisfied the sound business reason test). *See also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)) (noting that the Court defers to the trustee's judgment so long as there is a legitimate business justification); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in

question should be approved under section 363(b)(1).  Indeed, when applying the "business

judgment" standard, courts show great deference to a debtor's business decisions.  *See Pitt v.*

*First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989

WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . .

must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or

in gross abuse of the bankrupt's retained discretion.").

        29.     Liquidation sales are a routine part of chapter 11 cases.  *See, e.g.*, *In re*

*Ames Dept. Stores, Inc.*, 136 B.R. at 359 (holding that "going-out-of-business" sales are an

important part of "overriding federal policy requiring Debtor to maximize estate assets").

Bankruptcy courts in this and other districts have approved similar liquidation sales.  *See, e.g.*, *In*

*re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) (authorizing

debtors' entry into agency agreement to liquidate inventory); *In re Borders Grp., Inc.*, No. 11-

10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors' entry into agency agreement

to conduct full-scale liquidation of stores); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr.

S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency agreement to conduct store

closing sales on first day); *In re Goody's LLC*, No. 09-10124 (Bankr. D. Del. Jan. 21, 2009)

(authorizing debtors' assumption of prepetition agency agreement and to conduct full-scale

liquidation through store closing sales at the outset of the case); *In re Circuit City Stores Inc.*,

No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); *In re Whitehall Jewelers Holdings, Inc.*,

No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (authorizing debtors' entry into an agency

agreement to conduct store closing sales); *In re Goody's Family Clothing, Inc.*, No. 08-11133

(CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 08-10832 (CSS)

(Bankr. D. Del. May 30, 2008) (same); *In re G&G Retail, Inc.*, No. 06-10152 (RDD) (Bankr.

S.D.N.Y. Feb. 17, 2006); *In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. May

30, 2003) (authorizing debtor's entry into an agency agreement to conduct store closing sales).

### 1.    *The Bidding Protections Requested Are Reasonable and Justified*

30.    If the Stalking Horse is not the Successful Bidder, the Debtors propose to

provide the Stalking Horse with the following Bidding Protections: (a) the Break Up Fee; and

(b) the Expense Reimbursement.  The Bidding Protections are in consideration for the Stalking

Horse conducting its due diligence, entering into the Agency Agreement and agreeing to subject

its bid to the Auction.  The Bidding Protections were negotiated at arm's-length and in good faith

and are necessary to secure the Stalking Horse's participation in the Debtors' sale process.

Further, based on discussions with the Stalking Horse, the Debtors believe that the Stalking

Horse would not enter into the Agency Agreement without the Bidding Protections.

31.    The Debtors have determined that the Store Closing Sales or closing of

another higher and/or better Alternative Transaction are critical to preserving the value of their

estates and submit that providing the Bidding Protections to the Stalking Horse is an actual,

necessary cost of going forward with the Store Closing Sales. Therefore, the Debtors hereby

respectfully request that the Court approve the Bidding Protections.

32.    In the Third Circuit, bid protections, including traditional breakup fees and

expense reimbursement provisions, will be approved where they are necessary for the

preservation of the debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re*

*O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding. *In re O'Brien*, 181 F.3d at 537.

33.    The Bidding Protections should be approved and accorded administrative expense status under sections 503(b)(1)(A) and 507 of the Bankruptcy Code because they provide a clear benefit to the Debtors' estates and the Stalking Horse expressly conditioned its willingness to enter into the Agency Agreement upon the Debtors' agreement to, and Court approval of, the Bidding Protections. The Bidding Protections will enable the Debtors to secure an adequate consideration floor for a going concern bid as well as for competing liquidating bids for the Merchandise and, thus, ensure that competing bids will be materially higher or better than that contained in the Agency Agreement. Accordingly, the Debtors' ability to offer the Bidding Protections enables them to ensure the sale of the Merchandise to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

34.    The Debtors submit that the amount of the Break Up Fee (approximately 2% of the total consideration under the Agency Agreement) and Expense Reimbursement are reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review, negotiating the terms of the Agency Agreement and preparing for the commencement of the Store Closing Sales.

35.    In addition, payment of the Bidding Protections will not diminish the

Debtors' estates.  The Debtors do not intend to terminate the Agency Agreement if to do so

would incur an obligation to pay the Bidding Protections, unless they are accepting an alternative

bid, which bid must exceed the consideration offered by the Stalking Horse by an amount

sufficient to pay the Bidding Protections.

36.    The Court has approved protections similar to the Break Up Fee as

reasonable and consistent with the type and range of bidding protection typically approved.  *See,*

*e.g.*, *In re Coldwater Creek, Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) [Docket

No. 266] (approving break-up fee of 1.5% in connection with a $90-100 million sale of assets, a

$800,000 reimbursement plus the cost of additional merchandise acquired by the stalking horse

for inclusion in the sale); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov.

2, 2012) [Docket No. 206] (approving break-up fee of 3.0% in connection with a $258 million

sale of assets and a $2.5 million expense reimbursement); *In re Solyndra LLC*, No. 11-12799

(MFW) (Docket No. 1113) (Bankr. D. Del. Sept. 29, 2012) (approving break-up fee of 2.6% in

connection with $90 million sale of assets); *In re Northstar Aerospace (USA) Inc.*, No. 12-11817

(MFW) (Bankr. D. Del. June 27, 2012) [Docket No. 119] (approving break-up fee of 3.5% in

connection with $70 million sale of assets); *In re Anchor Blue Retail Grp., Inc.*, No. 09-11770

(PJW) (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to

$1,000,000.00).

## 2.    *Entry into the Agency Agreement Is a Sound Exercise of the Debtors' Business Judgment*

37.     Entry into the Agency Agreement is a sound exercise of the Debtors' business judgment, utilizing a professional liquidating agent with substantial experience and expertise in conducting orderly simultaneous Store Closing Sales will maximize proceeds for the Debtors' estates in the event no higher and/or better Alternative Transaction is consummated.  In particular, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estates, which minimizes the Debtors' risks while at the same time motivating the Stalking Horse (or other Successful Bidder) to maximize proceeds to the estates.

38.     Additionally, it is more cost effective for the Debtors to allow the Stalking Horse or other liquidator that is a Successful Bidder to conduct the Store Closing Sales than for the Debtors to conduct such sales on their own because, among other reasons, the Stalking Horse or such other liquidator will reimburse the Debtors for expenses of the Store Closing Sales. These significant cost savings would increase the overall recovery for creditors of the Debtors' estates in the event that a higher and/or better Alternative Transaction is not consummated. Moreover, the Stalking Horse or other liquidator the Debtors selects has, or will have, extensive knowledge, expertise and experience in conducting store closing sales.

39.     Similarly, a sound business purpose exists for the Debtors to consummate a sale to any Successful Bidder that is contemplating a purchase of substantially all of the Debtors' assets as a going concern.  In the context of a sale of a debtor's assets, the court in *In re Delaware & Hudson Railway Co.*, observed:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed

time since the filing; the likelihood that a plan of reorganization
will be proposed and confirmed in the near future; the effect of the
proposed disposition of the future plan of reorganization; the
amount of proceeds to be obtained from the sale versus appraised
values of the Property; and whether the asset is decreasing or
increasing in value.[7]

40.    The Debtors submit that the exercise of their business judgment in

consummating any going-concern transaction that prevails at the Auction would meet the above-

referenced standards. As noted, the Debtors extensively marketed the Assets and have pursued a

sale process designed to maximize the purchase price realized from the Sale. As a result of the

marketing efforts that have been undertaken and that the Debtors will continue to undertake, the

highest or otherwise best offer(s) obtained through the sale process will provide maximum value

to the Debtors under the current circumstances. Other potential buyers will be served with this

Motion and/or notice thereof. The fairness and reasonableness of the consideration to be paid by

the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtors have

undertaken, followed by a fair and reasonable sale process, and culminating in one or more

proposed sales. Inasmuch as adequate notice of the material terms of the Agency Agreement and

the transactions contemplated by such agreement is given by this Motion and has been provided

to the Debtors' major constituents the Debtors submit that no further hearing or notice should be

necessary with respect to approval of either the Agency Agreement or any other, materially

similar agreement based on the form of Stalking Horse Agency Agreement, as modified to

reflect such Successful Bidder's proposed transaction or other higher or better transaction (an

"Alternative Transaction Agreement") with the Successful Bidder.

---

[7]    124 B.R. 169, 176 (D. Del. 1991).

41.     The Debtors submit, and will demonstrate at the Sale Hearing, that the Agency Agreement is, and that any Alternative Transaction Agreement will be, the result of good faith arms'-length negotiations and the good faith extension of credit by the Stalking Horse and/or any other Successful Bidder, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's authorization to consummate the transactions contemplated by the Agency Agreement or any Alternative Transaction Agreement, and the security interest granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

42.     The Debtors submit that the consideration provided pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

43.     Based upon the foregoing, the Renzi Declaration, the Shea Declaration and the DiPippa Declaration, the Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment. Accordingly, the Debtors respectfully request that the Court approve the Agency Agreement with the Stalking Horse, or authorize the Debtors to enter into a substantially similar agreement or other higher or better transaction with the Successful Bidder.

**3.     *Bidding Procedures***

44.     The Debtors believe that the solicitation of bids to serve as the Debtors' agent in connection with the Store Closing Sales or to serve as a going-concern buyer is the best way to maximize the value of the Debtors' Merchandise and Owned FF&E, and an Auction for all Asset Classes as described herein with the Stalking Horse leading the bidding for Merchandise and Owned FF&E will result in the most beneficial arrangement for the Debtors and their estates.  Based on the Auction results, the Debtors will consummate the Agency Agreement and/or enter into an Alternative Transaction Agreement with the Successful Bidder. Accordingly, the Debtors respectfully request that the Court approve the Bidding Procedures, as set forth in Exhibit 1 to the Bidding Procedures Order.

45.     The use of the Agency Agreement, upon which all bids for the Asset Classes will be based, will enable the Debtors and other parties-in-interest to easily compare and contrast any differing terms of the Bids made for the Asset Classes by the Qualified Bidders (defined in the Bidding Procedures) at the Auction.  The Debtors reserve the right to amend or otherwise change the terms of the Agency Agreement in such manner as the Debtors deem to be in their best interests after consultation with the Consultation Parties (defined in the Bidding Procedures) and agreement of the Stalking Horse.

46.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Store Closing Sales, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein. Within three days of entry of the Bidding Procedures Order, the Debtors will serve the Auction Notice

by first class mail upon the Notice Parties.  In order to maximize notice, the Debtors are

providing notice of this Motion to (a) the U.S. Trustee, (b) the Debtors' prepetition and

postpetition secured lenders, (c) any parties known by the Debtors to be potentially interested in

participating in the proposed auction and (d) the 30 largest unsecured creditors of the Debtors,

upon filing of the Motion.

47.    The Debtors submit that the form of Auction Notice, substantially in the

form attached as <u>Exhibit 2</u> to the Bidding Procedures Order, is reasonably calculated to provide

timely and adequate notice of the proposed Store Closing Sales, the Bidding Procedures, the

Auction and the Sale Hearing to the Debtors' creditors and all other parties-in-interest that are

entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the

Assets on a going concern or liquidation basis.  Accordingly, the Debtors request that the Court

approve the notice procedures set forth in this Motion, including the form and manner of service

of the Auction Notice, and that no other or further notice of the Store Closing Sales, the Bidding

Procedures or the Auction is required.

48.    The Debtors submit that the foregoing procedures are fair, transparent and

will derive the highest and best bids for the Assets.

**D.    Scheduling Sale Hearing and Notice Thereof**

49.    The Debtors request that the Court hold the Sale Hearing on March 3,

2015.

50.    As mentioned above, in the event no higher and/or better Alternative

Transaction is consummated with a going-concern buyer or other liquidator, the Debtors propose

to commence the Store Closing Sales immediately following the Sale Hearing. Under this circumstance, the Debtors believe that going forward on an expedited basis will in no way impair recoveries because (a) all nationally-recognized potential liquidators (the other parties that can effectuate a transaction of this magnitude) have been involved in the process the Debtors engaged in prepetition to select the Stalking Horse, (b) those parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation process run by the Debtors' advisors was routine for such situations and the form of agency agreement used is customary and (d) the Debtors' secured lenders have had direct input in the process.

51.    Further, without a higher and/or better Alternative Transaction with a going-concern buyer, the Debtors believe that it is crucial that they commence the Store Closing Sales on their proposed timeline to maximize value for the Debtors' estates while minimizing administrative expenses and, pursuant to the Agency Agreement, their postpetition financing agreement and the plan support agreement, they are obligated to do so no later than March 4, 2015. Thus, the Debtors respectfully request that the Court hold the Sale Hearing on March 3, 2015.

E.    **The Store Closing Sales**

1.    *Approval of Store Closing Sales Under Section 363 of the Bankruptcy Code is Warranted*

52.    The Debtors, exercising their business judgment and in consultation with their advisors and key constituents, have determined that, in the event there is no viable higher and/or better Alternative Transaction with a going concern buyer, it is in the best interests of the

Debtors, their estates, creditors, and other parties-in-interest to conduct Store Closing Sales. Based on applicable precedent, the Court should authorize the Debtors to do so as set forth herein in order to enable the estates to recover as much as possible from the Sale.

53.     Delays in a sale or liquidation process could cause portions of the Debtors' inventory to become less valuable, not only due to lack of replenishment, but also due to changes in the quality of the inventory mix due to ongoing sales and lack of seasonally appropriate merchandise. The realization of fair value for the Assets as promptly as possible will inure to the benefit of all parties in interest. Thus, time is of the essence to preserve and maximize the value of the Debtors' Assets through one or multiple sales.

54.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Ames Dep't Stores, Inc. (Ames II)*, No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day). Courts in this and other Districts have approved similar requests by debtors to conduct store closing sales, finding the debtors' requested relief consistent with applicable provisions of the Bankruptcy Code. *See, e.g.*, *In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) (authorizing store closing sales); *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (same); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10,

2009) [Docket No. 81] (same); *In re Tweeter Home Entm't Grp., Inc.*, No. 07-10787 (PJW)

(Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's Holdings, L.L.C.*, No.

06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

    *2.    Sale of Assets Should Be Free and Clear of Liens, Claims and Encumbrances*

    55.    Sections 105(a) and 363(b) of the Bankruptcy Code authorize the sale of a

debtor's assets after notice and hearing.  Section 105(a) states, in pertinent part, that "[t]he court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).  More specifically, section 363(b) of the Bankruptcy

Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  *See In

re Ames Dept. Stores., Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-

of-business" sales are governed by section 363(b)).  To obtain court approval to use property

under section 363(b) of the Bankruptcy Code for the purpose of a liquidation sale at auction, the

Debtors need only show a legitimate business justification for the proposed action.  *See, e.g., In

re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir.

1991)); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722

F.2d 1063, 1070 (7th Cir. 1983) (same); *In re Delaware and Hudson Ry. Co.*, 124 BR. 169 (D.

Del. 1991) (noting that Third Circuit has adopted "sound business judgment" test for section

363(b) asset sales).

    56.    If a valid business justification exists, the law vests the debtor's decision

to use property out of the ordinary course of business with a strong presumption "that in making

a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Integrated Resources*, 147 B.R. at 656 (citations omitted).

57.    Courts examine four factors in determining whether a sound business purpose or justification exists for a sale of assets under section 363(b) of the Bankruptcy Code: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration will be provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. *See Lionel*, 722 F2d at 1071.

58.    As set forth in the DiPippa Declaration, ample business reasons exist for conducting the Store Closing Sales. As previously described to the Court, the Debtors and their advisors have analyzed exhaustively the Debtors' business and various strategic alternatives and determined that an immediate liquidation of the Debtors' retail locations is the most likely path to maximize recoveries for the Debtors' estates in the event there is no viable Alternative Transaction with a going concern buyer. The Renzi Declaration describes how the Assets will be monetized most efficiently and expeditiously through an orderly process conducted by an experienced liquidation firm.

59.     Moreover, immediate Store Closing Sales in accordance with the terms of the Agency Agreement will minimize the administrative expenses of the estates by reallocating a significant portion of the risks and costs of the Store Closing Sales from the Debtors to the Successful Bidder.  If the Debtors are not allowed to commence the Store Closing Sales, the estates would suffer significant detriment from the resulting delay, added postpetition expenses, depreciation in the value of the Assets and further time and efforts the Debtors would be required to expend to reformulate a different liquidation strategy.

60.     Additionally, there are substantial business reasons to consummate a going-concern transaction, if the Successful Bidder at the Auction seeks to purchase the Assets as a going-concern.  As noted, the Debtors extensively marketed the Assets and have pursued a sale process designed to maximize the purchase price realized from the Sale.  As a result of the marketing efforts that have been undertaken and that the Debtors will continue to undertake, the highest or otherwise best offer(s) obtained through the sale process will provide maximum value to the Debtors under the current circumstances.  Other potential buyers will be served with this Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtors have undertaken, followed by a fair and reasonable sale process, and culminating in one or more proposed sales.

61.     To facilitate the sale of Merchandise, the Debtors request authority to enter into the Agency Agreement to enable the sale of the Debtors' Assets on a final "as is" basis, free and clear of all Liens in accordance with section 363(f) of the Bankruptcy Code, with

any such Liens on the Merchandise and Owned FF&E attaching to the Guaranteed Amount and

any other consideration received pursuant to Alternative Transaction Agreements in the same

order or priority and with the same force, validity and effect as such Liens had with respect to

such Merchandise and Owned FF&E prior to the Transaction.

62.    Section 363(f) of the Bankruptcy Code allows a debtor to sell property

"free and clear of any interest in such property of an entity other than the estate" if one of the

following conditions is met:

(a)    applicable nonbankruptcy law permits the sale of such property free and

clear of such interest;

(b)    the party asserting the lien, claim or interest consents to the sale;

(c)    the interest is a lien and the purchase price for the property is greater than

the aggregate amount of all liens on the property;

(d)    the interest is the subject of a bona fide dispute; or claim.

(e)    such entity could be compelled to accept a money satisfaction of such

interest.

11 U.S.C. § 363(f); *see also In re Elliott*, 94 B.R. 343, 345 (E.D. Pa 1988) (noting that section

363(f) is written in the disjunctive, thereby allowing sales "free and clear" if any one of the

subsections is met).

63.    As noted above, the Debtors' secured lenders not only have consented to

the Store Closing Sales, the Debtors' proposed postpetition lender has required that the Debtors

conduct them in accordance with milestones contained in the Debtors' agreement with them, thereby satisfying section 363(f)(2) of the Bankruptcy Code.

64.     Furthermore, to the extent there are any entities with an interest in any of the Merchandise that have not already consented to the Store Closing Sales, such entity could be compelled to accept a money satisfaction of such interest.  Specifically, the Debtors propose that any Liens asserted against the Merchandise attach to any proceeds realized from the sale of such Merchandise, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

*3.        Restrictive Provisions Impeding Store Closing Sales are Unenforceable*

65.     The Debtors lease all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtors are a party, whether or not filed of record, with respect to any of the leased retail store locations, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtors from conducting store closing or similar themed sales.  Such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. *See In re Ames Dep't Stores*, 136 B.R. at 359 (holding that enforcement of lease restrictions would "contravene overriding federal policy requiring Debtors to maximize estate assets"); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord could not recover for breach of covenant to stay open because debtor had a duty to maximize

value to the estate by conducting a store closing sale and closing the store); *In re Tobago Bay*

*Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (concluding that a debtor's

reorganization would be significantly impaired if lease provisions prohibiting inventory

liquidation were enforced); *In re Libson Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982)

(holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to

conduct GOB sale).

        66.     Similarly, to the extent there are restrictive provisions in any of the

governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting

the use of advertising materials or signage to be used relating to the conduct of the Store Closing

Sales, the Debtors request that such restrictive provisions be invalidated as improper interference

with the Debtors' ability to effectively conduct the Store Closing Sales and maximize the

liquidation value of the Assets.  Courts in this and other Districts have routinely granted similar

relief and held that restrictive lease provisions affecting store closing sales in chapter 11 cases

are unenforceable. *See, e.g., In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del.

May 7, 2014) [Docket No. 355]; *In re Namco LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr.

12, 2013) [Docket No. 124] (authorizing store closing sales without the necessity of compliance

with any lease provision); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS)

(Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No

09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No.  81] (same); *In re Tweeter Home*

*Entm't Grp., Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same);

*In re Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

      67.     Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the retail store locations, the Debtors respectfully request that the Court invalidate such provisions and authorize the Debtors and/or the Successful Bidder to conduct the Store Closing Sales in accordance with the Sale Guidelines without interference by any landlords or other persons affected in any way, directly or indirectly, by the Store Closing Sales.

### 4.    *Store Closing Sales Should be Exempt from Federal, State, and Local Laws, Statutes, Rules and Ordinances Relating to Liquidations*

      68.     The Debtors operate their retail locations across numerous states that may have cumbersome state and local laws, statutes, regulations, rules and ordinances governing store closing, liquidation, or similar themed sales, that require long waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation (collectively, the "Liquidation Laws"). However, some state statutes provide that where a liquidation or bankruptcy sale is court authorized, then a company need not comply with such Liquidation Laws. *See e.g.*, Tex. Bus. & Com. Code § 17.91 (2004). Moreover, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies, and the Court has the authority, under section 105(a) of the Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary Liquidation Laws. *See generally Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) (noting that debtors have unique fiduciary and legal obligations pursuant to the Bankruptcy Code and that state statutes "cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

69.    Here, the Debtors' ability to use and sell the Merchandise pursuant to section 363 of the Bankruptcy Code, in order to maximize recovery for their estates and creditors, would be severely undermined if the Court does not provide for a waiver of the Liquidation Laws.  Courts in this and other Districts have routinely granted comparable relief. *See, e.g.*, *In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [Docket No. 355]; *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (authorizing store closing sales with waiver of federal and state "going out of business" laws); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No.  81] (same); *In re Tweeter Home Entm't Grp., Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

70.    Requiring the Debtors to comply with each state's applicable local Liquidation Laws would be extremely burdensome and adjudication of disputes with local authorities over the application and interpretation of local laws would be tremendously expensive for the estates.  Moreover, in the context of a bankruptcy proceeding, waiving compliance with Liquidations Laws is entirely appropriate as the Debtors and their Assets are subject to the Court's exclusive jurisdiction and the Court would be able to supervise and ensure proper conduct of the Store Closing Sales.  Additionally, governmental units and parties-in-interest will receive notice of this Motion and the opportunity to be heard on any objections.  Thus, the Debtors respectfully request that the Court expressly approve the Sale Guidelines and authorize

the Debtors and/or the Successful Bidder to conduct the Store Closing Sales without the added

costs and delay of complying with applicable local Liquidation Laws.

71.    The requested waiver is narrowly tailored to facilitate the successful

conduct of the Sale.  The Debtors are not seeking a general waiver of all state and local laws, but

only those specifically governing liquidation or similarly themed sales.  The Debtors fully intend

to comply with applicable state and local environmental, tax, employment, public health and

safety laws, and consumer protection laws (regulating deceptive practices), except as explicitly

set forth in this Motion.

### 5.    *Sale is Exempt from "Fast Pay" Laws and Regulations*

72.    Many states in which the Debtors operate also have laws and regulations

that require the Debtors to pay an employee substantially contemporaneously with his or her

termination (the "Fast Pay Laws").  In many cases, these laws require the payment to occur

either immediately or within a period of only a few days from the date such employee is

terminated.  The sweeping nature of the Sale contemplated by this Motion will result in a

substantial numbers of employees being terminated.  The Debtors' payroll systems might be

unable to process the payroll information associated with these terminations in a manner that will

be compliant with these state laws and regulations.

73.    As set forth above, the Bankruptcy Code preempts state and local laws

that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state

laws involved concern economic regulation rather than the protection of public health and safety.

74.    It will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Sale at the Closing Locations, this process could easily take several days.

75.    To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. However, if the Debtors are required to comply with these state laws and regulations, their efforts to wind-down their operations and stem unnecessary payroll costs could be hampered. If forced to comply, the Debtors could face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of the Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates. Both of these choices would provide no benefit to the Debtors' estates and would only increase the administrative costs of conducting the Sale.

76.    Accordingly, the Debtors respectfully submit that in this instance, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements. *See, e.g.*, *Loehmann's Holdings Inc.*, No. 13-14050 (MG) (waiving "fast pay" laws and regulations in connection with approval of store closing sales) [Docket No. 200] (Bankr. S.D.N.Y. Dec. 13, 2013); *Filene's Basement, LLC*, No. 11-13511(KJC) (same) [Docket No. 189] (Bankr. D. Del. Nov. 2, 2011).

## F.    **Other Related Relief**

### *1.    The Debtors Should be Authorized to Abandon Certain Property Following the Conclusion of the Store Closing Sales*

77.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

78.     Pursuant to the Agency Agreement, the Successful Bidder is authorized to sell Owned FF&E remaining in the retail store locations following the conclusion of the Store Closing Sales.  However, the Debtors (or the Successful Bidder) may determine that the costs associated with holding and/or selling certain property and/or Owned FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

79.     To maximize the value of the Debtors' Assets and to minimize the costs to the estates, the Debtors respectfully request authority for themselves and/or the Successful Bidder (in coordination) to abandon any of their remaining Owned FF&E or other property located at the retail store locations without incurring liability to any person or entity.  The Debtors further request that the landlords of each retail store location with any abandoned Owned FF&E or other property be authorized to dispose of such property without liability to any third parties.

2.      ***Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman***

80.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies as of the date of the commencement of the case, or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

81.    Pursuant to the Agency Agreement, the Successful Bidder will be permitted only to use the Debtors' customer lists when acting as the Debtors' agent and in connection with the Sale.  The Successful Bidder will be subject to reasonable restrictions by the Debtors in order to comply with the Debtors' privacy policy[8] and applicable laws governing the use and dissemination of confidential consumer personal data.  While the Debtors may sell or lease any personally identifiable information to the Successful Bidder, such transfer would be consistent with the Debtors' policies as of the Petition Date.  Therefore, appointment of a consumer privacy ombudsman is unwarranted.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

82.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the

---

[8] Among other things, the Debtors' privacy policy stated on the Petition Date: "Service Providers: We may disclose the information we collect from you [i.e. customers]to third party vendors, service providers, contractors or agents that perform functions on your behalf. These third parties have agreed to maintain the confidentiality, security and integrity of personal information and to only use it for the purposes for which they have been engaged by us.... Business Transfers: If we are acquired by or merged with another company, if substantially all of our assets are transferred to another company, or as part of a bankruptcy proceeding, we may transfer the information we have collected from you to the acquiring company." The Debtors' privacy policy is posted at http://www.cache.com/investor-relations#privacy-policy

> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale. *See* 11 U.S.C. § 363(n). Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith ... speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

83.    The Agency Agreement is a negotiated, arm's length transaction, in which

the Stalking Horse has acted in good faith, without collusion or fraud, and in compliance with the

*Abbotts Dairies* standards. The Stalking Horse is not an "insider" or "affiliate" of the Debtors as

those terms are defined in the Bankruptcy Code. Neither the Debtors nor the Stalking Horse has

engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy

Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the

consummation of the Transaction. In addition, if a party other than the Stalking Horse is the

Successful Bidder, the Debtors intend to make an appropriate showing at the Sale Hearing that

the purchase agreement with the other Successful Bidder is a negotiated, arm's length

transaction, in which the Successful Bidder at all times has acted in good faith under and

otherwise in accordance with such standards.

84.    The Debtors thus request that the Court find that the Stalking Horse or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assumed Contracts

85.    As discussed above, the Agency Agreement contemplates a process whereby the Debtors would shut down operation of their stores and the the Stalking Horse would liquidate the Merchandise and Owned FF&E, without assuming any of the Debtors' obligations under its retail store leases.  However, as discussed herein, the Debtors are also actively seeking participation by bidders interested in purchasing the Debtors' business as a going concern.  If the Successful Bidder at the auction seeks to purchase the business as a going concern (as opposed to a liquidation of the business) and contemplates assumption of the Debtors' retail leases, then the Debtors request authorization to assume and assign any executory contracts and unexpired real property leases as may be identified in the agreement with the Successful Bidder (the "Assumed Contracts")[9] to the Successful Bidder(s).

86.    Thus, if the Successful Bidder seeks to acquire the Assets on a going concern basis (and take assignment of certain of the Debtors' executory contracts), the Debtors propose approval of the assumption and assignment of Assumed Contracts to the Successful Bidder(s) upon the closing of the transactions contemplated under the applicable agreement and

---

[9]  The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Contract.

payment of the cure costs (the "Cure Costs"), which amounts, if any, are what the Debtors

believe are owed to each counterparty (each a "Counterparty," and collectively, the

"Counterparties") to an Assumed Contract in order to cure any defaults that exist under such

contract or lease.

       87.    If a contract or lease is assumed and assigned pursuant to the Court's order

approving same, then unless the affected counterparty properly files and serves an objection to

the Cure Costs and satisfies all its burdens on any such objection, the Counterparty will receive

at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs, with

payment made pursuant to the terms of the applicable asset purchase agreement, or the

agreement of the applicable Successful Bidder.

       88.    The Successful Bidder(s), on behalf of the Debtors, shall promptly pay or

cause to be paid the Cure Costs with respect to the Assumed Contracts, other than those Cure

Costs, if any, which are to be paid by the Debtors pursuant to the agreement with the Successful

Bidder(s).  The Successful Bidder(s) shall be responsible for satisfying any requirements

regarding adequate assurances of future performance that may be imposed under section 365(b)

of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts.

The Debtors propose that the Court make its determinations concerning adequate assurance of

future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy

Code at the Sale Hearing or in the case of any Assumed Contracts not assumed and assigned to

the Successful Bidder(s) at the Sale Hearing, at such other hearing to approve assumption and

assignment of such Assumed Contract to the Successful Bidder(s).  The Debtors request that

Cure Costs disputed by any Counterparty be resolved by the Court at the Sale Hearing or at such

other hearing to approve assumption and assignment of the relevant contract or lease.

89.     Except to the extent otherwise provided in the agreement(s) entered into

with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of any

Assumed Contracts will not be subject to any liability to the assigned contract or lease

counterparty that accrued or arose before the closing date of the sale of the Assets and the

Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k)

of the Bankruptcy Code.

90.     The Debtors further request that the Sale Order provide that the Assumed

Contracts will be assigned to, and remain in full force and effect for the benefit of, the applicable

Successful Bidder, notwithstanding any provisions in the Assumed Contracts, including those

described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such

assignment.

91.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

92.    Although section 365 of the Bankruptcy Code does not set forth standards

for courts to apply in determining whether to approve a debtor in possession's decision to

assume an executory contract, courts have consistently applied a "business judgment" test when

reviewing such a decision.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St.*

*Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Taylor*, 913 F.2d 102 (3d Cir.

1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).

Accordingly, assumption or rejection of any executory contract is appropriate where the

assumption or rejection would benefit the estate.  *Sharon Steel*, 872 F.2d at 40.   The assumption

and assignment of the Assumed Contracts, or any of them, to the extent it is a necessary part of

the proposed Sale will benefit the estates of the Debtors.

93.    As set forth above with respect to Assumed Contracts to be assumed and

assigned pursuant to the Sale, the Debtors will have sent notice of the Motion and a cure notice

in the form attached to the Motion as **Exhibit G** (the "Cure Notice") to all Counterparties to the

Assumed Contracts, notifying such Counterparties of the potential assumption by the Debtors

and assignment to the Successful Bidder(s) of the Assumed Contracts at the Sale Hearing.

94.     The Counterparties will have sufficient opportunity to file an objection to

the proposed cure costs (the "Cure Costs") set forth on the Cure Notice.  To the extent no

objection is filed with regard to a particular cure amount, such cure amount shall be binding on

the applicable contract or lease counterparty.  The payment of the Cure Costs set forth in the

Cure Notice (or a different amount either agreed to by the Debtors or resolved by the Court as a

result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final

satisfaction of all obligations to cure defaults and compensate the Counterparties for any

pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy

Code, unless the Debtors determine that a particular contract is not truly executory, and does not

need to be cured to transfer the Assets to the Successful Bidder or, alternatively, the Successful

Bidder subsequently elects not to have any Assumed Contracts assumed or assigned to it prior to

the Sale Hearing.

95.     The Stalking Horse Purchaser or other Successful Bidder is responsible for

providing evidence of "adequate assurance of future performance" to the extent required in

connection with the assumption and assignment of any Assumed Contracts.  The meaning of

"adequate assurance of future performance" for the purpose of the assumption of executory

contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction."

*See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also, e.g., In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean an absolute assurance that debtor will

thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985). If necessary, the Successful Bidder shall provide evidence of its ability to provide

adequate assurances to Counterparties at the Sale Hearing.

### Further Relief

96.     The Debtors request that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." As set forth above and in the Renzi Declaration, time is of the essence

and it is imperative that the Debtors be able to assume the Agency Agreement or, in the

alternative, enter into the Alternative Transaction Agreement, and commence the Store Closing

Sales on the timeline proposed. In order to maximize the value of the Assets and minimize the

estates' unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay

imposed by Bankruptcy Rules 4001(a), 6004(h) and 6006(d), to the extent that they apply, is in

the best interest of the Debtors' estates and stakeholders.

### Notice

97.     Notice of this Motion will be provided to: (a) the Office of the United

States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c)

the Debtors' prepetition and postpetition lenders; (d) counsel to the Stalking Horse; (e) all

landlords of the Closing Locations; (f) all applicable county and state consumer protection

agencies; (g) all applicable state attorneys general; (h) any potentially interested parties and (i)

parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of

the nature of the relief requested, no other or further notice need be given.

<u>**No Prior Request**</u>

98.    No prior motion for the relief requested herein has been made to this or

any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the forms annexed hereto as **Exhibits E** and **F**: (i) granting the Motion; and

(ii) granting such other and further relief as the Court deems appropriate.

Dated:  February 4, 2015          PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone:  302/652-4100
Facsimile:  302/652-4400
E-mail:      ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             jfried@pszjlaw.com
             crobinson@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in
Possession