**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------x
:
In re                               :       **Chapter 11**
:
                                 :       **Case No. 15-10172 (MFW)**
:
**CACHE, INC.,** *et al.,*[1]            :       **(Jointly Administered)**
:
           **Debtors.**           :
:
                                 :       Hearing Date: Feb. 23, 2015 at 12:30 p.m. (ET)
:       Obj. Due: Feb. 18, 2015 at 4:00 p.m. (ET)
:
:       Related to Docket Nos. 12, 13
------------------------------------------------------------------x

**COMBINED LIMITED OBJECTION OF MACERICH COMPANY, STARWOOD RETAIL PARTNERS LLC, THE FORBES COMPANY, THE RELATED COMPANIES, DEUTSCHE ASSET & WEALTH MANAGEMENT, G&I RETAIL CARRIAGE LLC, BOULEVARD INVEST, LLC, AND THE PRUDENTIAL INSURANCE COMPANY OF AMERICA TO (1) DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF; (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSINGS SALES AND (III) GRANTING RELATED RELIEF; AND (2) MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 FOR AUTHORIZATION TO:  (1) INCUR SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (2) USE OF CASH COLLATERAL; (3) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (4) GRANT ADEQUATE PROTECTION; (5) MODIFY THE AUTOMATIC STAY; AND (6) <u>SCHEDULE A FINAL HEARING</u>**

       The Macerich Company, Starwood Retail Partners LLC, The Forbes Company, The Related Companies, Deutsche Asset & Wealth Management, G&I Retail Carriage LLC, Boulevard Invest, LLC, and The Prudential Insurance Company of America (the "<u>Landlords</u>"), by and through their undersigned counsel, hereby files this combined limited objection (the "<u>Limited Objection</u>") to (1) Debtors' Motion For Orders (I)(A) Authorizing Entry Into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing (A)

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification npmber are: Cache, Inc. (8181); Cache of Las Vegas, Inc. (9821); and Cache of Virginia, Inc. (9725). The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

Sale of Assets and (B) Store Closings Sales And (III) Granting Related Relief [D.I. 13] (the "Sale Motion"),[2] and (2) Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 for Authorization to:  (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Use of Cash Collateral; (3) Grant Liens and Provide Superpriority Administrative Expense Status; (4) Grant Adequate Protection; (5) Modify the Automatic Stay; and (6) Schedule a Final Hearing [D.I. 12] (the "Financing Motion"), and respectfully represent as follows:

## I.    BACKGROUND FACTS

1.    Cache, Inc. and its affiliated co-debtors (collectively, the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on February 4, 2015.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§  1107(a) and 1108.[3]

2.    The Debtors lease retail space (the "Premises") from the Landlords pursuant to unexpired leases of nonresidential real property (individually, a "Lease," and collectively, the "Leases") at the locations (the "Centers") set forth in detail on Schedule A hereto.  The Leases are leases "of real property in a shopping center" as that term is used in Section 365(b)(3).  *See* In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

3.    On February 4, 2015, the Debtors filed the Sale Motion [Docket No. 13], which provides for a liquidation bid from a joint venture comprised of SB Capital Group, LLC and Tiger Capital Group, LLC (the "Agent") to act as the stalking horse bidder.  To the extent the successful bidder is a liquidation bid, Landlords do not object to a sale hearing taking place soon after the auction.  To the extent the successful bidder is a going concern bidder that is seeking the assumption and assignment of Leases, the schedule needs to be modified.  Landlords object to any request to approve the assumption and assignment of Leases without providing Landlords

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion, the Agency Agreement, and related documents.

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").

sufficient time to review adequate assurance of future performance information for the successful bidder, and to object if necessary, to the information provided or the proposed assignee. If the Debtors insist on a sale hearing the after the auction, it should only be a status conference with respect to issues of assumption and assignment of the Leases.

## II.    OBJECTION TO AUCTION SCHEDULE AND SALE MOTION

4.    The Debtors propose the following timeline for the auction process and final approval hearing:

- February 24 or February 25, 2015 – Deadline to submit qualifying bids.
- February 26, 2015 – Deadline to file and serve Cure Notice.
- February 26 or February 27, 2015 – Auction.
- TBD – Deadline to object to proposed cure/assumption and assignment of leases.
- March 3, 2015 – Store Closing/Transaction approval hearing.
- March 4, 2015 – Closing of Transaction.

5.    The Landlords do not object to the above schedule if a liquidator bid prevails. If a going concern bid prevails that seeks assumption and assignment of Leases, however, the procedures require modification. The Sale Motion does not provide a mechanism to give Landlords adequate assurance information, and provides no reasonable time for landlord objections. Any going concern sale process should provide the Landlords at least seven (7) days to review adequate assurance of future performance information prior to any objection deadline for the assumption and assignment of Leases. The schedule results in two business days to review and object to the proposed cures prior to the sale hearing. Landlords request that any sale hearing date serve as a status conference to set a further briefing schedule on issues relating to the assumption and assignment of Leases in the event of a successful going concern bidder.

6.    Fundamental concepts of due process require that "notice must be reasonably calculated to apprise interested parties of the pendency of an action and to afford them an opportunity to present objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). See also Sullivan v. Barnett, 139 F.3d 158, 171 (3rd Cir. 1998) (due process requires notice and a meaningful opportunity to be heard). The Court should ensure that Landlords have the opportunity to assess the ability of a successful bidder to perform under the

Leases, and if necessary, file a substantive objection based upon adequate assurance information, as well as conduct discovery and an evidentiary hearing on any contested assignment.[4]

**A.      *The Debtor must provide adequate assurance of future performance information prior to any objection deadline.***

7.      The Sale Motion and accompanying documents do not specifically require that Landlords receive any adequate assurance of future performance information.  The Sale Motion only states that Debtors will provide evidence of adequate assurance of future performance at the sale hearing, if necessary.  *See* Sale Motion at ¶ 95.  The failure to provide any evidence supporting adequate assurance of future performance prior to Landlord's deadline to object to a sale does not satisfy the requirements of Section 365(b), especially with respect to shopping center leases as discussed below.

8.      To satisfy the adequate assurance of future performance burden, Landlords must receive a minimum of the following information, and a reasonable time for its review:

(i)      the specific name of the proposed bidder, the proposed tenant that will act as the assignee, and the proposed name under which the assignee intends to operate the store;

(ii)     the potential assignee's intended use for the space;

(iii)    audited financial statements and annual reports for the past three (3) years, including all supplements or amendments thereto;

(iv)     cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, all cash flow projection for the Lease subject to the assignment request, and any financial projections, calculations and/or pro-formas prepared in contemplation of purchasing the Leases;

(v)      all documents and other evidence of the potential assignee's retail experience and experience operating in-line stores in a shopping center; and

(vi)     a contact person for the proposed assignee that Landlord may directly contact in connection with the adequate assurance of future performance.

9.      The above constitutes a non-exclusive list of the minimum information the Landlords will need to assess any potential assignee, and the Landlord reserves the right to request further information that it deems necessary to make an informed decision as to the ability of a potential assignee to satisfy the requirements of Section 365.

---

[4] To the extent the Sale Motion contemplates the assumption and assignment of the Leases, it initiates a contested hearing subject to Rule 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP").  See FRBP 6006(a).  Any evidentiary hearing will include witness testimony, and under FRBP 9014, the Court should establish procedures to provide parties a reasonable time to schedule an evidentiary hearing where witnesses will testify.  *See* FRBP 9014(e).  The Debtor does not establish a reasonable time to deal with evidentiary hearings relating to the assumption and assignment of Leases.

10.    The Debtors may not assume and assign the Leases unless there is adequate assurance of future performance under the Leases. 11 U.S.C. § 365(b)(1)(C); *see also* 11 U.S.C. § 365(f)(2).  The provision of adequate assurance of future performance is an affirmative duty of the Debtors, and the Debtors bear the ultimate burden of persuasion as to issues under Section 365.  See In re Rachels Industries, Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).  The obligation to comply with Section 365(b) and Section 365(f) is unaffected by maneuvering the assumption and assignment process through a sale under Section 363.  The Debtors cannot carry their burden under Section 365 without providing this information and, without receipt of such information, the Landlords cannot meaningfully assess the bona fides of any proposed assignee.[5]

11.    Landlords require at least seven (7) business days before any deadline to object to the assumption and assignment of the Leases to review and assess adequate assurance of future performance information for any proposed assignee.

**B.    *The Debtors must satisfy heightened adequate assurance under Section 365(b)(3).***

12.    The Leases are shopping center leases and, as such, the Bankruptcy Code requires more than the basic adequate assurance of future performance of the Leases under Section 365(b)(1)(C).  In re Sun TV and Appliances, Inc., 234 B.R. 356, 359 (Bankr. D. Del. 1999).  In order to assume and assign shopping center leases, the Debtor must satisfy the heightened requirements set forth in 11 U.S.C. § 365(b)(3)(A) - (D).  See Joshua Slocum, 922 F.2d at 1086; *see also* L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 299 (3d Cir. 2000).  The heightened adequate assurance requirements Debtors must satisfy under Section 365(b)(3) include the following:

- the source of rent and that the financial condition and operating performance of the proposed assignee and its guarantors, if any, must be similar to the financial condition and operating performance of the debtor and its guarantor(s), if any, as of the time the debtor became the lessee. See 11 U.S.C. § 365(b)(3)(A);

---

[5]  If the Landlords do not have sufficient information (or time) to make a determination as to a proposed assignee, or if the proposed assignee is unacceptable, the Landlords must object to the proposed sale and prepare for an evidentiary hearing.  In preparation of such evidentiary hearing, the Landlords must conduct expedited discovery, arrange for expert testimony, and file supplemental objections based upon the information gleaned from whatever information the Debtors actually produces.

- that any percentage rent due under the lease will not decline substantially. See 11 U.S.C. § 365(b)(3)(B);
- that assumption and assignment of the lease is subject to all provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach of any such provision in any other lease, financing agreement, or master agreement relating to such shopping center. See 11 U.S.C. § 365(b)(3)(C); and
- that assumption and assignment of the lease will not disrupt the tenant mix or balance in the shopping center. See 11 U.S.C. § 365(b)(3)(D).

13.    This heightened adequate assurance of future performance determination must be satisfied in connection with an assumption and assignment under Section 365(f)(2)(B). Sun TV and Appliances, Inc., 234 B.R. at 370.  In connection with the heightened adequate assurance requirement for shopping center leases, courts require a specific factual showing through competent evidence to determine whether the Debtor has provided adequate assurance of future performance.  Matter of Haute Cuisine, Inc., 58 B.R. 390, 394 (Bankr. M.D. Fla. 1986).  The Sale Motion does address this heightened requirement, and the Debtors must provide adequate assurance information to the Landlords that satisfies this heightened requirement.

## C.    *The cure procedure requires modification.*

14.    Landlords do not object to a reasonable cure procedure.  Any expedited process, however, must protect Landlords with legitimate claims against the Debtors and not impose an unreasonable burden on Landlords to preserve such claims. The two-day period that results from the proposed timeline is not sufficient.  In addition, the Debtors should serve the Cure Notice on Landlords' counsel of record where known and/or filed on the docket, as debtors frequently send such notices to an incorrect address or lock-box address where rent payments are transmitted. Therefore, these notices may not be timely received by the Landlord.

15.    Moreover, the procedure should require Debtors to pay all undisputed cure amounts upon the entry of a sale order, regardless of whether there is a pending cure objection.

16.    Finally, any order approving the sale must provide for the payment of all charges due under the Leases, including charges which have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods. Any assumption and assignment of the Leases cannot cut off the Landlords' right to recover unbilled charges that have accrued, or are accruing, under the Leases.  The Debtors must cure all existing defaults and compensate Landlords for any actual

pecuniary loss as a result of those defaults in order to assume the Leases under Section 365(b). *See* 11 U.S.C. § 365(b)(1)(A) and (B). This principle is well-recognized. See Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989). These obligations are payable immediately by Debtors or successful bidder. In re Tandem Group, Inc., 60 B.R. 125 127 (Bankr. C.D. Cal. 1986) (citing In Matter of Condominium Administrative Services, Inc., 55 B.R. 792 (Bankr. M.D. Fla. 1985)).

**D.     *Any assumption and assignment must comply with the terms of the Leases.***

17.     Through the BAPCPA[6] amendments, "Section 365(f)(1) is amended to make sure that all of the provisions of Section 365(b) are adhered to and that 365(f) of the code does not override Section 365(b)." Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005). The BAPCPA clarified Section 365 to reflect the Congressional intent that the language of Section 365(f), and any ability to assume and assign the Leases, is subject to the protections of Section 365(b)(1) and (3). It does not modify Section 365(b). Trak Auto Corp. v. West Town Ctr. LLC (In re Trak Auto Corp.), 367 F.3d 237, 243-44 (4th Cir. 2004) (bankruptcy courts could not use the general anti-assignment provision of Section 365(f)(1) to trump the specific protections granted to landlords in Section 365(b)(3)(C)). Therefore, any assignment must remain subject to all provisions of the Leases, including but not limited to those provisions concerning use, radius, exclusivity, and tenant mix and balance.

**E.     *Any sale must not be free and clear of obligations to pay all charges due under the Leases, including unbilled year-end adjustments and reconciliations.***

18.     The Sale Motion seeks authority for the sale the leases free and clear of liens, claims and encumbrances. See Sale Motion at ¶¶ 55 - 64. The Landlords object to any sale free and clear of the obligations to satisfy unbilled taxes, reconciliations, percentage rent, or other year-end adjustments or unbilled charges that may have accrued under the Leases prior to the assignment of the Leases, but which have not yet been billed. The Debtors continues to be responsible for all such unbilled charges as they come due under the Leases, and the Debtors, the

---

[6]  On October 17, 2005, the Bankruptcy Abuse Prevention And Consumer Protection Act of 2005 (the "BAPCPA") went into effect, clarifying, *inter alia*, the protections that Landlords are entitled to under 11 U.S.C. § 365.

Stalking Horse Bidder, or any other Successful Bidder must continue to satisfy all charges due under the Leases, including charges which have not yet been billed, reconciled and/or adjusted from pre-petition (or even post-petition) periods. Any assumption and assignment of the Leases cannot cut off the Landlords' right to recover unbilled charges that have accrued, or are accruing, under the Leases. If the sale is not subject to these reconciliation and adjustment claims, it is unlikely that these legitimate lease charges will get paid to the Landlords.

19.     Finally, the Leases provide that the Debtors must indemnify and hold the Landlords harmless with respect to any existing claims which may not become known until after the assumption and assignment of the Leases, examples of which may include such claims as personal injuries at the Premises and damage to the Premises or Centers by the Debtors or their agents. Any order approving the assumption and assignment of the Leases must provide that the assumption and assignment is pursuant to the terms of the Leases, including that any assignee continues to be responsible for all such indemnification obligations, regardless of when they arose. In the alternative, the Debtors must provide (by insurance or otherwise) that it can satisfy the indemnification obligations under the Leases for any such claims that relate to the period prior to any assumption and assignment of the Leases.

## III.     OBJECTION TO PROPOSED STORE CLOSING SALE AND GUIDELINES

### A.     *Any final sale guidelines must balance the rights of the Debtors and Landlords.*

20.     Landlords do not seek to deny the Debtors' ability to conduct reasonable sales of their inventory. The Landlords do object to the Sale Motion's request for a blanket invalidation of lease terms and local laws that restrict such sales. This blanket denial of reasonable restrictions on store-closing activities, as specifically negotiated in the Leases and as permitted under state law, is unnecessary, inappropriate, and inconsistent with Sections 363 and 365. Landlords typically reach agreements with liquidators that govern the manner and method of advertising and signage at the Centers. Landlords believe they will reach a similar agreement with any successful liquidator in these cases. Pending finalizing such agreement, the Sale Motion and Agency Agreement contain provisions that are objectionable to Landlords, requiring

- 8 –

Landlords to object to the Sale Motion, Agency Agreement, and proposed sale guidelines (the "Sale Guidelines"), and request that this Court incorporate the protections and modifications below.

21.    The Debtors cite various cases to support their request to conduct store closing sales without regard to restrictions that exist in the Leases.  None of these cases support the position that any lease restriction of store closing sales is unenforceable.  In *In re Ames Department Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992), the Bankruptcy Court held that an outright attempt to preclude store closing sales "would contravene overriding federal policy requiring a [debtor in possession] to maximize estate assets by imposing additional constraints never envisioned by Congress."   Nonetheless, the Bankruptcy Court also recognized the competing interests at play between a shopping center and a retail debtor, and held:

> "That is not to say the Code abrogates all lease provisions and statutes conditioning GOB sales.  Section 363(e) reserves for bankruptcy courts the discretion to condition the time, place and manner of GOB sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the [Debtor] to fulfill its fiduciary obligations."

*Ames Department Stores, Inc.*, 136 B.R. at 359.  *Ames* does not hold that all lease provisions restricting store closing sales are unenforceable, nor does it authorize the wholesale abrogation of lease restrictions and statutes conditioning such sales.  Rather, it holds that a court has discretion to fashion an order to adequately protect the interests of all parties under Section 363(e).

22.    Other cases that the Debtors cite do not support the wholesale invalidation of lease provisions restricting store closing sales.  *See In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Pa. 1982) (finding that the purpose of restrictive clauses in leases may be preserved by Bankruptcy Court supervision of GOB sales); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (rendering unenforceable provisions prohibiting GOB sales).   In all cases cited by the Debtors, the Court authorized the store closing sale subject to negotiated store closing guidelines, as well as separate side letter agreements between landlords and liquidators.

23.    Rather than simply nullify all lease provisions restricting store closing sales, courts fashion guidelines and orders to adequately protect the interests of all parties under Section

363(e).  Language that purports to render unenforceable any "restrictive provision" of a lease or state laws allowing restrictions on liquidations is inappropriate.  Such language goes beyond any appropriate relief provided by the Bankruptcy Code, or applicable case law, and the Court should strike such language from any final order.

24.    This is consistent with section 365(d)(3), which provides special protections to commercial landlords (and especially shopping center landlords) in light of the unique interests of shopping center landlords and other tenants.  Specifically, Section 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in Section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such time as the lease is assumed or rejected, . . .

11 U.S.C. § 365(d)(3)

There is a clear policy to preserve the rights of Landlords under their Leases, and Debtors do not need to render legitimate provisions of the Leases unenforceable to conduct closing sales.  Until such time as the Landlords can negotiate appropriate agreements with the successful bidder at the auction, Landlords object to the Sale Motion, Sale Guidelines and Agency Agreement.

**B.      The Court should modify the proposed Sale Guidelines.**

25.    A store closing sale or liquidation detrimentally impacts the Centers, as well as the surrounding individual tenants.  Shopping center tenants bargain for a certain environment as part of their decision to lease space in the Centers, and all tenants agree to abide by similar rules regarding sales and signage to protect this environment.  To protect Landlords and other shopping center tenants, any order approving store closing sales should require the Debtors to comply with all terms of the Leases, except as modified by any Court-approved sale guidelines and any agreements between Landlords and the liquidator.  In addition to the protections set forth in the proposed Sale Guidelines, and except to the extent that parties enter into a separate agreement for the store closing sales, Landlords seek the following additional changes to protect them and other neighboring tenants from the detrimental effects of the store closing sales.

Case 15-10172-MFW    Doc 129    Filed 02/18/15    Page 11 of 19

*(i)    Scope and duration of sales*

26.    The proposed Sale Guidelines provide that stores will remain open "no longer than normal operating hours" during the store closing sales.  *See* Sale Guidelines at ¶ A.  The Leases require specific hours of operations, and the Debtor must adhere to the mandated operating hours for each Center.

27.    The Agency Agreement provides for the augmentation of the sale with non-debtor inventory.  *See* Sale Guidelines at ¶ K; Agency Agreement at § 8.9.  It is critical for Landlords to maintain the proper use and product balance required under the Leases.  Introduction of non-debtor inventory potentially violates the use clauses and exclusivity provisions in the Leases, as well as other leases in the Centers.  Even if the Debtors and Agent represent that the goods will be of "like kind and quality," augmentation potentially violates the Leases and state consumer protections laws.  Landlords should not bear the risk of such violations.   At a minimum, any augmentation must be of "like kind and quality" that does not violate the use provisions of the Leases, or any exclusives of other shopping center tenants, and the Debtors must indemnify Landlords against liability for violation of consumer protection laws.

*(ii)    Advertising and signage*

28.    The Sale Guidelines and Agency Agreement do not adequately limit the extent of the proposed signage or advertising to be used in connection with the store closing sales at the Centers.  *See* Sale Guidelines at ¶ F. The Debtors cannot ignore the legitimate signage rules that exist in the Leases and for the Centers, as well as legitimate liability and safety concerns, to the detriment of Landlords, other tenants, and the shopping center environment. The Leases' were negotiated at arm's length, and Debtors should not receive carte blanche to breach these agreements, while enjoying all of the benefits provided by the Leases.  Any store closing sale should limit signage as follows:

a.    The Debtors shall be allowed to place one window sign per window that is 36" x 60", and in no event to exceed 50% of the window total area, and which sign is recessed at least 12" inches from the glass.  Signs must not be stapled, taped or otherwise affixed together to exceed the 36" x 60" limitation.

- 11 –

b.     The Debtors may place five (5) additional signs that are no more than 40" x 28" at appropriate locations throughout the store, provided that theses interior signs shall not be visible from the doors or windows of the store. No other signs should be taped, push-pinned, or otherwise affixed to the walls of any store. No interior banners shall be used.

c.     All signs shall be professionally produced and lettered. No neon or "day-glo" colors shall be used in the signage. Unless a center manager agrees in writing to a different signage package, the Debtors should agree that they will only use three-color signage produced on white background.

d.     The Debtors and the Agent should have no right to place banners of any kind at the Premises or Centers. Banners detract from the appearance of the Premises and Center, and the Court should not permit such banners at the Centers, regardless of whether the Centers are enclosed and non-enclosed. This differentiation is inappropriate, and the case law does not support treating a shopping center differently merely because it is not completely covered by a roof. *Joshua Slocum*, 922 F.2d at 1087-88; *In re Sun TV and Appliances, Inc.*, 234 B.R. 356, 370 (Bankr. D. Del. 1999) (a shopping center for purposes of Section 365(b)(3) may go beyond the traditional "shopping center" and that all shopping centers do not necessarily take the form of shopping mall), *citing Joshua Slocum*, 922 F.2d at 1087. A non-enclosed shopping center relies on its use and signage provisions to control the appearance of the shopping center just as an enclosed shopping center does, and should not be subject to any lesser protections in any final store closing procedures.[7] The exterior of the Premises is part of the common area and not property of the Debtors, and any attempt to utilize such space is an improper taking by the Debtors and should not be permitted. If the Court permits any exterior banner, it should be limited to a single exterior banner on stand-alone stores, where the store front faces a public street, and which banner is limited to the size the Debtors' existing sign for that store. In addition, any damage caused by hanging such banner must be borne by the Debtors and/or Agent.

29.     To the extent used, "toppers" should not exceed 7 ½ inches by 11 inches, and should be limited to one for each rack, counter or shelf.

30.     Any final Sale Guidelines should also limit the content of signage used to advertise the store closing sales. Landlords do not object to the use of the term "Store Closing Sale" in advertising the sales. Landlords do object to the use of such terms as "Going Out of Business" and "Total Liquidation Sale" as such advertisement is confusing to shopping center customers.

---

[7]   Additionally, many newer shopping centers fall into the "hybrid" shopping center model where the shopping center is not contained under a single roof. The fact that some shopping centers are not roofed, does not make them non-enclosed, it just means that they are located in climate that does not require insulation from the elements. These shopping centers, often known as village or lifestyle centers, are enclosed in every meaningful way in that all store fronts are enclosed within the mall and face the interior of the mall rather than the street. Landlords are aware of no authority that defines an enclosed mall as having a roof. Rather than differentiate guidelines between enclosed and non-enclosed shopping centers, risking potential delay and litigation with respect to "hybrid" centers, the Court should not allow banners at any of the Centers.

Additionally, signage should not contain language such as "court ordered sale," "bankruptcy sale," "Chapter 11 sale," "everything must go," or "lost our lease."

31.    Any final Sale Guidelines must also prohibit the Debtors from using tethered, hot-air or other balloons, inflatable images or devices, sandwich boards, A-frames, sign walkers, exterior banners or rooftop advertising of any kind in or around the Premises or Centers. Similarly, no flashing lights, strobe lights, large spotlights, vehicle advertising, bullhorns or any type of amplified sound should be used in any advertising, especially outside the lease line of the Premises. In addition, there should be no distribution of handbills, leaflets, or other written materials outside the Premises, or other advertising on Landlords' property. The Debtors do not lease space outside of the lease line of the Premises. The Debtors have no interest in any common area space, and they have no right to advertise in the common area of the Centers. Such signage and advertising is not customary in the Centers, risks liability to Landlords, is prohibited by the Leases' and Centers' requirements, and in many cases, by state and local laws.

32.    Finally, there shall be no fire sales, auction of inventory and outside sales, sidewalk sales, tent sales, or any sale of any merchandise outside the stores. No such auctions or sales are permitted under the Leases, or customary in the Premises or Centers.

33.    The Sale Guidelines should strike a balance between the interests of the Debtors, Landlords, and non-debtor tenants. Landlords are entitled to full performance under the Leases, and Debtors must tailor their sales to fit within the terms of the Leases as much as possible. The Court should not permit Debtors to compromise the interests of non-debtor tenants who must continue to comply with all signage and other restrictions in their leases. Landlords have a primary interest in maintaining an aesthetic appearance in the shopping center for the benefit of all tenants, especially during the holiday season. Signage limitations are critical to maintaining the desired appearance and environment and reasonably restrict any store closing sale.

    (iii)    *Reports of sales and compliance with Lease terms*

34.    The stores must provide sales reports to Landlords as required by the Leases. Rent and charges must be paid in advance for each month as required by the Leases, and any order

should require that the Debtors meet all monetary obligations as they fall due under the Leases, and otherwise timely perform all obligations under the Leases.

*(iv)     Written notice of conclusion of store closing sale*

35.   The Debtors should provide the Landlords and counsel seven (7) days advance written notice of the conclusion of the sale for each store.

*(v)      Center gift cards*

36.   Landlords offer center gift cards that are typically honored in all the stores in a Center, or even in all centers owned by Landlords.  The Agent should place conspicuous signs to this effect in the cash wrap area of a closing store.

*(vi)     Indemnity for violations caused by store closing sale*

37.   The Debtors seek authority to take actions regardless of local laws or ordinances. To the extent that the actions of the Debtors, or their respective employees or agents, in conducting the store closing sales cause Landlords to be cited or fined by any local or state authority or agency, the Debtors or Agent must indemnify and hold the Landlords harmless from any such damages as an administrative expense of the bankruptcy estate.[8]

*(vii)    FF&E*

38.   The Debtors also seek to sell furnishings, fixtures and equipment ("FF&E").  *See* Sale Guidelines at ¶ J.  Such sale cannot include FF&E that is property of Landlords or becomes property of Landlords under the Leases.  The Sale cannot include the auction of FF&E in any store.  If FF&E is sold, it should not be removed from the stores until the store closing sale has concluded, and then only after shopping center hours, through a non-public access area, and after the store-front is covered or "dressed."

*(viii)   Condition of stores*

39.   Debtors and Agent cannot make any alterations to the stores, including the storefront or walls of any of the stores, except for placing signage in compliance with the final

---

[8] Any final order should be modified to provide that the Landlords will be indemnified to the extent any liability is imposed on Landlords resulting from the conduct of the Debtors or Agent relating to the store closing sales. Landlords should receive notice of any such disputes that affect their Centers, so Landlords can confirm that they are not held liable for any conduct of the Debtors or Agent related to the store closing sales.

Sale Guidelines and any separate agreement. Debtors must keep the Premises and surrounding area clear and orderly consistent with present practices. Landlords shall have access to the store to conduct a walk-through upon the completion of any store closing sale and to dress store windows, if necessary, to minimize the appearance of a dark store. Any such dressing shall not be deemed to be an acceptance by the respective Landlords of surrender of the Premises, and a Lease shall only be deemed rejected in accordance with this Court's order.

40. The above modifications are necessary and appropriate to protect Landlords' interests and those of the other tenants at the Centers that are impacted by the store closing sales. Except as modified by the final Sale Guidelines, or any separate agreement between the Debtor, the Agent, and Landlords, the Debtors must comply with all other provisions of the Leases.

C.    ***Debtors must timely pay all lease obligations due under the Leases, including stub rent.***

41. The Leases require payment of all charges due under the Leases, <u>when such charges</u> <u>accrue</u>. Section 365(d)(3) conditions Landlords' duty to perform on the payment of all post-petition obligations under the Leases, when such obligations accrue. *See In re Pacific-Atlantic Trading Co.*, 27 F.3d 401, 403 (9th Cir. 1994). The Debtors must pay all such obligations and ensure that monthly monetary obligations under the Leases are paid, and Debtors must continue to timely perform all obligations under the Leases during any store closing sale until the Leases are assumed and assigned, or rejected, regardless of any provision of the Agency Agreement.

## IV.    DEBTORS SHOULD PAY STUB RENT FOR THEIR USE OF THE PREMISES.

42. There is a real prospect of administrative insolvency in these cases. The Debtors have not paid Landlords their post-petition February "stub rent" from February 4 – February 28 for the Leases, and the proposed budget in the Financing Motion does not provide payment of stub rent, putting Landlords in the position of providing the Debtors with an involuntary, interest-free loan. The Debtors will receive the majority of the proceeds of these cases in conjunction with the approval of the final sale order approving the appointment of the liquidator, or close of any alternate sale transaction. If stub rent is not paid from the proceeds of the sale, it is unlikely that Landlords will get paid for the Debtors' post-petition use and occupy of the

Premises during the stub rent period.  The Debtors are currently operating their stores and generating post-petition sales for the benefit of their lender, which is an actual and necessary cost of preserving the Debtors' estates. Landlords object to the release of any final sale proceeds, and any request in the Financing Motion that seeks a waiver of 506(c) claims.

43.    The Bankruptcy Code is not served by allowing the Debtors and their lenders to avail themselves of the protections of the Bankruptcy Code without paying for post-petition use of the Premises. Instead, depriving Landlords of the specific right to post-petition payment set out in the Bankruptcy Code, ignores clear legislative intent. The Court should not allow the store closing sales to commence until the Debtors commit to payment of all post-petition rent and charges, including stub rent. If the Debtors want to use the Premises to run a sale to pay their lender, they need to pay the post-petition cost of their use.

44.    Where an estate may be administratively insolvent, the court may provide Landlords with adequate protection under Section 363(e).  *See In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 819 (3d Cir. 2010). In such circumstances, it is appropriate for adequate protection to take the form of immediate cash payments for post-petition use of the Premises. *See* 11 U.S.C. § 361; *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002). Where there is a significant likelihood of administrative insolvency, as here, simply allowing an administrative expense claim for Stub Rent will not adequately protect Landlords. *See* 11 U.S.C. § 361(3).  Only the payment of stub rent will adequately protect Landlords, and the Court should require Debtors to pay Stub Rent as adequate protection for the continued use of the Premises.

45.    In addition, the Court may require payment of stub rent under Section 506(c), which provides that a trustee or debtor in possession may recover from property securing an allowed secured claim the "reasonable, necessary costs and expenses of preserving or disposing of, such property to the extent of any benefit to the holder of such claim …." 11 U.S.C. § 506(c); *In re Visual Ind., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995).  The premise underlying Section 506(c) is that the unsecured creditors should not be required to bear the costs of preserving a secured creditor's collateral.  *See In re Evanston Beauty Supply Inc.*, 136 B.R. 171, 175 (Bankr. N.D. Ill. 1992).

"Ample case authority exists which permits lessors to recover under Section 506(c) provided that the standards for recovery are met." *In re World Wines, Ltd.*, 77 B.R. 653, 658 (Bankr. N.D.Ill.1987). Standards for recovery are that the services were necessary and beneficial to the lender. *Visual Ind., Inc.*, 57 F.3d at 325. The post-petition use of the Premises is necessary and beneficial to generating sales for the Debtors.

46.     The Premises are being used to sell the secured lenders' collateral, and the post-petition use of the Premises allows for the continuing operations of the Debtors to sell their inventory for the lenders' benefit. The stub rent costs owing to Landlords are reasonable and necessary to the preservation and disposal of lender's collateral and provides a direct benefit to lender. Without it, the Debtors and their lenders would have to find another location to store and liquidate the inventory (likely at a diminished price), and pay costs associated with removing the inventory and finding another location. Moreover, allowing the lenders access to storage and preservation of collateral at no cost would "result in a windfall benefit to the secured creditor to the detriment of a third party." *In re So Good South Potato Chip Co.,* 116 B.R. 144, 146 (Bankr. E.D. Mo. 1990*)*. Based on the above, the Court should require the payment of stub rent for the preservation of lender's collateral under Section 506(c), and deny any request for such waiver in the Financing Motion until stub rent is paid.

## V.     APPROVAL OF A BACK-UP BIDDER REQUIRES A FURTHER HEARING

47.     The Sale Motion proposes that the in the event the successful bidder does not close on the sale, then the sale to the back-up bidder may be approved without further hearing or Bankruptcy Court order. This is inappropriate. In the unlikely event that the successful bidder drops out after the Sale Hearing, there will need to be some amount of time for Landlords to make a determination as to ability of the back-up bidder to provide adequate assurance of future performance, and object, if necessary. In the event there are objections to the back-up bidder, the Court should schedule a separate objection deadline and hearing to address any issues concerning the assumption and assignment of the Leases by the back-up bidder.

## VI. **RESERVATION OF RIGHTS TO RAISE FURTHER OBJECTIONS**

48.     The Landlords reserve the rights to amend or modify the Objection once the results of the auction become known.  Additionally, this Objection is without prejudice to Landlord's ability to raise further objections at the Sale Hearing and the Landlords reserve all rights to: (i) raise all objections to any request to assume and assign the Leases on any grounds, including objections based upon adequate assurance of future performance and the proposed use for any Premises; (ii) object to the form of any asset purchase agreement, agency agreement, or other document executed by the Debtors and the successful bidder; (iii) raise additional objections at this, or any further, sale hearing; (iv) raise all objections in connection with any attempt by the Debtors to designate any of the Leases; (v) require any attempted assignment to comply with all terms of the Leases, and (vi) to seek to continue the Sale Hearing

49.     To the extent consistent with the objections expressed herein, Landlords also join in the objections of other shopping center lessors to the Debtors' proposed relief.

## VI. **CONCLUSION**

The Court should require the payment of Stub Rent as part of any order approving the Sale and/or Financing Motion.  In addition, the Court should continue any request to assume and assign the Leases at the Sale Hearing to provide Landlords with adequate assurance of future performance information, as well as adequate time for the Landlord to assess such information. The Landlords also requests that the Court incorporate the modifications raised by this Objection, and grant such further relief as the Court deems proper.

Dated:  February 18, 2015
Wilmington, Delaware

Respectfully submitted,

*/s/ Leslie C. Heilman*
Leslie C. Heilman, Esquire (No. 4716)
Matthew G. Summers, Esquire (No. 5533)
BALLARD SPAHR LLP
919 Market Street, 11th Floor
Wilmington, DE  19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  heilmanl@ballardspahr.com
             summersm@ballardspahr.com

and

KATTEN MUCHIN ROSENMAN LLP
Dustin P. Branch (SBN:  174909)
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4400
Facsimile: (310) 788-4471
E-mail:  dustin.branch@kattenlaw.com

*Attorneys for Landlord Creditor The Macerich Company,
Starwood Retail Partners LLP, The Forbes Company,
The Related Companies, Deutsche Asset & Wealth
Management, G&I Retail Carriage LLC, Boulevard
Invest, LLC, and The Prudential Insurance Company of
America*