IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>CACHÉ, INC., *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No.: 15-10172 (MFW)<br>(Jointly Administered)<br><br>**Related D.I.: 13** |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ORDERS (I)(A)
AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING
PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION
AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE
THEREOF; (II) (A) SALE OF ASSETS AND (B) STORE CLOSING SALES
AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Caché, Inc., *et al.* (the "Debtors"), by and through its undersigned proposed counsel, submits this limited objection to the *Debtors' Motion for Orders (I)(A) Authorizing Entry Into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* [D.I. 13] (the "Motion" and the Committee's objection thereto, the "Limited Objection"). In support of the Limited Objection, the Committee respectfully represents as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Caché, Inc. (8181); Caché of Las Vegas, Inc. (9821); and Caché of Virginia, Inc. (9725). The location of the Debtors' headquarters and the service address for each of the Debtors is 256 W. 38th Street, New York, NY 10018.

{BAY:02663783v1}3590537.5

## PRELIMINARY STATEMENT[2]

1.  Although the Committee was formed just seven days ago and has been working around the clock to get comfortable with, among other critical matters, the proposed sale milestones for the receipt of Bids, the Auction and the Sale Hearing – the Committee believes that the proposed sale milestones are extremely aggressive and seem to fast track this case towards a Stalking Horse Agreement that includes a variety of objectionable provisions. To be clear, however, the filing of this Limited Objection is not intended to abort the proposed sale process or the Stalking Horse Agreement, but rather is intended to seek clarification of certain provisions of the Stalking Horse Agreement and modification of others, including the proposed Bid Protections and Bid Procedures. In addition, and for the avoidance of doubt, the Committee does not believe the Court should approve this Motion or the Stalking Horse Agreement absent the material modifications to the *Debtors' Motion Interim and Final Orders Pursuant to 11 U.S.C.§§ 105, 361, 362, 363, 364 and 507 for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Use Cash Collateral; (3) Grant Liens and Provide Superpriority Administrative Expense Status; (4) Grant Adequate Protection; (5) Modify the Automatic Stay; and (6) Schedule a Final Hearing* [D.I. 12] (the "DIP Motion") that are set forth in the Committee's separately filed objection to the DIP Motion.

## JURISDICTION

2.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to such terms in the Motion or the Agency Agreement (also referred to herein as the "Stalking Horse Agreement").

3590537.5
{BAY:02663783v1}

3.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On February 4, 2015 (the "Petition Date"), the Debtors filed the Declaration of Anthony DiPippa in Support of the First Day Motions (the "DiPippa Declaration") [D.I. 3]. The factual background with respect to the Debtors' operations, capital structure and prepetition activities is set forth in the DiPippa Declaration and are fully incorporated herein by reference.

5.      On the Petition Date, the Debtors filed the Motion with certain exhibits, including the declarations of Daniel Shea (the "Shea Declaration") in support of the Motion and the declaration of Mark Renzi (the "Renzi Declaration" and together with the Shea Declaration, the "Declarations) in support of the Motion. Certain other exhibits, including the Merchandise Ceiling and Threshold Adjustment schedule, the Merchandise Aging Schedule and the Cost Factor Adjustment Schedule were only made available to the Committee's proposed financial advisors on February 17, 2015.

## LIMITED OBJECTION

**A. The Proposed Sale Milestones are Unduly Compressed**

6.      Pursuant to the Stalking Horse Agreement, which is subject to higher and better offers, the Debtors will receive $0.82 of the Cost Value of the Debtors' Merchandise (which appears low based on a review of various comparable agency agreements by the Committee's proposed financial advisor) and either a 20% commission or a lump sum payment, subject to negotiation, for the sale of the Owned FF&E.

7.      It is estimated that the aggregate Cost value of Merchandise will be between $13.5 million and $15 million, which would generate approximately an

estimated $11 million to $12.3 million for the estate (the "Guaranteed Amount").  No estimate is provided for Owned FF&E proceeds, but experience suggests that such proceeds will be *de minimis.*  Based on these estimates, which do not take into account any potential downward adjustments, it does not appear that the Stalking Horse Bid will result in sufficient proceeds to provide for payment in full of the proposed debtor-in-possession financing and the asserted prepetition secured debt (together up to $22 million), let alone all administrative expenses and a distribution to general unsecured creditors.  As such, absent an auction with active bidding, the Debtors' estates may be administratively insolvent.  Thus, it is absolutely critical to have a process that will enhance the likelihood of a vigorous auction - one that will hopefully include going concern bids.  For that to be likely, more time is needed for parties to conduct due diligence and prepare and submit Qualified Bids.

8. Notwithstanding the need for a more fulsome process, the Debtors currently propose that: (a) Bids be submitted by February 26, 2015, just three days after the Bid Procedures would ostensibly be approved; (b) the Auction be held on March 2, 2015; and (c) the Sale Hearing be held on March 3, 2015.

9. The Committee understands that there may be other parties interested in making offers for the Debtors' assets as a going concern, or for their inventory, Owned FF&E, intellectual property, and/or other assets.  While the Committee does not wish to unduly delay the sale process due to, among other things, the attendant administrative expenses that the estate would incur (which is problematic considering that it does not appear that all administrative expenses can be paid even on the current timetable), the currently proposed sales process is inappropriately compressed and will likely inhibit

possibly interested parties from preparing and submitting a Qualified Bid (be it a going concern bid or otherwise).

10. With those concerns in mind, the Committee submits that the timeline for the proposed sales process should be extended by a few days to provide potentially interested parties a reasonable opportunity to participate in the process, while at the same time not incurring substantially more administrative expenses. This can be accomplished by adjusting the deadline for submission of Qualified Bids to March 3, 2015, the Auction Date to March 4, 2015; and the Sale Hearing to March 6, 2015,[3] subject of course to the Court's availability. The Committee believes that this is a reasonable request that balances the interest of both the Debtors' stakeholders and potentially interested parties.

### B. Bid Protections and Break-Up Fee

11. The proposed Break-Up Fee, Expense Reimbursements and overbid protections are too high and will chill bidding. Furthermore, as set forth below, the Break-Up Fee is not necessary and should be eliminated in its entirety.

12. Pursuant to the Stalking Horse Agreement the Agent would be entitled to the following fees, expenses reimbursements and other protections:

| Fees and Bid Protections | Amount |
|---|---|
| Break-Up Fee | $225,000 |
| Cash Expense Reimbursement | Up to $100,000[4] |
| Signage Costs | Up to $325,000[5] |
| Reimbursement of Written Commitments | Up to $375,000 |
| Overbid | 1% of the Cost Value of the |

---

[3] If the winning Bid is a going concern bid, then more time will be needed between the Auction and the Sale Hearing in order to provide landlords sufficient time to evaluate and object to adequate assurance and cure information.

[4] The proposed Expense Reimbursement includes fees, expenses and costs incurred by third parties. Such costs might include the cost of capital, which is wholly inappropriate considering the capital costs the Debtors' may incur with respect to the their proposed DIP Financing.

[5] The proposed signage reimbursement costs are particularly troubling as they are extremely high and may provide no benefit to the estate, if, for example, a going concern Bid is the winning Bid.

|  | Merchandise (estimated $135,000-$150,000), plus the Break-Up Fee, plus the Cash Expense Reimbursement, plus the Signage Costs, plus the reimbursement of written commitments |
|---|---|
| Total Overbid Cost | $1.16M-$1.175M |
| Approximate Agent's Fee | $2.3M-$2.7M |

13. Based on the foregoing, for a Qualified Bidder to have a higher Bid than the Agent, it would need to offer approximately $1,160,000 to $1,175,000 more than the Guaranteed Amount. Given the potential administrative insolvency of this estate, the Overbid amount is unduly high and may cause potentially interested parties to walk away from the process, which is something this estate cannot afford.

14. In addition to the Committee's concerns with the Overbid, the proposed bid protections total approximately 6% of the Cost Value of the Merchandise and approximately 8.3% of the Guaranteed Amount. Bid protections in the amount of 2% of the Guaranteed Amount inclusive of the expenses would be more appropriate. This is especially true given that some similar retailers have recently been running their own liquidations without the use of an agent. Furthermore, in considering requests for break-up fees and expense reimbursements, the Third Circuit has held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc*, 181 F.3d 527, 535 (3d Cir. 1999) ("O'Brien"). A break-up fee should only be approved where there has been a showing "that the fees were actually necessary to preserve the value of the estate." *Id.* at 535; 11 U.S.C. § 503(b)(1)(A). The Debtors have not demonstrated that the requested bid protections are necessary and appropriate under Third Circuit precedent. In fact, the Renzi Declaration makes clear that at least as to

liquidation bids, five other proposals were received. Renzi Declaration at ¶ 3. Yet, nothing in the Declaration addresses why the bid protections are necessary.

### C. The Bid Procedures and the Purchase Agreement Require Additional Critical Modifications

15. In addition to the above concerns, and as a condition to this Court's approval, it is critical that the Bid Procedures be modified to provide for a level playing field for all bidders. To that end, the Committee proposes the following additional modifications to the Agency Agreement:

   i  <u>Augmented Goods.</u>  It is not uncommon for a stalking horse agreement to provide for a sharing mechanism for proceeds realized on augmented goods. This Stalking Horse Agreement, however, has a more complex formula before sharing occurs, rather than a straight forward sharing of the augmented goods proceeds. The Stalking Horse Agreement provides that, to the extent proceeds exceed (a) the Guaranteed Amount; *plus* (b) the expenses of the sale; *plus* (c) the Agent's Fee (6% of the sum of the aggregate Cost Value of the Merchandise included in the sales and the gross proceeds from the sale of additional agent merchandise) there is a sharing. Thus, while the sharing percentage is favorable, the formula may result in the estates never getting over the hurdle for any sharing of the proceeds of Debtors' inventory or the augmented goods. There should be a direct sharing agreement on augmented goods.

   ii  <u>Notice to Vacate.</u>  The Stalking Horse Agreement permits the Agent to vacate a store on 7 days' notice. The proposed notice period for vacating is too short and may expose the estate to a large administrative burden. Sufficient notice should be provided such that the Debtors, if they determine to reject the store lease, may do so seamlessly such that their notice of rejection to the landlord will expire simultaneously with the outside date for the Agent to vacate the store. Pursuant to the Debtors' proposed rejection procedures it would have to provide the landlord with seven (7) calendar days' notice of rejection. Accordingly, the notice to vacate should be on ten (10) business days' written notice.

   iii  <u>Landlord Protections.</u>  The proposed sale guidelines should be fair to the landlords. Wholesale abrogation of their negotiated rights with respect to store closing and going out of business sales are neither necessary nor appropriate. A more tailored approach will not impede the sale. For example, the Agent should adhere to the store's normal operating hours, should not be able to sell non-Debtor Owned FF&E without written consent of the landlord,

      should not be able to use sign-walkers and should adhere to signage placement requirements of the lease.

iv <u>Bids</u>:  All Bids should be provided to the Committee's counsel either directly from the Bidder or by the Debtors substantially simultaneously with their receipt.

v <u>Excluded Store Merchandise.</u>  Pursuant to the Stalking Horse Agreement, Merchandise from excluded stores may be shipped into the included stores at Merchant's expense.  However, there is no corresponding increase in the Guaranteed Amount and it does not appear that such goods are included in the calculation of the Guaranteed Amount.

vi <u>Diligence.</u>  As the Committee was very recently formed, it has not had an opportunity to fully diligence the Stalking Horse Agreement and the Debtors' inventory to have any comfort that the purchase price will not be subject to significant downward adjustments for inventory ageing, inventory thresholds, cost factor, redemptions such as gift cards and shrinkage, etc. In addition, the procedures should be made clear at the outset as to how discounts are applied (i.e., whether to stock keeping units "SKUs" or on product lines).

vii <u>Termination and Force Majeure.</u>  The Termination and Force Majeure provisions are not entirely clear as to who is responsible for the cost to transfer the Merchandise.  It should be made clear that the Agent shall bear such costs.

viii <u>Default.</u>  Defaults include if anyone files a motion seeking conversion of the cases to Chapter 7 or for the appointment of a trustee.  This provision should be eliminated or, in the alternative be modified to be a Default if the Debtors file such a motion or an order is entered on such a motion.

## **RESERVATION OF RIGHTS**

16. The Committee reserves the right to raise further and other objections to the Motion prior to or at the hearing in the event the Committee's objections raised herein are not resolved prior to such hearing.

**CONCLUSION**

**WHEREFORE**, the Committee respectfully requests that the Court approve the Motion after making the modifications described herein and grant other and further relief as is just and proper.

Dated: February 19, 2015  BAYARD, P.A.
Wilmington, DE

*/s/ Evan T. Miller*
Scott D. Cousins (No. 3079)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Tel: (302) 655-5000
Fax: (302) 658-6395
E-mail:scousins@bayardlaw.com
  emiller@bayardlaw.com

-and-

OTTERBOURG P.C.
David M. Posner
Gianfranco Finizio
230 Park Avenue
New York, NY 10169-0075
Tel: (212) 661-9100
Fax: (212) 682-6104
E-mail:dposner@otterbourg.com
  gfinizio@otterbourg.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*