IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    CHAPTER 11

CACHE, INC., ET AL                        CASE NO. 15-10172 (MFW)

                    DEBTORS                (JOINT ADMIN. REQUESTED)

                                          RELATED DOCKET NOS. 13 & 63

Objection Deadline: February 18, 2015 at 4:00 p.m. (EST)

Hearing Date:        February 23, 2015 at 12:30 p.m. (EST)

**OBJECTION TO MOTION FOR ORDERS**

The undersigned Landlord of Debtor and/or the Debtors in Possession, Mohegan
Tribal Gaming Authority ("Landlord"), respectfully objects to the Debtors' Motion for
Orders in the above-captioned case to the extent that it pertains to the Debtors' Sale
Guidelines attached to the proposed Agency Agreement.  Landlord objects specifically
to Section E and a portion of Section F of Debtors' Sale Guidelines and the grounds for
these objections are as follows:

On May 18, 2001, the Debtor, Cache, Inc., entered into a Lease, as amended, with
Landlord (the "Lease") as attached hereto and Section 8.9 of the Lease provides as
follows: "No public or private auction of any fire, 'going out of business', bankruptcy or
similar sales or auctions shall be conducted in or from the Premises and the Premises
shall not be used except in a dignified and ethical manner consistent with the general
high standards of merchandising in the Complex and not in a disreputable or immoral
manner or in violation of national, state or local laws".  Section E of Debtors' Sale
Guidelines describes the proposed advertising in a manner contrary and in violation of
the Lease section described above.

Further, a portion of Section F of Debtors' Sale Guidelines would permit sign walkers
to advertise the sale of Debtors' assets, which is not objectionable if such sign walkers
are within the Debtors' leased space but would be objectionable to Landlord and in

violation of Section 8.9 of the Lease if such sign walkers were permitted to advertise within Landlord's enclosed mall-style complex.

The Landlord for the Debtors owns and operates an upscale retail mall and the proposed advertising techniques of the Debtors would adversely affect the integrity of Mohegan Tribal Gaming Authority's "general high standards of merchandising", which Mohegan Tribal Gaming Authority relies on to attract and maintain a certain caliber of patrons and other retail tenants.

Therefore, Landlord of Debtor, respectfully requests that the sale of any assets and/or merchandise be conducted in accordance with the Lease.

Dated this 18th day of February, 2015.

LANDLORD of DEBTORS:  MOHEGAN TRIBAL GAMING AUTHORITY

By: _____

Kimberly S. Doubleday
Vice-President/General Counsel

THIS IS TO CERTIFY that a copy of the foregoing was duly served upon the following: Debtors, Pachulski, Stang, Ziehl & Jones, LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, Attn:  Laura Davis Jones, Esq.; and the Office of the United States Trustee, J. Caleb Boggs, Federal Building, 844 N. King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801, Attn:  David L. Buchbinder, Esq.

_____

Kimberly S. Doubleday

## ORDER

Upon consideration of the Landlord for the Debtors' Objection to Debtors' Motion For Orders, it is hereby ORDERED that the Objection is:  Sustained   /  Overruled.

Dated at _____, Delaware this _____ day of February, 2015.

_____

*Finance Cache*

EXECUTION COPY

# CONFIDENTIAL

MOHEGAN SUN CASINO COMPLEX

LEASE

BY AND BETWEEN

MOHEGAN TRIBAL GAMING AUTHORITY
("Landlord")

AND

CACHE, INC.
("Tenant")

# CONFIDENTIAL

Definitions

The following capitalized terms appearing in the Lease are defined in the Sections set forth below:

| Term | Section |
|---|---|
| Additional Rent | Section 4.1 |
| Affiliate | Section 8.10 |
| Approval | Section 8.10 |
| Bankruptcy Case | Section 19.3 |
| Bankruptcy Code | Section 19.1 |
| Base Footage Rental | Section 4.1 |
| Commencement Date | Section 2.3 |
| Common Areas | Section 5.1 |
| Compact | Section 8.10 |
| Complex | Recitals |
| Consumer Price Index | Section 14.1 |
| Co-Tenancy Requirement | Section 4.1 |
| Delivery Date | Section 3.3 |
| Denial | Section 8.10 |
| Effective Date | Section 13.2 |
| Event of Default | Section 18.1 |
| Events of Bankruptcy | Section 19.1 |
| Fixed Contribution | Section 14.1 |
| Gaming Authorities | Section 8.10 |
| Gross Leasable Area | Section 4.1 |
| Hazardous Material(s) | Section 8.8 |
| In-Lieu Rent | Section 4.1 |
| Insolvency Laws | Section 19.1 |
| Landlord | Introduction |
| Landlord's Common Area Costs | Section 6.1 |
| Landlord's Work | Section 3.1 |
| Lease Term | Section 2.3 |
| Lease Year | Section 2.4 |
| Lease | Introduction |
| Marketing Fund | Section 14.1 |
| Marketing Fund Charge | Section 14.1 |
| Media Fund Charge | Section 14.2 |
| Media Fund | Section 14.2 |
| Minimum Annual Rent | Section 4.1 |
| Minimum Monthly Rent | Section 4.1 |
| Mohegan Sun | Recitals |
| Name | Section 14.4 |
| Natural Breakpoint | Section 4.3 |
| New Premises | Section 2.5 |
| Percentage Rent | Section 4.3 |
| Percentage Rent Rate | Section 4.3 |
| Premises | Section 2.1 |
| Property | Introduction |
| Property | Recitals |
| Rent Commencement Date | Section 4.1 |

| | |
|---|---|
| Required Completion Date | Section 3.3 |
| Retail Facilities | Recitals |
| Security Deposit | Section 15 |
| Store Floor Area | Section 2.1 |
| Taxes | Section 4.5 |
| Tenant Affiliates | Section 8.10 |
| Tenant Allowance | Section 3.2 |
| Tenant Information Handbook | Section 3.3 |
| Tenant Information Package | Section 3.3 |
| Tenant | Introduction |
| Tenant's Tax Percentage | Section 4.5 |
| Tenant's Work | Section 3.2 |
| Tenant Work Budget | Section 3.2 |
| Tenant Work Schedule | Section 3.2 |
| Tribal Utility Authority | Section 7.1 |
| Trustee | Section 19.3 |

EXECUTION COPY

# MOHEGAN SUN CASINO COMPLEX

## LEASE

THIS LEASE (the "Lease") made this _18th_ day of _MAY_____, 2001, by and between MOHEGAN TRIBAL GAMING AUTHORITY ("Landlord"), an instrumentality of The Mohegan Tribe of Indians of Connecticut, a federally recognized Indian tribe (the "Tribe"), and CACHE, INC., a Florida corporation ("Tenant");

### RECITALS

A.      The Tribe is the beneficial owner of land located in the State of Connecticut which is owned by the United States of America in trust for the benefit of the Tribe pursuant to the Tribe's recognized powers of self-government and the statutes and ordinances of the Tribe (the "Property").

B.      On behalf of the Tribe, Landlord has constructed on the Property a casino known as "Mohegan Sun" and is now expanding Mohegan Sun through construction of a second casino and related commercial space, a luxury hotel and customary amenities, a convention/events center with indoor seating and convention space, related food and beverage and parking facilities and other related infrastructure, including retail, restaurant and entertainment facilities (the foregoing expansion, together with any modifications of the foregoing elements undertaken by Landlord, collectively, the "Complex").

C.      The Complex will include certain retail and restaurant facilities which are expected to be located in the approximate locations shown in the Plot Plan attached hereto as Exhibit B (the "Retail Facilities").

D.      Tenant desires to lease from Landlord and Landlord desires to lease to Tenant certain retail space within the Retail Facilities pursuant to the terms and provisions of this Lease.

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

### ARTICLE I

### EXHIBITS

The exhibits listed below and attached to this Lease are incorporated herein by this reference:

EXHIBIT A          Legal description of the Property.

EXHIBIT B          Plot plan showing approximate locations of Retail Facilities within the Complex. This Exhibit is provided for informational purposes only, and shall not be deemed to be a warranty, representation or agreement by Landlord that the Complex or buildings will be exactly as indicated on the Exhibit. Landlord reserves unto itself the unlimited right to modify the configuration of the Complex at any time for the purpose of incorporating additional buildings within the Complex.

EXHIBIT C          Approximate location within the Retail Facilities of the space herein leased to Tenant. This Exhibit is provided for informational purposes only, and shall not be deemed to be a warranty, representation or agreement by Landlord

EXECUTION COPY

that the Retail Facilities or and/or any stores will be exactly as indicated on the Exhibit, or that the other tenants which may be drawn on said Exhibit will be occupants in the Retail Facilities or other portions of the Complex. Landlord reserves unto itself the unlimited right to modify the size and/or configuration of the Retail Facilities at any time.

**EXHIBIT D**          Description of Landlord's and Tenant's Work.

**EXHIBIT E**          Intentionally Omitted

**EXHIBIT F**          Rules and Regulations.

**EXHIBIT G**          Mohegan Sun Logo.

Notwithstanding anything else contained in this Lease, provided that access to and visibility of the Premises is not materially and adversely affected, Landlord reserves the right to change or modify and add to or subtract from the size and dimensions of the Complex or any part thereof (including, without limitation, the Retail Facilities), the number, location and dimensions of buildings and stores, the size and configuration of the parking areas, entrances, exits and parking aisle alignments, dimensions of hallways, malls and corridors, the number of floors in any building, the location, size and number of tenants' spaces and kiosks which may be erected in or fronting on any mall or otherwise, the identity, type and location of other stores and tenants, and the size, shape, location and arrangement of Common Areas, and to design and decorate any portion of the Complex (including, without limitation, the Retail Facilities) as it desires, but the general character of the Complex and the approximate location of the Premises shall not be changed substantially.

<u>**ARTICLE II**</u>

<u>PREMISES AND TERM</u>

<u>Section 2.1.</u>    <u>Premises.</u>

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the space (in the Complex) designated as C126 outlined in red on <u>Exhibit C</u> attached hereto (the "**Premises**"), irregularly shaped, containing approximately 2,114 square feet of gross floor area (the "**Store Floor Area**").

During the thirty (30) day period following delivery of possession of the Premises to Tenant, Tenant shall have the right to measure the floor area of the Premises in accordance with this Section 2.1. In the event Tenant does not agree with the measurement of the Premises as determined by Landlord, then, upon notice from Tenant in writing to Landlord, which notice shall set forth in detail the Tenant's findings, Landlord shall be entitled either to accept such findings (and to prospectively make the floor area adjustments as set forth above) or to advise Tenant in writing that it disagrees with such findings and will remeasure the Premises. Upon such remeasurement by Landlord, Tenant shall be entitled to either accept Landlord's determination of the floor area or to request an independent measurement of the Premises by a third party to be mutually selected within thirty (30) days following Tenant's notice to Landlord of its election to require such independent additional measurement. The party selected by Landlord and Tenant to conduct such independent measurement shall measure the Premises within thirty (30) days after selection, and the results of such measurement shall be final and binding upon both Landlord and Tenant. Notwithstanding the foregoing, Tenant shall be obligated to pay all rent and charges due under this Lease prior to and during the period of the determination of the square footage of the Premises pursuant to the foregoing) on the basis of the floor area set forth in the Lease (or as previously determined by Landlord) until such measurement of the Premises shall be so finally determined, whereupon



appropriate adjustments shall be made (and payments shall be made either to Landlord or Tenant by the other, as applicable) with respect to sums previously paid hereunder.

### Section 2.2.    Roof and Walls.

Landlord shall have the exclusive right to use all or any part of the roof, side and rear walls of the Premises for any purpose, including, without limitation, erecting signs or other structures on or over all or any part of the same, erecting scaffolds and other aids to the construction and installation of the same, and installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Complex in locations which do not interfere materially with Tenant's use of the Premises, and to the extent possible, located above Tenant's ceiling, below Tenant's floor or within existing columns.  Tenant shall have no right whatsoever in the exterior of exterior walls or the roof of the Premises.  In the event Landlord performs any work to the Premises or Common Areas (except any work necessitated by the acts or omissions of Tenant and provided Landlord does not recover proceeds from rental insurance for lost rent) and such work is of such a nature as to prevent Tenant from reasonably operating it's business in the Premises for more than three (3) consecutive days, then commencing with the first day thereafter the Minimum Annual Rent and all other rents and charges shall abate until such time as Tenant is again reasonably able to conduct it's business in the Premises.

### Section 2.3.    Lease Term.

(a)    This Lease shall be in full force and effect from the date executed by both Landlord and Tenant.  The term of this Lease (the "**Lease Term**") shall commence upon the earlier of (a) the day following the Required Completion Date, or (b) the day on which Tenant opens for business (whichever alternative applies, the "**Commencement Date**") and shall end at midnight upon the last day of the month of January following the one hundred twentieth (120th) full calendar month after the Commencement Date, unless otherwise terminated in accordance with the terms hereof.

### Section 2.4.    Lease Year.

The term "**Lease Year**" means each consecutive twelve (12) month period commencing on February 1st and ending January 31st, except the first Lease Year shall commence on the Commencement Date and end on January 31st following the twelfth (12th) month after the Commencement Date.

### Section 2.5    Early Termination

In the event Tenant fails to achieve Gross Sales (as defined in Section 4.4) in excess of one million dollars ($1,000,000) during the third (3rd) Lease Year of the Lease Term, Tenant shall have the right to terminate this Lease, without penalty, upon one hundred eighty (180) days prior written notice to Landlord; provided, however, that Tenant may only exercise such right to terminate by delivering a written notice of termination within seventy five (75) calendar days after the first day of the first month of the fourth (4th) Lease Year.

### Section 2.6.    Relocation of Premises.

(a)    In the event Landlord shall add additional buildings to the Complex or expand any of the buildings currently contained therein or reconfigure any part of the Complex in the vicinity of the Premises such that such reconfiguration specifically effects the Premises, Landlord shall have the right, subject to Tenant's right of termination as set forth in subparagraph (B), to relocate Tenant's operation to other premises (the "**New Premises**") in another part of the Complex or

building, provided Landlord does not relocate Tenant's operation no more than one time throughout the Lease Term, in accordance with the following:

    (i)    Landlord shall notify Tenant, at least one hundred fifty (150) days prior to the proposed relocation date, of Landlord's intention to relocate Tenant's operation to the New Premises;

    (ii)    The proposed relocation date and the size, configuration and location of the New Premises shall be set forth in Landlord's notice; and

    (iii)    The New Premises shall be substantially the same in size (2,000-2,500 square feet of Store Floor Area) configuration, and location with respect to the Retail Facilities Common Areas , other retail tenants and the Casino as the Premises described in the Lease.

    (iv)    During any time that its operations are terminated due to the relocation, the Minimum Annual Rent, Percentage Rent, common area charges, Marketing Fund charges, Media Fund charges and any other associated charges payable under this Lease during such time shall be abated, and Tenant shall be reimbursed for any lost profits during such period, the amount of which shall be determined by mutual agreement between Landlord and Tenant based upon the profits for the preceding twelve month period.

    (b)    If the New Premises described in Landlord's relocation notice are unacceptable to Tenant, Tenant shall have the right, exercisable by written notice to Landlord, given thirty (30) days following receipt of Landlord's relocation notice, to terminate this Lease, such termination to be effective as of the proposed relocation date as set forth in Landlord's notice. Failure by Tenant to exercise timely such right shall be deemed a waiver with respect thereto and confirmation that the New Premises are acceptable to Tenant. Tenant shall have the right to accept the New Premises only for the unexpired term of this Lease. If Tenant exercises its right to terminate hereunder, Landlord shall pay, within thirty (30) days of receipt of termination notice, Tenant's unamortized costs for Tenant's Work amortized in a straight line basis over ten years.

    (c)    If Tenant elects to relocate to the New Premises, Landlord shall construct within the New Premises, at Landlord's expense, improvements which are substantially similar in quality and utility to the improvements located in the Premises. Landlord shall reimburse Tenant for its actual storage costs and payroll and payroll related expenses for personnel hired to work on-site at the Premises for each week that Tenant is not operating its business during the relocation until Landlord delivers the new premises.

    (d)    Landlord has made no representation as to any additional improvements or stores or any existing stores in the Complex, and this provision does not create any rights of option, first refusal or otherwise with respect to any present or future space in the Complex.



## ARTICLE III

## LANDLORD'S AND TENANT'S WORK

Section 3.1.    Landlord's Work.

Landlord, at its expense, shall construct the Premises in substantial accordance with plans and specifications prepared or to be prepared by Landlord's architect, incorporating in such construction all work described in **Exhibit D** attached hereto as being required of Landlord (the "Landlord's Work").

Section 3.2.    Tenant's Work.

All work not provided herein to be done by Landlord shall be performed by Tenant (the "Tenant's Work"), including, without limitation, all work designated as Tenant's Work in **Exhibit D**, and Tenant shall do and perform at its expense all Tenant's Work diligently and promptly and in accordance with the following provisions. Tenant shall be solely responsible for all costs incurred in connection with the design and construction of Tenant's Work, provided that Landlord shall contribute an allowance (the "**Tenant Allowance**") in the amount of Sixty Thousand Dollars ($60,000) to be applied solely to the costs of design and construction of Tenant's Work. Upon completion of Final Construction Drawings (as defined in the Tenant Information Package) and specifications for Tenant's Work, Tenant shall obtain and provide to Landlord a preliminary budget for design and construction of Tenant's Work (the "**Tenant Work Budget**") and a preliminary construction schedule therefor (the "**Tenant Work Schedule**"). The Tenant Allowance shall be disbursed incrementally (but not more often than monthly on the sixteenth (16th) of each month following Tenant's submission (for the previous month) of invoices from Tenant's general contractors and direct suppliers for labor performed and materials, equipment or fixtures physically incorporated or delivered to and placed on-site at the Demised Premises. Landlord shall not be obligated to disburse the Tenant Allowance if (1) an Event of Default then exists beyond any applicable notice, grace or cure periods and such default continues to be uncured and Landlord has not exercised its remedy to terminate hereunder, or (2) Tenant has failed to provide Landlord, upon request, until Tenant has provided to Landlord, copies of all contracts, bills, vouchers, change orders and other information reasonably relating to the expenses of Tenant's general contractor and direct suppliers for which payment is being sought. If the actual costs of Tenant's Work exceed the Tenant Allowance, Tenant shall pay directly all such costs when due and shall provide Landlord with satisfactory evidence of such payment, except for those bills Tenant is contesting in good faith.

Section 3.3.    Tenant's Obligations Before Commencement Date.

As soon as reasonably possible hereafter, Landlord shall deliver to Tenant a tenant information package (the "**Tenant Information Package**") (including a dimensioned drawing of the Premises and a copy of a tenant information handbook (as amended from time to time, the "**Tenant Information Handbook**"). Within thirty (30) days after the execution date of this Lease, Tenant shall make a Preliminary Submittal (as defined in the Tenant Information Package). Within twenty-eight (28) days after receipt of the Preliminary Submittal, Landlord shall notify Tenant of any nonconformities with **Exhibit D** or the Tenant Information Package. Within fifteen (15) days after receipt of any such notice, Tenant shall submit Final Construction Documents (as defined in the Tenant Information Package) based upon the Preliminary Submittal and incorporating Landlord's comments thereto. Landlord shall notify Tenant of its approval or disapproval of the Final Construction Documents within twenty-eight (28) days after receipt. Upon approval, Landlord shall return one (1) set of approved Final Construction Documents to Tenant and the same shall become a part hereof by this reference as **Exhibit D-1**. Approval of construction documents by

EXECUTION COPY

Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy of sufficiency, or compliance with applicable codes, and Tenant shall be solely responsible for such construction documents.   Tenant shall not commence any of Tenant's Work until Landlord has approved the Final Construction Documents, unless prior Landlord approval has been obtained in writing.

Tenant shall complete Tenant's Work by the date that is the later of (a) ninety (90) days following the later of (i) the Delivery Date, or (ii) Tenant's receipt of Landlord approved Final Construction Documents, or (b) the grand opening of the expansion of the Complex (whichever alternative applies, the "Required Completion Date").   Landlord shall give Tenant ten (10) days prior written notice of the anticipated date upon which Landlord shall certify in writing to Tenant that Landlord's Work in the Premises has been substantially completed in accordance with the requirements therefor and that the Premises are available for the commencement of Tenant's Work (the "Delivery Date").   Tenant hereby releases Landlord and its contractors from any claim whatsoever for damages against Landlord or its contractors for any delay in the date on which the Premises shall be ready for delivery to Tenant or for any delay in commencing or completing any work Landlord is to perform or is authorized by Tenant to perform under Exhibit D, or with respect to the Complex.

Section 3.4.     Failure of Tenant to Perform.

Because of the difficulty or impossibility of determining Landlord's damages resulting from Tenant's failure to open for business fully fixtured, stocked and staffed on the Required Completion Date, including, without limitation, damages from loss of Percentage Rent from Tenant and other tenants, diminished saleability, leaseability, mortgageability or economic value of the Complex, if Tenant fails to commence Tenant's Work within the time provided above and proceed with the same diligently, or to open for business fully fixtured, stocked and staffed on or before the Commencement Date or to perform any of its obligations to be performed prior to the Required Completion Date, subject to Section 23.5, Landlord may, without notice or demand, in addition to the right to exercise any other remedies and rights herein or at law provided, proceed with Tenant's Work using any contractor Landlord desires at Tenant's expense, and collect rent from the Commencement Date in an amount equal to the Minimum Annual Rent and other additional rent and other amounts payable by Tenant hereunder, and, in addition thereto, an amount equal to two hundred fifty dollars ($250) per day for each day that Tenant has failed to open for business on and after the Required Completion Date, which latter amount shall be in lieu of Percentage Rent that might have been earned had Tenant opened in timely fashion.   In addition, subject to Section 23.5, Landlord may (a) do and perform any of Tenant's Work or Tenant's other obligations hereunder, at Tenant's expense, or (b) if such failure continues for more than ten (10) days after notice from Landlord to Tenant, either in lieu of, or at any time after proceeding as provided in subsection (a), terminate this Lease, in which event Landlord shall have the right to recover all damages available under this Lease and/or at law and equity.   If Tenant fails to submit Tenant's Plans within five (5) days after such plans become due in accordance with this Lease, Landlord shall have the right, in addition to its other rights and remedies as herein provided, to collect from Tenant a sum which shall be One Hundred and 00/100 Dollars ($100.00) per calendar day for each day that Tenant's Plans are not so submitted.   All remedies in this Lease or at law provided shall be cumulative and not exclusive and shall survive the expiration of the Lease Term or the earlier termination of this Lease.

Section 3.5.     Condition of Premises.

Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition, subject to (a) minor or touch-up items identified on a "punch list" provided to Landlord by Tenant within thirty (30) days after the Delivery Date, and (b)

any latent defects in Landlord's Work not reasonably discoverable at the time of delivery of the Premises to Tenant, which Landlord will remedy if identified within twelve (12) months following the Delivery Date.  Tenant also agrees that no representations respecting the condition of the Premises, no warranties or guarantees, expressed or implied, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to workmanship or any defects in material, and no promise to decorate, alter, repair or improve the Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein.

### ARTICLE IV

### RENT

Section 4.1.    Minimum Annual Rent.

Tenant covenants and agrees to pay to Landlord, without notice or demand and without set-off or counterclaim, at Landlord's address for notice (Landlord's and Tenant's notice addresses being the addresses specified in Section 24.7), as base rent for the Premises:

(a)    An amount per annum (the "**Minimum Annual Rent**") determined by multiplying (i) the initial sum of Forty Dollars ($40.00) (the "**Base Footage Rental**"), by (ii) the Store Floor Area, or Eighty Four Thousand Five Hundred Sixty Dollars ($84,560) (based upon the approximate Store Floor Area set forth in Section 2.1), payable in equal monthly installments (the "**Minimum Monthly Rent**"), in advance upon the first day of each and every month commencing upon the ~~thirteenth (13th)~~ teenth (14) month after the Commencement Date (the "~~Rent Commencement Date~~") and continuing thereafter through and including the last month of the fifth (5th) Lease Year of the Lease Term.  Commencing on the first day of the first the first month of the sixth (6th) Lease Year of the Lease Term, the Base Footage Rental (and correspondingly, the Minimum Annual Rent and Minimum Monthly Rent) shall be increased to Forty Five Dollars ($45.00). When Store Floor Area is determined in accordance with Section 2.1, the Minimum Annual Rent and Minimum Monthly Rent shall be deemed automatically increased or decreased based upon the Store Floor Area as thus determined, and any overpayments or underpayments of Minimum Monthly Rent to Landlord shall be adjusted accordingly. Notwithstanding the foregoing, in the event that less than seventy percent (70%) of the total leasable space (inclusive of Tenant's Store Floor Area) in the Retail Facilities (the "**Gross Leasable Area**") is open for business on the Commencement Date, or any time thereafter, (the "**Co-Tenancy Requirement**"), then Tenant may pay rent in the amount of six percent (5%) of its Gross Sales (the "**In-Lieu Rent**"), in lieu of Minimum Annual Rent and Percentage Rent, until the Co-Tenancy Requirement is met.  The In-Lieu Rent shall be paid on or before the 15th day of the month based on the preceding month's Gross Sales.   The Rent Commencement Date shall be extended a day for each day that Tenant is paying In-Lieu Rent.

(b)    Any amounts other than Minimum Annual Rent, as escalated, required to be paid by Tenant under the terms of this Lease and any charges or expenses incurred by Landlord on behalf of Tenant under the terms of this Lease shall be considered additional rent ("**Additional Rent**").  All payments of Additional Rent shall be payable to Landlord or its designated agent, in advance, without previous notice or demand therefor (unless such notice or demand is expressly provided for herein), and without deduction, diminution, abatement, set-off or counterclaim in the same manner as Minimum Annual Rent is payable pursuant to Section 4.1(a).  Tenant's obligation to pay any amounts of Additional Rent shall survive the expiration or termination of the Lease.

7

Section 4.2.    Miscellaneous Rent Provisions.

Any rent or other amounts to be paid by Tenant which are not paid when due shall bear interest from the date upon which they are due at the lesser of (a) the maximum rate of interest permitted in the State of Connecticut, or (b) two percent (2%) per annum over the prime rate announced by Citibank, N.A (provided that if such failure to pays continues no more than five (5) days following the due date thereof, Tenant shall not be obligated to pay said interest). If the Commencement Date is other than the first day of a month, Tenant shall pay on the Commencement Date a prorated partial Minimum Monthly Rent for the period prior to the first day of the next calendar month, and thereafter Minimum Monthly Rent payments shall be made not later than the first day of each calendar month.

Section 4.3.    Percentage Rent.

In addition to the Monthly Base Rent and all other sums payable hereunder by Tenant, Tenant shall pay to Landlord as "Percentage Rent" an amount equal to six percent (6%) (the "Percentage Rent Rate") of Tenant's annual Gross Sales in excess of the Natural Breakpoint. The term "Natural Breakpoint" shall mean the Minimum Annual Rent in effect for such Lease Year (excluding any Rent abatement granted), divided by the Percentage Rent Rate. Percentage Rent for the remaining months during the first Lease Year following the first twelve (12) months of the first Lease Year, if any, shall be based upon Gross Sales during the first twelve months of the first Lease Year. Notwithstanding anything herein to the contrary, Percentage Rent for the first partial Lease Year (which runs from the Commencement Date through January 31, 2002) shall be calculated by using the Gross Sales for the first twelve months of the Lease Term (the "Gross Sales Number"). To the extent the Gross Sales Number exceeds the Natural Breakpoint, the Percentage Rent due to Landlord shall be six percent (6%) of the figure calculated by subtracting the Natural Breakpoint from the Gross Sales Number, and multiplying the result by a fraction, the numerator of which is the number of days from the Commencement Date through January 31, 2002, and the denominator of which is 365.

Tenant shall (a) not later than the fifteenth (15th) day after the close of each calendar month, deliver to Landlord a written statement certified by Tenant or an officer of Tenant, showing Gross Sales made in such calendar month; and (b) not later than forty five (45) days after the end of each Lease Year or partial Lease Year, deliver to Landlord a statement of Gross Sales for such Lease Year or partial Lease Year. Each monthly and annual statement shall be certified to be complete and correct and signed by a duly authorized officer or partner of Tenant.

If Tenant fails to prepare and deliver any statement of Gross Sales required hereunder, within the time or times specified above, Landlord shall have the right, in addition to the rights and remedies set forth in this Lease (x) to collect from Tenant a sum which shall be One Hundred Dollars ($100.00) per calendar day for each day that Gross Sales reports are not so submitted within five (5) days after the due date, and (y) to estimate Tenant's Gross Sales for any non-reported period and bill Tenant's Percentage Rent accordingly. Landlord shall adjust Percentage Rent billings when actual Gross Sales reports are received. The statement or statements shall be prepared by Landlord or its agents and shall be conclusive and binding on Tenant. Tenant shall pay all expenses of such audit and of the preparation of any such statements and any and all such sums shown by such audit to be due as Percentage Rent.

Percentage Rent shall become due and payable in each Lease Year on the fifteenth (15th) day of the month immediately following the month during which six percent (6%) of Gross Sales exceed the Natural Breakpoint for such Lease Year, and thereafter shall be paid monthly on all additional Gross Sales made during the remainder of such Lease Year, such payments to be made concurrently with the submission by Tenant to Landlord of the written statement of monthly Gross Sales as provided for herein.

8

Tenant will preserve for at least three (3) years at Tenant's notice address all original books and records disclosing information pertaining to Gross Sales and such other information respecting Gross Sales as Landlord reasonably requires, including, without limitation, cash register tapes, sales slips, sales checks, sales tax returns, bank deposit records, sales journals and other supporting data, provided Tenant shall only be required to maintain such books and records pertaining to Gross Sales that Tenant maintains for all of Tenant's other stores if such books and records are in accordance with generally accepted accounting principals and are reasonably sufficient to determine Gross Sales for any specific time period.  Landlord and its agents shall have the right upon fourteen (14) days notice to Tenant, during business hours to examine and audit such books and records preserved by Tenant.  If such examination or audit discloses a liability for Percentage Rent of three percent (3%) or more in excess of the Percentage Rent paid by Tenant for any period, or if Tenant's Gross Sales cannot be verified due to the insufficiency or inadequacy of Tenant's records, Tenant shall promptly pay Landlord the cost of said audit.  Tenant shall, in any event, pay to Landlord the amount of any deficiency in rents which is disclosed by such audit plus interest at two percent (2%) per annum over the prime rate announced by Citibank, N.A. as of the first day of the month on which any sum was due and owing.

If Landlord and/or any other party requires financial information from Tenant, if Tenant is a corporation the stock of which is publicly owned, the annual and/or interim reports of such corporation as required by the Securities and Exchange Commission shall satisfy the foregoing provisions of this Lease provided such information specifically addressed such request for information.  Tenant shall only be required to use a type of sales recording device that is used at the majority of Tenant's other stores, provided such device (i) produces sales receipts for each transaction recorded thereon, (ii) such device interfaces with Landlord's customer card system.  In no event will Tenant be required to use cash register receipts.

Section 4.4.    Gross Sales Defined.

As used herein, Gross Sales means the sale prices of all goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at or from the Premises for cash, credit or otherwise, without reserve or deduction for uncollected amounts, including, without limitation, sales and services (a) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (b) pursuant to mail, telephone, telegraph or otherwise received or filled at the Premises, (c) resulting from transactions originating in, at or from the Premises, and deposits not refunded to customers.  Gross Sales shall not include (I) exchanges of merchandise between Tenant's stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises, (ii) returns to manufacturers, (iii) the amount of any cash or credit refund, limited to the sales price, made upon any sale at, in, on, about or from the Premises; (iv) sales taxes and/or excise taxes collected from customers as a separate item as part of the sales price and paid to a taxing authority; (v) the amount of any tips collected by or for employees, (vi) any discount on sales to employees of Tenant to the extent such discount sales to employees do not exceed more than two percent (2%) of Tenant's annual Gross Sales, (vii) bulk sales as defined by the Uniform Commercial Code, (viii) sales of trade fixtures or store equipment belonging to Tenant which are not made in the ordinary course of Tenant's business, (ix) parcel post, delivery, wrapping, alteration or fitting charges which are at no profit to Tenant, interest, service or sales carrying charges paid by customers for the extension of credit on sales and where not included in the merchandise sales price, (x) bad debts provided the same shall not exceed in the aggregate one percent (1%) of Tenant's Gross Sales in any Lease Year calculated on a non-cumulative basis provided if subsequently collected, said bad debts shall be included in Gross Sales in the Lease Year in which subsequently collected, and (xi) any sums collected from Tenant's insurance company for damage to Tenant's merchandise or property.  In no event shall any franchise tax, capital stock tax, tax based upon assets or net worth, gross receipts tax or any income or similar tax based upon income or profits be deducted from Gross Sales.

EXECUTION COPY

### Section 4.5.    Taxes.

Landlord shall pay or cause to be paid, before delinquent, all Taxes assessed or imposed upon the Complex and the Retail Facilities which become due or payable during the Lease Term. Landlord shall not pass through to Tenant any portion of such Taxes during the Lease Term. The term "Taxes" shall mean and include all property taxes, both real and personal, public and governmental charges and assessments, including all extraordinary, or special assessments, or assessments against any of Landlord's personal property now or hereafter located in the Complex (or any similar charges, levies or assessments in the nature of or in substitution of real or personal property taxes), all costs and expenses, including, without limitation, consulting, appraisal and attorneys' fees incurred by Landlord in contesting or negotiating with public authorities (Landlord having the sole authority to conduct such a contest or enter into such negotiations) as to any of the same and all sewer, water and other utility taxes and impositions, but shall not include taxes on Tenant's business in the Premises, machinery equipment, inventory or other personal property or assets of Tenant, Tenant agreeing to pay, before delinquency, all Taxes upon or attributable to such excluded items without apportionment.   Taxes shall not include interest and penalties due on delinquent Taxes, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest in the event such partial payment is permitted in connection with a tax appeal proceeding.

### Section 4.6.    Landlord's Expenses.

If Landlord pays any monies or incurs any expense to correct a breach of this Lease by Tenant or to do anything in this Lease required to be done by Tenant, beyond any applicable notice and cure period, or incurs any expense, as a result of Tenant's failure to perform any of Tenant's obligations under this Lease, all amounts so paid or incurred shall, on notice to Tenant, be considered Additional Rent payable in full by Tenant with the first Minimum Monthly Rent installment thereafter becoming due and payable, and may be collected as by law provided in the case of rent.  Notwithstanding anything provided herein to the contrary, in any litigation between Landlord and Tenant, the non-prevailing party shall pay the reasonable attorneys fees and costs of the prevailing party.

## ARTICLE V

## PARKING AND COMMON AREAS AND FACILITIES

### Section 5.1.    Common Areas.

All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Complex, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities, package pickup stations, elevators, escalators, pedestrian sidewalks, malls, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities, those areas within and adjacent to the Complex for ingress and egress to and from the Complex, which from time to time may be provided by Landlord or others for the convenience, use or benefit of the tenants of the Complex, Landlord, the Tribe, their respective concessionaires, agents, employees, customers, invitees and licensees, those areas, if any, upon which temporary or permanent off-site utility systems or parking facilities serving the Complex may from time to time be located and other areas and improvements provided by Landlord for the general use in common of tenants and their customers in the Complex (collectively, the "Common Areas") shall at all times be subject to the exclusive control and management of Landlord and the Tribe (if applicable), and Landlord (or the Tribe, if applicable) shall have the right, from time to time, to establish, modify and enforce reasonable non-discriminatory rules, regulations and requirements with respect to all Common Areas.  Tenant agrees to comply with, and to cause its employees and



contractors to comply with, all non-discriminatory applied rules, regulations and requirements set forth in <u>Exhibit F</u> attached hereto and all reasonable amendments thereto and any and all rules, regulations, requirements and amendments thereto adopted.  Tenant acknowledges that the Retail Facilities shall only have exterior pedestrian access through the main corridor passing through the Retail Facilities connecting the Casino of the Sky with the Casino of the Earth, as illustrated on <u>Exhibit B</u>.

Provided that access to and visibility of the Premises is not materially and adversely affected, Landlord shall have the right from time to time to:  change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas; designate parking areas for the Tribe, Landlord and/or their employees and tenants and/or tenants of Landlord, and/or limit the total number of such employee spaces; restrict parking by Tenant's employees to designated areas (provided that other similarly situated tenants are similarly restricted); construct surface, sub-surface or elevated parking areas and facilities; establish and from time to time change the level or grade of parking surfaces; add to or subtract from the buildings in the Complex; eliminate such access as may from time to time be available between the Complex or any retail or commercial business in an adjoining or neighboring building and do and perform such other acts in and to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers.  Tenant acknowledges that owners of other areas in and adjoining the Retail Facilities may similarly alter, enlarge, reduce or relocate the improvements from time to time located thereon.  Tenant further acknowledges that this Section 5.1 shall be for the benefit of and directly enforceable by Landlord and the Tribe.

In the event that Landlord determines, in its sole discretion, to provide parking or transportation facilities for the Complex, Landlord may charge a fee to users thereof and may impose and enforce such rules and regulations concerning the use thereof (including, without limitation, a prohibition of use by Tenant's employees, provided that other similarly situated tenants are similarly restricted) as Landlord may in its discretion deem desirable, provided that any fee may be waived for users designated by Landlord, in its sole discretion.  Landlord shall have the right at any and all times to utilize portions of Common Areas for promotions, exhibits, entertainments, product and other shows, displays, the leasing of kiosks or food facilities, or such other uses as may in Landlord's judgment tend to attract the public or benefit the Complex.  Notwithstanding the foregoing, Landlord shall not erect, or permit the erection of any kiosks within thirty (30) feet of the midpoint of Tenant's storefront; provided however, nothing herein shall be construed to prohibit the placement of seating accommodations, theming elements or signage placed or affixed to the grounds of the Complex within such thirty (30) foot radius as of the Commencement Date (or shortly thereafter if scheduled to be placed on the Commencement Date) or as may otherwise be placed or erected thereafter (provided any such subsequent placement or erection of seating accommodations, theming elements or signage shall not materially and adversely impair the visibility of the Premises within the Complex).

<u>Section 5.2.</u>    <u>Use of Common Area.</u>

Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord, the Tribe and all others to whom Landlord or the Tribe has granted or may hereafter grant rights, to use the Common Areas for ingress, egress and parking subject to such reasonable regulations as Landlord or such other person may from time to time impose and the rights of Landlord set forth above.  Tenant shall abide by all rules and regulations and cause its concessionaires, officers, employees and agents to abide thereby.  At any time, Landlord may close

11

temporarily any Common Areas to make repairs or changes, prevent the acquisition of public rights therein, discourage noncustomer parking, or for other reasonable purposes. Tenant shall not interfere with Landlord's or other permitted users' rights to use any part of the Common Areas.

### ARTICLE VI

### COST AND MAINTENANCE OF COMMON AREAS

**Section 6.1.**     **Expense of Operating and Maintaining the Common Facilities.**

Landlord will operate, manage, maintain and repair or cause to be operated, managed, maintained or repaired, the Common Areas of the Complex, including, without limitation, all parking facilities. "Landlord's Common Area Costs" shall mean all costs of operating and maintaining the Common Areas in a manner deemed by Landlord appropriate for the best interests of tenants and other occupants in the Complex. Included among the costs and expenses which constitute Landlord's Common Area Costs, without limitation, shall be, at the option of Landlord, all costs and expenses of protecting, operating, managing (including attorneys' fees and other professional fees), repairing, replacing, repaving, lighting, cleaning, painting, striping, insuring (including, without limitation, fire and extended coverage insurance on Common Areas, insurance protecting Landlord against liability for personal injury, death and property damage and workers' compensation insurance), removal of debris, police protection, security and security patrol, fire protection, regulating traffic, inspecting, repairing and maintaining of machinery and equipment used in the operation of the Common Areas, including, without limitation, heating, ventilating and air conditioning machinery and equipment, depreciation of machinery and equipment, providing heating, ventilating and air conditioning for the interior Common Areas, cost and expense of inspecting, maintaining, repairing and replacing storm and sanitary drainage systems, sprinkler and other fire protection systems, electrical, gas, water, telephone and irrigation systems, cost and expense of maintaining, repairing and replacing the interior and exterior of the Complex, including, without limitation, floors, roofs, skylights, escalators, elevators, walls, stairs and signs, cost and expense of installing, maintaining and repairing burglar or fire alarm systems on the Complex, if installed, cost and expense of landscaping and shrubbery, cost and expense of maintaining and operating or causing to be maintained and operated atriums and other areas used for access between the Retail Facilities and neighboring or adjoining buildings and personal property or other taxes (to the extent not included under Section 4.5) incurred by Landlord in respect thereof, whether said facilities or areas are located in the Retail Facilities or in an adjoining or neighboring building, expenses of utilities, maintenance and operation of any valet and/or self-park parking facilities which Landlord determines to provide either within or outside the Retail Facilities and any transportation services provided for the Retail Facilities, whether in connection with such parking facilities or otherwise, and all other structures, facilities and buildings used in the maintenance or operation of the Retail Facilities whether located within or outside of the Retail Facilities and administrative and overhead costs equal to fifteen percent (15%) of all of the foregoing and all other of Landlord's Common Area Costs.

**Section 6.2.**     **Tenant to Bear Pro Rata Share of Expenses.**

Commencing with the Commencement Date, for each Lease Year or portion thereof during the Lease Term, Tenant will pay Landlord, in addition to all other amounts in this Lease provided, an annual amount per usable square foot of Store Floor Area (the "Common Area Charge"). The Common Area Charge for the first (1ˢᵗ) Lease Year shall equal Eleven Dollars ($11.00), and shall be increased three percent (3%) annually on the anniversary of the Commencement Date. Tenant's Common Area Charge shall be paid in equal monthly installments, one (1) such installment being due on the first (1ˢᵗ) day of each month of each calendar year.

### ARTICLE VII

12

EXECUTION COPY



## UTILITIES AND SERVICES

Section 7.1    Utilities.

Tenant shall not install any equipment which can exceed the capacity of any utility facilities serving the Premises and if any equipment installed by Tenant requires additional utility facilities, the same shall be installed at Tenant's expense in compliance with all code requirements and plans and specifications which must be approved in writing by Landlord. The Premises shall be separately metered, and Tenant shall be solely responsible for and promptly pay all charges for use or consumption of sewer, gas, electricity, water and all other utility services. Subject to the applicable rules and regulations of any applicable regulatory authority, the Mohegan Tribal Utility Authority or any other instrumentality of the Tribe or Landlord or company owned by the Tribe or Landlord (the "Tribal Utility Authority") may make electricity, sewer, gas, water, and other utility services available to the Premises, and so long as the Tribal Utility Authority continues to provide such services Tenant agrees to purchase the same from the Tribal Utility Authority and pay in a timely manner the Tribal Utility Authority such services (based upon the Tribal Utility Authority's determination from time to time of Tenant's consumption of such services), on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date, provided such charges are at competitive rates.

Tenant shall operate its heating and air conditioning so that the temperature in the Premises will be the same as that in the surrounding space in the Complex, and set Tenant's thermostat at the same temperature as that thermostat nearest the Premises. Tenant shall be responsible for the installation, maintenance, repair and replacement of air conditioning, heating and ventilation systems within and specifically for the Premises, including all components such as air handling units, air distribution systems, motors, controls, grilles, thermostats, filters and all other components. Tenant shall operate ventilation so that the relative air pressure in the Premises will be the same as or less than that in the surrounding space in the Complex.

Section 7.2.    Enforcement and Termination.

Landlord shall not be liable to Tenant in damages or otherwise if any utilities or services, whether or not furnished by Landlord hereunder, are interrupted or terminated because of repairs, installation or improvements, or any cause beyond Landlord's reasonable control, nor shall any such termination relieve Tenant of any of its obligations under this Lease, except if such utilities provided by Landlord or the Tribal Utility Authority are interrupted for in excess of seventy two (72) hours (due to no fault of Tenant), and due to such interruption Tenant cannot reasonably operate its business at the Premises, then all Rents and other charges shall abate until Tenant is again reasonably able to operate its business at the Premises. Tenant shall operate the Premises in such a way as shall not waste fuel, energy or natural resources. Landlord may cease to furnish any one or more of said utilities or services to Tenant without liability for the same and no discontinuance of any utilities or services shall constitute a constructive eviction, provided the Tribal Utility Authority or Landlord, as the case may be, shall not discontinue furnishing utilities to the Premises, if within their control, until Tenant can reasonably obtain such utilities in sufficient quantities to meet its needs directly from the public utility.

## ARTICLE VIII

## CONDUCT OF BUSINESS BY TENANT

Section 8.1.    Use of Premises.

The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein the business of the retail sale of moderate to better priced women's and misses apparel and

13

related accessories (provided that: (i) no more than 14% of its total product line shall consist of handbags and (ii) no more than 14% of its total product line shall consist of costume jewelry), and Tenant shall not use or permit or suffer the use of the Premises for any other business or purpose. This Lease does not grant any exclusive use rights to Tenant.

Section 8.2.    Prompt Occupancy and Use.

Tenant will occupy the Premises upon the Commencement Date and thereafter continuously operate and conduct in 100% of the Premises during each hour of the entire Lease Term when Tenant is required under this Lease to be open for business the business permitted under Section 8.1 hereof, with a full staff and full stock of merchandise, using only such minor portions of the Premises for storage and office purposes as are reasonably required.  The parties agree that: Landlord has relied upon Tenant's occupancy and operation in accordance with the foregoing provisions; because of the difficulty or impossibility of determining Landlord's damages which would result from Tenant's violation of such provisions, including, without limitation, damages from loss of Percentage Rent from Tenant and other tenants, and diminished saleability, mortgageability and economic value, Landlord shall be entitled to liquidated damages if it elects to pursue such remedy; therefore, for any day that Tenant does not fully comply with the provisions of this Section 8.2, Landlord shall notify Tenant of such, and the Minimum Annual Rent, prorated on a daily basis, shall be increased by twenty percent (20%), such increased sum representing the damages which the parties agree Landlord will suffer by Tenant's noncompliance.  In addition to all other remedies, Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this Section 8.2.

Section 8.3.    Conduct of Business.

Such business shall be conducted (a) under the name "Cache" unless another name is previously approved in writing by the Landlord, in its sole discretion; and (b) in such manner as shall assure, in Tenant's reasonable business judgment, the transaction of a maximum volume of profitable business in and at the Premises.  Tenant's store shall be and remain open on such days, nights and hours as shall be set from time to time by Landlord (which such hours of operation shall be uniformly applied to all retail tenants (excluding restaurants, day care center and any other non-retail tenants) in the Retail Facilities), but Tenant shall not be obligated (but shall be authorized) to be open beyond the following hours, unless otherwise mutually agreed by Landlord and Tenant:

11:00 A.M. to 11:00 P.M. Monday through Sunday.

Notwithstanding the foregoing, Tenant shall be permitted to close for (i) reasonable periods of time to take inventory not to exceed two days in any Lease year and not to occur during June, July, or August, (ii) reasonable periods of time to make repairs, provided Tenant uses reasonable efforts to do so at times to minimize disruptions to Tenant's business operations, (iii) during the period of time the Casinos are closed (in which event, Tenant shall owe no Rent and other charges due hereunder).  If the Casinos permanently cease to operate, Tenant shall have the right to terminate this Lease with thirty (30) days written notice at any time after such cessation, without penalty.

Section 8.4.    Operation by Tenant.

Tenant covenants and agrees that it shall:  not place or maintain any merchandise, vending machines or other articles in any vestibule or entry of the Premises or outside the Premises; not permit any gaming or gaming devices in the Premises; store garbage, trash, rubbish and other refuse in rat-proof and insect-proof containers inside the Premises, and remove the same frequently and regularly and, if directed by Landlord, by such means and methods and at such times and intervals as are designated by Landlord, all at Tenant's expense; not permit any sound system audible, or objectionable advertising medium visible, outside the Premises; keep all mechanical equipment free

14

of vibration and noise and in good working order and condition; not commit or permit waste or a nuisance upon the Premises; not permit or cause odors to emanate or be dispelled from the Premises; not solicit business in the Common Areas or any other portion of the Complex nor distribute advertising matter to, in or upon any Common Areas or any other portion of the Complex; not permit the loading or unloading or the parking or standing of delivery vehicles outside any area designated therefor, nor permit any use of vehicles which will interfere with the use of any Common Areas or any other portion of the Complex; comply with all laws, recommendations, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, including those with authority over insurance rates, with respect to the use or occupancy of the Premises; light the show windows of the Premises and all signs each night of the year for not less than one (1) hour after the Premises is permitted to be closed (provided that Tenant shall not be required to keep the store lights (excluding the show windows and signs) on more than one hour before or one hour after the Premises is permitted to be closed); not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; not place a load on any floor in the Complex which exceeds the floor load per square foot which such floor was designed to carry.

Section 8.5.    Storage.

Tenant shall store in the Premises only merchandise which Tenant intends to sell at, in or from the Premises, within a reasonable time after receipt thereof.

Section 8.6.    Painting, Decorating, Displays, Alterations.

Tenant will not paint, decorate or change the architectural treatment of any part of the exterior of the Premises (or any part of the Premises visible from the exterior thereof) nor make any structural alterations, additions or changes in the Premises without Landlord's written approval thereto (which shall be in Landlord's sole discretion), and will promptly remove any such paint, decoration, alteration, addition or changes applied or installed without Landlord's approval and restore the Premises to an acceptable condition or take such other action with respect thereto as Landlord directs. Notwithstanding anything contained in this Lease to the contrary, Tenant may make non-structural and non-storefront alterations without Landlord's consent that do not exceed twenty five thousand dollars ($25,000).

Tenant will install and maintain at all times, subject to the other provisions of this Section 8.6, merchandise displays in any show windows on the Premises; the arrangement, style, color and general appearance thereof and of displays in the interior of the Premises which are visible from the exterior, including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be maintained in keeping with the character and standards of the Complex.

Section 8.7.    Other Operations.

If, during the Lease Term, Tenant directly or indirectly operates, manages or has any interest whatsoever in any other store or business operating under the trade name of the Premises within or as part of any casino, gaming facility, gaming resort or associated hotel or other associated facilities located within a radius of twenty five (25) miles of the Complex, it will injure Landlord's ability and right to receive Percentage Rent (such ability and right being a major consideration for this Lease and the construction of the Complex). Accordingly, if Tenant operates, manages or has such interest in any such store or business within such radius, one hundred percent (100%) of all sales made from any such other store or business shall be included in the computation of Gross Sales for the purpose of determining Percentage Rent under this Lease as though said Gross Sales had actually been made at, in or from the Premises. Landlord shall have all rights of inspection of books and records with respect to such stores or businesses as it has with respect to the Premises; and Tenant shall furnish to Landlord such reports with respect to Gross Sales from such other store or business as it is herein required to furnish with respect to the Premises.

15

Section 8.8.    Emissions and Hazardous Materials.

Tenant shall not, without the prior written consent of Landlord (which may be withheld or conditioned in Landlord's sole discretion), cause or permit, knowingly or unknowingly, any Hazardous Material to be brought or remain upon, kept, used, discharged, leaked, or emitted in or about, or treated at the Premises or the Complex. As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended 42 U.S.C. § 9601 et seq., ("CERCLA"), and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq. ("RCRA"). As a condition to Landlord's consent, Landlord may require, among other things, that Tenant prepare an "Environmental Audit" for Landlord's review. Such Environmental Audit shall list:  (a) the name(s) of each Hazardous Material and a Material Safety Data Sheet (MSDS) as required by the Occupational Safety and Health Act; (b) the volume proposed to be used, stored and/or treated at the Premises (monthly); (c) the purpose of such Hazardous Material; (d) the proposed on-premises storage location(s); (e) the name(s) of the proposed off-premises disposal entity; and (f) an emergency preparedness plan in the event of a release. Additionally, the Environmental Audit shall include copies of all required federal, state, and local permits concerning or related to the proposed use, storage, or treatment of any Hazardous Material(s) at the Premises. Tenant shall submit a new Environmental Audit whenever it proposes to use, store, or treat a new Hazardous Material at the Premises or when the volume of existing Hazardous Materials to be used, stored, or treated at the Premises expands by ten percent (10%) during any thirty (30) day period. Landlord may revoke any consent previously granted upon: (x) Tenant's failure to remain in full compliance with applicable environmental permits and/or any other requirements under any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement (including, without limitation, CERCLA and RCRA related to environmental safety, human health, or employee safety; (y) Tenant's business operations pose or potentially pose a human health risk to other tenants, occupants, guests of invitees at the Complex; or (z) Tenant expands its use, storage or treatment of any Hazardous Material(s) in a manner inconsistent with the safe operation of the Complex. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material(s) in or upon the Premises or the Complex, Tenant shall strictly obey and adhere to any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements (including, without limitation, CERCLA and RCRA) which in any way regulate, govern or impact Tenant's possession, use, storage, treatment or disposal of said Hazardous Material(s). In addition, Tenant represents and warrants to Landlord that (1) Tenant shall apply for and remain in compliance with any and all federal, state or local permits in regard to Hazardous Materials; (2) Tenant shall report to any and all applicable governmental authorities any release of reportable quantities of any Hazardous Material(s) as required by any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements; (3) Tenant, within five (5) days of receipt, shall send to Landlord a copy of any notice, order, inspection report, or other document issued by any governmental authority relevant to the Tenant's compliance status with environmental or health and safety laws; and, (4) Tenant shall remove from the Premises all Hazardous Materials which did not exist in the Premises prior to Tenant taking possession of the Premises at the termination of this Lease.

In addition to, and in no way limiting, Tenant's duties and obligations as set forth in Section 11.6, should Tenant breach any of its duties and obligations as set forth in this Section 8.8, or if the presence of any Hazardous Material(s) introduced by Tenant on the Premises results in contamination of the Premises, the Complex, any land other than the Complex, the atmosphere, or any water or waterway (including, without limitation, groundwater), or if contamination of the Premises or of the Complex by any Hazardous Material(s) otherwise occurs for which Tenant is

EXECUTION COPY

16

otherwise legally liable to Landlord for damages resulting therefrom, Tenant shall indemnify, save harmless and, at Landlord's option and with attorneys approved in writing by Landlord, defend the Tribe, Landlord and their contractors, agents, employees, partners, officers, directors, and mortgagees, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature (including, without limitation, diminution in value of the Premises or the Complex, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or the Complex, damages arising from any adverse impact on marketing space in the Complex, and sums paid in settlement of claims and for attorney's fees, consultant fees and expert fees, which may arise during or after the Lease Term or any extension thereof as a result of such contamination). This includes, without limitation, costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Material(s) introduced by Tenant on or about the Premises or the Complex, or because of the presence of Hazardous Material(s) anywhere else which came or otherwise emanated from Tenant. Without limiting the foregoing, if the presence of any Hazardous Material(s) on or about the Premises or the Complex caused by Tenant results in any contamination of the Premises or the Complex, Tenant shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Complex to the condition existing prior to the introduction of any such Hazardous Material(s) to the Premises or the Complex; provided, however, that Landlord's approval of such actions shall first be obtained in writing.

In the event there are any Hazardous Materials in the Premises prior to the Commencement Date not introduced by Tenant or by any party under Tenant's control, or any Hazardous Materials thereafter introduced in the Premises by Landlord or any party or source under Landlord's Control, Landlord shall be solely responsible therefor, including, without limitation, any costs of remediation or clean-up. Landlord shall defend, indemnify and hold harmless the Tenant against and from any liability, claim of liability or expense arising out of any release of Hazardous Materials in violation of the foregoing.

### Section 8.9.    Sales and Dignified Use.

No public or private auction or any fire, "going out of business," bankruptcy or similar sales or auctions shall be conducted in or from the Premises and the Premises shall not be used except in a dignified and ethical manner consistent with the general high standards of merchandising in the Complex and not in a disreputable or immoral manner or in violation of national, state or local laws.

### Section 8.10.    Gaming Authorities.

If at any time (a) Tenant or any person associated in any way with Tenant is denied a license, found unsuitable, or is denied or otherwise unable to obtain any other Approval with respect to the Premises or the Complex or the Hotel by any applicable regulatory agency or subdivision regulating gaming (collectively "Gaming Authorities"), is required by any Gaming Authority to apply for an Approval and does not apply within any required time limit, as the same may be extended by such Gaming Authority, withdraws any application for Approval other than upon a determination by the applicable Gaming Authority that such Approval is not required, and if the result of the foregoing has or would have an adverse effect on Landlord or the Tribe or any Affiliate of Landlord or the Tribe or does or would delay obtaining any Approval; (b) any Gaming Authority commences or threatens to commence any suit or proceeding against Landlord or the Tribe or any Affiliate of Landlord or the Tribe or to terminate or deny any Approval of Landlord or Tribe or any Affiliate of Landlord or the Tribe as a result of the presence or action of Tenant or any person associated with Tenant; or (c) alleges any violation of the Compact as a result of the presence or

EXECUTION COPY



action of Tenant or any person associated with Tenant (collectively, a "Denial"), Landlord may terminate this Lease by written notice to Tenant; provided, however, that if Landlord exercises its right to terminate this Lease pursuant to this Section solely as the result of an association of Tenant or any person associated with Tenant which is the subject of a Denial, this Lease shall not terminate if Tenant ends such association within thirty (30) days of such notice of termination or within such shorter period of time, if any, as the Gaming Authority gives for terminating such association. Tenant and all such persons associated with Tenant shall promptly, and in all events within any time limit established by law, regulation or such Gaming Authority, furnish each Gaming Authority any information requested by such Gaming Authority and shall otherwise fully cooperate with all Gaming Authorities.

A person shall be deemed associated with Tenant if that person directly or indirectly owns any equity interest in Tenant, any equity interest in such person is directly or indirectly owned by Tenant, any equity interest in such person is directly or indirectly owned by a person directly or indirectly having any equity interest in Tenant ("Tenant Affiliates"), such person is employed by Tenant or a Tenant Affiliate, is an officer, director, managing member, general partner or agent of Tenant or a Tenant Affiliate, has any contractual relationship with Tenant or a Tenant Affiliate, furnishes services or property to Tenant or a Tenant Affiliate, or has the power to exercise a significant influence over Tenant or a Tenant Affiliate. Tenant represents to Landlord that neither Tenant, nor, to the best of Tenant's knowledge, any person associated with Tenant, is unwilling to file all necessary applications to obtain whatever Approvals may be required of such persons in connection with this lease. To the best of Tenant's knowledge, neither Tenant nor any person associated with Tenant has ever engaged in any conduct or practices which any of the foregoing persons should reasonably believe would cause such person or entity to be denied any Approval.

The term "Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person or any officer, director, trustee, managing member or general partner of either of such persons. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities or by agreement or otherwise. "Approval" means any license, finding of suitability or any other approval or permit by or from the Gaming Authorities. The term "Compact" means the tribal-state Compact entered into between the Tribe and the State of Connecticut pursuant to the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2701 et seq. (as amended), as such Compact may be amended from time to time, or such other Compact as may be substituted therefor.

## ARTICLE IX

## MAINTENANCE OF LEASED PREMISES

### Section 9.1.    Maintenance by Landlord.

Landlord shall keep or cause to be kept the foundations, roof and structural portions of the Premises in good order, repair and condition except for damage thereto due to the acts or omissions of Tenant, its agents or employees. Landlord shall commence required repairs as soon as reasonably practicable after receiving written notice from Tenant thereof. This Section 9.1 shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which events the obligations of Landlord shall be controlled by Article XVI and XVII. Except as provided in this Section 9.1 or if caused by the negligence of Landlord, its agents, servants, contractors or employees, Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures

EXECUTION COPY

therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises.

Section 9.2.    Maintenance by Tenant.

Tenant shall at all times keep the Premises (including, without limitation, all entrances and vestibules) and all partitions, window and window frames and mouldings, glass, store fronts, doors, door openers, fixtures, equipment and appurtenances thereof (including, without limitation, lighting, heating, electrical, plumbing, ventilating and air conditioning fixtures and systems and other mechanical equipment and appurtenances exclusively serving the Premises) and all parts of the Premises, and parts of Tenant's Work not on the Premises, not required herein to be maintained by Landlord, in good order, condition and repair and clean, orderly, sanitary and safe, damage by casualty excepted, (including, without limitation, doing such things as are necessary to cause such parts of the Premises to comply with applicable laws, ordinances, rules, regulations and orders of governmental and public bodies and agencies).    If replacement of equipment, fixtures and appurtenances thereto is necessary, Tenant shall replace the same with new or completely reconditioned equipment, fixtures and appurtenances, and repair all damages done in or by such replacement.    If Tenant fails to perform its obligations hereunder, and should such failure continue for more than ten (10) days after notice from Landlord to Tenant of such failure (except in cases of emergency, in which case no time or grace period shall be required), Landlord may, but shall not be obligated to, perform Tenant's obligations or perform work resulting from Tenant's acts, actions or omissions and add the cost of the same to the next installment of Minimum Monthly Rent due hereunder to be repaid in full.

Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated to pay for the repair, installation or alteration of any item of a structural nature with respect to the Premises that is not part of Tenant's Work unless necessitated by either (i) the nature of Tenant's business use of the Premises, (ii) the negligence of Tenant, or (iii) the omission by Tenant of any of its obligations under this Lease.

Section 9.3.    Surrender of Premises.

At the expiration or earlier termination of the Lease Term, Tenant shall surrender the Premises in the same condition as they were required to be in on the Required Completion Date, reasonable wear and tear and damage by casualty and condemnation excepted, and deliver all keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 24.7 or, at Landlord's option, to the office of the Complex's general manager.

**ARTICLE X**

**SIGNS, AWNINGS, CANOPIES, FIXTURES, ALTERATIONS**

Section 10.1.    Fixtures.

Throughout the Lease Term, Tenant shall maintain and operate the Premises in a first-class manner in keeping with the standards of the Complex, and to the extent necessary, Tenant shall refurbish all or any portion of the interior of the Premises so that the furnishings, furniture, flooring, wall fixtures and coverings, equipment and other appurtenances in the Premises are in a first-class condition.

Section 10.2.    Removal and Restoration by Tenant.

EXECUTION COPY

All alterations, changes and additions and all improvements, including, without limitation, leasehold improvements which attach to the Premises, made by Tenant, or made by Landlord on Tenant's behalf, whether part of Tenant's Work or not and whether or not paid for wholly or in part by Landlord, shall remain Tenant's property for the Lease Term. Any alterations, changes, additions and improvements shall immediately upon the termination of this Lease become Landlord's property, be considered part of the Premises, and not be removed at or prior to the end of the Lease Term without Landlord's written consent (in its sole discretion), unless Landlord requests Tenant to remove the same. If Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Premises prior to the end of the Lease Term, they shall become Landlord's property and Tenant shall repair or pay for the repair of any damage done to the Premises resulting from removing same but not for painting or redecorating the Premises.

<u>Section 10.3</u>    <u>Tenant's Liens.</u>

(a)    Tenant shall not suffer any mechanics' or materialmen's lien to be filed against the Premises or the Complex by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. Tenant agrees that it will make full and prompt payment of all sums necessary to pay for the costs of all repairs and permitted alterations, improvements, changes and other work done by or for the benefit of Tenant in or to the Premises, except for any bills which Tenant may be contesting in good faith, and further agrees to indemnify and save harmless Landlord from and against any and all costs and liabilities incurred by Landlord against any and all construction, mechanics', materialmen's, laborers' and other statutory or common law liens arising out of or from such work, or the cost thereof, which may be asserted, claimed or charged against all or any part of the Premises or the Complex. Notwithstanding anything to the contrary set forth in this Lease, the interest of Landlord in all or any part of the Premises or the Complex shall not be subject to any liens of any kind for improvements or work made or done by or at the instance, or for the benefit, of Tenant improvements or work made or done by or at the instance, or for the benefit, of Tenant whether or not the same shall be made or done by or at the permission or by agreement between Tenant and Landlord, and it is agreed that in no event shall Landlord, or the interest of Landlord in the Premises or the Complex, or any portion thereof, be liable for or subjected to construction, mechanics', materialmen's, laborers' or other statutory or common law liens for improvements or work made or done by or at the instance of Tenant, or concerning which Tenant is responsible for payment under the terms hereof or otherwise, and all persons dealing with or contracting with Tenant or any contractor of Tenant are hereby put on notice of these provisions. If any notice, claim or lien shall be asserted or recorded against the interest of Landlord in the Premises or the Complex, or any portion thereof, on the account of or extending from any improvement or work made or done by or at the instance, or for the benefit, of Tenant, or any person claiming by, through or under Tenant, or from any improvement or work the cost of which is the responsibility of Tenant, then Tenant agrees to have such notice, claim or lien canceled, discharged, released, bonded or transferred to other security in accordance with applicable statutes within fifteen (15) days after notice to Tenant by Landlord, and in the event Tenant fails to do so and such failure continues for another (15) days, Tenant shall be considered in default under this Lease with like effect as if Tenant shall have failed to pay an installment of rent when due and within any applicable grace period provided for the payment thereof. If Tenant fails to release of record any such lien within the aforesaid period, Landlord may remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in

20

connection with the discharge of said lien, together with interest thereon at the rate set forth in Section 4.2 and reasonable expenses incurred in connection therewith, including, without limitation, reasonable attorneys' fees, which amounts are due and payable to Landlord, is additional rent on the first day of the next following month.  Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under any applicable lien laws.  Tenant's obligation to observe and perform any of the provisions of this Section 10.3 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

(b)     Tenant shall not create or suffer to be created a security interest or other lien against any improvements, additions or other construction made by Tenant in or to the Premises or against any equipment or Fixtures installed by Tenant therein (other than Tenant's property), and should any security interest be created in breach of the foregoing.  Landlord shall be entitled to discharge the same by exercising the rights and remedies afforded it under subsection (a) of this Section.

(c)     Upon Tenant's opening in the Premises, Tenant shall furnish to Landlord lien waivers from the general contractor, sub-contractors and materialmen who provided work, labor, services or material to Tenant., except from those entities whose bills Tenant is contesting in good faith.

## ARTICLE XI

## INSURANCE

### Section 11.1   By Landlord.

Landlord shall carry public liability insurance on those portions of the Common Areas included in the Complex providing coverage of not less than $5,000,000.00 against liability for bodily injury including death and personal injury for any one (1) occurrence and $ 1,000,000.00 property damage insurance, or combined single limit insurance in the amount of $5,000,000.00.

Landlord shall also carry a standard all risk policy of property insurance insuring all improvements on the Complex, including the Premises (excluding any leasehold improvements or Tenant's merchandise, trade fixtures, furnishings, equipment, personal property and excluding plate glass) for the full insurable value thereof, with such deductibles as Landlord deems advisable.

### Section 11.2.   By Tenant.

Tenant agrees to carry public liability insurance on the Premises during the Lease Term, covering the Tenant and naming the Landlord and the Tribe as an additional named insured with terms and companies reasonably satisfactory to Landlord, for limits of not less than $2,000,000.00 for bodily injury, including death, and personal injury for any one (1) occurrence, $1,000,000.00 property damage insurance or a combined single limit of $2,000,000.00.  Tenant's insurance will include, without limitation, contractual liability coverage recognizing this Lease, products and completed operations liability and providing that Landlord and Tenant shall be given a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in such insurance.  Tenant also agrees to carry insurance against fire and such other risks as from time to time are reasonably required by Landlord, including, without limitation, a standard "all-risk" policy of property insurance protecting against all risk of physical loss or damage.  Such insurance shall include, without limitation, sprinkler leakage coverage and plate glass insurance, shall be in amounts not less than the actual replacement cost, or eighty percent (80%) of the actual replacement cost if Tenant maintains a net worth of at least ten million dollars ($10,000,000) and shall cover all

EXECUTION COPY



contents, betterments and improvements in the Premises, including, without limitation, any leasehold improvements and Tenant's merchandise, trade fixtures, furnishing, wall covering, floor covering, carpeting, drapes, equipment and all items of personal property of Tenant located on or within the Premises. Tenant shall provide Landlord with certificates evidencing that such insurance is in full force and effect and stating the terms thereof. The minimum limits of the comprehensive general liability policy of insurance shall in no way limit or diminish Tenant's liability under Section 11.6 and shall be subject to reasonable increase at any time, and from time to time upon reasonable prior notice from Landlord.

Notwithstanding anything contained herein to the contrary, Tenant shall be entitled to self-insure with respect to plate glass in the Premises and shall be deemed for the purposes of this Lease to have satisfactorily purchased such insurance.

### Section 11.3.    Mutual Waiver of Subrogation Rights.

(a)    Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by insurance on the Premises and the Complex to the extent of such insurance coverage or required coverage or in connection with property on or activities conducted on the Premises and the Complex and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof to the extent of such insurance coverage or required coverage and evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to make such insurance coverage commercially unavailable.

(b)    Notwithstanding anything contained herein to the contrary, except for the negligent or wrongful acts of Tenant, it's agents, servants and/or employees, Landlord agrees to indemnify, defend and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or from the Common Areas.

### Section 11.4.    Waiver.

Except to the extent caused by, the negligence or willful misconduct of Landlord, its agents, servants or employees, Landlord, its agents and employees, shall not be liable for, and Tenant waives all claims for, damage, including, without limitation, consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon any part of the Complex including, without limitation, claims for damage resulting from: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Complex in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (I) water, snow or ice upon the Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Premises, other tenants in the Complex, occupants of nearby properties, or any other persons; and (m) any act or omission of owners or occupants of adjacent or contiguous property, or of Landlord, its agents or employees. All property of Tenant kept in the Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.

EXECUTION COPY

<u>Section 11.5.    Insurance – Tenant's Operation.</u>

Tenant will not do or suffer to be done anything which will contravene Landlord's insurance policies or prevent Landlord from procuring such policies in amounts and companies selected by Landlord. If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Premises shall cause the rates of any insurance effected or carried by Landlord on the Premises or other property to be increased beyond the regular rate from time to time applicable to the Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand and Landlord shall have the right to correct any such condition at Tenant's expense. If this Lease so permits and Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices approved by Underwriters Laboratories and Factory Mutual Insurance Company and the installation thereof must be approved by the appropriate local authority. Tenant shall keep such devices under service as required by such organizations. If gas is used in the Premises, Tenant shall install gas cut-off devices (manual and automatic). Notwithstanding anything contained herein to the contrary, Tenant's permitted use of the Premises under Section 8.1 hereof shall be deemed not to effect any insurance policy or the premiums therefore or Landlord's ability to obtain any insurance policy.

<u>Section 11.6.    Indemnification.</u>

Except to the extent caused by the negligence or willful misconduct of Landlord, the Tribe their agents, servants or employees, Tenant shall save harmless, indemnify (to the maximum extent permitted by law), and at such indemnitee's option, defend Landlord, the Tribe and their respective agents and employees, and mortgagees, if any, from and against any and all liability, liens, claims, demands, damages, expenses, fees (including attorneys' fees), costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management or control of the premises or Tenant's operations, conduct or activities in the Complex.


## ARTICLE XII

## ESTOPPEL CERTIFICATE, ATTORNMENT, SUBORDINATION

<u>Section 12.1.    Estoppel Certificate.</u>

Within twenty (20) days after Landlord's written request Tenant shall deliver, executed in recordable form a declaration prepared by Landlord to any person designated by Landlord (a) ratifying this Lease; (b) stating the commencement and termination dates, and (c) certifying (I) that this lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated), (ii) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any), (iii) that no defenses or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed): (iv) as to advance rent, if any, paid by Tenant, (v) the date to which rent has been paid, (vi) as to the amount of security deposited with Landlord, and such other information as Landlord reasonably requires. Persons receiving such statements shall be entitled to rely upon them.



## Section 12.2.    Attornment.

Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises is located or this Lease or the Complex, or if the Premises or such building comes into the hands of a mortgagee or any other person because of a mortgage foreclosure, exercise of a power of sale under a mortgage, by the exercise of remedies by a ground lessor pursuant to a ground lease, or otherwise, attorn to the purchaser, mortgagee, ground lessor or other person and recognize the same as Landlord hereunder provided such entity agrees in writing that Tenant's quiet enjoyment of the Premises shall not be disturbed as long as Tenant is not in default of its obligations under this Lease.    Tenant shall execute, at Landlord's request, any attornment agreement with content reasonably acceptable to Tenant required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires provided that the same does not conflict with the terms of this Lease.

## Section 12.3.    Subordination.

This Lease shall be secondary, junior and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing (hereinafter collectively referred to as "mortgage") now or hereafter existing against all or a part of the Complex, and to all renewals, modifications, replacements, consolidations and extensions thereof, and Tenant shall execute within twenty (20) days after receipt from Landlord and deliver all documents with content reasonably acceptable to Tenant, requested by any mortgagee or security holder to effect such subordination provided such entity agrees in writing that Tenant's quiet enjoyment of the Premises shall not be disturbed as long as Tenant is not in default of its obligations under this Lease.   If Tenant fails to execute and deliver any such document reasonably requested by a mortgagee or security holder to effect such subordination and such failure continues for more than ten (10) days after notice from Landlord to Tenant of such failure, Landlord is hereby authorized to execute such documents and take such other steps as are necessary to effect such subordination on behalf of Tenant as Tenant's duly authorized irrevocable agent and attorney- in-fact coupled with an interest.

## ARTICLE XIII

## ASSIGNMENT, SUBLETTING AND CONCESSIONS

## Section 13.1.    Consent Required.

Except for assignments permitted pursuant to Section 13.3 hereof, Tenant shall not sell, assign, mortgage, pledge or in any manner transfer this Lease or any interest therein, nor sublet all or any part of the Premises, nor license concessions nor lease departments therein, without Landlord's prior written consent in each instance, which may be withheld or conditioned in Landlord's sole discretion. Consent by Landlord to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting.  This prohibition shall include a prohibition against any subletting or assignment by operation of law. If this Lease is assigned or the Premises or any part sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant and apply the same to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of any restrictive covenant contained in this Section 13.1 or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of any covenants on the part of Tenant herein contained.  Except for assignments permitted pursuant to Section 13.3 hereof, any assignment (a) as to which Landlord has consented; or (b) which is required by reason of a final nonappealable order of a court of competent jurisdiction; or (c) which is made by reason of and in accordance with the provisions of any law or statute, including, without limitation, the laws

24

governing bankruptcy, insolvency or receivership shall be subject to all terms and conditions of this Lease, and shall not be effective or deemed valid unless, at the time of such assignment:

(i) Each assignee or sublessee shall agree, in a written agreement reasonably satisfactory to Landlord, to assume and abide by all of the terms and provisions of this Lease, including those which govern the permitted uses of the Premises described in Article VIII; and

(ii) Each assignee or sublessee has submitted a current financial statement, audited by a certified public accountant, showing a net worth and working capital in amounts reasonably determined by Landlord to be sufficient to assure the future performance by such assignee or sublessee of Tenant's obligations hereunder; and

(iii) Each assignee or sublessee has submitted, in writing, evidence satisfactory to Landlord of substantial retailing experience in shopping centers of comparable size to the Complex and in the sale of merchandise and services permitted under Article VIII; and

(iv) The business reputation of each assignee or sublessee shall meet or exceed generally acceptable commercial standards; and

(v) The use of the Premises by each assignee or sublessee shall not violate, or create any potential violation of applicable laws, codes or ordinances (including, without limitation) those promulgated by any Gaming Authority), nor violate any other agreements affecting the Premises, Landlord or other tenants in the Complex.

(vi) Tenant shall pay Landlord the sum of One Thousand Five Hundred Dollars ($1,500.00) as reimbursement to Landlord for administrative and legal expenses incurred by Landlord in connection with any such assignment or subletting.

In the event of any assignment or subletting as provided above (other than assignments permitted pursuant to Section 13.3), there shall be paid to Landlord, in addition to the Minimum Annual Rent and other charges due Landlord pursuant to this Lease, the excess, if any, of the rent and other charges payable by the assignee or sublessee over the Minimum Annual Rent and other charges payable under the Lease to Landlord by Tenant pursuant to this Lease. Such additional rent shall be paid to Landlord concurrently with the payments of Minimum Annual Rent required under this Lease, and Tenant shall remain primarily liable for such payments. Notwithstanding any assignment or subletting, Tenant shall remain fully liable on this Lease and for the performance of all terms, covenants and provisions of this Lease.

Neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the part leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

Section 13.2. Right of Recapture.

Except for assignments permitted pursuant to Section 13.3, if Tenant agrees to assign this Lease or to sublet all or any portion of the Premises, Tenant shall deliver to Landlord executed

25



counterparts of any such agreement and all ancillary agreements with the proposed assignee or subtenant prior to the effective date thereof (the "Effective Date"). Landlord shall have the right to do any of the following by giving Tenant written notice thereof within thirty (30) days after receiving all of the foregoing documents:

(a)    With respect to a proposed assignment of this Lease or a proposed subletting of the entire Premises, Landlord shall have the right to terminate this Lease on the Effective Date as if such date were the expiration date of the Lease Term;

(b)    With respect to a proposed subletting of less than the entire Premises, Landlord shall have the right to terminate this Lease as to the portion of the Premises affected by such subletting on the Effective Date as if such date were the expiration date of the Lease Term, in which case Tenant shall promptly execute and deliver to Landlord an appropriate amendment of this Lease and other documentation in form satisfactory to Landlord in all respects.

If Landlord terminates this Lease as to only a portion of the Premises pursuant to this Section 13.2, the Minimum Annual Rent and additional rent shall be adjusted by Landlord in proportion to the area of the Premises affected by such partial termination. If Landlord exercises any of its rights under this Section 13.2, Landlord may thereafter lease the Premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be, without any liability to Tenant. If Landlord does not exercise its rights under this Section 13.2 within such thirty (30) day period, such rights shall be deemed waived, but Tenant shall nevertheless be required to fulfill all of the other requirements of this Lease, including Tenant's obligation to obtain Landlord's consent to such proposed assignment or sublease pursuant to this Article XIII. Landlord's rights under this Section 13.2 shall apply to any further subletting or assignment notwithstanding Landlord's consent to any proposed assignment or sublease. If Tenant subleases or assigns any interest in the Premises without the consent of Landlord as required herein, and if Landlord's consent is required by the terms of this Lease, Landlord shall be entitled, without waiving any of Landlord's other rights or remedies hereunder, to all economic consideration received by Tenant as a result thereof.

Section 13.3.    Permitted Assignments or Subleases.

Provided Tenant is not in default under any of the terms and conditions hereunder, Tenant may, following notice to, but without the necessity of obtaining consent from Landlord, assign this Lease to any parent, subsidiary, or affiliate corporation of Tenant, to the surviving corporation in connection with a merger, consolidation or acquisition, a corporation of which Tenant owns in excess of 50% of the outstanding capital stock, or to a purchaser which either buys substantially all of the stock of Tenant or substantially all of Tenant's stores, provided that (i) any such assignment shall not constitute a release of Tenant from the performance by Tenant of any covenants, obligations or agreements on the part of Tenant herein contained (for which Tenant shall remain primarily liable), (ii) the net worth (determined in accordance with generally accepted accounting principles) of the assignee shall not be less than that of Tenant at execution of this Lease, (iii) such assignee assumes in writing all of tenant's obligations hereunder, (iv) such assignee provides to Landlord such evidence as Landlord reasonably requires that the Premises shall continue to be operated under the name "Cache" or other name acceptable to Landlord in its sole discretion and (v) such assignee submits, in writing, evidence reasonably satisfactory to Landlord that the operator or management of the Premises shall have substantial experience in operating retail store operations. Furthermore, upon the foregoing conditions, Tenant shall have the right, without consent of Landlord and without any of the following constituting an assignment of this Lease: (a) cease to be a publicly held corporation (e.g. Tenant shall have the right to "go private"), (b) to make a public offering of stock, or (c) in any other way to alter the control of the shares of Tenant's stock.

26

### ARTICLE XIV

### MARKETING FUND AND ADVERTISING

**Section 14.1.    Provisions Relating to Marketing Fund.**

Landlord may, at its option, create and maintain a marketing fund (the "Marketing Fund"), the primary purpose of which is to provide sums necessary for professional marketing services which benefit the tenants in the Complex. In the event Landlord does create and maintain the Marketing Fund, Tenant agrees to contribute to such Marketing Fund, beginning upon the later to occur of (a) the Commencement Date, or (b) the date the Marketing Fund is created, one dollar ($1.00) per square foot of Store Floor Area during each calendar year of the Lease (the "Marketing Fund Charge") payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months). Commencing with the first (1st) day of the second (2nd) full calendar year following creation of the Marketing Fund and continuing on the first (1st) day of each calendar year thereafter, the Marketing Fund Charge shall be increased five percent (5%) annually. The failure of any other tenant to contribute to the Marketing Fund shall not affect Tenant's obligations hereunder.

**Section 14.2.    Media Fund.**

Landlord may, at its option, create and maintain a "Media Fund," the exclusive purpose of which shall be to pay all costs and expenses associated with the purchase of electronic, print or outdoor advertising for the promotion of the Complex. In the event Landlord does create and maintain the Media Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date or (b) the date the Media Fund is created, a sum of one dollar ($1.00) per square foot of Store Floor Area during each calendar year of the Lease (the "Media Fund Charge") payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months). Commencing with the first (1st) day of the second (2nd) full calendar year following creation of the Media Fund and continuing on the first (1st) day of each calendar year thereafter, the Media Fund Charge shall be increased five percent (5%) annually.

Tenant hereby authorizes Landlord to use Tenant's trade name and a brief description of Tenant's business in connection with any media advertising purchased pursuant to this Section.

**Section 14.3    Grand Opening Assessment**

For the purposes of paying sums necessary for the promotion of the grand opening of the new casino and Retail Facilities, Tenant shall pay to Landlord a one time fee equal to one dollar ($1.00) per square foot of Store Floor Area payable on the first day of the calendar month following the Commencement Date.

**Section 14.4.    Promotion.**

Tenant shall refer to the Complex under the name "Mohegan Sun" (the "Name") in designating the location of the Premises in all newspaper and other advertising in which Tenant will list the name of the Premises and in all other references to the location of the Premises. The rights granted herein to the Name do not include the right to use any of the "Mohegan Sun" trademarks and/or service marks, nor shall Tenant be permitted to use the Name in any manner other than as the name and address of the Complex. In particular, but not by way of limitation, Tenant shall not have the right to use the Name to market or make any product that has the Name on the product. The Mohegan Sun logo style, illustrated in Exhibit G attached hereto and made a part hereof, shall be used by Tenant whenever Tenant is entitled to use the Name hereunder. All signage and literature of or on behalf of Tenant using the Name shall be submitted to Landlord for its prior

EXECUTION COPY

written approval as to form and content, such approval to be at the sole discretion of Landlord; provided, however, Tenant may refer to the Complex under the Name for the specific purpose of designating the location of the Premises in all newspaper, literature and other advertising without the prior consent of Landlord. Further, Tenant shall have no rights to register the Name or take any action against third parties regarding an alleged infringement of the Name or any part thereof. The rights granted to Tenant pursuant to this Section 14.4 shall terminate upon the expiration of the Lease Term or the earlier termination for breach of this Lease or Landlord's cessation of the use of the Name. The rights granted herein shall not be assigned or sublicensed to any third party, other than in accordance with the provisions of this Section 14.4 or to the assignee or sublessee of Tenant's interest in this Lease pursuant to a permitted assignment or sublease. Should Landlord determine, in its reasonable discretion, that any advertising by Tenant which contains the name adversely affects the image, reputation or operation of the Complex, Tenant shall cease such advertising promptly upon receipt of notice to do so from Landlord.

## ARTICLE XV

### INTENTIONALLY OMITTED

### ARTICLE XVI

### DAMAGE AND DESTRUCTION

**Section 16.1.   Notice.**

If the Premises or any part thereof shall be damaged by fire or any other cause, Tenant shall give prompt notice thereof to Landlord.

**Section 16.2.   Restoration.**

If restoration is possible, in Landlord's reasonable estimate, within one hundred twenty (120) days from the date of damage; (a) Landlord shall restore the Premises at Landlord's expense up to the limit of insurance proceeds received by Landlord but subject to superior rights of any mortgagee in such proceeds (provided, however, that Landlord shall have no obligation to repair damage to or replace any leasehold improvements or any other contents, betterments or improvements located in the Premises which shall be repaired or replaced promptly by Tenant); and (b) if the Premises are untenantable for Tenant's permitted uses as set forth in this Lease, in whole or in part, during such restoration, the Minimum Annual Rent and Additional Rent payable hereunder shall be abated to the extent the Premises, or part thereof, are untenantable (in Landlord's reasonable judgment) and for the period of such untenantability. If Landlord commences restoration hereunder and fails to return the Premises to Tenant in substantially the condition originally required upon completion of Landlord's Work within one year of the date of such casualty, prior to completion of such work, Tenant may terminate this Lease by written notice to Landlord upon thirty (30) days notice.

**Section 16.3.   Termination.**

If restoration is not possible, in Landlord's reasonable estimate, within a period of one hundred twenty (120) days or is not permitted, or if the proceeds of insurance remaining after payment of any such proceeds to Landlord's mortgagee are insufficient to repair or restore the damage or destruction, then Landlord or Tenant, at its option, shall have the right to terminate this Lease by giving written notice thereof to the other within sixty (60) days after the occurrence of such damage, in which event this Lease and the tenancy hereunder shall terminate as of the date specified in such notice, which shall be no later than ninety (90) days after the occurrence of such

28

damage. If the Complex generally is so severely damaged by fire or other casualty (whether or not the Premises is affected) that Landlord shall decide, in its sole discretion, not to rebuild or reconstruct the Complex, this Lease and the tenancy hereunder shall terminate on the date specified by Landlord in a notice which shall be given no later than sixty (60) days after the casualty. If the Lease is terminated in accordance with this provision, all rental obligations hereunder shall terminate as of the effective date of such termination, provided, however, that those provisions of this Lease which are designated to cover matters of termination and the period thereafter shall survive the termination thereof. Notwithstanding anything contained herein to the contrary, in no event shall Landlord terminate this Lease unless Landlord contemporaneoulsy terminates the leases of all other similarly situated tenants in the Retail Facilities.

## ARTICLE XVII

## EMINENT DOMAIN

### Section 17.1.    Condemnation.

If ten percent (10%) or more of the Store Floor Area or fifteen percent (15%) or more of the Complex shall be acquired or condemned by right of eminent domain for any public or quasi public use or purpose, Landlord at its election may terminate this Lease by giving notice to Tenant of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination. If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials or equipment, labor difficulties, breakdown of equipment, government restrictions, fires, other casualties or other causes beyond the reasonable control of Landlord) repair or rebuild what remains of the Premises for Tenant's occupancy; and a just proportion of the Minimum Annual Rent and all Additional Rent shall be abated, according to the nature and extent of the injury to the Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term. If there is a condemnation, Landlord shall not exercise its right to terminate this Lease unless Landlord contemporaneously terminates the leases of all other similarly situated Tenants.

### Section 17.2.    Damages.

Landlord reserves, and Tenant assigns to Landlord, all rights to damages on account of any taking or condemnation or any act of any public or quasi public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. If Tenant fails to execute instruments required by Landlord, or undertake such other steps as requested, Landlord shall be deemed the duly authorized irrevocable agent and attorney-in-fact of Tenant to execute such instruments and undertake such steps on behalf of Tenant. However, Landlord does not reserve any damages payable for trade fixtures installed by Tenant at its own cost which are not part of the realty.

## ARTICLE XVIII

## DEFAULT BY TENANT

Section 18.1.    Events of Default.

Any of the following occurrences or acts shall constitute an event of default (each, an "Event of Default") under this Lease:

(a)    Tenant fails to pay any Minimum Annual Rent or any Additional Rent when due and such failure continues for more than ten (10) days following Landlord's notice thereof, provided that no more than two (2) notices in any Lease Year after which it shall be an Event of Default if such payments are not made within five (5) days of the due date thereof; or

(b)    Tenant fails to observe or perform any of the covenants, conditions and agreements of this Lease and such failure shall continue for a period of twenty (20) days after notice to Tenant of such failure; or

(c)    Tenant fails to correct any violation of health or safety laws or regulations within three (3) days (or such longer period if such violation cannot be cured within such three day period and Tenant diligently pursues such correction within such three day period) after an issuance of a citation therefor or within such shorter period as provided therein; or

(d)    The Premises are closed for business for more than fifteen (15) consecutive days (other than as a result of casualty or condemnation) or are abandoned; or

(e)    An Event of Bankruptcy occurs with respect to Tenant, any guarantor of this Lease or any general partner of Tenant (if Tenant is a partnership); or

(f)    The dissolution or liquidation of Tenant or any guarantor of this Lease, or if Tenant or any guarantor of this Lease is a natural person, the death or disability of such person.

Section 18.2.    Landlord's Rights and Remedies.

If an Event of Default has occurred and is continuing, Landlord shall have any of the following rights and remedies, in addition to any other rights and remedies provided in this Lease or allowed at law or in equity, without further notice or demand of any kind:

(a)    Landlord may make any payment or perform any act required of Tenant but the making of such payment or the doing of such act by Landlord shall not operate to cure such Event of Default or to estop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled.  Any such payments made or funds expended by Landlord shall be paid by Tenant upon demand as Additional Rent.

(b)    Landlord, without terminating this Lease or Tenant's right of possession hereunder, may recover any damages or delinquent payments due hereunder, in separate actions, from time to time or in a single proceeding deferred until the expiration of the Term of this Lease (in which event Tenant hereby agrees that no cause of action shall be deemed to have accrued until the expiration of the Term).

(c)    Landlord, at once or at any time thereafter, may terminate this Lease by written notice to Tenant, whereupon this Lease shall end and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided.  Within fourteen (14) days after receipt of notice of such termination by Landlord,  Tenant shall immediately surrender possession of



30

the Premises to Landlord and remove all of Tenant's effects therefrom, and Landlord may reenter and repossess the Premises and remove all persons and effects therefrom, by summary proceeding, ejectment or other legal action or by using such force as may be necessary, if not prohibited by applicable law.  Neither Landlord nor its agents shall be liable by reason of any such reentry, repossession or removal.

(d)     Within fourteen (14) days after receipt of notice of such termination by Landlord, if not prohibited by applicable law, Landlord may terminate Tenant's right of possession (without terminating this Lease unless such termination is effected by operation of law) and may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim for any damages or liability therefor, and, if Landlord so elects, make such alterations and repairs as, in Landlord's absolute discretion, may be necessary to relet the Premises, and relet the Premises or any part thereof, without notice to Tenant, for such rent and such use, and for such period of time and subject to such terms and conditions as Landlord, in its absolute discretion, may deem advisable and receive the rent therefor.  Upon each such reletting, all rent received by Landlord from such reletting shall be applied, first, to the payment of any indebtedness, other than any rent or other payment due hereunder, from Tenant to Landlord, including interest thereon; second, to the payment of any costs and expenses of such reletting, including brokerage fees, attorneys' fees and the costs of such alterations and repairs; third, to the payment of any Minimum Annual Rent and Additional Rent due and unpaid hereunder, together with interest thereon as herein provided; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder.  Tenant agrees to pay Landlord, on demand, any deficiency that may arise by reason of such reletting.  Landlord shall not be liable for any failure to relet the Premises or any part thereof or for any failure to collect any rent due upon any such reletting.  It is agreed that commencement and prosecution of any action by Landlord in unlawful detainer, ejectment or otherwise, or any execution of any judgment obtained in an action to recover possession of the Premises or other re-entry or removal shall not be construed as an election to terminate this Lease and shall not discharge Tenant from any of its obligations hereunder.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such prior default.

(e)     Landlord shall have the right, at its option, to take exclusive possession of Tenant's personal property and any other property located in the Premises and to use such property without charge therefor except Tenant's property removed upon or prior to termination.

(f)     Notwithstanding anything contained herein to the contrary, Landlord shall use commercially reasonable efforts to mitigate its damages following an Event of Default by Tenant hereunder. Nothing herein this subsection (f) shall be construed to limit the remedies of Landlord under this Lease or at law.

Section 18.3.    Extent of Liabilities.

If Landlord terminates this Lease pursuant to Section 18.2, Tenant shall remain liable for (a) Minimum Annual Rent, Additional Rent and any other sums due hereunder had such termination not occurred, and any and all expenses (including, without limitation, attorneys' fees, disbursements and brokerage fees) incurred by Landlord in re-entering and repossessing the Premises, in making good any default of Tenant, in painting, altering, repairing or dividing the Premises, in protecting and preserving (as reasonably necessary) the Premises by reasonable use of security guards and caretakers, and in reletting the Premises, and any and all expenses which Landlord may incur during the occupancy of any new tenant, less (b) the net proceeds of any reletting until the date this Lease would have expired if it had not been terminated.  Tenant agrees to pay to Landlord the

31

difference between items (a) and (b) above for each month during the Term, at the end of such month. Landlord shall be entitled to any excess with no credit to Tenant except that any excess payment from a prior month shall be a credit for any money due from Tenant in a subsequent month. Any suit brought by Landlord to enforce collection of such difference for any one month shall not prejudice Landlord's right to enforce the collection of any difference for any subsequent month. Tenant's liability shall survive the institution of summary proceedings and the issuance of any warrant hereunder.

Section 18.4.    Liquidated Damages.

At Landlord's option, if Landlord terminates this Lease pursuant to Section 18.2, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's default and in lieu of Tenant's liability under Section 18.3 beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages) the Percentage Rent (based upon the average Percentage Rent previously paid by Tenant) for the remainder of the unexpired Lease Term, the sum of which shall be discounted to present value using a discount rate of 8% per annum.

Section 18.5.    Tenant's Waiver.

Subject to the rights of notice under Section 18.2(c), Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, hereby specifically waives and surrenders any and all rights and privileges, so far as is permitted by law, which Tenant and all such persons might otherwise have under any present or future law (a) to the service of any notice to quit or of Landlord's intention to reenter or to institute legal proceedings, which notice may otherwise be required to be given, (b) to redeem the Premises, (c) to reenter or repossess the Premises, (d) to restore the operation of this Lease, with respect to any dispossession of Tenant by judgment or warrant of any court or judge, or any reentry by Landlord, or any expiration or termination of this Lease, whether such dispossession, reentry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease or (e) to the benefit of any homestead rights or exemptions or laws which exempts property from liability for debt or for distress for rent, (f) any right to assert pre-judgment remedies, and (g) any right to assert counterclaims in a summary proceeding except those which would be waived by Tenant if not so asserted. The words "dispossession," "reenter," "reentry," "reentered," "repossess" and "redeem" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

Section 18.6.    Right to Enjoin.

In the event of any breach or threatened breach by Tenant, or any persons claiming through Tenant, of any of the provisions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right or remedy allowed at law, in equity or otherwise as if reentry, summary proceedings or other specific remedies were not provided for in this Lease.

Section 18.7.    Remedies Cumulative; Fees.

Pursuit of any of the foregoing remedies shall not preclude Landlord from pursuing any other remedies herein or at law or in equity provided, nor shall pursuit of any remedy by Landlord constitute a forfeiture or waiver of any Minimum Annual Rent, Additional Rent or other sums due to Landlord hereunder or of any damages accruing to Landlord by reason of Tenant's violation of any of the covenants and provisions of this Lease. No failure of Landlord to exercise any power hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's right to demand exact compliance with the terms hereof. Receipt by Landlord of any Minimum Annual Rent or Additional Rent with knowledge of the breach of any provisions hereof

EXECUTION COPY

shall not constitute a waiver of such breach of any provisions hereof, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless made in writing. In the event of any Event of Default hereunder, regardless of what remedy Landlord elects to pursue, Landlord shall be entitled to collect all costs and expenses incurred by Landlord in connection therewith, including, without limitation, reasonable attorneys' fees.

Section 18.8.    Consent to Jurisdiction; Agent for Process; Waiver of Counterclaims.

Tenant and Landlord hereby consent to the exercise of personal jurisdiction over it by any federal or local court located in the State of Connecticut.

Section 18.9.    Late Charge; Interest.

Any payment of Minimum Annual Rent or Additional Rent not paid within five (5) days of the due date thereof shall be subject to a late charge of the lesser of (a) $200, or (b) five percent (5%) of such payment. In addition, such unpaid amount shall bear interest until paid beginning on the sixth (6th) day after such installment is due at the lesser of (i) the rate of three percent (3%) per annum over the prime rate of interest announced by Citibank, N.A. or its successors, or (ii) the highest non-usurious rate permitted under the laws of the State of Connecticut, and such interest shall constitute Additional Rent due and payable with the next installment of Minimum Annual Rent.

## ARTICLE XIX

## BANKRUPTCY OF TENANT

Section 19.1.    Event of Bankruptcy.

For purposes of this Lease, the following shall be deemed "Events of Bankruptcy": (a) if a receiver or custodian is appointed for any or all of Tenant's property or assets, or if there is instituted a foreclosure action on any of Tenant's property; or (b) if Tenant files a voluntary petition under 11 U.S.C. Section 101 et seq., as amended (the "Bankruptcy Code"), or under the insolvency laws of any state, district, commonwealth or territory of the United States of America (the "Insolvency Laws"); or (c) if there is filed an involuntary petition against Tenant as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is not dismissed within sixty (60) days of filing, or results in issuance of an order for relief against the debtor; or (d) if Tenant makes or consents to an assignment of its assets, in whole or in part, for the benefit of creditors, or a common law composition of creditors; or (e) if Tenant generally is not paying its debts as its debts become due.

Section 19.2.    Termination of Lease.

Upon the occurrence of an Event of Bankruptcy, Landlord, at its option and sole discretion, may terminate this Lease by written notice to Tenant (subject, however, to applicable provisions of the Bankruptcy Code or Insolvency Laws during the pendency of any action thereunder involving Tenant as the subject debtor). If this Lease is terminated under this Section 19, Tenant shall surrender and vacate the Premises immediately, and hereby waives all statutory or other notice to quit, and agrees that Landlord may recover possession by process of law or in any other lawful manner. If this Lease terminates pursuant to this Section 19.2, Tenant's obligations to pay Minimum Annual Rent, Percentage Rent and other charges due hereunder shall cease.

Section 19.3.    Assumption by Trustee.

If Tenant becomes the subject debtor in a case pending under the Bankruptcy Code (the "Bankruptcy Case"), Landlord's right to terminate this Lease under this Section 19 shall be subject

33

to the applicable rights (if any) of the debtor-in-possession or the debtor's trustee in bankruptcy (collectively, the "Trustee") to assume or assign this Lease as then provided for in the Bankruptcy Code; provided, however, the Trustee must give to Landlord, and Landlord must receive, proper written notice of the Trustee's assumption or rejection of this Lease within sixty (60) days (or such other applicable period as is provided pursuant to the Bankruptcy Code, it being agreed that sixty (60) days is a reasonable period of time for election of an assumption or rejection of this Lease) after the commencement of the Bankruptcy Case; it being agreed that failure of the Trustee to give notice of such assumption hereof within said period conclusively and irrevocably shall constitute the Trustee's rejection of this Lease and waiver of any right of the Trustee to assume or assign this Lease. The Trustee shall not have the right to assume or assign this Lease unless said Trustee (a) promptly and fully cures all defaults under this Lease, (b) promptly and fully compensates Landlord for all monetary damages incurred as a result of such default, and (c) provides to Landlord "adequate assurance of future performance." Landlord and Tenant (which term may include the debtor or any permitted assignee of debtor) hereby agree in advance that "adequate assurance of future performance," as used in this paragraph, shall mean that all of the following minimum criteria must be met: (i) the source of Minimum Annual Rent, Additional Rent, Percentage Rent and other consideration due under the Lease, and the financial condition and operating performance of the Tenant, and its guarantor, if any, shall be similar to the source, financial condition and operating performance of the Tenant as of the Term Commencement Date; (ii) the Percentage Rent due under the Lease will not decline substantially; (iii) Trustee or Tenant must pay to Landlord all Minimum Annual Rent, Additional Rent and other sums payable by Tenant hereunder, including its share (as estimated by Landlord) of the cost of all services provided by Landlord, in advance of the performance or provision of such services, and (iv) Trustee or Tenant must agree (by writing delivered to Landlord) that the use of the Premises as stated in this Lease will remain unchanged and that any assumption or assignment of this Lease is subject to all of the provisions thereof and will not violate or affect the rights or agreements of any other tenants or occupants in the Complex or of the Landlord (including any mortgage or other financing agreement for the Complex). The criteria stated above are not intended to be exhaustive or all-inclusive and Landlord may determine that the circumstances of the Tenant or of the Lease require other or further assurances of future performance. In the event Tenant is unable to: (w) cure its defaults, (x) reimburse Landlord for its monetary damages, (y) pay the Minimum Annual Rent, Additional Rent and Percentage Rent due under this Lease on time, or (z) meet that criteria and obligations imposed by (i) through (iv) above in this Section 19.3, then Tenant hereby agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Section 19.2.

## ARTICLE XX

## ACCESS BY LANDLORD

Landlord and its agents and employees shall have the right to enter the Premises from time to time at reasonable times (provided Landlord uses its best efforts to do so in a manner to least effect the operation of Tenant's business in the Premises), including, without limitation, the right of immediate entry at any time in the case of an emergency, to examine the same and show them to prospective purchasers and other persons and to post notices during periods of Tenant's construction as Landlord may deem reasonably necessary or appropriate for protection of Landlord, its interests or the Premises. Landlord and its agents and employees shall have the further right to enter the Premises from time to time at reasonable times to make such repairs, alterations, improvements, additions or perform maintenance functions to the Premises or other portions of the Complex (including mechanical, electrical and plumbing systems) as Landlord deems desirable (provided Landlord uses its best efforts to do so in a manner to least effect the operation of Tenant's business in the Premises). During the last six (6) months of the Lease Term, Landlord may exhibit the Premises to prospective tenants. In addition, during any apparent emergency, Landlord or its agents may enter the Premises forcibly without liability therefor and without in any manner affecting Tenant's

34

obligations under this Lease. Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided.

## ARTICLE XXI

## HOLDING OVER, SUCCESSORS

### Section 21.1.    Holding Over.

If Tenant holds over or occupies the Premises beyond the Lease Term (it being agreed there shall be no such holding over or occupancy without Landlord's written consent), Tenant shall pay Landlord for each day of such holding over a sum equal to the greater of (a) twice the Minimum Monthly Rent prorated for the number of days of such holding over, or (b) Minimum Annual Rent plus Percentage Rent prorated for the number of days of such holding over, plus, whichever of (a) or (b) is applicable, a prorata portion of all other amounts which Tenant would have been required to pay hereunder had this Lease been in effect. If Tenant holds over with or without Landlord's written consent Tenant shall occupy the Premises on a tenancy at sufferance but all other terms and provisions of this Lease shall be applicable to such period.

### Section 21.2.    Successor.

All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties and if Tenant is more than one (1) person, they shall be bound jointly and severally by this Lease except that no rights shall inure to the benefit of any assignee or subtenant of Tenant unless the assignment or sublease was approved by Landlord in writing as provided in Section 13.1 or otherwise permitted pursuant to Section 13.3 hereunder. Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment, Landlord and its successors and assigns (other than the assignee of Landlord's interest in this Lease) shall be released from any and all liability thereafter accruing hereunder.

## ARTICLE XXII

## QUIET ENJOYMENT

If Tenant pays the rents and other amounts herein provided, observes and performs all the covenants, terms and conditions hereof, Tenant shall peaceably and quietly hold and enjoy the Premises for the Lease Term without, interruption by Landlord or any person or persons claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease, the Ground Lease, and any Operating Agreement made between Landlord and persons owning or occupying all or any portion of the Adjacent Land or any buildings adjacent to the Complex.

## ARTICLE XXIII

## MISCELLANEOUS

### Section 23.1.    Waiver.

No waiver by Landlord or Tenant of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition. The acceptance of rent by Landlord shall not be deemed a waiver of any earlier breach by Tenant of any term, covenant or condition hereof, regardless of Landlord's

EXECUTION COPY

knowledge of such breach when such rent is accepted. No covenant, term or condition of this Lease shall be deemed waived by Landlord or Tenant unless waived in writing.

### Section 23.2.    Accord and Satisfaction.

Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same as indicated by Tenant on or with said payments, or if Tenant has not made any such indication thereof, at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. Except as provided herein, no endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy.

### Section 23.3.    Entire Agreement.

There are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by them.

### Section 23.4.    No Partnership.

Landlord does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant.

### Section 23.5.    Force Majeure.

If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other similar reason not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 23.5 shall at no time operate to excuse Landlord or Tenant from any obligations for payment of Minimum Annual Rent, Percentage Rent, other Additional Rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

### Section 23.6.    Submission of Lease.

Submission of this Lease to Tenant does not constitute an offer to lease; this Lease shall become effective only upon execution and delivery thereof by Landlord and Tenant. The effective date of this Lease shall be the date filled in on Page 1 hereof by Landlord, which shall be the date of execution by the last of the parties to execute the Lease.

### Section 23.7.    Notices.

36

All notices from Tenant to Landlord required or permitted by any provision of this agreement shall be directed to Landlord as follows:

> Mohegan Tribal Gaming Authority
> 5 Crow Hill Road
> Uncasville, CT  06382
> Attention:  Chairman of the Management Board
> Facsimile:  (860) 862-6162

with a copy to:

> Mohegan Tribal Gaming Authority
> 5 Crow Hill Road
> Uncasville, CT  06382
> Attention:  Mr. Robert Soper, Esq.
> Facsimile: (860) 862-6122

All notices to Tenant required or permitted hereunder shall be directed as follows, namely:

> Cache, Inc.
> 1460 Broadway
> New York, NY 10036
> Attention:  Mr. Tom Reinckens

All notices to be given hereunder by any person shall be written and sent by registered or certified mail, return receipt requested, postage pre-paid, by facsimile (with telephone confirmation and facsimile receipt) or by a recognized overnight delivery service, addressed to the person intended to be notified at the address set forth above.  Any person may, at any time, or from time to time, notify the other persons named herein in writing of a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address.  Notice given as aforesaid shall be sufficient service thereof and shall be deemed given as of the date received (or refusal), as evidenced by the return receipt of the registered or certified mail, the facsimile telephone confirmation and receipt, or the overnight delivery receipt, as the case may be.

Section 23.8.    Captions and Section Numbers.

This Lease shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

Section 23.9.    Number and Gender.

The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

Section 23.10.    Representation by Corporate Tenant.

If Tenant is or will be a corporation or limited liability company, Tenant hereby covenants and warrants that Tenant is a duly qualified corporation or limited liability company, as the case may be, authorized to do business in the State of Connecticut, that all franchise and corporate taxes have been paid to date and all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due, and the person signing this Lease on behalf of the

37



corporation is an officer of Tenant (or an authorized member of Tenant in the case of a limited liability company), and is duly authorized to sign and execute this Lease.

Section 23.11.  Joint and Several Liability.

If Tenant is comprised of more than one person or entity or is a partnership or other business organization the members of which are subject to personal liability, the liability of each such member shall be deemed to be joint and several.

Section 23.12.  Broker's Commission.

Except for Gordon/Brandt, LLC (who shall be compensated by Landlord pursuant to the terms of a separate agreement), each party represents and warrants that it has caused or incurred no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and each party shall indemnify and hold the other harmless against and from all liabilities arising from any such claims caused or incurred by it (including without limitation, the cost of attorneys' fees in connection therewith).

Section 23.13.  Partial Invalidity.

If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

Section 23.14.  Delay in Delivery.

Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable in any manner to Tenant for damages or any other claim resulting from failure to deliver the Premises or for any delay in commencing or completing any work Landlord is to perform or is authorized by Tenant to perform hereunder or with respect to the Complex, and Tenant hereby waives all such liability provided that in the event that the Commencement Date shall not have occurred within three (3) years after the effective date of this Lease (unless such failure shall be due to Tenant's fault), then this Lease shall automatically become null and void, and both parties hereto shall be relieved of all obligations hereunder, in which event each party will, at the other's request, execute an instrument in recordable form containing a release and surrender of all right, title and interest in and to this Lease.

Section 23.15.  Landlord's Consent to Suit.

Landlord expressly waives its immunity from unconsented suit for the purpose of permitting a suit by Tenant in any court of competent jurisdiction for any claims by Tenant for the purpose of enforcing this Lease and any judgment arising out of this Lease.  Landlord's waiver of immunity from suit is specifically limited to the following actions and judicial remedies: (a) the enforcement of Landlord's payment obligations under this Lease with an award of actual damages in connection with any breach of the provisions hereof; provided, however, that the court shall have no authority or jurisdiction to order execution against any assets or revenues of Landlord except cash of Landlord (other than cash which Landlord can demonstrate was derived from a source other than the Retail Facilities); and (b) an action to prohibit Landlord from taking an action that would prevent the operation of this Lease pursuant to its terms, or that requires Landlord to specifically perform any obligation under this Lease.  In no instance shall any enforcement of any kind whatsoever be allowed against any assets of Landlord other than the limited assets of Landlord specified in the foregoing clause (a).

38

### Section 23.16.  Tribe's Assets.

Nothing in this Lease shall obligate or authorize the payment or encumbrance of any assets or revenues of the Tribe.  Neither the Tribe or Landlord nor any of their respective directors, officers or office holders, employees, agents, representatives or members, as such, shall have any liability for any obligations of Landlord under this Lease or for any claim based upon, in respect of, or by reason of such obligations or their creation.

### Section 23.17.  Governing Law.

The rights and obligations of the parties and the interpretation and performance of this Lease shall be governed by the law of the Tribe, and, to the extent not addressed by the law of the Tribe, by applicable federal law, and, to the extent not addressed by the law of the Tribe or applicable federal law, the law of the State of Connecticut, without regard to its principles regarding conflicts of law.

### Section 23.18.  Customer Incentive Program.

At all times during the Lease Term, Tenant agrees to accept, as a form of payment, "customer cards" issued by the casino operator to its patrons.  For any Gross Sales for which customer cards are used as the form of payment, Landlord shall reimburse Tenant for ninety percent (90%) of the amount thereof.  Tenant's monthly statements of customer card use shall specify, in reasonable detail, those sales for which customer cards were used as the form of payment, and shall set forth the amount due from Landlord pursuant to this Section 23.18.  Landlord shall pay Tenant such amount due within ten (10) days following delivery of Tenant's monthly statement of customer card use.  In no event shall Tenant sell any good(s) or service(s) purchased with customer cards at a price higher than such good(s) or service(s) would otherwise be sold using any other form of payment.  Landlord shall not issue cash refunds for any purchases made using customer cards.  Notwithstanding anything provided in Section 4.4 or elsewhere in this Lease, any sales of goods or services paid using customer cards that are refunded in cash by Landlord shall not be excluded from the meaning of Gross Sales set forth in Article IV. Tenant shall comply with all reasonable rules, policies, and requirements established by Landlord, as may be amended from time to time, regarding the acceptance of customer cards.

### [SIGNATURES APPEAR ON FOLLOWING PAGE]

EXECUTION COPY



IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

LANDLORD

MOHEGAN TRIBAL GAMING AUTHORITY

By: *W-Scheler*
Name: William J. Velardo
Its:  President and General Manager
      Mohegan Sun Casino

TENANT

*Cache, Inc.*

By: *(signature)*
Name: Thomas E. Reinkens
Its:  President

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY



A certain tract or parcel of land, together with the buildings and all other improvements thereon, situated on the southeasterly side of Sandy Desert Road, the southeasterly side of Connecticut Route No. 32, the northeasterly side of Broadview Avenue and the northwesterly side of Fort Shantok Road in the Town of Montville, County of New London and State of Connecticut and being more particularly shown and delineated on a certain map or plan entitled "Survey Plan Prepared for The Mohegan Tribe of Indians of Connecticut Showing Land of United States of America In Trust for the Benefit of the Mohegan Tribe of Indians of Connecticut  #67 Sandy Desert Road  Montville, Connecticut  Scale: 1" = 200'  March 1999  Job Number: 99-5347-02  Sheet 1 of 1".  By Harris & Clark, A Division of McFarland-Johnson, Inc.    Griswold Connecticut, which premises are more particularly bounded and described as follows:

Beginning at a point in the southeasterly street line of Sandy Desert Road at a northwesterly corner of the herein-described tract and on the dividing line between the herein-described tract and land now or formerly of Mohegan Tribe of Indians of Connecticut; thence running South 04° 34' 54" East for a distance of 298.94 feet to a concrete monument recovered; thence running South 04° 35' 33" East for a distance of 254.69 feet to a concrete monument recovered; thence running North 85° 28' 43" West for a distance of 52.08 feet to a concrete monument recovered, the last three courses being bounded by said Mohegan Tribe of Indians of Connecticut land; thence running South 06° 35' 16" East for a distance of 181.76 feet to a concrete monument recovered; thence running North 85° 19' 00" West for a distance of 239.12 feet to a concrete monument recovered; thence running South 06° 37' 20" East for a distance of 126.21 feet to a concrete rebar recovered; thence running South 03° 10' 57" West for a distance of 99.70 feet to a concrete monument recovered; thence running North 86° 44' 47" West for a distance of 212.23 feet to a concrete monument recovered, the last five courses being bounded by land now or formerly of MTIC Acquisitions, LLC; thence running South 01° 15' 36" West for a distance of 99.98 feet, bounded northwesterly by land now or formerly of Emmatt-N. & Linda A. Strickland to a concrete monument recovered; thence running South 07° 03' 31" West for a distance of 124.82 feet to a concrete monument recovered; thence running South 07° 34' 18" West for a distance of 138.80 feet to a concrete monument recovered; thence running North 78° 51' 45" West for a distance of 209.41 feet to a concrete monument recovered, the last three courses being bounded by land now or formerly of Walter J. and Debbie L. Keane; thence running South 07° 31' 24" West for a distance of 69.99 feet, bounded northwesterly by Connecticut Route No. 32 to a concrete monument recovered; thence running South 78° 52' 36" East for a distance of 209.39 feet to a concrete monument recovered; thence running South 78° 51' 05" East for a distance of 160.71 feet to a concrete monument recovered at Connecticut Grid Coordinates North 739507.44, East 1178517.72; thence running South 11° 08' 03" West for a distance of 36.00 feet to a point; thence running South 78°51' 57" East for a distance of 11.00 feet to a point; thence running South 11° 08' 03" West for a distance of 92.35 feet to a point, the last five courses being bounded by land now or formerly of Frank G. Roderick, Jr., et al; thence running South 79° 25' 36" East for a distance of 191.76 feet along a stone wall, bounded southwesterly in part by land now or formerly of Richard and Shirley McDonald and in part by land now or formerly of

Page 1 of 5

Jimmy N. and Kathleen M. Sistare to a concrete monument recovered; thence running South 78° 35' 40" East for a distance of 200.59 feet, bounded southwesterly in part by land now or formerly of MTIC Acquisitions, LLC and in part by land now or formerly of Agnes and Ernest J. LaPorte to a concrete monument recovered; thence running South 78° 54' 17" East for a distance of 300.86 feet, bounded southwesterly in part by land now or formerly of Joyce Carol Elliott, et al, in part by land now or formerly of Eleanor Joyce Luft and in part by land now or formerly of Christopher A. and Lisa M. Newell to a rebar recovered; thence running South 77° 39' 24" East for a distance of 209.75 feet, bounded southwesterly in part by land now or formerly of Peter G. and Helen H. Rousseau and in part by land now or formerly of MTIC Acquisitions, LLC to a concrete monument recovered; thence running South 78° 50' 54" East for a distance of 216.56 feet, bounded southwesterly by land now or formerly of Christopher L. and Phyllis M. McCormick to an iron pipe recovered; thence running South 88° 02' 27" East for a distance of 183.74 feet, bounded southwesterly in part by said McCormick land and in part by land now or formerly of Horace W. and Gloria M. Deshefy to a concrete monument recovered; thence running South 01° 34' 54" West for a distance of 202.82 feet to a concrete monument recovered; thence running South 88° 26' 02" East for a distance of 150.00 feet to a point, the last two courses being bounded by said Deshefy land; thence running North 01° 31' 09" East for a distance of 35.00 feet to an iron pipe recovered; thence running South 83° 26' 29" East for a distance of 322.65 feet to a concrete monument recovered; thence running South 08° 21' 36" West for a distance of 200.83 feet to a concrete monument recovered, the last three courses being bounded by land now or formerly of Harry W. Collins; thence running South 81° 53' 04" East for a distance of 415.62 feet bounded southwesterly by Broadview Avenue to a concrete monument recovered; thence running North 01° 42' 10" West for a distance of 58.70 feet to an iron pipe recovered; thence running North 10° 42' 05" West for a distance of 45.00 feet to a point; thence running North 05° 19' 48" West for a distance of 124.70 feet to a concrete monument recovered; thence running North 81° 57' 48" East for a distance of 181.26 feet to a concrete monument recovered; thence running South 81° 57' 48" East for a distance of 192.70 feet to a point; thence running South 48° 42' 13" East for a distance of 158.40 feet along a fence line to a concrete monument recovered; thence running South 47° 09' 18" East for a distance of 565.19 feet to a drill hole recovered in a stone wall, the last seven courses being bounded by land now or formerly of Catherine Bolduc; thence running North 72° 11' 49" East for a distance of 102.09 feet along a stone wall to an angle in said stone wall; thence running North 80° 58' 11" East for a distance of 58.21 feet along a stone wall to the end of said stone wall; thence running North 71° 15' 46" East for a distance of 92.65 feet to a stone wall corner; thence running North 71° 20' 54" East for a distance of 23.94 feet along a stone wall to an angle in said stone wall; thence running North 74° 43' 10" East for a distance of 71.08 feet along a stone wall to a concrete monument recovered; thence running North 76° 14' 03" East for a distance of 28.06 feet along a stone wall to an angle in said stone wall; thence running North 68° 37' 42" East for a distance of 15.60 feet along a stone wall to an angle in said stone wall; thence running North 73° 29' 49" East for a distance of 127.85 feet along a stone wall to a drill hole recovered in said stone wall; thence running North 72° 22' 11" East for a distance of 21.61 feet along a stone wall to an iron pipe recovered; thence running South 16° 57' 33" East for a distance of 31.59 feet along a fence line to a fence post; thence running South 15° 05' 54" East for a distance of 84.04 feet along a fence line to a 6-inch Oak tree with wire; thence running South 13° 10' 31" East for

a distance of 54.71 feet along a fence line to a 4-inch Birch tree with wire; thence running South 23° 18' 51" East for a distance of 62.20 feet along a fence line to a 4-inch Beech tree with wire; thence running South 20° 45' 04" East for a distance of 114.84 feet along a fence line to a wood fence post; thence running South 17° 30' 25" East for a distance of 41.85 feet along a fence line to a stump with wire; thence running South 16° 42' 33" East for a distance of 148.83 feet along a fence line to a 14-inch Oak tree with wire; thence running South 19° 07' 08" East for a distance of 22.59 feet along a fence line to a 15-inch Oak tree with wire; thence running South 12° 45' 40" East for a distance of 36.94 feet along a fence line to a 10-inch dead Oak tree with wire; thence running South 14° 30' 26" East for a distance of 11.00 feet along a fence line to a 10-inch dead Oak tree with wire; thence running South 04° 25' 15" East for a distance of 28.81 feet along a fence line to a 12-inch dead Oak tree with wire; thence running South 11° 13' 19" East for a distance of 17.10 feet along a fence line to an 8-inch dead Oak tree with wire; thence running South 07° 15' 03" East for a distance of 84.60 feet along a fence line to an 18-inch dead Oak tree with wire; thence running South 03° 14' 32" West for a distance of 56.66 feet along a fence line to a point in the center of a stone wall; thence running North 78° 00' 54" West for a distance of 68.44 feet along a stone wall to an angle in said stone wall; thence running North 84° 17' 33" West for a distance of 109.78 feet along a stone wall to an angle in said stone wall; thence running North 87° 48' 33" West for a distance of 53.11 feet along a stone wall to an angle in said stone wall; thence running South 85° 52' 52" West for a distance of 29.79 feet along a stone wall to a drill hole recovered at a stone wall corner; thence running South 09° 09' 03" East for a distance of 238.99 feet along a stone wall to a drill hole set at the end of said stone wall; thence running South 03° 03' 18" East for a distance of 61.53 feet along a fence line to a 26-inch Oak tree with wire; thence running south 23° 09' 48" East for a distance of 47.77 feet along a fence line to a 17-inch Oak tree with wire; thence running South 11° 51' 03" West for a distance of 36.61 feet along a fence line to a 16-inch dead tree with wire; thence running South 46° 39' 16" East for a distance of 32.48 feet to a railroad spike in ledge recovered; thence running South 07° 17' 57" East for a distance of 55.19 feet along a stone wall to an iron pipe recovered in said stone wall; the last thirty-three courses being bounded by land now or formerly of Martin Realty, Inc.; thence running South 12° 31' 24" East for a distance of 115.48 feet, bounded southwesterly by land now or formerly of Glenn P. Martin, et al to an iron pipe recovered; thence running North 83° 21' 50" East for a distance of 242.09 feet to a drill hole recovered on ledge; thence running South 06° 08' 17" East for a distance of 400.24 feet to a point in the northwesterly street line of Fort Shantok Road, the last two courses being bounded by land now or formerly of Mathew C. Hopkins and Antonette M. Hopkins; thence running North 83° 46' 08" East for a distance of 429.13 feet, bounded southeasterly by Fort Shantok Road to a point in the northwesterly street line of Fort Shantok Road at a southwesterly corner of land now or formerly of MTIC Acquisitions, LLC; thence running North 14° 53' 14" West for a distance of 65.12 feet to the remains of a metal fence post; thence running North 11° 17' 57" West for a distance of 21.20 feet to the remains of a metal fence post; thence running North 15° 18' 17" West for a distance of 23.09 feet to the remains of a metal fence post; thence running North 15° 15' 33" West for a distance of 89.79 feet along a stone wall to an angle in said stone wall; thence running North 13° 28' 03" West for a distance of 52.97 feet along a stone wall to an angle in said stone wall; thence running North 09° 03' 32" West for a distance of 11.42 feet along a stone wall to a drill hole recovered in said stone wall; thence running North 12° 03' 02" West for a distance of

56.33 feet along a stone wall to an iron pipe recovered; thence running North 14° 23' 00" West for a distance of 117.48 feet along a stone wall to the end of said stone wall; thence running North 15° 10' 19" West for a distance of 227.98 feet to a stone pile; thence running North 15° 16' 30" West for a distance of 137.29 feet to a stone pile; thence running North 16° 07' 30" West for a distance of 304.36 feet to a point; thence running North 16° 43' 31" West for a distance of 94.09 feet to a point, the last twelve courses being bounded by land now or formerly of MTIC Acquisitions, LLC; thence running North 17° 46' 50" West for a distance of 86.72 feet to a point; thence running North 15° 59' 54" West for a distance of 69.57 feet to a point; thence running North 13° 09' 20" West for a distance of 241.49 feet to a point; thence running North 08° 51' 10" West for a distance of 99.13 feet to a point; thence running North 13° 11' 22" West for a distance of 44.72 feet to a point; thence running North 06° 55' 31" West for a distance of 44.45 feet to a point; thence running North 73° 35' 41" East for a distance of 58.04 feet along a stone wall to a concrete monument recovered, the last seven courses being bounded by land now or formerly of the Town of Montville; thence continuing North 73° 35' 41" East for a distance of 13.62 feet along a stone wall to the end of said stone wall; thence running North 73° 57' 46" East for a distance of 48.45 feet to a concrete monument recovered, the last two courses being bounded by land now or formerly of MTIC Acquisitions, LLC; thence running North 75° 05' 39" East for a distance of 190.94 feet, bounded in part by land now or formerly of MTIC Acquisitions, LLC and in part by land now or formerly of Southeastern Connecticut Regional Resource Recovery Authority to a concrete monument recovered; thence running North 73° 18' 39" East for a distance of 166.10 feet to an angle point; thence running North 75° 48' 39" East for a distance of 241.15 feet to a point at Connecticut Grid Coordinates North 738813.29, East 1183036.66, the last two courses being bounded by land now or formerly of Southeastern Connecticut Regional Resource Recovery Authority; thence running North 44° 37' 01" West for a distance of 437.22 feet to a point; thence running North 46° 20' 29" West for a distance of 133.75 feet to a point; thence running North 43° 39' 31" East for a distance of 209.89 feet to a point, the last three courses being bounded by land now or formerly of The Mohegan Tribe of Indians of Connecticut, LLC; thence running along the arc of a curve to the left with a radius of 3,100.00 feet, a central angel of 04° 34' 39" for a distance of 247.66 feet to a point; thence running North 51° 56' 11" West for a distance of 150.00 feet to a point; thence running along the arc of a curve to the right with a radius of 1,132.75 feet, a central angle of 37° 19' 02" for a distance of 737.77 feet to a point; thence running along the arc of a curve to the right with a radius of 883.00 feet, a central angle of 38° 49' 37" for a distance of 598.37 feet to a concrete monument recovered, the last four courses being bounded by land now or formerly of Central Vermont Railway, Inc.; thence running North 45° 14' 00" West for a distance of 35 feet, more or less, bounded northeasterly by land now or formerly of Central Vermont Railway, Inc. to the tidal high water mark of Trading Cove; thence running in a general westerly direction along the tidal high water mark of Trading Cove for a distance of 3, 743 feet, more or less, to a point which is located North 06° 33' 05" East 77 feet, more or less, from a rebar recovered at Connecticut Grid Coordinates North 741768.53, East 1179180.50; thence running South 06° 33' 05" West for a distance of 77 feet, more or less, to a rebar recovered; thence running South 06° 33' 05" West for a distance of 547.80 feet to an iron pipe recovered, the last two courses being bounded northwesterly by land now or formerly of John Lahaniatis and Mary Stevens, Trustee; thence running South 06° 34' 37" West for a distance of 275.26 feet, bounded northwesterly by land now or formerly of Joan Lahaniatis to a point; thence running South 07° 16' 42" West for a

distance of 52.35 feet, bounded northwesterly by the southeasterly terminus of Sandy Desert Road to a point; thence running South 88° 08' 28" West for a distance of 246.94 feet, bounded northwesterly by Sandy Desert Road to the point and place of beginning.

Together with all rights, easements, hereditaments and appurtenances thereto appertaining and all right, title and interest, if any, in and to strips and gores adjoining said premises and in and to the land lying in the bed of any street or streets adjoining said premises.



**EXHIBIT B**

**PLOT PLAN**





Level I - Plan

Level II - Plan

Retail

Mohegan Sun : Phase II

**EXHIBIT C**

**LOCATION OF PREMISES**

EXECUTION COPY



Mohegan Sun

GIS - Development Retail



Level 1 Retail

EXHIBIT D

DESCRIPTION OF LANDLORD'S AND TENANT'S WORK

I.      **WORK BY LANDLORD AT LANDLORD'S EXPENSE** - - The following work is to be performed exclusively by Landlord at Landlord's sole expense:

A.      COMMON AREA.  This may include, without limitation, the sidewalks, parking areas, access roads, driveways, landscaped areas (interior and exterior), truck serviceways, pedestrian bridges, interior corridors, loading areas, the enclosed mall, seating areas, courts, stairs, ramps, elevators, escalators, comfort and first-aid stations, public restrooms, retaining walls, drainage systems, water and sewage systems, trash disposal facilities, and lighting facilities designated by Landlord as part of Common Areas.

B.      STRUCTURE.   The structural framing, columns, beams and roof deck shall be constructed of framing in accordance with local building codes.

C.      FLOOR SLAB.  A concrete floor will be provided in compliance with the base building specifications.

D.      ROOF.  The roof assembly shall consist of a weather-resistant layer and structural components in accordance with local building codes.

E.      EXTERIOR WALLS.  Exterior walls shall be constructed in accordance with local building codes, having a finished appearance designed by Landlord.

F.      CEILINGS.  The Premises will be left open to the structural systems overhead. Public areas in the Complex may be provided treatments as determined by Landlord. Certain common areas may be exposed to structure.

G.      PARTITIONS AND DOORS.  Partitions, which may include doors, shall be provided to define the Premises.

1.      <u>Demising</u>.  These partitions shall extend from the floor slab to the underside of the deck, shall be of exposed studs.

2.      <u>Common Area Separation</u>.   These partitions shall be constructed in accordance with codes and standards of the Complex (as described in the Tenant Information Handbook), with a finished surface on the Common Area side of Landlord's selection.  Interior will be exposed studs to be completed by Tenant.

3.      <u>Doors</u>.   Landlord may will install a door and frame with construction hardware.  All additional doors required by codes or Tenant design are the work of the Tenant.

H.      STOREFRONT SEPARATION.  Landlord may be required by code or local governing ordinances to install some portion of the storefront partition separating the Premises from Common Area prior to delivery of the space to Tenant for completion of Tenant's Work.

I.    NEUTRAL PIER. A vertical neutral pier may be installed at the Landlord's option at the storefront line between stores.

J.    STOREFRONT BARRICADES. Landlord may install temporary storefront or barricade shielding the interior of the Premise from the complex at Landlord's sole option prior to tenant fitout. Maintenance of such temporary assemblies will be the sole expense of Tenant until completion of the Tenant permanent assemblies, as accepted by Landlord.

K.    UTILITIES. Subject to the provisions of Article VII of the Lease to which this Exhibit is attached:

1.    HVAC Systems. A heating, ventilating and/or air-conditioning system will be provided for the Common Area with a closed loop water system for Tenant areas. Closed-loop supply and return tap(s) will be installed with connection locations at the perimeter of the premises as designated by Landlord. Smoke evacuation system will be installed if required by base building design. A toilet exhaust routing and discharge criteria will be provided to serve areas with roof access or to minimize roof access with connection point and roof penetration points identified by Landlord.

2.    Plumbing. Sanitary sewer and domestic water will be installed at the perimeter of the premises at a point to be determined by Landlord. A master sanitary vent routing and connection point will be provided to serve areas with roof access or with connection point and roof penetration points and routing identified by Landlord.

3.    Fire Protection. A fire protection system will be installed for the Common Area with capacity to service tenant areas. An automatic fire sprinkler system based on a standard grid will be installed throughout the Premises in compliance with the requirements of the codes and standards of the Complex (as described in the Tenant Information Handbook) after Certificate of Occupancy of the Phase II complex, which includes in part the retail lease areas. Prior thereto, a valved connection point at the fire sprinkler loop will be identified by the Landlord for tenant connection at the perimeter of the premises, the fire sprinkler fit out work within the premise, at Tenant's expense.

4.    Natural Gas. If required, a master gas distribution meter location will be installed for accepted process loads at the perimeter of the premises at point(s) to be determined by Landlord. All remaining distribution approved gas work is at the Tenant's expense.

5.    Electrical Service. Connections to the electrical distribution system will be determined by Landlord. Electrical conduit and wire will be installed to the perimeter of the Premises from an electrical switch, or disconnect at Landlord's option, at an electrical distribution panel and meter provided in a location determined by Landlord.

6.    Communication Services. Communication and broadcast/data communication services will be provided to specified building locations at the perimeter of the premises as determined by Landlord. Empty conduit for communication services shall be stubbed into only landlocked tenant spaces from nearest service location.

EXECUTION COPY

7. <u>Life Safety Systems</u>. A life safety system will be provided for the Common Area with the capacity and connected at a point to the Premises designated by Landlord for tenant area improvements.

II. **WORK BY TENANT AT TENANT'S EXPENSE** - The following work required to complete and place the Premises in finished condition ready to open for business is to be performed by the Tenant at the Tenant's own expense and shall be in addition to any work described in the Tenant Information Handbook. If this Lease or the Tenant Information Handbook is in conflict with approved plans, the approved plans shall control, provided such approved plans comply with all applicable laws, rules and regulations. Tenant's Work includes, without limitation, the following:

A. **GENERAL PROVISIONS**: All work done by Tenant shall be governed in all respects by, and be subject to the following:

1. Intentionally Omitted.

2. <u>Tenant's Work Standards</u>. All Tenant's Work shall conform to applicable statutes, ordinances, regulations, codes, all requirements of Factory Mutual Insurance Company, all rating bureaus, and the Tenant Information Handbook which contains the basic architectural, electrical and mechanical standards necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease. Tenant shall obtain and convey to Landlord all approvals, tests, and inspections with respect to framing, structural, electrical, HVAC, plumbing, telephone and any other work requiring permit and or inspection by any agency or utility company. Landlord reserves the right to require changes in Tenant's Work when necessary by reason of the aforementioned standards.

3. <u>Landlord Approvals</u>. No approval by Landlord shall be deemed valid unless in writing and signed by Landlord.

4. <u>Space Verification</u>. Tenant shall be obligated to have its architect, store planner, engineer or contractor conduct an on-site verification of all dimensions and field conditions prior to proceeding with Tenant's Work.

5. <u>Insurance Requirements</u>. Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect and maintain Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Complex, all to the actual replacement cost thereof at all times on a completed value basis. In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of

Tenant's Work, and claims, fines, and penalties arising out of any failure of Tenant or its agents, contractors and employees to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

a. Workmen's Compensation and Occupational Disease Insurance in accordance with laws of the State in which the property is located and Employer's Insurance to the limit of the Tenant Information Handbook.

b. Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than the Tenant Information Handbook combined single limit per occurrence.

c. Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than the Tenant Information Handbook for any one occurrence combined single limit.

d. Owners and Contractors Protective Liability coverage for an amount not less than the Tenant Information Handbook.

6. Tenant agrees that the contract of every contractor, subcontractor, mechanic, journeyman, laborer, material supplier or other person or entity performing labor upon, or furnishing materials or equipment to, the Premises in connection with Tenant's Work shall contain the following provision:

"Contractor acknowledges that this provision is required under Tenant's lease of the premises to be improved under this Contract (Lease Premises) from The Mohegan Tribal Gaming Authority (Lease). In consideration of Tenant's engagement of Contractor to perform the work hereunder, and as an inducement to Tenant to enter into this Contract with Contractor, Contractor acknowledges, covenants and agrees that any mechanic's lien which it may hereafter file, claim, hold or assert with respect to the work hereunder (i) shall attach only to Tenant's interest in the Lease Premises under the Lease and (ii) shall be subject, subordinate and inferior to the lien of any mortgage(s) now or hereafter held upon and against the Mohegan Tribal Gaming Authority by any lender(s) now or hereafter providing funds thereto, notwithstanding that any such mortgage(s) may be recorded after the commencement of the work hereunder and that Contractor's mechanic's lien otherwise might be entitled to priority over any such mortgage(s). For such purposes, Contractor also shall execute, acknowledge and deliver a separate subordination agreement submitted by the Tenant, the Mohegan Tribal Gaming Authority, or any such lender(s), prior to making any application or request for payment hereunder and as a condition precedent to Contractor's

right to receive any payment hereunder. Contractor likewise shall cause the liens and lien rights of all subcontractors, sub-subcontractors, materialmen, suppliers, laborers and all other persons furnishing work, labor, materials, equipment and services on or in connection with the Lease Premises to be limited to the Tenant's interest in the Lease Premises under the Lease and to be subordinated to such mortgage(s), and Contractor shall obtain and deliver to Tenant a similar subordination agreement duly executed and acknowledged by each such subcontractor, sub-subcontractor, materialman, supplier, laborer and other person prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor shall indemnify, defend and hold harmless Tenant, The Mohegan Tribal Gaming Authority, The Mohegan Tribe of Indians and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorneys' fees), liability, suits, actions and judgments arising or resulting from Contractor's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Lease Premises under the Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens."

Tenant shall indemnify, defend and hold harmless Landlord and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, action and judgments arising or resulting from Tenant's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under this Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens.

7.    If Landlord in its reasonable discretion determines that the Complex or the businesses conducted thereon would otherwise be materially and adversely affected (e.g. strike or threatened strike), any or all work shall be done by recognized union labor.

8.    **Damage Deposit.** Prior to commencement of construction in the Premises, Tenant or its agent shall deliver a $1,000.00 damage deposit to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any damage, or other "cleaning" causes, caused by Tenant or its contractors to any mail finishes. Landlord shall refund the unused portions of the damage deposit to Tenant within thirty (30) days after the Commencement Date.

9.    **Temporary Services.** Any temporary services required by Tenant during its construction period, including, without limitation, HVAC, plumbing, electrical service, security, and dumpster service for trash removal shall be secured by Tenant or Tenant's agent at per square foot charge to be reasonably determined by Landlord (based upon actual costs).

10.   **Impact Fee.** Tenant shall pay impact fees assessed by applicable authorities having jurisdiction or reimburse Landlord for impact fees paid on the Tenant's behalf; provided however, such impact fees shall not exceed three thousand dollars ($3,000).

11.  <u>Construction Rules</u>.  Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by rules and regulations published by Landlord from time to time, including, without limitation, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Complex, trash storage, clean up or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

12.  <u>Reasonable Easement</u>.  Landlord specifically reserves the rights (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights), to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical, plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Complex.  Adequate access panels or doors shall be incorporated into Tenant's Work for inspection, service and replacement of both Landlord and Tenant equipment.

B.  **STORE DESIGN AND CONSTRUCTION.**  This shall include, without limitation, design and consulting fees, storefront and signing, interior partitions, all interior finishes, visual merchandising and fixturing, furnishings and equipment, lighting, plumbing, HVAC, mechanical, electrical and life safety systems interface, all as described herein and in the Tenant Information Handbook.  In connection with Tenant's Work, Tenant shall file all drawings, plans and specifications, pay all fees and obtain all permits and applications from applicable governmental authorities having jurisdiction.

1.  <u>Architectural Theme</u>.  Design guidelines will be enforced to maintain the integrity of the architectural theme of the Common Area in accordance with the Tenant Design Criteria Handbook.

2.  <u>Roof</u>.  Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof.  All such work shall be done only by contractor designated by Landlord at commercially reasonable rates consistent with those rates paid by Landlord for all work at the Complex.  Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

3.  <u>Floor Slab</u>.  Tenants shall provide concrete slab preparation for finishes and all code related issues, in example, but not limited to, pitch of floor to meet drainage required, ADA Compliance, etc.

4.  <u>Ceiling</u>.  All interior finishes beyond the exposed structural system will be installed by Tenant.  Ceiling enclosure will be required by the Landlord to maintain assembly ratings and building system functions.

5.  <u>Walls and Doors</u>.  Tenant shall furnish and install 5/8" fire-rated gypsum board, taped, floated, airtight against the deck above on the interior of all common partitions in the Premises.  Where required by Landlord, Tenant shall provide transfer air openings to match the rating of the partition.  All other interior partitions in the Premises shall be constructed of non-combustible materials in accordance with applicable code requirements.

Where required, Tenant shall provide and install any additional exit doors beyond the installation of the door required by Landlord in Section I(G)(3) hereof as provided in Tenant's Plans. Tenant will be responsible for repair, maintenance and replacement of exit doors from the time Tenant's contractor commences Tenant's Work in the Premises. If panic hardware is required, it shall be provided by Tenant.

5A.    Contractor.    Only contractors included in the Landlord approved contractor list or as reasonably approved by the Landlord, at request of the Tenant, may work at the complex or premises.

6.    Utilities and Services.    Tenant is responsible for all connections to the following utilities to make a complete, approved and operating system:

a.    HVAC System.    Tenant will provide all equipment, controls, duct work, etc. and a water-source heat pump or condenser water air conditioning unit. The system shall include, but not be limited to, toilet, process, kitchen and thermal exhaust, as Tenant design requires.

b.    Plumbing.    Tenant will complete waste, grease waste, water and vent systems utilizing Landlord located and supplied utilities.

c.    Fire Protection.    Modifications to the base building or tenant lease provides automatic fire sprinkler system will be performed by contractor designated by Landlord at commercially reasonable rates consistent with those rates paid by Landlord for all work at the Complex.. This work may include, but not be limited to, the cost of relocating, re-sizing, adding sprinkler mains, controls or heads, draining the sysem and fire watch during system down-time.

d.    Natural Gas.    If required, gas will be used only for food service or other approved process loads. Tenant shall provide all necessary information for provision of service to the Premises and the Tenant work to complete installation for the Premises.

e.    Electrical.    Tenant shall install all electrical improvements within the Premises. Tenant shall employ contractor designated by Landlord to complete all connections to Landlord's electrical system at commercially reasonable rates consistent with those rates paid by Landlord for all work at the Complex. Tenant shall provide necessary components and devices so that HVAC systems, life-safety systems and other systems can be interfaced with Landlord's Complex management systems at Tenants sole expense.

f.    Communication Services.    Tenant shall make all necessary arrangements with available vendor(s) for communication services to the Premises designated by the Landlord. Special applications will require Landlord's written approval prior to proceeding with the work all distribution boards, implements, etc. to be provided and installed by Tenant.

g.    Life Safety Systems.    Tenant shall provide all required life safety system components necessary to comply with code and complete

EXECUTION COPY



Landlord's monitoring and alarm systems. Installations shall be performed by contractor designated by Landlord at commercially reasonable rates consistent with those rates paid by Landlord for all work at the Complex, at Tenant's sole expense.

7. <u>Special Equipment</u>. Tenant shall provide, as required, alarm systems or other protective devices, including, without limitation, public address system, conveyors, time clocks, delivery door buzzers, fire extinguishers, dry chemical fire protection systems or any other equipment which Landlord designates as peculiar to Tenant's business needs.

8. <u>Signing</u>. Tenant will not erect any signs except in conformity with the following:

   a. Tenant's signs and graphics shall be located within the limits of the storefront, shall not project more than six inches beyond the Lease Line, and shall not exceed eighteen-inches in height.

   b. Decals or graphics on storefront glass subject to the approval of Landlord.

   c. Promotional paper items such as signs, stickers, banners or flags, are prohibited.

   d. Except as otherwise approved in writing by Landlord, only one storefront identification sign for Tenant will be permitted with the enclosed mall areas, except that corner tenants may have two such signs.

   e. Tenant shall not install any roof-top sign or pylon signs.

C. **CLOSE-OUT REQUIREMENTS.** Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

   1. <u>Proof of Payment</u>. Furnish evidence satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full, (and that such work has been accepted by Landlord), other than those payments contested in good-faith by Tenant (for which Tenant shall provide notice of such disputed amounts) including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this <u>Exhibit D</u>, the Tenant Information Handbook, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

   2. <u>Tenant's Affidavit</u>. Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises.

   3. <u>Tenant Contractor's Affidavit</u>. Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises.

4.  <u>Certificate of Occupancy</u>.  Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

5.  <u>Record Drawings</u>.  Furnish Landlord with one set of CADD record drawings of the Premises showing any changes made during construction, provided that if no changes were made from the CADD record drawings previously submitted to Landlord, Tenant shall be permitted, in lieu of submitting another set of CADD drawings, to provide Landlord a statement certified by Tenant's architect that no changes have been made.

6.  <u>Estoppel Certificate</u>.  Furnish a Tenant-executed estoppel certificate as may be required by Landlord or Landlord's mortgagee, with the content of such certificate reasonably acceptable to Tenant.

EXECUTION COPY



### EXHIBIT F

### RULES AND REGULATIONS

1.  Tenant shall advise and cause its vendors to deliver all merchandise before noon on Mondays through Fridays, not at other times.

2.  All deliveries are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives.

3.  Tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. No parking or storing of such trailers will be permitted in the Complex.

4.  Except for small parcel packages, no deliveries will be permitted through the malls unless Tenant does not have a rear service door. In such event, prior arrangements must be made with the Mohegan Sun's operations department designated by Landlord to handle such arrangements. Merchandise being received shall immediately be moved into Tenant's Premises and not be left in the service or receiving areas.

5.  Tenant is responsible for storage and removal of its trash, refuse and garbage. Tenant shall not dispose of the following items in drains, sinks or commodes: plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naptha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive. All Store Floor Area of Tenant, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition.

6.  Other than as permitted under the provisions of <u>Exhibit D</u>, Tenant shall not permit or suffer any advertising medium to be placed on mall walls, on Tenant's mall or exterior windows, on standards in the mall, on the sidewalks or on the parking lot areas or light poles. No permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign, and trade or seasonal decoration of any size, style or material within the Complex, outside the Premises.

7.  Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously given its written consent.

8.  Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside its Premises, nor shall Tenant use the exterior sidewalks or exterior walkways of its Premises to display, store or place any merchandise. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the parking lot or other common areas.

9.  Tenant shall not permit or suffer any portion of the Premises to be used for lodging purposes.

10. Tenant shall not, in or on any part of the Common Areas:

(a)   Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever.

(b)   Exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord and only in such areas as approved.

(c)   Distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord and only in such areas as approved.

(d)   Solicit membership in any organization, group or association or contribution for any purpose.

(e)   Create a nuisance.

(f)   Use any Common Areas for any purpose when none of the other retail establishments within the Complex is open for business or employment, except for activities as approved in writing by Landlord and only in such areas as approved.

(g)   Throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind.

(h)   Deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Complex, or the property of customers, business invitees or employees situated within the Complex.

(11)   In addition, the following rules and regulations shall apply to Tenant's employees:

(a)   All permanent (whether part-time, full-time or seasonal) tenant employees while on-duty or participating in any work-related activity, including general managers, must park in the assigned locations (if required for all similarly situated tenants) and must display proper parking stickers at all times.

(b)   Tenant employees will not have access to the Uncas Grill Employee Cafeteria at any time. Tenant employees may access any dining locations within the public areas of the Complex, as cash customers.

(c)   Tenant employees will not have access to the Eagle View Employee Center.

(d)   Smoking will be permitted only in approved smoking areas.

(e)   During their working hours, Tenant employees may use only public restrooms in the Retail Facilities.

(f)   All Tenant employees, if permitted by law, may be required to be tested for tuberculosis and the test results provided to Landlord.

(g)   All Tenant employees must attend a Mohegan Sun orientation to familiarize them with the Complex.

(h)   Conversations with the press regarding the Complex, its operation, Landlord or the Tribe are prohibited.

(i)   Tenant and its employees must comply with Mohegan Tribal Ordinances.

**EXHIBIT G**

**MOHEGAN SUN LOGOS**

EXECUTION COPY



