# Exhibit
# "A"

| (10/9/02)

NOV - 5 2002

Sold to Mall: _____

Lease Verified: _____

---

LEASE AGREEMENT

by and between

CHERRY HILL CENTER, LLC

(Landlord)

and

CACHE', INC.

t/a CACHE'

(Tenant)

---

<u>TABLE OF CONTENTS</u>

PAGE

ARTICLE I   DEFINITIONS AND ATTACHMENTS .......................... 1

      Section 1.1.  Certain Defined Terms ............................... 1
      Section 1.2.  Additional Defined Terms ........................... 4
      Section 1.3.  Attachments ....................................... 5

ARTICLE II   PREMISES .......................................... 6

      Section 2.1.  Demise .......................................... 6

ARTICLE III   TERM ........................................... 6

      Section 3.1.  Term ........................................... 6
      Section 3.2.  Termination ..................................... 6
      Section 3.3.  Holding Over ..................................... 6

ARTICLE IV   USE .................................. ............ 7

      Section 4.1.  Prompt Occupancy and Use .......................... 7
      Section 4.2.  Storage and Office Areas .......................... 7
      Section 4.3.  Tenant Trade Name ................................ 7
      Section 4.4.  Store Hours ..................................... 7

ARTICLE V   RENTAL ........................................... 8

      Section 5.1.   Rentals Payable ................................. 8
      Section 5.2.   Annual Basic Rental ............................. 8
      Section 5.3.   Annual Percentage Rental ........................ 8
      Section 5.4.   "Rental Year" Defined ........................... 8
      Section 5.5.   "Gross Sales" Defined ........................... 9
      Section 5.6.   Statements of Gross Sales ........................ 9
      Section 5.7.   Tenant's Records ................................ 10
      Section 5.8.   Payment of Rental ............................... 10
      Section 5.9.   Advance Rental .................................. 11
      Section 5.10.  Future Expansion ................................ 11

ARTICLE VI   TAXES ........................................... 11

      Section 6.1.  Tenant to Pay Proportionate Share of Taxes ......... 11
      Section 6.2.  Payment of Proportionate Share of Taxes ........... 11
      Section 6.3.  "Tax Year" Defined ............................... 12
      Section 6.4.  Taxes on Rental .................................. 12

(i)



ARTICLE VII   IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Section 7.1.  Tenant's Improvements . . . . . . . . . . . . . . . . . . . . . . . . . .   12
Section 7.2.  Effect of *Opening* for Business . . . . . . . . . . . . . . . . . . . . . . .   13
Section 7.3.  Mechanic's Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
Section 7.4.  Tenant's Leasehold Improvements and Trade Fixtures . . . . . . . . . . . .   13

ARTICLE VIII   OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Section 8.1.  Operations by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
Section 8.2.  Signs and Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
Section 8.3.  Painting and Displays by Tenant . . . . . . . . . . . . . . . . . . . . . .   15
Section 8.4.  Trash Removal Service . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
Section 8.5.  Permitted Use Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . .   16
Section 8.6.  Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

ARTICLE IX   REPAIRS AND ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . .   17

Section 9.1.  Repairs To Be Made By Landlord . . . . . . . . . . . . . . . . . . . . . .   17
Section 9.2.  Repairs To Be Made By Tenant . . . . . . . . . . . . . . . . . . . .   17
Section 9.3.  Damage to Premises . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
Section 9.4.  Alterations by Tenant . . . . . . . . . . . . . . . . . . . . . . . .   18
Section 9.5.  Changes and Additions to Shopping Center . . . . . . . . . . . . . . . . .   18
Section 9.6.  Roof and Walls . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

ARTICLE X   COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Section 10.1.  Use of Common *Areas* . . . . . . . . . . . . . . . . . . . . . . . . . .   19
Section 10.2.  Management and Operation of Common *Areas* . . . . . . . . . . . . . . .   15
Section 10.3.  Employee Parking Areas . . . . . . . . . . . . . . . . . . . . . . . . .   19
Section 10.4.  Tenant to Share Expense of Common Areas . . . . . . . . . . . .   19
Section 10.5.  "Landlord's Operating Costs" Defined . . . . . . . . . . .   2r
Section 10.6.  Mall Heating, Ventilating and Air-conditioning Equipment
               Contribution Rate . . . . . . . . . . . . . . . . . . . . . . .   21
Section 10.7.  Renovation or Expansion of Common Areas . . . .   21

ARTICLE XI   MERCHANTS' ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . .21

Section 11.1.  Merchants' Association . . . . . . . . . . . . . . . . . . . . .   21
Section 11.2.  Tenant's Contribution to Merchants' Association . . . . . . . . . . . . .   22
Section 11.3.  Landlord's Contribution to Merchants' Association . . . . . . . . . . . . .   22
Section 11.4.  "First Association Year" and "Association Year" Defined . . . . . . . . . .   22
Section 11.5.  Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

ARTICLE XII   UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Section 12.1.  Water, Electricity, Telephone and Sanitary Sewer . . . . . . . . . . . . .   23
Section 12.2.  Heating, Ventilating and Air-conditioning . . . . . . . . . . . . . . . . .   24
Section 12.3.  Fire Protection Sprinkler System . . . . . . . . . . . . . . . . . . . . .   24

(ii)



Section 12.4.  Discontinuances and Interruptions of Utility Services . . . . . . . . . . . . .   25

ARTICLE XIII   INDEMNITY AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

   Section 13.1.  Indemnities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
   Section 13.2.  Landlord Not Responsible for Acts of Others . . . . . . . . . . . . . . . . . .   26
   Section 13.3.  Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   Section 13.4.  Tenant's Contractor's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   Section 13.5.  Policy Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
   Section 13.6.  Increase in Insurance Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
   Section 13.7.  Waiver of Right of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
   Section 13.8.  Tenant to Pay Proportionate Share of Insurance Costs . . . . . . . . . . . .   28

ARTICLE XIV    DAMAGE AND DESTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

   Section 14.1.  Landlord's Obligation to Repair and Reconstruct . . . . . . . . . . . . . . . .   28
   Section 14.2.  Landlord's Option to Terminate Lease   . . . . . . . . . . . . . . . . . . . . . .   29
   Section 14.3.  Demolition of Landlord's Building . . . . . . . . . . . . . . . . . . . . . . . . .   29
   Section 14.4.  Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

ARTICLE XV    CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

   Section 15.1.  Effect of Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
   Section 15.2.  Condemnation Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

ARTICLE XVI   ASSIGNMENTS AND SUBLETTING

   Section 16.1.  Landlord's Consent Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
   Section 16.2.  Transfer of Corporate Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
   Section 16.3.  Transfer of Partnership Interests . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
   Section 16.4.  Acceptance of Rent from Transferee . . . . . . . . . . . . . . . . . . . . . . . .   32
   Section 16.5.  Additional Provisions Respecting Transfers . . . . . . . . . . . . . . . . . . .   32

ARTICLE XVII   DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

   Section 17.1.  "Event of Default" Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
   Section 17.2.  Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
   Section 17.3.  Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
   Section 17.4.  Remedies in Event of Bankruptcy or Other Proceeding . . . . . . . . . . . .   36

ARTICLE XVIII   SUBORDINATION AND ATTORNMENT . . . . . . . . . . . . . . . . . . . . .   39

   Section 18.1.  Subordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
   Section 18.2.  Mortgagee's Unilateral Subordination . . . . . . . . . . . . . . . . . . . . . . .   39
   Section 18.3.  Attornment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

(iii)

ARTICLE XIX    NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

    Section 19.1.  Sending of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40
    Section 19.2. Notice *to* Mortgagees . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

ARTICLE XX    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

    Section 20.1.  Radius Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40
    Section 20.2.  Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
    Section 20.3.  Inspections and Access by Landlord . . . . . . . . . . . . . . . . . . . . .    41
    Section 20.4.  Memorandum of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
    Section 20.5.  Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
    Section 20.6.  Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
    Section 20.7.  Compliance with Laws and Regulations . . . . . . . . . . . . . . . . . . . .    42
    Section 20.8.  Captions and Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42
    Section 20.9.  Joint and Several Liability . . . . . . . . . . . . . . . . . . . . . . . . . . .    42
    Section 20.10. Broker's Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42
    Section 20.11. No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42
    Section 20.12. No Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
    Section 20.13. No Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
    Section 20.14. No Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
    Section 20.15. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
    Section 20.16. Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
    Section 20.17. Corporate Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44
    Section 20.18. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44
    Section 20.19. Performance of Landlord's Obligations by Mortgagee . . . . . . . . . . . .    44
    Section 20.20. Waiver of Certain Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44
    Section 20.21. Limitation on Right of Recovery Against Landlord . . . . . . . . . . . . . .    44
    Section 20.22. Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45
    Section 20.23. Relocation of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

(10/9/02)

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") dated    NOV - 5 2002

by and between CHERRY HILL CENTER, LLC, a Maryland limited liability company ("Landlord"), and CACHE', INC., a Florida corporation, t/a CACHE', ("Tenant").

### WITNESSETH:

THAT FOR AND IN CONSIDERATION of the sum of One Dollar ($1.00) and the mutual covenants herein contained, the parties hereto do hereby covenant and agree as follows:

### ARTICLE I
### DEFINITIONS AND ATTACHMENTS

Section 1.1.   Certain Defined Terms.

As used herein. *the* term:

A.   "Shopping Center Area" means that certain parcel of land owned, leased or controlled by Landlord situate in the County of Camden, State of New Jersey, as more particularly described in Schedule "A-1", and upon the opening for business with the public, any such property used for expansion or addition.

B.   "Shopping Center" means the Shopping Center Area and the adjacent parcel or parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the shopping center known as the Cherry Hill Center and, upon the opening for business with the public, any such property used for expansion or addition.

C.   "Landlord's Building" means the structure or portions of a structure constructed or to be constructed by Landlord in the Shopping Center Area intended to be leased to retail tenants in the location shown on Schedule "A", as the same may be altered, reduced, expanded or replaced from time to time.

D.   "Premises" means Tenant's portion of Landlord's Building shown *on* Schedule "A" having the following Area:

Floor Area: 1475 square feet.

E.   "Outside Commencement Date" means August 1, 2002.

"Termination Date" means January 31, 2013.  *See* Rider to Lease Section 7.1.

F.   "Permitted Use" means the sale at retail of better quality women's apparel, lingerie, shoes, accessories related to women's apparel, and such other better quality apparel items as may be sold in other Cache' stores; provided, however, that the display of such accessories and other items shall not exceed twenty-five percent (25%) of the sales area of the Premises.

-1-



(10/9/02)

G.  "Annual Basic Rental" means an amount equal to the product of the following figure multiplied by Tenant's Floor Area (subject to adjustment as provided m Section 5.1.): $60.00

H.  "Annual Percentage Rental" means a sum equal to six percent (6%) of the amount by which annual Gross Sales exceed the product of $1,000.00 multiplied by Tenant's Floor Area (the "Breakpoint"), subject to adjustment as provided in Section 5.1.; provided, however, that if, during the first or last Rental Year in the Term, the Premises are not open for business with the general public for twelve (12) full calendar months, the Breakpoint shall be adjusted for any such Rental Year by multiplying the Breakpoint specified above by a fraction, the numerator of which shall be the actual number of days in such Rental Year during which the Premises were open for business with the general public, and the denominator of which shall be three hundred sixty-five (365).

I.  "Advance Rental" means the sum of $0.00. See Section 5.9.

J.  "HVAC Equipment Contribution Rate" means the sum of $1.25. See Schedule F.

K.  "Mall Heating, Ventilating and Air-Conditioning Equipment Contribution Rate" is included in HVAC Equipment Contribution Rate in Section 1.1.J.

L.  "Marketing Fund Contribution Rate" means the sum of $1.00. See Article XI.

M.  "Sprinkler Contribution Rate" means the sum of $.15. See Section 12.3.

N.  "Trash Removal Service Charge". See Section 8.4.

O.  "Water and Sewer Charge". See Schedule E.

P.  "Tenant Notice Address" means

    CACHE', INC.
    1460 Broadway
    New York, New York 10036
    Attn.: Tom Reinckens

Q.  "Tenant Trade Name" means CACHE' which Tenant represents it is entitled to use pursuant to all applicable laws.

R.  "Store Hours" means Monday through Saturday 10:00 a.m. to 9:30 p.m. and Sunday 11:00 a.m. to 6:00 p.m.

S.  "Restriction Area" means five (5) miles.

T.  "Landlord's Floor Area" means the aggregate number of square feet of Landlord's leasable floor area in Landlord's Building (exclusive of Anchor Stores and exclusive of any building not structurally connected to the enclosed mall or not having an opening into the enclosed mall) which, with respect to any such floor area which has been leased to any rent-paying tenant, shall be determined in accordance with the provisions of any lease applicable thereto and which, with respect to any such floor area not so leased, shall consist of all such leasable floor area in Landlord's Building designed for the exclusive use and occupancy of rent-paying

-2-



(10/9/02)

tenants, which shall exclude Common *Areas*, storage areas leased separately from retail areas, mezzanine areas and areas used for Landlord's management and promotion offices.

U.   "Tenant's *Floor Area*" means the number of square feet contained in that portion of Landlord's Floor Area constituting the Premises which shall be measured (a) with respect to the front and rear width thereof, from the exterior face of the adjacent exterior or corridor wall or, if none, from the center of the demising partition, to the opposite exterior face of the adjacent *exterior* or corridor wall or, if none, to the center of the opposite demising partition, and (b) with respect to the depth thereof, from the front lease line to the exterior face of the rear exterior wall, or corridor wall, or, if neither, to the center of the rear demising partition; and in no case shall there be any deduction for columns or other structural elements within any tenant's premises.

V.   "Common Areas" means those areas and facilities which may be furnished by Landlord or others in or near the Shopping Center Area for the non-exclusive general common use of tenants, Anchor Stores and other occupants of the Shopping Center, their officers, agents, employees and customers, including (without limitation) parking areas, access areas (other than public streets), employee parking areas, truckways, driveways, loading docks and areas, delivery passageways, package pick-up stations, sidewalks, interior and exterior pedestrian walkways and pedestrian bridges, malls, promenades, mezzanines, roofs, sprinklers, plazas, courts, *ramps*, common seating areas, landscaped and planted areas, retaining walls, balconies, stairways, escalators, elevators, bus *stops*, first-aid stations, sewage treatment facilities (if any) lighting facilities, comfort stations or rest rooms, civic center, meeting rooms, and other similar areas, facilities or improvements.

W.   "Default Rate" means an annual rate of interest equal to the lesser of (i) the maximum rate of interest for which Tenant may lawfully contract in the State in which the Shopping Center is located, or (ii) eighteen percent (18%).

X.   "Anchor Store" means any department or specialty *store* which either (i) occupies a floor area in excess of 50,000 square feet in the Shopping Center, or (ii) is designated an Anchor Store in a notice to that effect given by Landlord to Tenant.

Y.   "Landlord's Leased *Floor Area*" means the monthly average of the aggregate number of square feet contained in those portions of Landlord's Floor Area leased to tenants (including the Premises) as of the first day of each calendar month during the billing period in question, but not less than eighty-five percent (85%) of Landlord's Floor Area.

-3-



(10/9/02)

Section 1.2.  Additional Defined Terms.

The following additional terms are defined in the places in this Lease noted below

| Term | Section |
|---|---|
| "Additional Rental" | 5.1 |
| "Annual Merchants' Association Contribution" | 11.2 |
| "Association" | 11.1 |
| "Association Year" | 11.4 |
| "Casualty" | 14.1 |
| "Commencement Date" | 3.1 |
| "Consumer Price Index" | 11.2 |
| "Electricity Component" | Schedule E (if applicable) |
| "Electricity Factor" | Schedule E (if applicable) |
| "Event of Default" | 17.1 |
| "Expansion Opening Contribution" | 11.2 |
| "First Association Year" | 11.4 |
| "Fiscal Year" | Schedule F (if applicable) |
| "Gross Sales" | 5.5 |
| "Hazardous Substance" | 8.6 |
| " W A C Equipment Contribution" | Schedule F (if applicable) |
| "HVAC Factor" | Schedule F (if applicable) |
| "Landlord's Operating Costs" | 10.5 |
| "Liquidated Damages" | 17.3 |
| "Mortgage" | 18.2 |
| "Mortgagee" | 18.2 |
| "Release" | 8.6 |
| "Rental" | 5.1 |
| "Rental Year" | 5.4 |
| "Taxes" | 6.1 |
| "Tax Year" | 6.3 |
| "Tenant's Electrical Installation" | Schedule E (if applicable) |
| "Tenant's HVAC Charge" | Schedule F (if applicable) |
| "Tenant's V/CW Charge | Schedule F (if applicable) |
| "Term" | 3.1 |
| "Termination Damages" | 17.3 |
| "Umpire" | Schedule E (if applicable) |
| "V/CW Equipment Contribution" | Schedule F (if applicable) |
| "V/CW Factor" | Schedule F (if applicable) |

-4-



(10/9/02)

Section 1.3. Attachments.

The following documents are attached hereto, and such *documents,* as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| | |
|---|---|
| Schedule "A" | Drawing of Shopping Center Area including Landlord's Building and Tenant's Premises |
| Schedule "A-1" | Legal Description of Shopping Center |
| Schedule "A-2" | Additional Legal Description of Shopping Center (if applicable) |
| Schedule "B" | None |
| Schedule "C" | None |
| Schedule "D" | None |
| Schedule "E" | Utility Consumption and Payment Schedule |
| Schedule "F" | Tenant Heating Ventilating and Air-Conditioning Schedule or V/CW Schedule |

-5-

Case 15-10172-MFW    Doc 569-3    Filed 05/27/15    Page 13 of 101

ARTICLE II

PREMISES

Section 2.1.  Demise.

Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the Premises having the Floor *Area* as set forth in clause D of Section 1.1. hereof, which Landlord and Tenant hereby conclusively agree represents Tenant's Floor *Area* for all purposes of this Lease.

Landlord warrants that it and no other person or corporation has the right to lease the Premises hereby demised, and that so long as Tenant is not in default hereunder, Tenant shall have peaceful and quiet use and possession of the Premises, subject to any Mortgage, and all matters of record or other agreements to which this Lease is or may hereafter be subordinated.

Notwithstanding anything to the contrary contained herein, the Premises have been inspected by Tenant who shall be deemed to have accepted the same as existing as of the date Landlord delivers the Premises to Tenant for completion of all work required of it.

ARTICLE III

TERM

Section 3.1.  Term.

The term of this Lease (the "Term") shall commence on that date (the "Commencement Date") which shall be the earlier to occur of (a) the Outside Commencement Date or (b) the opening by Tenant of its business in the Premises, and shall terminate on the Termination Date.  Landlord and Tenant agree, upon demand of the other, to execute a declaration setting forth the Commencement Date as soon as the Commencement Date has been determined.

Section 3.2.  Termination.

This Lease shall terminate on the Termination Date, without the necessity of any notice from either Landlord or Tenant to terminate the same, and Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over to the same extent as if statutory notice had been given.  Tenant hereby agrees that if it fails to surrender the Premises at the end of the Term, or any renewal thereof, Tenant will be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof, and Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant.  For the period of three (3) months prior to the expiration of the Term, Landlord shall have the right to display on the exterior of the Premises a "For Rent" sign (not to exceed one foot by one foot in size) and during such period Landlord may show the Premises and all parts thereof to prospective tenants during normal business hours.

Section 3.3.  Holding Over.

If Tenant shall be in possession of the Premises after the expiration of the Term, in the absence of any agreement extending the Term, the tenancy under this Lease shall become one from month to month, terminable by either party on thirty (30) days' prior notice, and shall be subject to all of the terms and conditions of this Lease as though the Term had been extended from month to month, except that

-6-



(i) the Annual Basic Rental payable hereunder for each month during said holdover period shall be *equal* to twice the monthly installment of Annual Basic Rental payable during the last month of the Term, (ii) the installments of Annual Percentage Rental payable hereunder for each such month shall be *equal to* one-twelfth (1/12th) of the average Annual Percentage Rental payable hereunder for the last three (3) Rental Years of the Term, or if the Term is less than *three* (3)Rental Years, then such installments shall be *equal* to one-twelfth (1112th) of the Annual Percentage Rental payable hereunder for the last complete Rental Year preceding expiration of the Term, and (iii) all Additional Rental payable hereunder shall be prorated for each month during such holdover period.

ARTICLE IV<br>USE

### Section 4.1. Prompt Occupancy and Use.

Tenant shall occupy the Premises upon commencement of the Term and thereafter will continuously use the Premises for the Permitted Use and for no other purpose whatsoever.

### Section 4.2. Storage and Office Areas.

Tenant *shall* use only such minor portions of the Premises for storage and office purposes as are reasonably required therefor.

### Section 4.3. Tenant Trade Name.

Unless otherwise approved by Landlord, Tenant shall conduct business in the Premises only in the Tenant Trade Name.

### Section 4.4. Store Hours.

Tenant shall cause its business to be conducted and operated in good faith and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises. Tenant covenants and agrees that the Premises shall remain open for business at least during the Store Hours or such other hours as shall be seasonally adjusted by Landlord. If Tenant shall fail to cause its business to be operated during the hours required by the preceding sentence, or as otherwise required by Landlord, in addition to *any* other remedy available to Landlord under this Lease, Tenant shall pay to Landlord, as liquidated *damages* for such breach, a sum *equal* to One Hundred Dollars ($100.00) for each hour or portion thereof during which Tenant shall fail to so operate.

If Tenant shall request Landlord's approval of the opening of the Premises for business for periods exceeding those designated above and Landlord shall approve such request, Tenant shall pay for any additional *costs* incurred by Landlord in connection with Tenant's opening the Premises for business during such additional hours, including but not limited to, a proportionate share of any additional amounts of Landlord's *Operating Costs*, additional costs of heating, ventilating and air-conditioning the Premises, and additional utilities furnished to the Premises by Landlord.

-7-



ARTICLE V
RENTAL

Section 5.1.    Rentals Payable.

Tenant covenants and agrees to pay to Landlord as rental ("Rental") for the Premises, the following:

    (a)    the Annual Basic Rental specified in clause G of Section 1.1; plus

    (b)    the Annual Percentage Rental specified in clause H of Section 1.1; plus

    (c)    all additional sums, charges or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as additional rental (collectively referred to as "Additional Rental");

provided, however, that the Annual Basic Rental and the minimum amount of Gross Sales utilized in the computation of Annual Percentage Rental shall be adjusted proportionately for any Rental Year of more or less than twelve (12) calendar months.

Section 5.2.    Annual Basic Rental.

Annual Basic Rental shall be payable in equal monthly installments in advance on the first day of each full calendar month during the Term, the first such payment to include also any prorated Annual Basic Rental for the period from the date of the commencement of the Term to the first day of the first full calendar month in the Term.

Section 5.3.    Annual Percentage Rental.

Annual Percentage Rental shall be determined and payable monthly on or before the fifteenth (15th) day following the close of each full calendar month during the Term, based on Gross Sales for the preceding calendar month. Monthly payments of Annual Percentage Rental shall be calculated by (a) dividing the product specified in clause H of Section 1.1. by twelve (12); (b) subtracting the quotient thus obtained from the amount of Gross Sales for the month in question, and (c) multiplying the difference thus obtained (if greater than zero) by the percentage specified in clause H of Section 1.1. The first monthly payment of Annual Percentage Rental due hereunder shall include prorated Annual Percentage Rental based on Gross Sales from the *Commencement Date* through the last day of the month immediately prior to the first full calendar month in the Term. As soon as practicable after the end of each Rental Year, the Annual Percentage Rental paid or payable for such Rental Year shall be adjusted between Landlord and Tenant, and each party hereby agrees to pay to the other, on demand, the amount of any excess or deficiency in Annual Percentage Rental paid by Tenant *to* Landlord during the preceding Rental *Year* as may be necessary to effect adjustment to the agreed Annual Percentage Rental.

Section 5.4.    "Rental *Year*" Defined.

The first "Rental Year" shall commence on the first day of the Term and shall end at the close of the twelfth full calendar month following the commencement of the Term; thereafter each Rental Year shall consist of successive periods of twelve calendar months. Any portion of the Term remaining at the end of the last full Rental *Year* shall constitute the final Rental Year and all Rental shall be apportioned therefor.

-8-



Section 5.5. "GrossSales" Defined.

"Gross Sales" means the actual sales prices or rentals of all goods, wares and merchandise sold, leased, licensed or delivered and the *actual* charges for all services performed by Tenant or by any subtenant, licensee or concessionaire in, at, from, or arising out of the use of the Premises, whether for wholesale, retail, cash, credit, trade-in or otherwise, without reserve or deduction for inability or failure to collect. Gross Sales shall include, without limitation, sales and services (a) where the orders therefor originate in, at, from, or arising out of the use of the Premises, whether delivery or performance is made from the Premises or from some other place, (b) made or performed by mail, telephone, or telegraph orders, (c) made or performed by means of mechanical or other vending devices in the Premises, or (d) which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary course of its business would credit or attribute to its operations in any part of the Premises. Any deposit not refunded shall be included in Gross Sales. Each installment or credit sale shall be treated as a sale for the full price in the month during which such sale is made, regardless of whether or when Tenant receives payment therefor. No franchise, occupancy or capital stock tax and no income or similar tax based on income or profits shall be deducted from Gross Sales.

The following shall not be included in Gross Sales: (i) any exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made in, at or from the Premises, or for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made in or at the Premises, (ii) returns to shippers or manufacturers, (iii) cash or credit refunds to customers on transactions (not to exceed the actual selling price of the item returned) otherwise included in Gross Sales, (iv) sales of trade fixtures, machinery and equipment after use thereof in the conduct of Tenant's business, (v) amounts collected and paid by Tenant to any government for any sales or excise tax, and (vi) the amount of any discount on sales to employees.

Section 5.6. Statements of Gross Sales.

Tenant shall deliver to Landlord: (a) within ten (10) days after the close of each calendar month of the Term, a written report signed by Tenant or by an authorized officer or agent of Tenant, showing the Gross Sales made in the preceding calendar month and (b) within sixty (60) days after the close of each Rental Year, a statement of Gross Sales for the preceding Rental Year which shall conform to and be in accordance with generally accepted accounting principles and Section 5.5. The annual statement shall be accompanied by the signed certificate of an independent Certified Public Accountant stating specifically that (i) he has examined the report of Gross Sales for the preceding Rental Year, (ii) his examination included such tests of Tenant's books and records as he considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Rental Year, and (iv) the said Gross Sales conform with and are computed in compliance with the definition of Gross Sales contained in Section 5.5 hereof. If Tenant shall fail to deliver such annual statement and certificate to Landlord within said sixty (60) day period, Landlord shall have the right thereafter to employ an independent Certified Public Accountant to examine such books and records, including without limitation all records required by Section 5.7, as may be necessary to certify the amount of Tenant's Gross Sales for such Rental Year, and Tenant shall pay to Landlord the cost thereof as Additional Rental.

If such audit shall disclose that Tenant's records, in the opinion of such independent Certified Public Accountant, are inadequate to disclose such Gross Sales, Landlord shall be entitled to collect, as Additional Rental, an equitable sum determined by such independent Certified Public Accountant but not exceeding fifty percent (50%) of the Annual Basic Rental payable by Tenant during the period in question.

-9-



Section 5.7. Tenant's Records.

For the purpose of permitting verification by Landlord of my amounts due as Rental, Tenant will (i) cause the business upon the Premises to be operated so that a duplicate sales slip, invoice or non-resettable cash register receipt, serially numbered, or such other device for recording sales as Landlord approves, shall be issued with each sale or transaction, whether for cash, credit or exchange, and (ii) preserve for at least three (3) years, and during the Term shall keep at the Tenant Notice Address or the Premises, a general ledger, required receipts and disbursement journals and such sales records and other supporting documentation, together with original or duplicate books and records, which shall disclose all information required to determine Tenant's Gross Sales and which shall conform to and be in accordance with generally accepted accounting principles. At any time or from time to time after advance notice to Tenant, Landlord or any Mortgagee, their agents and accountants, shall have the right during business hours to make any examination or audit of such books and records which Landlord or such Mortgagee may desire. If such audit shall disclose a liability in any Rental Year for Rental in excess of the Rental theretofore paid by Tenant for such period, Tenant shall promptly pay such liability. Should any such liability for Rental equal or exceed three percent (3%) of Annual Percentage Rental previously paid for such Rental Year, or if such audit shall disclose that Tenant has underreported Gross Sales by five percent (5%) or more during any Rental Year, (a) Tenant shall promptly pay the cost of audit and interest at the Default Rate on all additional Annual Percentage Rental then payable, accounting from the date such additional Annual Percentage Rental was due and payable, and (b) an Event of Default shall be deemed to exist unless, within ten (10) days after Landlord shall have given Tenant notice of such liability, Tenant shall furnish Landlord with evidence satisfactorily demonstrating to Landlord that such liability for additional Annual Percentage Rental was the result of good faith error on Tenant's part. If such audit shall disclose that Tenant's records, in Landlord's opinion, are inadequate to accurately reflect Tenant's Gross Sales, Landlord shall have the right to retain a consultant to prepare and establish a proper recording system for the determination of Tenant's Gross Sales and Tenant agrees that it shall use the system, books and records prescribed by such consultant for such purpose. Tenant shall pay to Landlord, as Additional Rental, the fees and expenses of such consultant.

Section 5.8. Payment of Rental.

Tenant shall pay all Rental when due and payable, without any setoff, deduction or prior demand therefor whatsoever. Except as provided herein, Tenant shall not pay any Rental earlier than one (1) month in advance of the date on which it is due. If Tenant shall fail to pay any Rental within seven (7) days after the same is due, Tenant shall be obligated to pay a late payment charge equal to the greater of One Hundred Dollars ($100.00) or ten percent (10%) of any Rental payment not paid when due to reimburse Landlord for its additional administrative costs. In addition, any Rental which is not paid within seven (7) days after the Same is due shall bear interest at the Default Rate from the first day due until paid. Any Additional Rental which shall become due shall be payable, unless otherwise provided herein, with the next installment of Annual Basic Rental. Rental and statements required of Tenant shall be paid and delivered to Landlord at the management office of Landlord in the Shopping Center Area during normal business hours, or at such other place as Landlord may from time to time designate in a notice to Tenant. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.

-10-

Section **5.9.** Advance Rental.

. Upon execution of this Lease by Tenant, Tenant shall pay to Landlord the Advance Rental, the same to be held as security for the performance by Tenant of all obligations imposed under this Lease which Tenant is required to perform prior to the commencement of the Term. If Tenant shall faithfully perform all such obligations, then the Advance Rental shall be applied, pro tanto, by Landlord against the Rental first becoming due hereunder. Otherwise, Landlord shall be entitled to apply the Advance Rental, pro tanto, against any damages which it may sustain by reason of Tenant's failure to perform its obligations under this Lease, but such application shall not preclude Landlord from recovering greater damages if the same can be established.

Section 5.10. Future Expansion.

In the event that during the Term (i) additional Anchor Stores are constructed in the Shopping Center, or (ii) one or more expansions of Landlord's Building, each involving the addition of at least 50,000 square feet of Landlord's Floor Area, are constructed, then, upon the opening for business of each such additional Anchor Store or expansion of Landlord's Building, the Annual Basic Rental shall be increased by ten percent (10%) for each such Anchor Store or expansion opening and the Breakpoint shall be increased by a like percentage.

## ARTICLE VI
## TAXES

Section 6.1. Tenant to Pay Proportionate Share of Taxes.

Tenant shall pay in each Tax Year during the Term, as Additional Rental, a proportionate share of all amounts payable by Landlord with respect to real estate taxes, ad valorem taxes and assessments, general and special, taxes on real estate rental receipts, taxes on Landlord's gross receipts, or any other tax imposed upon or levied against real estate, or upon owners of real estate as such rather than persons generally, extraordinary as well as ordinary, foreseeable and unforeseeable, including taxes imposed on leasehold improvements which are assessed against Landlord, payable with respect to or allocable to the Shopping Center Area, including all land, Landlord's Building and all other buildings and improvements situated thereon, together with the reasonable cost (including fees of attorneys, consultants and appraisers) of any negotiation, contest or appeal pursued by Landlord in an effort to reduce any such tax, assessment or charge, and all of Landlord's reasonable administrative costs in relation to the foregoing, all of the above being collectively referred to herein as "Taxes." Tenant's proportionate share of Taxes shall be computed by multiplying the amount of such Taxes (less any contributions by Anchor Stores) by a fraction, the numerator of which shall be Tenant's Floor Area and the denominator of which shall be Landlord's Floor Area. For the Tax Year in which the Term commences or terminates, the provisions of this Section shall apply, but Tenant's liability for its proportionate share of any Taxes for such year shall be subject to a pro rata adjustment based upon the number of days of such Tax Year falling within the Term.

Section 6.2. Payment of Proportionate Share of Taxes

Tenant's proportionate share of Taxes shall be paid by Tenant in monthly installments in such amounts as are estimated and billed for each Tax Year during the Term by Landlord, each such installment being due on the first day of each calendar month. At any time during a Tax Year, Landlord may reestimate Tenant's proportionate share of Taxes and thereafter adjust Tenant's monthly installments payable during the Tax Year to reflect more accurately Tenant's proportionate share of Taxes. Within

-11-



...

one hundred twenty (120) days after Landlord's receipt of tax bills for each Tax Year, or such reasonable (in Landlord's determination) time thereafter, Landlord will notify Tenant of the amount of Taxes for the Tax Year in question and the amount of Tenant's proportionate share thereof. Any overpayment or deficiency in Tenant's payment of its proportionate share of Taxes for each Tax Year shall be adjusted between Landlord and Tenant, and Landlord and Tenant hereby agree that Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall pay Tenant), as the case may be, within fifteen (15) days of the aforesaid notice to Tenant, such amounts as may be necessary to effect such adjustment. Failure of Landlord to provide such notice within the time prescribed shall not relieve Tenant of its obligations hereunder. Notwithstanding the foregoing, if Landlord is required under law to pay Taxes in advance, Tenant agrees to pay Landlord, upon commencement of the Term of this Lease, an amount equal to Tenant's share of Taxes for the entire Tax Year in which the Term of this Lease commences, and in such event, at the termination of this Lease, Tenant shall be entitled to a refund of Taxes paid which are attributable to a period after this Lease expires.

Section 6.3.  "Tax Year" Defined.

The term "Tax Year" means each twelve (12) month period (deemed, for the purpose of this Section, to have 365 days) established as the real estate tax year by the taxing authorities having lawful jurisdiction over the Shopping Center Area.

Section 6.4.  Taxes on Rental.

In addition to Tenant's proportionate share of Taxes, Tenant shall pay to the appropriate agency any sales, excise and other taxes (not including, however, Landlord's income taxes) levied, imposed or assessed by the State in which the Shopping Center is situate or any political subdivision thereof or other taxing authority upon any Rental payable hereunder. Tenant shall also pay, prior to the time the same shall become delinquent or payable with penalty, all taxes imposed on its inventory, furniture, trade fixtures, apparatus, equipment, leasehold improvements installed by Tenant or by Landlord on behalf of Tenant (except to the extent such leasehold improvements shall be covered by Taxes referred to in Section 6.1), and any other property of Tenant. Landlord may require that Tenant's leasehold improvements be separately assessed by the taxing authority.

ARTICLE VII
IMPROVEMENTS

Section 7.1.  Tenant's Improvements.

Tenant agrees, at its sole cost and expense, to remodel the interior and exterior of the Premises in accordance with approved plans and specifications, using new and quality materials and equipment. Plans and specifications for all improvements, including the type of materials to be used by Tenant in the Premises, must be set forth in detail and submitted to Landlord for approval immediately upon execution of this Lease. Tenant agrees to commence remodeling of the Premises promptly upon approval by Landlord of such plans and specifications. All such remodeling must be completed prior to commencement of the Term.

For the purpose of performing its obligations hereunder and for the purpose of installing its fixtures and other equipment, Tenant will be permitted to enter the Premises not less than thirty (30) days prior to the commencement of the Term, on condition that (i) Tenant's activities are conducted in such a manner so as not to unreasonably interfere with Landlord's shopping center activities, and (ii) Tenant

-12-



shall, at its own expense, remove from the Premises and from the Shopping Center Area in its entirety all trash which may accumulate in connection with Tenant's activities. It is understood and agreed that during said thirty (30) day period, Tenant shall perform all duties and obligations *imposed* by *this Lease*, saving and excepting only the obligation to pay Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder).

### Section 7.2. Effect of Opening for Business.

By *opening* the Premises for business, Tenant shall be deemed to have (a) accepted the Premises, (b) acknowledged that the same are in the condition called for hereunder, and (c) agreed that the obligations of Landlord imposed hereunder have been fully performed.

### Section 7.3. Mechanic's Liens.

No work performed by Tenant pursuant to this Lease, whether in the nature of erection, construction, alteration or repair, shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises. Tenant shall place such contractual provisions as Landlord may request in all contracts and subcontracts for Tenant's improvements assuring Landlord that no mechanic's liens will be asserted against Landlord's interest in the Premises or the property of which the Premises are a part. Said contracts and subcontracts shall provide, *among* other things, the following: That notwithstanding anything in said contracts or subcontracts to the contrary, Tenant's contractors, subcontractors, suppliers and materialmen (hereinafter collectively referred to as "Contractors") will perform the work and/or furnish the required materials on the sole credit of Tenant; that no lien for labor or materials will be filed or claimed by the Contractors against Landlord's interest in the Premises or the property of which the Premises are a part; that the Contractors will immediately discharge any such lien filed by any of the Contractor's suppliers, laborers, materialmen or subcontractors; and that the Contractors will indemnify and save Landlord harmless from any and all costs and expenses, including reasonable attorneys' fees, suffered or incurred as a result of any such lien against Landlord's interest that may be filed or claimed in connection with or arising out of work undertaken by the Contractors. Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its Contractors on or about the Premises. If any mechanic's or other liens shall at any time be filed against the Premises or the property of which the Premises are a part by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, and regardless of whether any such lien is asserted against the interest of Landlord or Tenant, Tenant shall forthwith *cause* the same to be discharged of record or bonded to the satisfaction of Landlord. If Tenant shall fail to cause such lien forthwith to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord, including reasonable attorneys' fees incurred by Landlord either in defending against such lien or in procuring the bonding or discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable by Tenant to Landlord as Additional Rental.

### Section 7.4. Tenant's Leasehold Improvements and Trade Fixtures.

All leasehold improvements (as distinguished from trade fixtures and apparatus) installed in the Premises at any time, whether by or on behalf of Tenant or by or on behalf of Landlord, shall not be removed from the Premises at any time, unless such removal is consented to in advance by Landlord; and at the expiration of this Lease (either on the Termination Date or upon such earlier termination as

-13-



provided in this Lease), all such leasehold improvements shall be deemed to be part of the Premises, shall not be removed by Tenant when it vacates the Premises, and title thereto shall vest solely in Landlord without payment of any nature to Tenant.

All trade fixtures and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term; provided Tenant shall not at such time be in default of any terms or covenants of this Lease, and provided further, that Tenant shall repair any *damage* to the *Premises* caused by *the* removal of said trade fixtures and apparatus and shall restore the Premises to substantially the same condition as existed prior to the installation of said trade fixtures and *apparatus*.

To protect Landlord in the event Tenant defaults hereunder, Tenant hereby grants to Landlord a security interest in all goods, inventory, equipment, trade fixtures, and all personal property belonging to Tenant which are or may be put into the Premises during the Term and all proceeds of the foregoing. Said security interest shall secure all amounts to be paid by Tenant to Landlord hereunder, including all costs of collection and other costs specified in Sections 17.2 and 17.3 hereof, and any other indebtedness of Tenant to Landlord. Tenant agrees to sign any financing statement or security agreement requested by Landlord in order to perfect such security interest. The lien granted hereunder shall be in addition to any Landlord's lien that may now or at any time hereafter be provided by law.

ARTICLE VIII
**OPERATIONS**

Section 8.1. <u>Operations by Tenant.</u>

In regard to the use and occupancy of the Premises, Tenant will at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean; (b) keep all exterior store surfaces of the Premises clean; (c) replace promptly any cracked or broken glass of the Premises with glass of like color, grade and quality; (d) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; (e) keep any garbage, trash, rubbish or other refuse in rat-proof containers within the interior of the Premises until removed; (f) deposit such garbage, trash, rubbish and refuse, on a daily basis, in designated receptacles provided by Landlord; (g) keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the Premises; (h) comply with all laws, ordinances, rules and regulations of governmental authorities and all reasonable recommendations of Landlord's casualty insurer(s) and other applicable insurance rating organization now or hereafter in effect; (i) light the show windows of the Premises and exterior signs and turn the same off to the extent required by Landlord; (j) keep in the Premises and maintain in good working order one (1) or more type 2A10BC dry chemical fire extinguisher(s); (k) comply with and observe all rules and regulations established by Landlord from time to time which apply generally to all retail tenants in the Shopping Center Area; (l) maintain sufficient and seasonal inventory and have sufficient number of personnel to maximize sales volume in the Premises; and (m) conduct its business in all respects in a dignified manner in accordance with high standards of store operation consistent with the quality of operation of the Shopping Center Area as determined by Landlord and provide an appropriate mercantile quality comparable with the entire Shopping Center.

In regard to the use and occupancy of the Premises and the Common Areas, Tenant will not: (n) place or maintain any merchandise, signage, trash, refuse or other articles in any vestibule or entry of the Premises, on the footwalks or corridors adjacent thereto or elsewhere on the exterior of the Premises, nor obstruct any driveway, corridor, footwalk, parking area, mall or any other Common Areas; (o) use or permit the use of any objectionable advertising medium such as, without limitation,

-14-



loudspeakers, phonographs, public *address* systems, sound amplifiers, reception of radio or television broadcasts within the Shopping Center, which is in any manner audible or visible outside of the Premises; (p) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (q) *cause* or permit objectionable odors (in Landlord's opinion) to emanate or to be dispelled from the premises; (r) solicit business in *any* Common Areas; (s) distribute handbills or other advertising matter in any Common *Areas* (including placing any of the same in or upon any automobiles parked in the parking *areas);* (t) permit the parking of vehicles so as to interfere with the use of any driveway, corridor, footwalk, parking area, mall or other Common Areas; (u) receive or ship articles of any kind outside the designated loading areas for the Premises; (v) use the mall, corridor or any other Common Areas adjacent to the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking; (w) conduct or permit to be conducted any auction, fictitious fire sale. going out of business sale, bankruptcy sale (unless directed by court order), or other similar *type* sale in or connected with the Premises (but this provision shall not restrict the absolute freedom of Tenant in determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); (x) use or permit the use of any portion of the Premises in a manner which will be in violation of law, or for any activity of a type which is not generally considered appropriate for regional shopping centers conducted in accordance with good and generally accepted standards of operation; (y) place a load upon any floor which exceeds the floor load which the floor was designed to carry; (z) operate its heating or air-conditioning in such a manner as to drain heat or air-conditioning from the Common Areas or from the premises of any other tenant or other occupant of the Shopping Center; or (aa) use the Premises for any unlawful or illegal business, use or purpose, or for any business, use or purpose which is immoral or disreputable (including without limitation "adult entertainment establishments" and "adult bookstores"), or which is hazardous, or in such manner as to constitute a nuisance of any kind (public or private), or for any purpose or in any way in violation of the certificates of occupancy (or other similar approvals of applicable governmental authorities).

Tenant acknowledges that it is Landlord's intent that the Shopping Center Area be operated in a manner which is consistent with the highest standards of decency and morals prevailing in the community which it serves. Toward that end, Tenant agrees that it will not sell, distribute, display or offer for sale any item which, in Landlord's good faith judgment, is inconsistent with the quality of operation of the Shopping Center Area or may tend to injure or detract from the moral character or image of the Shopping Center Area within such community. Without limiting the generality of the foregoing, Tenant will not sell, distribute, display or offer for sale (i) any roach clip, water pipe, bong, coke spoon, cigarette papers, hypodermic syringe or other paraphernalia commonly used in the use or ingestion of illicit drugs, (ii) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine. film. picture, recording, representation or merchandise of any kind, or (iii) any handgun.

Section 8.2. <u>Signs and Advertising</u>.

Tenant will not place or suffer to be placed or maintained on the exterior of the Premises, or any part of the interior visible from the exterior thereof, any sign, banner, advertising matter or any other thing of any kind (including, without limitation, any hand-lettered advertising), and will not place or maintain any decoration, letter or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's approval. Tenant will, at its sole cost and expense, maintain such sign, banner, decoration, lettering, advertising matter or other thing as may be permitted hereunder in good condition and repair at all times.

Section 8.3. <u>Painting and Displays by Tenant</u>.

Tenant will not paint or decorate any part of the exterior of the Premises, or any part of the interior of the Premises visible from the exterior thereof, without first obtaining Landlord's approval.

-15-



Case 15-10172-MFW    Doc 563-2    Filed 03/27/15    Page 23 of 102

Tenant will install and maintain at all times, subject to the other provisions of this Section, displays of merchandise in the show windows (if any) of the Premises. All articles, and the arrangement, style, color and general appearance thereof, in the interior of the Premises including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and standards of the improvements within the Shopping Center, as determined by Landlord. Landlord reserves the right to require Tenant to correct any non-conformity.

### Section 8.4.  Trash Removal Service.

At its option, Landlord may furnish (or authorize others to furnish) a service for the removal of trash from receptacles designated by Landlord for the daily deposit by Tenant of its garbage, trash, rubbish or other refuse, and, if it shall do so, then in each Rental Year, at Landlord's election, Tenant shall either (i) reimburse W o r d monthly, as Additional Rental, for all costs incurred by Landlord in furnishing such service, or (ii) pay Landlord the Trash Removal Service Charge, if any, set forth in clause N of Section 1.1. in twelve (12) equal monthly installments, subject to adjustments reflecting any increase in Landlord's cost and expense in furnishing such trash removal service, or (iii) pay directly such person, firm or corporation authorized by Landlord to provide such trash removal service; provided, however, that all amounts which Tenant is obligated to pay to Landlord pursuant to clause (i) or (ii) above shall not exceed the amounts which Tenant would otherwise be obligated to pay directly to the same independent contractor utilized by Landlord for the removal of Tenant's trash, if Tenant were dealing with such contractor at arm's length for trash removal services for the Premises.

### Section 8.5.  Permitted Use Disclaimer.

Nothing contained in this Lease shall be construed to indicate any intent or attempt on the part of Landlord to restrict the price or prices at which Tenant may sell any goods or services permitted to be sold at or from the Premises pursuant to this Lease.

### Section 8.6.  Hazardous Substances.

Tenant shall not use or allow the Premises to be used for the Release, storage, use, treatment, disposal or other handling of any Hazardous Substance, without the prior consent of Landlord. The term "Release" shall have the same meaning as is ascribed to it in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., as amended, ("CERCLA"). The term "Hazardous Substance" means (i) any substance defined as a "hazardous substance" under CERCLA, (ii) petroleum, petroleum products, natural gas, natural gas liquids, liquefied natural gas, and synthetic gas, and (iii) any other substance or material deemed to be hazardous, dangerous, toxic, or a pollutant under any federal, state or local law, code, ordinance or regulation.

Tenant shall: (a) give prior notice to Landlord of any activity or operation to be conducted by Tenant at the Premises which involves the Release, use, handling, generation, treatment, storage, or disposal of any Hazardous Substance ("Tenant's Hazardous Substance Activity"), (b) comply with all federal, state, and local laws, codes, ordinances, regulations, permits and licensing conditions governing the Release, discharge, emission, or disposal of any Hazardous Substance and prescribing methods for or other limitations on storing, handling, or otherwise managing Hazardous Substances. (c) at its own expense, promptly contain and remediate any Release of Hazardous Substances arising from or related to Tenant's Hazardous Substance Activity in the Premises, Landlord's Building, the Shopping Center, the Shopping Center Area or the environment and remediate and pay for any resultant damage to property, persons, and/or the environment, (d) give prompt notice to Landlord, and all appropriate regulatory authorities, of any Release of any Hazardous Substance in the Premises, Landlord's Building,

-16-



the Shopping Center, the Shopping Center *Area* or the environment arising from or related to Tenant's Hazardous *substance* Activity, which Release is not made pursuant to and in conformance with the terms of any permit or license duly issued by appropriate governmental authorities, any such notice to include a description of measures taken or proposed to be taken by Tenant to contain and remediate the Release and *any* resultant damage to property, persons, or the environment, (e) at Landlord' s request, which shall not be more frequent than once per calendar year, retain an *independent engineer* or other qualified consultant or expert acceptable to Landlord, to conduct, at Tenant's expense, an environmental audit of the Premises and immediate surrounding areas, and the scope of work to be performed by such engineer, consultant, or expert shall be approved in advance by Landlord, and all of the engineer's, consultant's. or expert's work product shall be made available to Landlord, (**9** *at* Landlord's request from time to time, execute affidavits, representations and the like concerning Tenant's best knowledge and belief regarding the presence of Hazardous Substances in the Premises, (g) reimburse to Landlord, upon demand, the reasonable cost of any testing for the purpose of ascertaining if there has been any Release of Hazardous Substances in the Premises, if such testing is required by any governmental agency or Landlord's Mortgagee, (h) upon expiration or termination of this Lease, surrender the Premises to Landlord free from the presence and contamination of any Hazardous Substance.

## ARTICLE IX
## REPAIRS AND ALTERATIONS

### Section 9.1.    Repairs To Be Made By Landlord.

Landlord, at its expense, will make, or cause to be made  structural repairs to exterior walls, structural columns, roof penetrations and structural floors which collectively enclose the Premises (excluding, however, all doors, door frames, storefronts, windows and glass); provided Tenant shall give Landlord notice of the necessity for such repairs.

### Section 9.2.    Repairs To Be Made By Tenant.

All repairs to the Premises or any installations, equipment or facilities therein, other than those repairs required to be made by Landlord pursuant to Sections 9.1, 12.3 or Section 14.1, shall be made by Tenant at its expense.  Without limiting the generality of the foregoing, Tenant will keep the interior of the Premises, together with all electrical, plumbing and other mechanical installations therein and (if and to the extent provided in Schedule F) the heating, ventilating and air-conditioning system installed by Tenant in the Premises, in good order and repair and will make all replacements from time to time required thereto at its expense. Tenant will surrender the Premises at the expiration of the Term or at such other time as it may vacate the Premises in as good condition as when received, excepting depreciation caused by ordinary wear and tear, damage by Casualty, unavoidable accident or Act of God. Tenant will not overload the electrical wiring serving the Premises or within the Premises, and will install at its expense, subject to the provisions of Section 9.4, any additional electrical wiring which may be required in connection with Tenant's apparatus. Any damage or injury sustained by any person because of mechanical, electrical, plumbing or any other equipment or installations, whose maintenance and repair shall be the responsibility of Tenant, shall be paid for by Tenant, and Tenant hereby agrees to indemnify and hold Landlord harmless from and against all claims, actions, damages and liability in connection therewith, including, but not limited to attorneys' and other professional fees, and any other cost which Landlord might reasonably incur.

### Section 9.3.    Damage to Premises.

Tenant will repair promptly at its expense any damage to the Premises and, upon demand, shall reimburse Landlord (as Additional Rental) for the cost of the repair of any damage elsewhere in the

-17-



Shopping Center, caused by or arising from the installation or removal of property in *or from the premises*, regardless of fault **or** by whom such damage shall be caused (unless caused by Landlord, its agents, employees or contractors). If Tenant shall fail to **commence** such repairs within five *(5)* days after notice *to do so from Landlord*, Landlord may **make** or cause the *same* to be made and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rental, the **cost** thereof with interest thereon at the Default Rate until paid.

Section 9.4.  Alterations by Tenant.

Tenant will not make any alterations, renovations, improvements or other installations in, on or to any part of the Premises (including, without limitation, any alterations of the storefront, signs, structural alterations, or any cutting or drilling into any part of the Premises or any securing of any fixture, apparatus, or equipment of any kind to any part of the Premises) unless and until Tenant shall have caused plans and specifications therefor to have been prepared, at Tenant's expense, by an architect or other duly qualified person and shall have obtained Landlord's approval thereof. If such approval is granted, Tenant shall cause the work described in such plans and specifications to be **performed**, at its expense, promptly, efficiently, competently and in a **good** and workmanlike manner by duly qualified and licensed persons or entities, using first grade materials, without interference with or Qsruption to the operations of tenants or other occupants of the Shopping Center. All such work shall comply with all applicable codes, rules, regulations and ordinances.

Section *9.5.* Changes and Additions to Shopping Center

Landlord reserves the right at any time **and** from time to time  to (a) make or permit changes or revisions in the plan for the Shopping Center or the Shopping Center Area including additions to, subtractions from, rearrangements of, alterations of, modifications of, or supplements to, **the** building areas, walkways, driveways, parking areas, or other Common Areas, (b)  construct improvements in Landlord's Building and the Shopping Center Area and to make alterations thereof or additions thereto and to build additional stories on or in any such building(s) and build adjoining same, including (without limitation) kiosks, pushcarts and other displays in the Common Areas, and (c) make or permit changes or revisions in the Shopping Center or the Shopping Center Area, including additions thereto, and to convey portions of the Shopping Center *Area* to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof; provided, however, that no such changes, rearrangements or other construction shall reduce the parking areas below the *number* of parking spaces required by law.

Section 9.6.  Roof and Walls.

Landlord shall have the exclusive right to use all or any part of the roof of the Premises for any purpose; to erect additional stories or other structures over all or any part of the Premises; to erect in connection with the construction thereof temporary scaffolds and other aids to construction on the exterior of the Premises, provided that access to the Premises shall not be denied; and to install, maintain, use, repair and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment serving other parts of *the* Shopping Center Area, the same to be in locations within the Premises **as** will not unreasonably deny Tenant's use thereof. Landlord may make any use it desires of the side or rear walls of the Premises or other structural elements of the Premises (including, without limitation, free-standing columns and footings for all columns), provided that such use shall not encroach on the interior of the Premises unless (i) all **work** carried on by Landlord with respect to such encroachment shall be done during hours when the Premises are not open for business and otherwise shall be carried out in such a manner as not to unreasonably interfere with Tenant's operations in the Premises, (ii) Landlord, at its

-18-



13  expense, shall provide any security services to the Premises required by such work, and (iii) Landlord,
14  at its expense, shall repair all damage to the Premises resulting from such work.

## ARTICLE X
## COMMON AREAS

### Section 10.1. Use of Common Areas

1  Landlord grants to Tenant and its agents, employees and customers a non-exclusive license to use
2  the Common Areas in common with others during the Term, subject to the exclusive control and
3  management thereof at all times by Landlord or others and subject, further, to the rights of Landlord set
4  forth in Sections 9.5 and 10.2.

### Section 10.2. Management and Operation of Common Areas.

1  Landlord will operate and maintain, or will cause to be operated and maintained, the Common
2  Areas in a manner deemed by Landlord to be reasonable and appropriate and in the best interests of the
3  Shopping Center. Landlord will have the right (i) to establish, modify and enforce reasonable rules and
    regulations with respect to the Common Areas; (ii) to enter into, modify and terminate easement and
5  other agreements pertaining to the use and maintenance of the Common Areas; (iii) to enforce parking
6  charges (by operation of meters or otherwise) with appropriate provisions for free parking ticket
7  validation by tenants; (iv) to close all or any portion of the Common Areas to such extent as may, in the
8  opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any
9  person or to the public therein; (v) to close temporarily any or all portions of the Common Areas; (vi)
10  to discourage non-customer parking; and (vii) to do and perform such other acts in and to said areas and
11  improvements as, in the exercise of good business judgment, Landlord shall determine to be advisable.

### Section 10.3. Employee Parking Areas.

1  Tenant and its employees shall park their cars only in such areas designated for that purpose by
2  Landlord. Upon request by Landlord, Tenant shall furnish Landlord with State automobile license
3  numbers assigned to Tenant's car or cars and cars used by its employees and shall thereafter notify
4  Landlord of any changes in such information within five (5) days after such changes occur. If Tenant
5  or its employees shall fail to park their cars in the designated parking areas, then, without limiting any
6  other remedy which Landlord may pursue in the event of Tenant's default, Landlord, after giving notice
7  to Tenant, shall have the right to charge Tenant, as Additional Rental, the sum of Ten Dollars ($10.00)
8  per day per car parked in violation of the provisions of this Section. Tenant shall notify its employees
9  in writing of the provisions of this Section.

### Section 10.4. Tenant to Share Expense of Common Areas.

1  Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's Operating
2  Costs which shall be computed by multiplying Landlord's Operating Costs (less any contribution to such
3  costs and expenses made by the owner or operator of any Anchor Store in the Shopping Center) by a
4  fraction, the numerator of which is Tenant's Floor Area and the denominator of which is Landlord's
5  Leased Floor Area. Such proportionate share shall be paid by Tenant in monthly installments in such
6  amounts as are estimated and billed by Landlord at the beginning of each twelve (12) month period
7  commencing and ending on dates designated by Landlord, each installment being due on the first day of

-19-



each calendar month. At any time during any such twelve (12) month period, Landlord may reestimate Tenant's proportionate share of Landlord's Operating Costs and thereafter adjust Tenant's monthly installments payable during such twelve (12) month period to reflect more accurately Tenant's proportionate share of Landlord's Operating Costs. Within one hundred twenty (120) days (or such additional time thereafter as is reasonable under the circumstances) after the end of each such twelve (12) month period, Landlord shall deliver to Tenant a statement of Landlord's Operating Costs for such twelve (12) month period and the monthly installments paid or payable shall be adjusted between Landlord and Tenant, and Tenant shall pay Landlord or Landlord shall credit Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall pay *Tenant)*, as the *case* m y be, within fifteen (15) days of receipt of *such* statement, such amounts as may be necessary to effect such adjustment  Upon reasonable notice, Landlord shall make available for Tenant's inspection (which inspection shall be at Tenant's sole cost and expense) at Landlord's office, during normal business hours, Landlord's records relating to Landlord's Operating Costs for such preceding twelve (12) month period.  Failure of Landlord to provide the statement called for hereunder within the time prescribed shall not relieve Tenant from its obligations hereunder.

### Section 10.5.  "Landlord's Operating Costs" Defined.

The term "Landlord's Operating Costs" means all costs and expenses incurred by or on behalf of Landlord in operating, managing, insuring, securing and maintaining the Common Areas pursuant to Section 10.2.  "Landlord's Operating Costs" includes, but is not limited to, all costs and expenses of operating, maintaining, repairing, lighting, signing, cleaning, painting, striping, policing and security of the Common Areas (including the *cost* of uniforms, equipment and employment taxes); alarm and life safety systems; insurance, including, without limitation, liability insurance for personal injury, death and property damage, all-risks casualty insurance (including coverage against fire, flood, theft or other casualties), worker's compensation insurance or similar insurance covering personnel, fidelity bonds for personnel, insurance against liability for assault and battery, defamation and claims of false arrest occurring on and about the Common *Areas*, plate glass insurance for glass exclusively serving the Common Areas; the costs and expenses of maintenance of all exterior glass; maintenance of sprinkler systems; removal of water, snow, ice, trash and debris; regulation of traffic; surcharges levied upon or assessed against parking spaces or areas by governmental or quasi-governmental authorities; payments toward mass transit or car pooling facilities or otherwise as required by governmental or quasi-governmental authorities; costs and expenses in connection with maintaining federal, state or local governmental ambient air and environmental standards; the cost of all materials, supplies and services purchased or hired therefor; operation of public toilets; installing and renting of signs; fire protection; maintenance, repair and replacement of utility systems serving the Common Areas, including, but not limited to, water. sanitary sewer and storm water lines and other utility lines, pipes and conduits; costs and expenses of maintaining and operating sewage treatment facilities, if any; costs and expenses of inspecting and depreciation of machinery and equipment used in the operation and maintenance of the Common *Areas* and personal property taxes and other charges (including, but not limited to, financing, leasing or rental costs) incurred in connection with such equipment; costs and expenses of the coordination and use of truck docks and loading facilities; costs and expenses of repair or replacement of awnings, paving, curbs, walkways, landscaping, drainage, pipes, ducts, conduits and similar items, plate glass, lighting facilities, floor coverings, and the roof; costs and expenses of planting, replanting, replacing and displaying flowers, shrubbery and planters; costs and expenses incurred in the purchase or rental of music program services and loudspeaker systems, including furnishing electricity therefor; costs of providing light and power to the Common Areas; costs of providing energy to heat, ventilate and air-condition the Common Areas and the operation, maintenance, and repair of equipment required therefor (including, without limitation. the costs of energy management systems serving the Shopping Center Area); cost of water services, if any, furnished by Landlord for the non-exclusive use of all tenants; parcel pick-up and delivery services; and administrative costs attributable to the Common Areas for on-

-20-

34  site personnel and an overhead cost equal to fifteen percent (15%) of the total costs and expenses of
35  operating and maintaining the Common Areas. Landlord may elect to amortize any of the foregoing costs
36  and expenses over a useful life determined in accordance with generally accepted accounting principles.

### Section 10.6. Mall Heating, Ventilating and Air-Conditioning Equipment Contribution Rate.

1   In each Rental Year, Tenant shall pay Landlord annually (in twelve (12) equal monthly
2   installments together with the Annual Basic Rental), as Additional Rental, an amount '(the "Mall Heating,
3   ventilating and Air-conditioning Equipment Contribution") determined by multiplying the Mall Heating,
4   Ventilating and Air-conditioning Equipment Contribution Rate by Tenant's Floor Area.

### Section 10.7. Renovation or Expansion of Common Areas.

1    If, during the Term, the Common Areas, or any part thereof, are expanded or renovated to the
2    extent that Landlord's Improvement Costs incurred in connection therewith exceed a sum equal to Twenty
3    Dollars ($20.00) per square foot of Landlord's Floor Area, the Annual Basic Rental and the dollar
4    amount set forth in clause H of Section 1.1 each shall be increased by ten percent (10%) thereof for each
5    such expansion or renovation effective as of the date on which Landlord delivers to Tenant a notice that
6    Landlord has incurred such costs. The term "Landlord's Improvement Costs" means all direct and
7    indirect costs and expenses incurred by Landlord and properly allocated to the construction and
8    development of capital improvements to the Common Areas, but not including any cost or expense
9    included in Landlord's Operating Costs. Upon reasonable notice, Landlord shall make available for
10   Tenant's inspection (which inspection shall be at Tenant's sole cost and expense) at Landlord's office,
11   during normal business hours, Landlord's records relating to Landlord's Improvement Costs as to which
12   any such notice shall have been delivered.

### ARTICLE XI
### MERCHANTS' ASSOCIATION

### Section 11.1. Merchants' Association.

1    Tenant agrees to maintain a membership in any merchants' association, if and when established
2    by Landlord (the "Association"), and for the purpose of creating and maintaining a fund for the general
3    promotion and welfare of the Shopping Center as a whole, agrees to pay to the Association or its agent
4    the amounts specified in Section 11.2 regardless of whether Tenant shall remain a member of the
5    Association during the Term. Notwithstanding anything to the contrary which may be contained in this
6    Lease, or in any Article of Incorporation, Corporate Charter or By-Laws of the Association, Tenant
7    covenants and agrees that Landlord may in its sole discretion elect to provide the Association with any
8    or all of the following, and Tenant further expressly authorizes the Association to reimburse Landlord
9    for providing:  (i) the services of a marketing manager and all staff deemed necessary by Landlord to
10   carry out effectively the promotion and public relations objectives of the Association; (ii) such reasonable
11   space as may be necessary to carry out the functions of the marketing manager and his or her staff; and
12   (iii) such office equipment, supplies, telephones and other related costs as may be deemed necessary by
13   Landlord to service fully the marketing manager and his or her staff. The Association may appoint
14   Landlord as its agent for the collection of the Association contributions with the right, joint and several,
15   to collect and enforce on behalf of the Association all debts owing by Tenant to the Association. The
16   Association shall have the benefit of Tenant's obligations under this Article XI and shall be entitled to
17   enforce such obligations directly.

-21-



Section **11.2.** Tenant's Contribution to Merchants' Association.

Tenant shall make the following contributions to the Association:

(a) In the First Association Year Tenant shall pay to the Association on the first day of each calendar month an amount determined by (i) multiplying the Merchants' Association Contribution Rate set forth in Section 1.1.L. by Tenant's Floor Area, and (ii) dividing the product thus obtained by twelve (12). In each subsequent Association Year, Tenant shall pay to the Association an amount (the "Annual Merchants' Association Contribution") determined by multiplying the Merchants' Association Contribution Rate, adjusted as provided below, by Tenant's Floor Area. The Annual Merchants' Association Contribution shall be paid by Tenant in twelve (12) equal monthly installments, in advance, on the first day of each calendar month. The Annual Merchants' Association Contribution shall be adjusted annually, as of the first day of each Association Year during the Term, in the same proportion as the Consumer Price Index for All Urban Consumers (U. S. City Average) published by the Bureau of Labor Statistics of the United States Department of Labor (the "Consumer Price Index") most recently reported as of such adjustment date bears to the Consumer Price Index reported for the first full calendar month of the Term, all such adjustments to be apportioned for fractional years.

If during the Term the Consumer Price Index is changed or discontinued, Landlord shall choose a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means shall be utilized in place of the Consumer Price Index as if it had been originally designated in this Lease.

In addition to the adjustment for the Consumer Price Index, the Annual Merchants' Association Contribution may be increased at any time during the Term by a vote of tenants (exclusive of Anchor Stores and Landlord) occupying more than fifty percent (50%) of Landlord's Floor Area.

(b) If the Shopping Center shall be expanded by adding floor area equal to more than ten percent (10%) of Landlord's Floor Area contained in the Shopping Center as of the date of this Lease, Tenant shall pay to said Association a one time charge for each such expansion (the "Expansion Opening Contribution") determined by (i) multiplying Tenant's Floor Area by the average rate per square foot of all contributions which tenants in the expansion area shall become obligated pursuant to their respective leases to make to the Association with respect to promotion and advertising of the opening of such expansion for business, and (ii) dividing the product thus obtained by two (2).

Section 11.3. Landlord's Contribution to Merchants' Association.

Landlord shall contribute to the Association for the First Association Year and for each subsequent Association Year, an amount equal to one-fifth (1/5) of the aggregate contributions made by the other contributors to the Association for each such period.

Section 11.4. "First Association Year" and "Association Year" Defined.

"First Association Year" means the period commencing on the first day of the Term and terminating on the second succeeding December 31. "Association Year" means each successive period of twelve (12) months commencing with January 1.

-22-



Section 11.5.  Advertising.

During each Rental Year, Tenant shall advertise its business at the Premises either (i) by expending an amount equal to a minimum of three percent (3%) of Tenant's annual Gross Sales for such period in recognized regional print or electronic advertising media, or (ii) by participating in twelve (12) cooperative advertising units per year sponsored by the Association.  Each advertisement shall specify Tenant's business located at the Premises.  If Tenant elects to advertise pursuant to clause (i) hereof, Tenant shall preserve original or duplicate books and records at Tenant's Notice Address which shall disclose all information required to determine Tenant's advertising expenditures.  Upon advance notice, Landlord, its agents and accountants, shall have the right to audit such books and records.  If the audit discloses noncompliance by Tenant for any Rental Year in question, Tenant, in addition to the remedies contained in this Lease, shall pay to Landlord a sum equal to Landlord's cost of the audit, which sum shall be deemed to be Additional Rental, plus as liquidated damages, a sum equal to the amount by which Tenant's expenditures for advertising as required by clause (i) above shall be less than three percent (3%) of Tenant's annual Gross Sales.

Tenant shall, within ten (10) days after the beginning of each Rental Year, notify Landlord of its election to advertise its business either under clause (i) or (ii) above.  If Tenant elects to advertise under clause (ii), Tenant may not withdraw such election until the following Rental Year; however, if Tenant elects clause (i), Tenant shall have the right at any time during the Rental Year to change such election to clause (ii).

ARTICLE XII
UTILITIES

Section 12.1.  Water, Electricity, Telephone and Sanitary Sewer.

Landlord will provide, or cause to be provided, at points in or near the Premises the facilities necessary to obtain to Tenant or obtain for the Premises water, electricity, telephone and sanitary sewer service.  Schedule E sets forth those utilities for which service shall be provided to the Premises by Landlord, if any, as well as the manner in which charges for their consumption shall be determined and paid by Tenant.  Unless otherwise provided in Schedule E, Landlord shall not be responsible for providing any utility service to the Premises, nor for providing meters or other devices for the measurement of utilities supplied to the Premises, and Tenant shall arrange for the furnishing to the Premises of such utility services as it may require, as well as for the installation of all such meters or other devices.  Tenant shall be solely responsible for and shall promptly pay, as and when the same become due and payable, all charges for water, sewer, electricity, gas, telephone and any other utility used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm or corporation, including Landlord, supplying the same.

If Schedule E does not provide that Landlord will supply electricity to the Premises, Landlord shall have the option, exercisable at any time and from time to time during the Term, to supply electricity to the Premises.  If Landlord shall elect to supply electricity to the Premises, Tenant will purchase its requirements for such service tendered by Landlord, and Tenant will pay Landlord, within ten (10) days after mailing by Landlord to Tenant of statements therefor, at the applicable rates determined by Landlord from time to time which Landlord agrees shall not be in excess of the public utility rates for the same service, if applicable.  If Landlord so elects to supply electricity, Tenant shall execute and deliver to Landlord, within ten (10) days after request therefor, any documentation reasonably required by Landlord to effect such change in the method of furnishing of electricity.

-23-



Landlord, in its sole discretion, shall have the right, from time to time, to alter the method and source of supply to the Premises of electricity or any other utility, and Tenant agrees to execute and deliver to Landlord such documentation as may be required to effect such alteration. provided, however, that Tenant shall not be required to bear any portion of the cost of such alteration or to incur any additional financial obligation as a result of such alteration, other than as provided in Schedule E.

Tenant shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, or other facilities by which such utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment which shall require additional utility facilities or utility facilities of a greater capacity than the facilities provided by Landlord, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, the cost for providing such additional utility facilities or utility facilities of greater capacity.

Section 12.2. Heating, Ventilating and Air-Conditioning.

Schedule F entitled "Tenant Heating, Ventilating and Air-Conditioning' specifies the obligations of Landlord and Tenant (other than those obligations set forth in Article X) regarding the heating, ventilating, and air-conditioning equipment and system serving the Premises or the Shopping Center Area and the energy required to operate the heating, ventilating and air-conditioning equipment serving the Premises. Tenant covenants and agrees to pay to Landlord, as Additional Rental and in the same manner as Annual Basic Rental is payable, all charges as the same may be adjusted from time to time, and as more particularly set forth in said Schedule F.

Landlord, in its sole discretion, shall have the right, from time to time, to alter the heating, ventilating and air-conditioning systems and equipment serving the Shopping Center, or any part thereof, and Tenant agrees to execute and deliver to Landlord such documentation as may be required to effect such alteration; provided, however, that Tenant shall not be required to bear any portion of the cost of such alteration or to incur any additional financial obligation as a result of such alteration.

Tenant shall not at any time overburden or exceed the capacity of the heating, ventilating and air-conditioning systems and equipment serving the Premises. If Tenant desires any additional equipment or revision of the design of the existing equipment, or if Landlord deems it necessary, because of internal loading causing the temperature in the Premises to exceed the temperature in the Common Areas, to install any additional equipment or revise the design of the existing equipment, such additional equipment or revised design shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor and shall be at Tenant's sole cost and expense. If such additional equipment or revised design is approved by Landlord and if Landlord provides such additional equipment or revised design, Tenant agrees to pay W o r d , on demand, the cost for providing such additional equipment or revised design.

Section 12.3. Fire Protection Sprinkler System.

Landlord shall provide, install, repair and maintain, or cause to be provided, installed, repaired and maintained, a fire protection sprinkler system in the Premises, which system shall remain the property of Landlord. Tenant shall pay Landlord, as Additional Rental, for providing such fire protection

-24-



sprinkler system, an annual amount determined by multiplying the Sprinkler Contribution Rate by Tenant's Floor *Area*, said annual sum to be payable in twelve (12) equal monthly installments, in advance on the first day of each calendar month. Any modifications or additions to the existing sprinkler system, whether required as a result of the improvements to be made to the Premises pursuant to Section **7.1** or requested by Tenant after commencement of the Term, shall be made by Landlord at Tenant's *cost and expense* (after agreement between Landlord and Tenant on a price for such work) or, at **Landlord's** election, shall be made by Tenant (at its cost and expense), provided Tenant utilizes a licensed contractor approved by Landlord for such purpose.

Section **12.4.** Discontinuances and Interruptions of Utility Services.

Landlord reserves the right to cut off and discontinue, upon notice to Tenant, furnishing any heating, ventilation, air-conditioning or other utility services furnished by Landlord at any time when Tenant has failed to pay when due any amount (whether as Rental or otherwise) due under this Lease. Landlord shall not be liable for any damages resulting from or arising out of any such discontinuance and the same shall not constitute a termination of this Lease or an eviction of Tenant. Landlord shall not be liable to Tenant in *damages* or otherwise (i) if any utility shall become unavailable from any public utility company, public authority or any other person or entity (including Landlord) supplying or distributing such utility, or (ii) for any interruption in any utility service (including, without limitation, any heating, ventilation, air-conditioning or sprinkler) caused by the making of any necessary repairs or improvements or by any cause beyond Landlord's reasonable control, and the same shall not constitute a termination of this Lease or an eviction of Tenant.

ARTICLE XIII
**INDEMNITY AND INSURANCE**

Section **13.1.** Indemnities.

To the extent permitted by law, Tenant shall and does hereby indemnify Landlord and agrees to save it harmless and, at Landlord's option, defend it from and against any and all claims, actions, damages, liabilities and expenses (including attorneys' and other professional fees) judgments, settlement payments, and fines paid, incurred or suffered by Landlord in connection with loss of life, personal injury and/or damage to property or the environment suffered by third parties arising from or **our** of the occupancy or use by Tenant of the Premises or any part thereof or any other part of the Shopping Center, occasioned wholly or in part by any act or omission of Tenant, its officers, agents, contractors, employees or invitees, or arising, directly or indirectly, wholly or in part, from any conduct, activity, act, omission, or operation involving the use, handling, generation, treatment, storage, disposal, other management or Release of any Hazardous Substance in, from or to the Premises, whether or not Tenant may have acted negligently with respect to such Hazardous Substance. Tenant's obligations pursuant to this Section shall survive any termination of this Lease with respect to any act, omission or occurrence which took place prior to such termination.

To the extent permitted by law, Landlord shall and does hereby indemnify Tenant and agrees to save it *harmless* from *and* against any and all claims, actions, damages, liabilities and expenses (including attorneys' and other professional fees) in connection with loss of life, personal injury and/or damage to property suffered by third parties arising from or out of the use of any portion of the Common *Areas* by Landlord, occasioned wholly or in part by any act or omission of Landlord, its officers, agents, contractors or employees.

-25-

### Section **13.2.** Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Premises or any part of the premises adjacent to or connecting with the premises or any other part of the Shopping Center, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, or water, gas, sewer or steam pipes.  To the maximum extent permitted by law, Tenant agrees to use and occupy the Premises, and to use such other portions of the Shopping Center as Tenant is herein given the right to use, at Tenant's own risk.

### Section 13.3.  Tenant's Insurance.

At all times on and after delivery of the Premises to Tenant, Tenant will carry and maintain, at its expense, a non-deductible:

(a) commercial general liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, to afford protection with respect to personal injury, death or properly damage of not less than Two Million Dollars ($2,000,000) per occurrence combined single limit/Four Million Dollars ($4,000,000) general aggregate (but not less than $2,000,000 per location aggregate); and

(b) all-risks property and casualty insurance policy, including theft coverage, written at replacement cost value and with replacement cost endorsement, covering all of Tenant's personal property in the Premises (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) and all leasehold improvements installed in the Premises by or on behalf of Tenant; and

(c) comprehensive boiler and machinery equipment policy, including electrical apparatus, if applicable; and

(d) if and to the extent required by law, worker's compensation insurance policy, or similar insurance in form and amounts required by law.

### Section 13.4.  Tenant's Contractor's Insurance

Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord, a non-deductible:

(a) commercial general liability insurance policy, including (but not limited to) contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection, with respect to personal injury,

-26-



5    death or property damage of not less than Three Million Dollars ($3,000,000)
6    per occurrence combined single limit/Five Million Dollars ($5,000,000) general
7    aggregate (but not less than $3,000,000 per location aggregate);

1    **(b)**    comprehensive automobile liability insurance policy with limits for each
2    occurrence of not less than One Million Dollars ($1,000,000) with respect to
3    personal injury or death and Five Hundred Thousand Dollars ($500,000) with
4    respect to property damage; and

1    **(c)**    worker's compensation insurance policy or similar insurance in form and
2    amounts required by law.

### Section 13.5. Policy Requirements.

1    The company or companies writing any insurance which Tenant is required to carry and maintain
2    or cause to be carried or maintained pursuant to Sections 13.3 and 13.4, as well as the form of such
3    insurance, shall at all times be subject to Landlord's approval and any such company or companies shall
4    be licensed to do business in the State in which the Shopping Center is located. Commercial general
5    liability and all-risks property and casualty insurance policies evidencing such insurance shall, with
6    respect to commercial general liability policies, name Landlord and/or its designee(s) as additional insured
7    and, with respect to all-risks property and casualty insurance policies, name Landlord and/or its
8    designee(s) as loss payee, shall be primary and non-contributory, and shall also contain a provision by
9    which the insurer agrees that such policy shall not be cancelled, materially changed or not renewed
10    without at least thirty (30) days' advance notice to Landlord, c/o The Rouse Company, 10275 Little
11    Patuxent Parkway, Columbia, Maryland 21044, Attention: Risk Manager, by certified mail, return receipt
12    requested, or to such other party or address as may be designated by Landlord or its designee. Each such
13    policy, or a certificate thereof, shall be deposited with Landlord by Tenant promptly upon commencement
14    of Tenant's obligation to procure the same. If Tenant shall fail to perform any of its obligations under
15    Sections 13.3, 13.4 or 13.5, Landlord may perform the same and the cost of same shall be deemed
16    Additional Rental and shall be payable upon Landlord's demand.

### Section 13.6. Increase in Insurance Premiums.

1    Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about
2    the premises which will violate Landlord's policies of hazard or liability insurance or which will prevent
3    Landlord from procuring such policies in companies acceptable to Landlord. If anything done, omitted
4    to be done or suffered by Tenant to be kept in, upon or about the Premises shall cause the rate of fire
5    or other insurance on the Premises or on other property of Landlord or of others within the Shopping
6    Center to be increased beyond the minimum rate from time to time applicable to the Premises or to any
7    such property for the use or uses made thereof, Tenant will pay, as Additional Rental, the amount of any
8    such increase upon Landlord's demand.

### Section 13.7. Waiver of Right of Recovery.

1    Except as provided in Section 8.6, neither Landlord nor Tenant shall be liable to the other or to
2    any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or
3    damage to any building, structure or other tangible property, or any resulting loss of income, or losses
4    under worker's compensation laws and benefits, even though such loss or damage might have been
5    occasioned by the negligence of such party, its agents or employees. The provisions of this Section 13.7
6    shall not limit the indemnification for liability to third parties pursuant to Section 13.1.

-27-

**Section 13.8.** Tenant to Pay Proportionate Share of Insurance Costs.

Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's cost of maintaining all insurance with respect to Landlord's Building (other than the Common Areas) including, without limitation, all-risks property and casualty insurance and rent insurance. Such insurance may be carried at the discretion of Landlord in such amounts and companies as Landlord shall determine.

Tenant's proportionate share of such costs shall be computed by multiplying Landlord's insurance costs by a fraction, the numerator of which shall be Tenant's Floor Area and the denominator of which shall be Landlord's Floor Area. Such proportionate share shall be paid by Tenant in monthly installments in such amounts as are estimated and billed by Landlord during each twelve (12) month period commencing and ending on dates designated by Landlord, each installment being due on the first day of each calendar month. At any time during any such twelve (12) month period, Landlord may reestimate Tenant's proportionate share of Landlord's insurance costs and thereafter adjust Tenant's monthly installments payable during such twelve (12) month period to reflect more accurately Tenant's proportionate share of such costs. Within one hundred twenty (120) days (or such additional time thereafter as is reasonable under the circumstances) after the end of each such twelve (12) month period, Landlord shall deliver to Tenant a statement of such insurance costs for such twelve (12) month period and the installments paid or payable shall be adjusted between Landlord and Tenant, and Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term Landlord shall pay Tenant), as the case may be, within fifteen (15) days of receipt of such statement, such amounts as may be necessary to effect such adjustment. Upon reasonable notice, Landlord shall make available for Tenant's inspection at Landlord's office, during normal business hours, Landlord's records relating to such insurance costs for such preceding twelve (12) month period. Failure of Landlord to provide the statement called for hereunder within the time prescribed shall not relieve Tenant of its obligations hereunder.

## ARTICLE XIV
## DAMAGE AND DESTRUCTION

**Section 14.1.** Landlord's Obligation to Repair and Reconstruct.

If the Premises shall be damaged by fire, the elements, accident or other casualty (any of such causes being referred to herein as a "Casualty"), but the Premises shall not be thereby rendered wholly or partially untenantable, Landlord shall promptly cause such damage to be repaired and there shall be no abatement of Rental. If, as the result of Casualty, the Premises shall be rendered wholly or partially untenantable, then, subject to the provisions of Section 14.2, Landlord shall cause such damage to be repaired and all Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be abated proportionately as to the portion of the Premises rendered untenantable during the period of such untenantability, and, in addition, during such period of untenantability, the Breakpoint shall also be proportionately reduced by an amount equal to the amount obtained by multiplying the Breakpoint by a fraction, the numerator of which shall be the length of time the Premises are closed and the denominator of which shall be the length of the Rental Year(s) in question. All such repairs shall be made at the expense of Landlord; provided, however, that Landlord shall not be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) or to any leasehold

-28-

...

16  improvements installed in the Premises by or on behalf of Tenant, all of which damage, replacement or
17  repair shall be undertaken and completed by Tenant promptly.

Section 14.2.  Landlord's Option to Terminate Lease.

1   If the Premises are *(a)* rendered wholly untenantable, or (b) damaged as a result of any cause
2   which is not covered by W o r d ' s insurance or (c) damaged or destroyed in whole or in part during the
3   last three (3) years of the Term, or if Landlord's Building is damaged to the extent of fifty percent (50%)
4   or more of Landlord's Floor Area, then, in any of such events, Landlord may elect to terminate this
5   Lease by giving to Tenant notice of such election within ninety (90) days after the Occurrence of such
6   event. If *such* notice is given, the rights and obligations of the parties shall cease as of the date of such
7   notice, and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to
8   perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 14.3.  Demolition of Landlord's Building.

1   If Landlord's Building shall be so substantially *damaged* that it is reasonably *necessary*, in
2   Landlord's sole judgment, to demolish same for the purpose of reconstruction, Landlord may demolish
3   the same, in which event the Rental shall be abated to the same extent as if the Premises were rendered
4   untenantable by a Casualty.

Section 14.4.  Insurance Proceeds.

1   If Landlord does not elect to terminate this Lease pursuant to Section 14.2, Landlord shall,
2   subject to the prior rights of any Mortgagee, disburse and apply any insurance proceeds received by
3   Landlord to the restoration and rebuilding of Landlord's Building in accordance with Section 14.1 hereof
4   All insurance proceeds payable with respect to the Premises (excluding proceeds payable to Tenant
5   pursuant to Section 13.3) shall belong to and shall be payable to Landlord.

ARTICLE XV
CONDEMNATION

Section 15.1.  Effect of Taking.

1   If the whole or *any* part of the Premises shall be taken under the power of eminent domain, this
2   Lease shall terminate as to the part so taken on the date Tenant is required to yield possession thereof *to*
3   *the* condemning authority. Landlord shall make, or cause to be made, such repairs and alterations as may
4   be necessary in order to restore the part not taken to useful condition and all Rental (other than any
5   Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder)
6   shall be reduced in the same proportion as the portion of the floor area of the Premises so taken bears
7   to Tenant's Floor Area. If the aforementioned taking renders the remainder of the Premises unsuitable
8   for the Permitted Use, either party may terminate this Lease as of the date when Tenant is required to
9   yield possession by giving notice to that effect within thirty (30) days after such date. If twenty percent
10  (20%)or more of Landlord's Floor *Area* is taken as aforesaid, or if parking spaces in the Shopping
11  Center are so taken thereby reducing the number of parking spaces to less than the number required by
12  law and Landlord does not deem it reasonably feasible to replace such parking spaces with other parking
13  spaces *on the* portion of the Shopping Center not taken, then Landlord may elect to terminate this Lease

-29-



as of the date on which possession thereof is required to be yielded to the condemning authority, by giving notice of such election within ninety (90) days after *such date*. If any notice of termination is given pursuant to this Section, this Lease and the rights and obligations of the parties hereunder shall cease as of the date of such notice and Rental (other *than* any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 15.2. Condemnation Awards.

All compensation awarded for any taking of the Premises, Landlord's Building, the Shopping Center *Area*, or any interest in any of the same, shall belong to and be the property of Landlord, Tenant hereby assigning to Landlord all rights with respect thereto; provided, however, nothing contained herein shall prevent Tenant from applying for reimbursement from the condemning authority (if permitted by law) for moving expenses, or the expense of removal of Tenant's trade fixtures, or loss of Tenant's business good will, but only if such action shall not reduce the amount of the award or other compensation otherwise recoverable from the condemning authority by Landlord or the owner of the fee simple estate in the Shopping Center *Area*.

## ARTICLE XVI
## ASSIGNMENTS AND SUBLETTING

Section 16.1. Landlord's Consent Required.

(a) Except as provided in Section 17.4 with respect to assignment of this Lease following Tenant's bankruptcy, Tenant will not assign this Lease, in whole or in part, nor sublet all or any part of the Premises, nor license concessions or lease departments therein, nor pledge or encumber by mortgage or other instruments its interest in this Lease (each individually and collectively referred to in this Section as a "transfer") without first obtaining the consent of Landlord, which consent Landlord may withhold in its sole and absolute discretion. This prohibition includes, without limitation, any subletting or assignment which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate, partnership or proprietary structure. Any transfer to or by a receiver or trustee in any federal or state bankruptcy, insolvency, or similar proceeding shall be subject to, and in accordance with, the provisions of Section 17.4. Consent by Landlord to any transfer shall not constitute a waiver of the requirement for such consent to any subsequent transfer.

(b) Subject to the provisions of Section 17.4 respecting assignment of this Lease following Tenant's bankruptcy and assumption of this Lease by Tenant or its trustee, it is expressly understood and agreed that Landlord may, in its sole and absolute discretion, withhold its consent to any transfer of this Lease or of all or any part of the Premises. The parties recognize that this Lease and the Premises are unique, and that this Lease and the Premises derive value from the remainder of Landlord's Building and the Shopping Center *Area* as a whole, and that the nature and character of the operations within and management of the Premises are important to the success of Landlord's Building and the Shopping Center Area. Accordingly, and without limiting the generality of the foregoing, Landlord may condition its consent to any transfer upon satisfaction of all or any of the following conditions:

(i)     the net assets of the assignee, licensee, sublessee or other transferee or permittee (collectively "transferee") immediately prior to the transfer shall not be less than

-30-

the greater of the net assets of Tenant immediately prior to the transfer or the net assets of Tenant at the time of the signing of this Lease;

(ii)    *such* transfer shall not adversely affect the quality and type of business operation which Tenant has conducted theretofore;

(iii)    *such* transferee shall possess qualifications for the Tenant business substantially equivalent to those of Tenant and shall have demonstrated recognized experience in successfully operating such a business, including, without limitation, experience in successfully operating a similar quality business in first-class shopping centers;

(iv)    *such* transferee shall continue to operate the business conducted in the Premises under the same Tenant Trade Name, in the same manner as Tenant and pursuant to all of the provisions of this Lease;

(v)    *such* transferee shall assume in writing, in a form acceptable to Landlord, all of Tenant's obligations hereunder and Tenant shall provide Landlord with a copy of such assumption/transfer document;

(vi)    Tenant shall pay to Landlord a transfer fee of *One* Thousand Dollars ($1,000.00) prior to the effective date of the transfer in order to reimburse Landlord for all of its internal costs and expenses incurred with respect to the transfer, including, without limitation, costs incurred in connection with the review of financial materials, meetings with representatives of transferor and/or transferee and preparation, review, approval and execution of the required transfer documentation, and, in addition, Tenant shall reimburse Landlord for any out-of-pocket costs and expenses incurred with respect to such transfer;

(vii)    as of the effective date of the transfer and continuing throughout the remainder of the Term, the Annual Basic Rental shall be the greater of *(A)* the Annual Basic Rental set forth in Section 1.1.G. hereof, or (B) the sum of all Annual Basic Rental and all Annual Percentage Rental payable by Tenant during the twelve calendar months preceding the transfer;

(viii)    Tenant to which the Premises were initially leased shall continue to remain liable under this Lease for the performance of all terms, including, but not limited to, payment of Rental due under this Lease;

(ix)    Tenant's guarantor, if any, shall continue to remain liable under the terms of the Guaranty of this Lease and, if Landlord deems it necessary, such guarantor shall execute such documents necessary to insure the continuation of its guaranty;

(x)    Landlord shall receive upon execution of its consent the full unamortized amount of any construction or other allowances given to the original Tenant under this Lease, any due but unpaid Rental, and an amount equal to fifteen percent (15%) of any and all consideration paid or agreed to be paid, directly or indirectly, to Tenant for such transfer or for the sale of Tenant's business in connection with which any such transfer is made; and

-31-



(xi)    each of Landlord's Mortgagees shall have consented in writing to such transfer.

Section 16.2. <u>Transfer of Corporate Shares.</u>

If Tenant is a corporation (other than a corporation the outstanding voting stock of which is listed on a "national securities exchange," as defined in the Securities Exchange Act of 1934) and if at any time after execution of this Lease any part or all of the corporate shares shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition (including, but not limited to, such a transfer to or by a receiver or trustee in federal or state bankruptcy, insolvency, or other proceedings) so as to result in a change in the present control of said corporation by the person(s) now owning a majority of said corporate shares, Tenant shall give Landlord notice of such event within fifteen (15) days of the date of such transfer. If any such transfer is made (and regardless of whether Tenant has given notice of same), Landlord may elect to terminate this Lease at any time thereafter by giving Tenant notice of such election, in which event this Lease and the rights and obligations of the parties hereunder shall cease as of a date set forth in such notice which date shall not be less than sixty (60) days after the date of such notice. In the event of any such termination, all Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 16.3. <u>Transfer of Partnership Interests.</u>

If Tenant is a general or limited partnership and if at any time after execution of this Lease any part or all of the interests in the capital or profits of such partnership or any voting or other interests therein shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition (including, but not limited to, such a transfer to or by a receiver or trustee in federal or state bankruptcy, insolvency or other proceedings, and also including, but not limited to, any adjustment in such partnership interests) so as to result in a change in the present control of said partnership by the person or persons now having control of same, Tenant shall give Landlord notice of such event within fifteen (15) days of the date of such transfer. If any such transfer is made (and regardless of whether Tenant has given notice of same), Landlord may elect to terminate this Lease at any time thereafter by giving Tenant notice of such election, in which event this Lease and the rights and obligations of the parties hereunder shall cease as of a date set forth in such notice which date shall be not less than sixty (60) days after the date of such notice. In the event of any such termination, all Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 16.4. <u>Acceptance of Rent from Transferee.</u>

The acceptance by Landlord of the payment of Rental following any assignment or other transfer prohibited by this Article shall not be deemed to be a consent by Landlord to any such assignment or other transfer nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.

Section 16.5. <u>Additional Provisions Respecting Transfers.</u>

Without limiting Landlord's right to withhold its consent to any transfer by Tenant, and regardless of whether Landlord shall have consented to any such transfer, neither Tenant nor any other person



having an interest in the possession, use or occupancy of the Premises or any part thereof shall enter into any lease, sublease, license, concession, assignment or other transfer or agreement for possession, use or occupancy of all or any portion of the Premises which provides for rental or other payment for such use, occupancy or utilization based, in whole or in part, on the net income or profits derived by any person or entity from the space so leased, used or occupied, and any such purported lease, sublease, license, concession, assignment or other transfer or agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use or occupancy of all or any part of the Premises. There shall be no deduction from the rental payable under any sublease or other transfer nor from the amount thereof passed on to any person or entity, for any expenses or costs related in any way to the subleasing or transfer of such space.

If Tenant shall make or suffer any such transfer without first obtaining any consent of Landlord required by Section 16.1, any and all amounts received as a result of such transfer shall be the property of Landlord to the extent the same (determined on a *square* foot basis) is greater than the *Annual Basic Rental* (on a *square* foot basis) payable under this Lease, it being the parties' intent that any profit resulting from such transfer shall belong to Landlord, but the same shall not be deemed to be a consent by Landlord to any such transfer or a waiver of any right or remedy of Landlord hereunder.

ARTICLE XVII
DEFAULT

Section 17.1. "Event of Default" Defined.

Any one or more of the following events shall constitute an "Event of Default":

    (a)    The sale of Tenant's interest in the Premises under attachment, execution or similar legal process, or if Tenant is adjudicated as bankrupt or insolvent under any state bankruptcy or insolvency law or an order for relief is entered against Tenant under the Federal Bankruptcy Code and such adjudication or order is not vacated within ten (10) days.

    (b)    The commencement of a case under any chapter of the Federal Bankruptcy Code by or against Tenant or any guarantor of Tenant's obligations hereunder, or the filing of a voluntary or involuntary petition proposing the adjudication of Tenant or any such guarantor as bankrupt or insolvent, or the reorganization of Tenant or any such *guarantor*, or an arrangement by Tenant or any such guarantor with its creditors, unless the petition is filed or case commenced by a party other than Tenant or any such guarantor and is withdrawn or dismissed within thirty (30) days after the date of its filing.

    (c)    The admission in writing by Tenant or any such guarantor of its inability to pay its debts when due;

    (d)    The appointment of a receiver or trustee for the business or property of Tenant or any such guarantor, unless such appointment shall be vacated within ten (10) days of its entry.

-33-



(e)     The making by Tenant or any such guarantor of an assignment for the benefit of its creditors, or if in any other manner Tenant's interest in this Lease shall pass to another by operation of law.

(f)     The failure of Tenant to pay any Rental or other sum of money within seven (7) days after the same is due hereunder.

(g)     Default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within ten (10) days after the giving of notice thereof by Landlord, unless such default is of such nature that it cannot be cured within such ten (10) day period, in which case no Event of Default shall occur *so* long as Tenant shall commence the curing of the default within such ten (10) day period and shall thereafter diligently prosecute the curing of same; provided, however, if Tenant shall default in the performance of any such covenant or agreement of this Lease two *(2)* or more times in any twelve (12) month period, then notwithstanding that each of such defaults shall have been cured by Tenant, any further similar default shall be deemed an Event of Default without the ability for cure.

(h)     The vacation or abandonment of the Premises by Tenant at any time following delivery of possession of the Premises to Tenant.

(i)     The occurrence of any other event described as constituting an "Event of Default" elsewhere in this Lease.

Section 17.2. Remedies.

Upon the occurrence of an Event of Default, Landlord, without notice to Tenant in any instance (except where expressly provided for below or by applicable law) may do any one or more of the following:

(a)     With or without judicial process, enter the Premises and take possession of any and *all* goods, inventory, equipment, fixtures and all other personal property of Tenant, which is or may be put into the Premises during the Term, whether exempt or not from sale under execution or attachment (it being agreed that said property shall at all times be bound with a lien in favor of Landlord and shall be chargeable for all Rental and for the fulfillment of the other covenants and agreements herein contained), and Landlord may sell all or any part thereof at public or private sale. Tenant agrees that five *(5)* days prior notice of any public or private sale shall constitute reasonable notice. The proceeds of any such sale *shall* be applied, first, to the payment of all costs and expenses of conducting the sale or caring for or storing said property (including reasonable attorneys' fees); second, toward the payment of any indebtedness, including (without limitation) indebtedness for Rental, which may be or may become due from Tenant to Landlord; and third, to pay Tenant, on demand, any surplus remaining after all indebtedness of Tenant to Landlord has been fully paid;

-34-



(b)   Perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform and of which Landlord shall have given Tenant notice, the cost of which performance by W o r d . together with interest thereon at the Default Rate from the date of such expenditure. shall be deemed Additional Rental and shall be payable by Tenant to Landlord upon demand. Notwithstanding the provisions of this clause (b) and regardless of whether an Event of Default shall have occurred, Landlord may exercise the remedy described in this clause (b) without any notice to Tenant if Landlord, in its good faith judgment, believes it would be materially injured by failure to take rapid action or if the unperformed obligation of Tenant constitutes an emergency;

(c)   Elect to terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant, and reenter the Premises, without the necessity of legal proceedings, and remove Tenant and all other persons and property from the Premises, and may store such property in a public warehouse or elsewhere at the cost of and for the account of Tenant without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; or

(d)   Exercise any other legal or equitable right or remedy which it may have.

Any costs and expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rental and shall be repaid to Landlord by Tenant upon demand.

Section 17.3. Damages

If this Lease is terminated by Landlord pursuant to Section 17.2., Tenant nevertheless shall remain liable for (a) any Rental and damages which may be due or sustained prior to such termination, all reasonable costs, fees and expenses including, but not limited to, reasonable attorneys' fees, costs and expenses incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to others from time to time (all such Rental, damages, costs, fees and expenses being referred to herein as "Termination Damages"), and (b) additional damages (the "Liquidated Damages"), which, at the election of Landlord, shall be either:

(i)   an amount equal to the Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the amount of Rental, if any, which Landlord shall receive during such period from others to whom the Premises may be rented (other than any Additional Rental received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of the Lease and continuing until the date on which the Term would have expired but for such termination, and any suit or action brought to collect any such Liquidated Damages for any month shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month by a similar proceeding; or

-35-



(ii)   an amount equal to the present worth (as of the date of such termination) of Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the fair rental value of the Premises, as determined by an independent real estate appraiser named by Landlord, in which case such Liquidated Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid.  For purposes of this clause (ii), "present worth" shall be computed by discounting such amount to present worth at a discount rate equal to one percentage point above the discount rate then in effect at the Federal Reserve Bank nearest to the location of the Shopping Center.

If such termination shall take place after the expiration of two or more Rental Years, then, for purposes of computing the Liquidated Damages, the *Annual* Percentage Rental payable with respect to each Rental Year following termination (including the Rental Year in which such termination shall take place) shall be conclusively presumed to be equal to the average Annual Percentage Rental payable with respect to each complete Rental Year preceding termination.  If such termination shall take place before the expiration of two Rental Years, then, for purposes of computing the Liquidated Damages, the Annual Percentage Rental payable with respect to each Rental Year following termination (including the Rental Year in which such termination shall take place) shall be conclusively presumed to be equal to twelve (12) times the average monthly payment of Annual Percentage Rental due prior to such termination, or if no Annual Percentage Rental shall have been payable during such period, then the Annual Percentage Rental for each year of the unexpired Term shall be conclusively presumed to be a sum equal to twenty-five percent *(25%)* of the *Annual* Basic Rental due and payable during such unexpired Term.  Termination Damages shall be due and payable immediately upon demand by Landlord following any termination of this Lease pursuant to Section 17.2.  Liquidated Damages shall be due and payable at the times set forth herein.

If this Lease is terminated pursuant to Section 17.2, Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term or terms (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, in its sole discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any rent due upon such reletting.

Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the *damages* are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.  The failure or refusal of Landlord to relet the Premises or any part or parts thereof shall not release or affect Tenant's liability for damages.

Section 17.4.  Remedies in Event of Bankruptcy or Other Proceeding.

(a)   Anything contained herein to the contrary notwithstanding, if termination of this Lease shall be stayed by order of any court having jurisdiction over any proceeding described in paragraph (b) of Section 17.1., or by federal or state statute, then, following the expiration of any such

-36-



stay, or if Tenant or Tenant as debtor-in-possession or the trustee appointed in any such proceeding (being collectively referred to as "Tenant" only for the purposes of this Section 17.4.) shall fail to assume Tenant's obligations under *this* Lease within the period prescribed therefor by law or within **fifteen (15)** days after *entry* of the order for relief or as may be allowed by the court, or if Tenant shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease. Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on fifteen (15) days' notice to Tenant and upon the expiration of said fifteen (15) day period this Lease shall cease and expire as aforesaid and Tenant shall immediately quit and surrender the Premises as aforesaid.  Upon the termination of this Lease as provided above, Landlord, without notice, may re-enter and repossess the premises using such force for that purpose as may be necessary without being liable to indictment, prosecution or damages therefor and may dispossess Tenant by *summary* proceedings or otherwise.

(b)  For the purposes of the preceding paragraph (a), adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, shall include, without limitation, the following requirements:

(i)    that Tenant comply with all of its obligations under this Lease;

(ii)   that Tenant pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate Rental payable for such monthly period;

(iii)  that Tenant continue to use the Premises in the manner originally required by this Lease;

(iv)   *that* Landlord be permitted to supervise the performance of Tenant's obligations under this Lease;

(v)    that Tenant pay to Landlord within fifteen (15) days after entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, an additional security deposit in an amount acceptable to Landlord;

(vi)   *that* Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease;

(vii)  that if Tenant assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, or as the Same may be amended) to any person who shall have made a bona fide offer to accept an assignment of this Lease o n terms

-37-



acceptable to *such court* having competent jurisdiction over Tenant's estate. then notice of such proposed assignment. *setting* forth (x) the name and address of such person, (y) all of the terms and conditions of such offer, and (z) the adequate assurance to be provided Landlord to assure such person's future performance under this Lease, including, without limitation, the assurances referred to in Title 11 U.S.C.§ 365(b)(3), as it may be amended, shall be given to Landlord by Tenant no later than fifteen (15) days after receipt by Tenant of such offer, but in any event no later than thirty (30) days prior to the date that Tenant shall *make* application to such court for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less *any* brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease; and

(viii)   that if Tenant assumes this Lease and proposes to assign the same, and Landlord does not exercise its option pursuant to paragraph (vii) of this Section 17.4, Tenant hereby agrees that:

(A)   such assignee shall have a net worth not less than the net worth of Tenant as of the Commencement Date. or such Tenant's obligations under this Lease shall be unconditionally guaranteed by a person having a net worth equal to Tenant's net worth as of the Commencement Date;

(B)   such assignee shall not use the Premises except subject to all the restrictions contained in this Lease;

(C)   such assignee shall assume in writing all of the terms, covenants and conditions of this Lease including, without limitation. all of such terms, covenants and conditions respecting the Permitted Use and payment of Rental, and such assignee shall provide Landlord with assurances satisfactory to Landlord that it has the experience in operating stores having the same or substantially similar uses as the Permitted Use, in first-class shopping centers, sufficient to enable it so to comply with the terms, covenants and conditions of this Lease and successfully operate the Premises for the Permitted Use;

(D)   such assignee shall indemnify Landlord against, and pay to Landlord the amount of, any payments which Landlord may be obligated to make to any Mortgagee by virtue of such assignment;

(E)   such assignee shall pay to Landlord an amount equal to the unamortized portion of any construction allowance made to Tenant; and

-38-



(F)   if *such* assignee makes any payment to Tenant, or for Tenant's account, for the right to assume this Lease (including, without limitation, any lump *sum* payment, installment payment or payment in the nature of rent over and above the Rental payable under this Lease), Tenant shall pay over to Landlord one-half of any such payment, less any amount paid to Landlord pursuant to clause (E) above on account of any construction allowance.

## ARTICLE XVIII
## SUBORDINATION AND ATTORNMENT

Section 18.1. Subordination.

Unless a Mortgagee (as hereinafter defined) shall otherwise elect as provided in Section **18.2**, Tenant's rights under this Lease are and shall remain subject and subordinate to the operation and effect of

(a)   any lease of land only or of land and buildings in a sale-leaseback or lease-subleaseback transaction involving the Premises or Landlord's interest therein, or

(b)   any mortgage, deed of trust or other security instrument constituting a lien upon the Premises or Landlord's interest therein,

whether *the* same shall be in existence at the date hereof or created hereafter, any such **lease**, mortgage, deed of trust or other security instrument being referred to herein as a "Mortgage", and the party or parties having the benefit of the same, whether as lessor, mortgagee, trustee or noteholder, being referred to herein as a "Mortgagee". Tenant's acknowledgment and agreement of subordination provided for in this Section are self-operative and no further instrument of subordination shall be required; however, Tenant shall execute such further assurances thereof as shall be requisite or as may be requested from time to time by Landlord or any Mortgagee.

Section **18.2.** Mortgagee's Unilateral Subordination.

If a Mortgagee shall so elect by notice to Tenant or by the recording of a unilateral declaration of subordination, this Lease and Tenant's rights hereunder shall be superior and prior in right to the Mortgage of which such Mortgage has the benefit, with the same force and effect as if this Lease had been executed, delivered and recorded prior to the execution, delivery and recording of such Mortgage, subject, nevertheless, to such conditions as may be set forth in any such notice or declaration.

Section 18.3. Attornment.

If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, and if so requested or required by such successor in interest. Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request.

-39-



ARTICLE XIX
NOTICES

Section 19.1.  Sending of Notices.

Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be deemed to have been given as **follows:**

    (i)    if intended for Landlord, on the third day following the day on which the same shall have been mailed by United States registered or certified mail or express mail, return receipt requested, with all postage charges prepaid, addressed to Landlord, Attention: General Counsel, c/o The Rouse Company Building, Columbia, Maryland 21044, with a copy to Landlord's management office in the Shopping Center except that payment of Rental and sales reports shall be delivered to Landlord's management office in the Shopping Center; and

    (ii)    if intended for Tenant, upon the earlier to occur of the following:

        (a)    the third day following the day on which the same shall have been mailed by United States registered or certified mail or express mail, return receipt requested, with all postal charges prepaid, addressed to Tenant at the Tenant Notice Address, or

        (b)    actual receipt at the Tenant Notice Address, and in the event more than one copy of such notice shall have been sent or delivered to Tenant, the first actually received shall control for the purposes of this clause (b).

Either party may, at any time, change its address for the above purposes by sending a notice to the other party stating the change and setting forth the new address.

Section 19.2.  Notice to Mortgagees.

if any Mortgagee shall notify Tenant that it is the holder of a Mortgage affecting the Premises, no notice, request or demand thereafter sent by Tenant to Landlord shall be effective unless and until a copy of the same shall also be sent to such Mortgagee in the manner prescribed in Section 19.1 and to such address as such Mortgagee shall designate.

ARTICLE XX
MISCELLANEOUS

Section 20.1.  Radius Restriction.

Tenant agrees that Tenant (and if Tenant is a corporation or partnership, its officers, directors, stockholders, any affiliates or partners) shall not, directly or indirectly, operate, manage or have any interest in any other store or business (unless in operation on the date of this Lease) which is similar to or in competition with the Permitted Use on the commencement date of this Lease and for the Term of this Lease within the Restriction Area. Without limiting any of Landlord's remedies under this Lease,

-40-



in the event Tenant operates, manages or has any interest in a store or business violating the provisions of this *Section*, then, at Landlord's option, Landlord may by notice to Tenant require Tenant to include the gross sales of such other store or business in the Gross Sales of the Premises for the purposes of calculating Annual Percentage Rental under *this* Lease.

### Section 20.2.  Estoppel Certificates.

At any time and from time to time, within ten (10) days after Landlord shall request the same, Tenant will execute, acknowledge and deliver to Landlord and to such Mortgagee or other party as may be designated by Landlord, a certificate in an acceptable form with respect to the matters required by such party and such other matters relating to this Lease or the status of performance of obligations of the parties hereunder as may be reasonably requested by Landlord.  If Tenant fails to provide such certificate within ten (10) days after request by Landlord, Tenant shall be deemed to have approved the contents of any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to *so* certify.

### Section 20.3.  Inspections and Access by Landlord.

Tenant will permit Landlord, its agents, employees and contractors to enter all parts of the Premises during Tenant's business hours to inspect the same and to enforce or carry out any provision of this Lease, including, without limitation, any access necessary for the making of any repairs which are Landlord's obligation hereunder; provided, however, that, in the event of an emergency, Landlord may enter the Premises for such purposes at any time, upon such notice to Tenant, if any, as shall be feasible under the circumstances.

### Section 20.4.  Memorandum of Lease.

Neither this Lease nor a short form or memorandum thereof shall be recorded in the public records.

### Section 20.5.  Remedies Cumulative.

No reference to any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity.  No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition.  No waiver by Landlord of *any* breach by Tenant under this Lease or of any breach by any other tenant under any other lease of any portion of the Shopping Center shall affect or alter this Lease in any way whatsoever.

### Section 20.6.  Successors and Assigns.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns and shall inure to the benefit of Tenant and only such assigns and subtenants of Tenant to whom the assignment of this Lease or the subletting of the Premises by Tenant has been consented to by Landlord as provided in this Lease.  Upon any sale or other transfer by Landlord of its interest in the

-41-



6  Premises and in this Lease, and the assumption by Landlord's transferee of the obligations of Landlord
7  hereunder, Landlord shall be relieved of any Obligations under this Lease accruing thereafter.

### Section 20.7. Compliance with Laws and Regulations.

1  Tenant, at its sole cost and expense, shall comply, and shall cause the Premises to comply with
2  (a) all federal, state, regional, county, municipal and other governmental statutes, laws, rules, orders,
3  regulations and ordinances affecting any part of the Premises. or the use thereof, including, but not
4  limited to, those which require the making of any structural, unforeseen or extraordinary changes,
5  whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter
6  enacted involve a change of policy on the part of the governmental body enacting the same, and (b) all
7  rules, orders and regulations of the National Fire Protection Association. Landlord's casualty insurer(s)
8  and other applicable insurance rating organizations or other bodies exercising similar functions in
9  connection with the prevention of fire or the correction of hazardous conditions which apply to the
10 Premises.

### Section 20 8. Captions and Headings.

1  The table of contents and the Article and Section captions and headings are for convenience of
2  reference only and in no way shall be used to construe or modify the provisions set forth in this Lease.

### Section 20.9. Joint and Several Liability.

1  If two or more individuals, corporations, partnerships or other business associations (or any
2  combination of two or more thereof) shall sign this Lease as 'Tenant, the liability of each such individual,
3  corporation, partnership or other business association to pay rent and perform all other obligations
4  hereunder shall be deemed to be joint and several and all notices, payments and agreements given or
5  made by, with or to any one of such individuals, corporations, partnerships or other business associations
6  shall be deemed to have been given or made by, with or to all of them.  In like manner, if Tenant shall
7  be a partnership or other business association, the members of which are, by virtue of statute or federal
8  law, subject to personal liability, the liability of each such member shall be joint and several.

### Section 20.10. Broker's Commission.

1  Each of the parties represents and warrants that there are no claims for brokerage commissions
2  or finders' fees in connection with the execution of this Lease, and agrees to indemnify the other against,
3  and hold it harmless from, all liability arising from any such claim including, without limitation, the cost
4  of counsel fees in connection therewith.

### Section 20.11. No Discrimination.

1  It is Landlord's policy to comply with all applicable state and federal laws prohibiting
2  discrimination in employment based on race, age, color, sex, national origin, disability, religion, or other
3  protected classification.  It is further intended that the Shopping Center shall be developed and operated
4  so that all prospective tenants thereof, and all customers, employees, licensees and invitees of all tenants
5  shall have equal opportunity to obtain all the goods, services, accommodations, advantages, facilities and
6  privileges of the Shopping Center without discrimination because of race, age. color, sex, national origin,
7  disability, or religion.  To that end, Tenant shall not discriminate in the conduct and operation of its

-42-



business in the Premises against any person or group of persons because of the race, **age**, color, **sex**, religion, national origin or other protected classification of such person or group of **persons.**

Section 20.12. <u>No Joint Venture</u>.

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed. The provisions of this Lease in regard to the payment by Tenant and the acceptance by Landlord of a percentage of Gross Sales of Tenant and others is a reservation for rent for the use of the Premises.

Section **20.13.** <u>No Option</u>.

The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease shall become effective only upon execution and delivery thereof by both parties. Execution by signature of an authorized officer of Landlord or any corporate entity acting on behalf of Landlord shall be effective only upon attestation thereof and the affixation of the *seal* of such corporation by a corporate Secretary or Assistant Secretary of Landlord.

Section **20.14.** <u>No Modification</u>.

This writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all negotiations, considerations and representations between the parties having been incorporated herein. No course of prior dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Lease. Acceptance of, or acquiescence in, a course of performance rendered under this or any prior agreement between the parties or their affiliates shall not be relevant or admissible to determine the meaning of any of the terms of this Lease. No representations, understandings or agreements have been made or relied upon in the making of this Lease other than those specifically set forth herein. This Lease can be modified only by a writing signed by the party against whom the modification is enforceable.

Section **20.15.** <u>Severability</u>

If any portion of any term or provision of this Lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section **20.16.** <u>Third Party Beneficiary</u>.

Nothing contained in this Lease shall be construed so as to confer upon any other party the rights of a third party beneficiary except rights contained herein for the benefit of a Mortgagee.

-43-



...

Section **20.17.** <u>Corporate Tenants</u>.

If Tenant is a corporation, the **persons** executing **this** Lease on behalf of Tenant hereby covenant and warrant that: Tenant is a duly constituted corporation qualified to do business in the State in which the Shopping Center is located; all Tenant's franchises and corporate taxes have been paid to date; all future forms, reports, fees and other documents necessary for Tenant to comply with applicable laws will be filed by Tenant when due; and such persons are duly authorized by the board of directors of such corporation to execute and deliver **this** Lease on behalf of the corporation.

Section 20.18. <u>Applicable Law</u>.

This Lease and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the State in which the Shopping Center is located.

Section **20.19.** <u>Performance of Landlord's Obligations by Mortgagee</u>.

Tenant shall accept performance of any of Landlord's obligations hereunder by any Mortgagee of Landlord.

Section **20.20.** <u>Waiver of Certain Rights</u>.

Landlord and Tenant hereby mutually waive any and all rights which either may have to *request* a jury trial in any action, proceeding or counterclaim (except for those involving personal injury or property damage) arising out of this Lease or Tenant's occupancy of or right to occupy the Premises.

Tenant further agrees that in the event Landlord commences any summary proceeding for non-payment of rent or possession of the Premises, Tenant will not interpose and hereby waives all right to interpose any counterclaim of whatever nature in any such proceeding. Tenant further waives any right to remove said *summary* proceeding *to* any other court or to consolidate said summary proceeding with any other action, whether brought prior or subsequent to the summary proceeding.

Section **20.21.** <u>Limitation on Right of Recovery Against Landlord</u>.

Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to its interest in the Shopping *Center* Area and *any* Judgments rendered against Landlord shall be satisfied solely out of the proceeds of sale of its interest in the Shopping Center Area. No personal judgment shall lie against Landlord upon extinguishment of its rights in the Shopping Center Area and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any Mortgage. The foregoing provisions are not intended to relieve Landlord from the performance of any of Landlord's obligations under this Lease, but only to limit the personal liability of Landlord in case of recovery of a judgment against Landlord; nor shall the foregoing be deemed to limit Tenant's rights to obtain injunctive relief or specific performance or to avail itself of any other right or remedy which may be awarded Tenant by law or under this Lease.

If Tenant claims or asserts that Landlord has violated or failed to perform a covenant of Landlord not to unreasonably withhold or delay Landlord's consent or approval, Tenant's sole remedy shall be an

-44-



...

3    action for specific performance, declaratory judgment or injunction and in no event shall Tenant be
4    entitled to any money damages for a breach of such covenant and in no event shall Tenant claim or assert
5    any claim for any money damages in any action or by way of set off, defense or counterclaim and Tenant
6    hereby specifically waives the right to any money damages or other remedies.

Section 20.22. Survival.

1    All representations, warranties, covenants, conditions and agreements contained herein which
2    either are expressed as surviving the expiration or termination of this Lease or, by their nature, are to
3    be performed or observed, in whole or in part, after the termination or expiration of this Lease, including
4    (without limitation) the obligations of Tenant pursuant to Sections 8.6 and 13.1, shall survive the
5    termination or expiration of this Lease.

Section 20.23. Relocation of Premises.

1    In the event of an expansion, renovation or remerchandising of the Shopping Center in the
2    vicinity of the Premises, Landlord may elect, by giving notice of such election to Tenant, to require
3    Tenant to surrender possession of all or such portion of the Premises and for such period of time
4    (including the remainder of the Term) as Landlord, in its sole discretion, shall deem to be required for
5    such purposes. Such election shall be exercised not more than once during the Term, except that if any
6    such notice of election shall be withdrawn by Landlord, the same shall be deemed not to have been given.
7    Landlord's notice of the exercise of such election shall designate (i) the portion of the Premises required
8    for such purposes, (ii) the period of time during which such surrender shall be required, and (iii) the date
9    by which possession of same shall be surrendered by Tenant, which date shall not be earlier than ninety
10   (90) days after the date on which such notice is given.

1    If Tenant shall be required to surrender possession of all or a portion of the Premises for a period
2    of time which is less than the remainder of the Term, Rental shall abate as to such portion or all of the
3    Premises required to be surrendered, such abatement to be effective beginning as of the date Tenant is
4    required to surrender such possession and continuing until the date on which Landlord redelivers
5    possession to Tenant. For purposes of determining the extent of such abatement of Rental, Tenant's
6    Floor Area hereunder shall be deemed to be reduced during the abatement period by the number of square
7    feet contained in the portion of the Premises of which possession is required to be surrendered.

1    If Tenant shall be required to surrender possession of a portion of the Premises for the entire
2    remainder of the Term, this Lease shall terminate as to such portion as of the date on which Tenant is
3    required to surrender possession thereof to Landlord and all Rental shall be proportionately reduced. For
4    purposes of determining the extent of such reduction of Rental, Tenant's Floor Area hereunder shall be
5    deemed to be reduced as of the date of such termination by the number of square feet contained in the
6    portion of the Premises of which possession is required to be surrendered.

1    If Tenant shall be required to surrender possession of a portion of the Premises, Landlord shall
2    (a) provide any permanent or temporary barriers required by the nature of Landlord's use of such portion,
9    which barriers shall be constructed in such a manner so as to not materially interfere with Tenant's
4    business operations in the Premises; and (b) make such alterations as may be necessary in order to restore
9    the remainder of the Premises to useful condition.

-45-



If Tenant shall be required to surrender possession of a portion of the Premises and the remainder of the Premises shall be rendered unsuitable for the Permitted Use, or if Tenant shall be required to surrender possession of the entire Premises, Landlord shall have the further right and option to cause Tenant to relocate its business, within ninety (90) days after notice to do so, to another location within the Shopping Center Area, comparable in size and location to the Premises, mutually agreed upon by Landlord and Tenant. Within sixty (60) days after any such notice shall be given, Landlord and Tenant shall execute and deliver an amendment to this Lease which shall substitute a description of the premises to which Tenant is to be relocated for the description of the Premises contained herein and shall modify Tenant's Floor Area accordingly; otherwise all of the terms and conditions of this Lease shall be applicable to Tenant's occupancy of the new premises.

If Landlord and Tenant cannot agree on a new location within such sixty (60) days after notice of the exercise by Landlord of its relocation option described in the preceding paragraph, then Landlord may elect to withdraw its notice requiring Tenant to relocate its business, in which event Tenant shall remain in possession of the Premises and this Lease shall remain in full force and effect. If Landlord shall not elect to withdraw its notice requiring Tenant to relocate its business, the Term shall terminate on the ninetieth (90th) day after such notice, in which event Landlord agrees to pay to Tenant, provided Tenant is not in default under this Lease, and, provided Tenant shall have furnished Landlord with the statement referred to in the last sentence of this paragraph, an amount equivalent to the unamortized value of Tenant's leasehold improvements which were installed in the Premises at Tenant's sole cost and expense. Said amortization shall be determined on the straight-line depreciation method allowed by the Internal Revenue Code of 1986 (as amended) assuming a depreciation period commencing with the placement in service of such leasehold improvements and ending on the date of expiration of the Term determined pursuant to Section 3.1. Payment of the amount equivalent to the unamortized value of Tenant's leasehold improvements will be made to Tenant within thirty (30) days after Tenant shall have vacated the Premises in accordance with the terms of this Lease, provided that Landlord shall have the right to deduct therefrom any amounts due Landlord from Tenant pursuant to this Lease. For purposes of this Section, "Tenant's leasehold improvements" shall include partitioning, electrical wiring, plumbing (other than plumbing fixtures), painting, wallpaper, storefront and other permanent improvements installed, affixed or attached in or to the Premises, but shall not include (x) Tenant's inventory or stock in trade, (y) such trade fixtures, electrical fixtures, equipment or apparatus as are removable by Tenant at the expiration of the Term pursuant to Section 7.4, or (z) Landlord's fixtures or other improvements installed by or at the expense of Landlord. In order for Tenant to be entitled to payment of the unamortized value of its leasehold improvement as set forth in this paragraph, Tenant shall, within sixty (60) days after commencement of the Term, furnish to Landlord a statement, signed by an independent certified public accountant, setting out in detail the cost of Tenant's leasehold improvements.

If this Lease shall be terminated as to any portion or all of the Premises pursuant to this Section, the rights and obligations of the parties hereunder shall cease as of the date specified herein and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination. No further documentation shall be required to effect the termination of this Lease, but each party agrees that, upon the request of the other party to do so, it shall execute, acknowledge and deliver an appropriate instrument evidencing such termination prepared by or at the expense of the party requesting the same.

(10/9/02)

**THIS LEASE AGREEMENT CONTAINS *IN* SECTION 20.20. A *MUTUAL* WAIVER BY THE PARTIES OF THE RIGHT TO A JURY TRIAL IN CERTAIN ACTIONS BETWEEN THE PARTIES.**

LANDLORD AND TENANT ACKNOWLEDGE THAT CERTAIN SECTIONS OF THIS LEASE HAVE BEEN MODIFIED AND/OR SUPPLEMENTED BY THE RIDER TO LEASE FOUND *IMMEDIATELY* FOLLOWING THIS SIGNATURE PAGE. WHEREVER THERE IS *ANY* CONFLICT BETWEEN THE RIDER AND THE LEASE, THE PROVISIONS OF THE RIDER ARE PARAMOUNT AND THE LEASE SHALL BE CONSTRUED ACCORDINGLY.

IN **WITNESS** WHEREOF, the **parties** hereto intending to be legally bound hereby have executed this Lease under their respective hands **as** of the day and year first above written.

ATTEST:                          CHERRY HILL CENTER, LLC, Landlord

_____          By: _____
Assistant Secretary                        Vice-President

ATTEST:                          CACHE', INC., Tenant

_____          By: _____
Secretary                        Vice President Finance

-47-



(10/9/02)

RIDER TO LEASE

    THIS RIDER is annexed to and forms part of the Lease dated
NOV - 5 2002 , between CHERRY HILL CENTER, LLC, as Landlord, and
CACHE', INC., a Florida corporation, t/a CACHE', as Tenant.

    The printed part of the Lease is hereby modified
and supplemented as follows. Wherever there is
any conflict between this Rider and the Lease,
the provisions of this Rider are paramount and
the Lease shall be construed accordingly.

    **Section 1.1.** (The printed Section deals with Certain Defined Terms):

    **X.** Delete the printed Section **1.1.X.** and insert the following in lieu thereof:

    "X. 'Anchor Store' means any department or specialty store which occupies a floor area in excess of 50,000 contiguous square feet in the Shopping Center."

    **W.** Delete the words and number "eighteen percent (18%)" appearing in the printed Section **1.1.W.**, and insert in lieu thereof "two (2) percentage points over the Prime Rate, reported as of the beginning of the most recent calendar quarter prior to the date as of which the interest is to accrue. 'PrimeRate' is an annual percentage rate published by The Wall Street Journal in its Money Rates."

    **Section 2.1.** (The printed Section deals with Demise):

    At the end of the printed Section **2.1.**, change the period to a comma and insert the following language: "except, however, that Landlord shall repair (i) any apparent defect in work performed by Landlord, if any, and which is brought to Landlord's attention within thirty (30) days from the date Tenant takes possession of the Premises, and (ii) any latent defect in work performed by Landlord, if any, and which is brought to Landlord's attention within six (6) months from the date Tenant takes possession of the Premises."

    Add the following to the end of the printed Section **2.1.**:

    "Upon the election of either Landlord or Tenant, upon delivery of the Premises to Tenant, but prior to Tenant's installation of its improvements, the Premises shall be remeasured by Landlord, at the sole cost and reasonable expense of the party requesting such measurement, using the formula set forth in Section 1.1.U. hereof. If the total area of the Premises is found to be less than or greater than the area as set forth in the printed Section 1.1.D., then Landlord and Tenant shall execute an amendment to the Lease to correct the discrepancy in the total area of the Premises, for all purposes of

-1-



(10/9/02)

this Lease.  If neither party requests a remeasurement within ten (10) days following delivery of the Premises to Tenant, the Floor Area stated in Section 1.1.D. shall be deemed accepted by the parties hereto for all purposes of this Lease.

If Landlord and Tenant cannot agree upon the floor area of the Premises after such remeasurement, the parties hereto agree that a second remeasurement of the Premises, using the formula set forth in Section 1.1.U. hereof, shall be performed by an independent third party ("Umpire")mutually acceptable to Landlord and Tenant who shall be duly qualified in terms of professional education and experience as to be competent to determine, as an expert, the correct measurement of the floor area of the Premises.  If Landlord and Tenant cannot agree promptly upon an Umpire, then the parties shall promptly arbitrate the square footage difference in controversy before the American Arbitration Association, in accordance with the rules of said Association, at such offices of said Association as the parties may mutually agree upon, or, in the absence of any such agreement, at such office of said Association in closest proximity to the Cherry Hill, New Jersey.  The Umpire determination or arbitration, as the case may be, shall be binding on both parties.  The cost of such Umpire determination or arbitration shall be shared equally by Landlord and Tenant.  In each case, upon completion of the Umpire determination and, if necessary, arbitration pursuant to this paragraph, the parties agree to amend this Lease to correct the floor area stated in Section 1.1.D.

Section 3.1.  (The printed Section deals with Term):

In the second and third lines of the printed Section 3.1., delete the language "the earlier to occur of (a) the Outside Commencement Date, or (b) the opening by Tenant of its business in the Premises" and insert "the Outside Commencement Date set forth in Section 1.1.B." in lieu thereof.

Section 3.3.  (The printed Section deals with Holding Over):

Add the following to the end of the printed Section 3.3.:

"For a period of sixty (60) days following the expiration of the Tern, provided Landlord and Tenant are engaged in good-faith negotiations for a renewal or extension of this Lease, the provisions of this Section 3.3. shall be waived with regard to the change in the terms regarding the payment of Rental, and during such 60-day period, Tenant shall continue to pay the Rental which was due and payable under the Lease at the end of the Term.

"If such negotiations terminate before the expiration of said 60-day period, or if Landlord and Tenant have not executed a renewal lease or an extension of this Lease within the aforesaid 60-day period, the provisions of this Rider Section 3.3. shall no longer be applicable, and the full provisions of the printed Section 3.3. shall prevail.  Nothing herein shall be construed to obligate Landlord to negotiate with Tenant for a renewal or extension of this Lease."

Section 4.3.  (The printed Section deals with Tenant Trade Name):

-2-



(10/9/02)

Add the following to the end of the printed Section 4.3.:

"Landlord will not unreasonably withhold its consent to a change in Tenant Trade Name provided the majority of Tenant's stores within the southern New Jersey area, operating under the same Tenant Trade Name at the time of such name change shall be changing their trade name to the same new trade name as the new trade name being requested for the Premises, and such other trade name will not conflict with, and is not likely to confuse the public regarding, the trade names of other tenants in the Shopping Center. Within thirty (30) days of **a** permitted change in Tenant Trade Name, Tenant agrees, at its sole cost and expense, to replace its storefront sign to reflect the new Tenant Trade Name. Plans and specifications for such storefront sign must be set forth in detail and submitted to Landlord for approval prior to installation of said sign."

Section 4.4. (The printed Section deals with Store Hours):

Delete the words "shall assure the transaction of a maximum volume of business in and" in the second line of the first paragraph of the printed Section 4.4., and insert in lieu thereof the words ", in Tenant's business judgement, shall yield the greatest profit to Tenant, provided, however, that the reference to profit shall not be construed to permit Tenant to cease operation at the Premises in violation of Sections 4.1. and 4.4. of this Lease".

After the word "Landlord" in the fourth line of the first paragraph of the printed Section 4.4., add the words ", subject to the other provisions of this Lease".

Delete the word "Landlord" appearing in the fifth line of the printed Section 4.4. and insert the words "this Lease" in lieu thereof.

Add the following to the end of the first paragraph of the printed Section 4.4.:

"Tenant shall not be charged the liquidated damages provided for in the printed Section 4.4. until Landlord shall have given Tenant notice four (4) times in any Rental Year of Tenant's failure to cause the Premises to be operated pursuant to the provisions contained in the printed Section 4.4. Upon the fifth and subsequent such occurrence in any Rental Year, Landlord shall have the right to charge Tenant the liquidated damages provided for in the printed Section 4.4.

"Tenant's failure to operate its business at the Premises shall not be considered an Event of Default nor be subject to the aforesaid damages if such failure to operate is due to the making of necessary repairs to the Premises, or the taking of inventory in the Premises; provided (a) Tenant notifies Landlord of its intention to close the Premises and the reason therefor, (b) Tenant shall not be closed for more than seven (7) days per Rental Year for the making of repairs (unless such repairs are of a nature that they require more than seven days, in which event Tenant shall diligently pursue the completion of such repairs) nor more than one (1) day per Rental Year for the taking of inventory, and (c) all of the terms and conditions of this Lease including, without limitation, the payment of all Rental hereunder

-3-



(10/9/02)

shall continue in full force and effect during the period Tenant is closed for business, subject to Sections 14.1. and 15.1."

Add the following to the end of the printed Section 4.4.:

"Landlord warrants and represents that at least eighty percent (80%) of the retail tenants (excluding Anchor Stores, food tenants where food is prepared on the Premises, theaters and service commercial tenants) in the Shopping Center Area shall be open or required by their leases to be open for the same Store Hours."

Section 5.3. (The printed Section deals with Annual Percentage Rental):

Delete the printed Section 5.3. in its entirety and insert in lieu thereof the following:

"Tenant shall be under no obligation to make any payments of Annual Percentage Rental in any Rental Year until Tenant has achieved the Breakpoint set forth in Section 1.1.H. of this Lease for that Rental Year. Upon achieving such Breakpoint in any Rental Year, Tenant shall thereupon make monthly payments of Annual Percentage Rental payable on or before the twentieth (20th) day following the close of each full calendar month during the said Rental Year based on Gross Sales for such period. Monthly payments of Annual Percentage Rental shall be calculated by multiplying the amount of Gross Sales for the month in question by the percentage specified in Section 1.1.H., the first such payment to include also any prorated Annual Percentage Rental for the period from the date Tenant's Gross Sales reach the Breakpoint set forth in Section 1.1.H. to the first day of the next full calendar month in the Rental Year in question. If necessary, within sixty (60) days after the end of each Rental Year, the Annual Percentage Rental paid or payable for such Rental Year shall be adjusted between Landlord and Tenant, each party hereby agreeing to make such adjustment and to pay to the other, on demand, such amount as may be necessary to effect adjustment to the agreed Annual Percentage Rental."

Section 5.4. (The printed Section deals with "Rental Year" Defined):

Delete the printed Section 5.4., and insert the following in lieu thereof:

"The period from the commencement of the Term through January 31, 2003 shall constitute the 'Initial Partial Rental Year,' and Rental shall be apportioned therefor. The first 'Rental Year' shall commence on February 1, 2003, and shall end on January 31, 2004; thereafter a Rental Year shall consist of successive periods of twelve (12) calendar months ending January 31. The period from the end of the last full Rental Year through the end of the Term, or the Termination Date, shall constitute the 'Final Partial Rental Year' and Rental shall be apportioned therefor. The Breakpoint for any Rental Year which is not twelve (12) full calendar months in duration shall be proportionately increased or decreased to reflect the length of such Rental Year on the basis of a three hundred sixty-five (365) day year.

- 4 -



(10/9/02)

"If Gross Sales for the first twelve (12) month period beginning with the commencement of the Term exceed the Breakpoint specified in Section 1.1.H., then Tenant shall pay to Landlord, as Annual Percentage Rental for the Initial Partial Rental Year, an amount equal to six percent (6%) of Gross Sales for the first twelve (12) months in excess of the Breakpoint specified in Section 1.1.H. multiplied by a fraction, the numerator of which shall be the number of days in the Initial Partial Rental Year and the denominator of which shall be the number three hundred sixty-five (365). The above calculation shall in no way affect Tenant's Annual Percentage Rental obligations for the first full Rental Year. Within sixty (60) days following the expiration of said twelve-month period, Tenant shall furnish to Landlord a statement of Gross Sales certified in accordance with the provisions of Section 5.6., and concurrently therewith shall pay to Landlord the Annual Percentage Rental due for the Initial- Partial Rental Year, if any.

"If Gross Sales for the last twelve-month period ending with the Termination Date exceed the Breakpoint specified in Section 1.1.H., then Tenant shall pay to Landlord, as Annual Percentage Rental for the Final Partial Rental Year, an amount equal to six percent (6%) of Gross Sales for the last twelve (12) months in excess of the Breakpoint specified in Section 1.1.H. multiplied by a fraction, the numerator of which shall be the number of days in the Final Partial Rental Year and the denominator of which shall be the number three hundred sixty-five (365). The above calculation shall in no way affect Tenant's Annual Percentage Rental obligations for the final full Rental Year. Within sixty (60) days following the expiration of said twelve-month period, Tenant shall furnish to Landlord a statement of Gross Sales certified in accordance with the provisions of Section 5.6., and concurrently therewith shall pay to Landlord the Annual Percentage Rental due for the Final Partial Rental Year, if any.''

Section 5.5.    (The printed Section deals with "Gross Sales" Defined):

At the end of the first paragraph of the printed Section 5.5., add the following: "For the purposes of this Section 5.5., deposits on merchandise for lay-away sales shall be included in Gross Sales as and when received by Tenant."

Add the following to the end of the printed Section 5.5.:

"In addition to the exclusions set forth in the second paragraph of this printed Section 5.5., and notwithstanding anything to the contrary contained in Section 5.5., Gross Sales shall not include (i) to the extent that any purchase was previously included in Gross Sales, bad debts not in excess of one percent (1%) of Gross Sales in any one Rental Year (provided,however, that if Tenant subsequently receives payment on any account heretofore excluded, such payment shall be included in Gross Sales for the Rental Year in which received); (ii) sales to employees and their bonafide dependents (provided such dependents are entitled to receive such discount) at a discount of at least forty percent (40%) off of the original ticket price, to the extent that such sales do not exceed three percent (3%) of the Gross Sales during any Rental Year; (iii) receipts from vending machines located in non-sales areas for the exclusive use of Tenant's

-5-



(10/9/02)

employees, so long as such vending machines are operated at no profit to Tenant; and (iv) sales in bulk to manufacturers and jobbers (v) service charges and interest payable to Tenant on accounts receivable where credit has been extended by Tenant (not to include major credit card charges); and (vi) charges made for repairs or alterations of merchandise, parcel post and delivery charges, provided same are billed on a non-profit to Tenant basis, and any service rendered at cost, or approximately at cost for the convenience of customers."

Section 5.6. (The printed Section deals with Statements of Gross Sales):

Insert the phrase "Subject to force majeure" at the beginning of the third sentence of the printed Section 5.6.

Delete the word and number "ten (10)" in the printed Section 5.6., and insert "fifteen (15)" in lieu thereof.

Delete the second paragraph of the printed Section 5.6.

Add the following to the end of the printed Section 5.6.:

"Notwithstanding anything to the contrary in this Section 5.6., so long as Tenant's records are maintained in accordance with generally accepted accounting principles, reporting of Gross Sales remains accurate, and Tenant is not in default under the provisions of Sections 5.2., 5.3. and 5.7. of this Lease, Tenant's annual statement of Gross Sales may be signed by Tenant's Chief Financial Officer in lieu of certification by an independent Certified Public Accountant. In the event Tenant's statement of Gross Sales reveals a discrepancy in Annual Percentage Rental previously payable in excess of three percent (3%) for any one Rental Year, or Tenant defaults under said Sections 5.2., 5.3. or 5.7., Tenant shall be required to have such statement accompanied by the signed certificate of an independent Certified Public Accountant for each Rental Year during the remainder of the Term, as further provided in the printed Section 5.6."

Section 5.7. (The printed Section deals with Tenant's Records):

Delete the phrase "or the Premises" appearing in the fifth and sixth lines of the printed Section 5.7.

Insert the words "ten (10) days written" before the word "advance" in the ninth line of the printed Section 5.7.

Delete the last two sentences of the printed Section 5.7.

Add the following to the end of the printed Section 5.7:

"For the purpose of this Section 5.7. regarding Tenant's requirement to keep books and records which disclose all information required to determine Gross Sales, it is agreed that Tenant's normal business records will be considered sufficient, so long as such records are kept in accordance with generally accepted accounting principles, and so long as Tenant has established an adequate system of internal control."

-6-



(10/9/02)

section 5.8. (The printed Section deals with Payment of Rental):

Add the following to the end of the printed Section 5.8.:

"Notwithstanding anything to the contrary contained in this Section 5.8., Landlord shall waive the late payment charge two (2) times only in any one Rental Year during the Term. Upon the third and subsequent occurrence of late payment of Rental in any Rental Year, Landlord shall have the right to the late payment charge as otherwise hereinabove provided."

Section 5.9. (The printed Section deals with Advance Rental):

Delete the printed Section 5.9. in its entirety.

Section 5.10. (The printed Section deals with Future Expansion):

Delete the printed Section 5.10. in its entirety.

Section 6.1. (The printed Section deals with Tenant to Pay Proportionate Share of Taxes):

Add the following at the end of the printed Section 6.1.:

"Notwithstanding anything to the contrary contained in this Lease, Landlord warrants that there shall be no duplication of Taxes or other charges contained in this Lease.

"Nothing in this Section 6.1. shall require Tenant to pay any general income, franchise, corporate transfer, estate or gift tax imposed upon Landlord generally rather than as owner of the Shopping Center Area.

"Landlord warrants that at least eighty percent (80%) of the retail tenants' leases for retail tenants (excluding Anchor Stores) in the Shopping Center Area executed concurrently herewith and subsequent hereto shall contain a requirement that the tenant pay a proportionate share of Taxes."

Section 6.2. (The printed Section deals with Payment of Proportionate Share of Taxes):

Add the following to the end of the printed Section 6.2.:

"Landlord's estimates of Tenant's proportionate share of Taxes for each Tax Year shall be deemed reasonable if based upon the bill received for the preceding Tax Year or upon the taxing authority's reassessment of the Shopping Center Area; Landlord's re-estimate of Tenant's proportionate share of Taxes during the Tax Year shall be deemed reasonable if based upon the reassessment of the Shopping Center Area."

Section 7.1. (The printed Section deals with Tenant's Improvements):

Delete the printed Section 7.1. in its entirety and insert the following in lieu thereof:

-7-



(10/9/02)

"Tenant agrees, at its sole cost and expense, to remodel the interior and exterior of the Premises to Tenant's newest and most recent **2002** prototype design which is currently in use by Tenant at its store location at Fashion Show Mall and which shall include Tenant's storefront being replaced in its entirety.  Such remodeling shall be in accordance with approved plans and specifications, using new and quality materials and equipment, as set forth in Tenant's approved plans and specifications.  Plans and specifications for all improvements, including the type of materials to be utilized by Tenant in the remodeling of the Premises, must be set forth in detail and submitted to Landlord for approval.  All such remodeling must be completed prior to October 1, 2002.

Notwithstanding anything to the contrary set forth herein, in the event Tenant is unable to demonstrate to Landlord that its remodel of the Premises cost at least Ninety Thousand Dollars ($90,000), the Termination Date set forth in Section 1.1.E. of this Lease shall be changed to July 31, 2009.  Tenant shall provide such invoices, receipts, and other evidence of its expenditures as are reasonably requested by Landlord.

"Tenant agrees during the period of remodeling (i) to conduct its activities at the Premises in such a manner so as not to unreasonably interfere with any of the Shopping Center activities and (ii) to remove, at its sole cost and expense, from the Premises and the Shopping Center in its entirety all trash which may accumulate in connection with Tenant's remodeling activities."

Section 7.2.  (The printed Section deals with Effect of Opening for Business):

At the end of the printed Section 7.2., delete the period and insert the following language: "with respect to Tenant's ability to open".

Section 7.3.  (The printed Section deals with Mechanic's Liens):

Delete the second and third sentences of the printed Section 7.3.

Insert the word "reasonable" before the word "satisfaction" in the twenty-third line of the printed Section 7.3.

After the word "may" appearing in the twenty-fifth line of the printed Section 7.3., insert: ", after thirty (30) days notice to Tenant,".

Add the following to the end of the printed Section 7.3.:

"Notwithstanding anything to the contrary contained in this Section 7.3., Tenant may contest any such lien at its own cost and expense, provided (i) Tenant has such lien bonded, (ii) Tenant holds Landlord harmless from any loss, cost, expense or liability arising out of such action, and (iii) Tenant promptly discharges any such lien immediately upon any final judgment arising out of such action."

-8-



(10/9/02)

Section 7.4. (The printed Section deals with Tenant's Leasehold
Improvements and Trade Fixtures):

Add the phrase "and Tenant's personal property and merchandise"
after the word "apparatus" wherever it appears in the first and second
paragraphs of the printed Section 7.4.

Delete the third paragraph of the printed Section 7.4. in its
entirety.

Section 8.1. (The printed Section deals with Operations by
Tenant):

(i) At the end of the printed Section 8.1.(i), add the following:
"(Notwithstanding anything to the contrary contained in this Section
8.1.(i), Tenant shall only be required to light the show windows of
the Premises one (1) hour prior to opening, during the Store Hours set
forth in Section 4.4., and one (1) hour after closing.)"

(l) Insert the words "profit from" after the word "maximize"
appearing in the sixteenth line of the printed Section 8.1.(l).

(l) Delete the word "volume" appearing in the sixteenth line of
the printed Section 8.1.(l).

(l) Insert the phrase "in Tenant's reasonable business judgment"
after the word "Premises" appearing in the sixteenth line of the
printed Section 8.1.(l).

(m) Insert the word "reasonably" before the word "determined" in
the printed Section 8.1.(m).

Add the following to the end of the printed Section 8.1.:

"Tenant may install coin or token operated vending machines and
pay telephones in the non-sales area at the rear of the Premises for
the exclusive use of its employees."

Section 8.3. (The printed Section deals with Painting and
Displays by Tenant):

After the word "approval" appearing in the second line of the
printed Section 8.3., change the period to a semicolon, and insert the
following: "provided, however, that Landlord's approval shall not be
necessary for the painting or decorating of any portion of the
interior of the Premises so long as such painting or decorating is in
conformance with the color or decorating scheme originally installed
by Tenant and approved by Landlord for the Premises."

Insert the word "reasonably" before the word "determined" in the
seventh line of the printed Section 8.3.

Section 8.4. (The printed Section deals with Trash Removal
Service):

Add the following to the end of the printed Section 8.4.:

-9-

(10/9/02)

"If Landlord is providing trash removal service to the Premises, Landlord agrees that any charges imposed by it for such trash removal shall be reasonable for and competitive with the same quality of service rendered by other companies providing trash removal service in the area in which the Shopping Center is located."

Section 8.6. (The printed Section deals with Hazardous Substances):

(e) and (g)  Add the following to the end of the printed Section 8.6. (e) and (g):

"Notwithstanding anything contained in Sections 8.6. (e) and 8.6. (g) to the contrary, any environmental audit required by Landlord or Landlord's mortgagee pursuant to Section 8.6. (e) or Section 8.6. (g) which is not required by law, regulations, governmental authority or as a result of Tenant's remodeling or renovation of the Premises shall be at Landlord's expense, unless the audit reveals activity by Tenant which is prohibited by this Section."

(h)  At the end of the printed Section 8.6. (h), insert the phrase "caused by the acts or omissions of Tenant, its officers, agents, contractors, employees or invitees".

Add the following to the end of the printed Section 8.6.:

"Landlord agrees that it shall not look to Tenant for contribution to the cost of any remedial activity necessitated as a result of a catastrophe, spill or discharge involving Hazardous Substances in the Premises, except to the extent (if any) that such existence resulted, directly or indirectly, from the acts or omissions of Tenant, its officers, agents, contractors, employees or invitees.

"In the process of its construction of its 2002 prototype design of the Premises, if Tenant discovers the existence of any Hazardous Substance (defined as of the date of execution of this Lease) in the Premises, and such Hazardous Substance was not brought into the Premises by Tenant, its agents or contractors, then Landlord agrees that it will remove or encapsulate, at its sole cost and expense, any such Hazardous Substance which is required to be removed or encapsulated by laws and regulations in effect as of the date of execution of this Lease.  In the event of any delay in Tenant's construction or remodeling due to the removal of any Hazardous Substance which is required by law or regulation to be removed or encapsulated (other than those brought into the Premises by Tenant), the Commencement Date shall be extended by one (1) day for each day of delay."

Section 9.1. (The printed Section deals with Repairs to be Made by Landlord):

Add the following to the end of the printed Section 9.1.:

"Landlord's repairs as required under this Section 9.1. which are made during Tenant's business hours will not materially, unreasonably interfere with Tenant's use of the Premises except in emergency situations."

-10-



(10/9/02)

"Landlord shall make repairs to the plumbing, electrical, or other mechanical installations which pass over and/or beneath or through the Premises and are not exclusively servicing the Premises to the extent such repairs are not the obligation of the utility company or other entity or person providing such service.

"In the event that Landlord performs any work in the Premises or in the Common Area and such work is of such a nature as to render the Premises untenantable and as a result Tenant is unable to operate its business in the Premises for more than seventy-two (72) consecutive hours, then commencing with the first full business day after said seventy-two hour period, Annual Basic Rental, Annual Percentage Rental and all Additional Rental (other than that Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder shall abate until such time as the Premises are again tenantable.  If despite the untenantable condition of the Premises, Tenant continues to operate its business in the Premises only Annual Basic Rental shall abate  (and the Breakpoint shall be reduced in the same proportion as the abatement of Annual Basic Rental) until such time as the Premises are again tenantable."

Section 9.2. (The printed Section deals with Repairs to be Made by Tenant):

Insert the word "reasonable" before the word "attorneys'" and before the word "cost" in the sixteenth line of the printed Section 9.2.

Add the following at the end of the printed Section 9.2.:

Tenant's obligation to repair electrical, plumbing and other mechanical installations contained within the Premises shall be limited to such installments which are used solely by Tenant.

"Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated for the repair, installation or alteration of any item of a structural nature with respect to the Premises."

Section 9.3. (The printed Section deals with Damage to Premises):

Delete the word and number "five (5)" appearing in the fifth line of the printed Section 9.3., and insert the word and number "ten (10) business" in lieu thereof.

Before the word "cost" appearing in the penultimate line of the printed Section 9.3., add the word "reasonable".

Section 9.4. (The printed Section deals with Alterations by Tenant):

Add the following to the end of the printed Section 9.4.:

"Notwithstanding anything to the contrary contained in this Section 9.4., without first obtaining Landlord's prior written consent or approval, Tenant shall have the right to make interior repairs or

-11-



(10/9/02)

replacements in and to the Premises, provided (i) such interior repairs or replacements neither require any structural alteration nor impose any greater load on any structural portion of the Premises, (ii) such interior repairs or replacements are in accordance with Tenant's originally approved plans and are in conformance with Landlord's most current Design Criteria, (iii) the cost of such interior repair or replacement shall not exceed Twenty-five Thousand Dollars ($25,000.00) per Rental Year and (iv) Tenant agrees to indemnify and hold harmless Landlord from and against all claims, actions, liability and damage sustained by Landlord (including, without limitation, as provided in Section 9.2.) as a result of any such work by Tenant, its agent, employees or contractors."

Section 9.5. (The printed Section deals with Changes and Additions to Shopping Center):

Add the following to the end of the printed Section 9.5:

"Any changes or additions by Landlord to the Shopping Center Area shall be performed in such a manner so as not to unreasonably interfere with Tenant's use of the Premises and shall not change in a material, adverse way the access to the Premises from the Common Areas adjacent to the Premises. In no event, however, shall this provision prevent Landlord from installing and maintaining kiosks or pushcarts in the Common Areas."

"Landlord agrees that it will not construct or permit construction of a permanent retail kiosk within the area extending Ten (10) feet out from the storefront of the Premises and bounded by the side leaselines of the Premises extended outward."

Section 9.6. (The printed Section deals with Roof and Walls):

Add the following to the end of the printed Section 9.6.

"Landlord agrees that any such uses contemplated hereunder shall not decrease the size of the Premises nor materially interfere with Tenant's use of or access to the Premises from the Common Areas immediately in front of and adjacent to the Premises, and any such pipes or conduits shall be concealed along the walls and ceilings of the Premises."

Section 10.2. (The printed Section deals with Management and Operation of Common Areas):

Add the following to the end of the printed Section 10.2.:

"Landlord agrees that the exercise of its rights under this Section 10.2. will not materially, adversely affect access to the Premises from the Common Areas immediately in front of and adjacent to the Premises or Tenant's use of the Premises. In the event that Landlord performs any work in the Premises or in the Common Area and such work is of such a nature as to render the Premises untenantable, and as a result Tenant ceases to operate its business in the Premises for more than seventy-two (72) consecutive hours, then commencing with the first full business day after said seventy-two hour period, Annual Basic Rental, Annual Percentage Rental and all Additional Rental

-12-

(10/9/02)

(other than that Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder shall abate until such time as the Premises are again tenantable. If despite the untenantable condition of the Premises, Tenant continues to operate its business in the Premises, only Annual Basic Rental shall abate (and the Breakpoint shall be reduced in the same proportion **as** the abatement of Annual Basic Rental) until such time as the Premises are again tenantable."

Section 10.3. (The printed Section deals with Employee Parking Areas):

Add the following phrase to the beginning of the printed Section 10.3.:

"Provided the employees of all Tenant's are similarly restricted,"

After the word "employees" appearing in the third line of the printed Section 10.3.. insert the phrase "who work at the Premises".

Delete the words "such changes occur" in the fourth line of the printed Section 10.3. and insert in lieu thereof the words "Tenant's receipt of a request from Landlord".

After the word "areas" in the fifth line of the printed Section 10.3., insert the phrase "while they are working in the Premises".

Delete the words "in writing" in the last line of the printed Section 10.3.

Add the following to the end of the printed Section 10.3.:

"Tenant shall not be charged Ten Dollars ($10.00) per car per day pursuant to this Section 10.3. until Landlord gives two (2) notices of such violation to Tenant in any Rental Year."

Section 10.4. (The printed Section deals with Tenant to Share Expense of Common Areas):

Add the following as a new paragraph to the printed Section 10.4.:

"Notwithstanding anything to the contrary contained in this Section 10.4., during the first full calendar year falling in the Term ("Base Year") and any partial year prior thereto, Tenant shall pay its proportionate share of Landlord's Operating Costs calculated in accordance with the terms of and subject to the Cap set forth in Section 10.4. of Tenant's Existing Lease. In the next succeeding twelve-month period and each subsequent full calendar year or any subsequent partial year of the Term, Tenant shall pay its proportionate share of Landlord's Operating Costs calculated in accordance with Section 10.4. of this Lease, subject to the Cap (as defined below). For purposes of the calculation of Tenant's proportionate share, Landlord's Operating Costs shall be deemed not to increase by more than ten percent (10%) on a compounded basis from year to year, over the Base Year Landlord's Operating Costs (the

-13-



(10/9/02)

"Cap").  By the term 'compounded' the parties agree that it is their intention that the Cap for each successive year shall be an amount equal to one hundred ten percent (110%) of Landlord's Operating Costs for the Base Year and thereafter, the Cap for each year shall be established by multiplying the Cap for each previous year by one hundred ten percent (110%)."

After the word "Area" in the fifth line of the printed Section 10.4. insert the words "as defined in Section 1.1.Y. hereof".

Before the word "estimated" in the sixth line of the printed Section 10.4., add the word "reasonably".

Add the following to the end of the printed Section 10.4.:

"Notwithstanding anything to the contrary contained in this Lease, Landlord warrants that there shall be no duplication of charges contained in this Lease.

"Landlord warrants that at least eighty percent (80%) of the leases for retail tenants (excluding Anchor Stores) in the Shopping Center Area executed concurrently herewith and subsequent hereto shall contain a requirement that the tenant pay a proportionate share of Landlord's Operating Costs."

Section 10.5.  (The printed Section deals with "Landlord's Operating Costs" Defined):

Add the following to the end of the printed Section 10.5.:

"Landlord's Operating Costs as provided in this Section 10.5. will not contain the initial cost of development of the Shopping Center.  There shall be no duplication of any costs or expenses."

Section 10.7.  (The printed Section deals with Renovation or Expansion of Common Areas):

Delete the printed Section 10.7. in its entirety.

Article XI.    (The printed Article deals with Merchants' Association):

Delete the printed Article XI in its entirety and insert the following in lieu thereof:

"Section 11.1. Marketing Fund.

"Tenant agrees that at any time hereafter, Landlord shall have the right and option to create a Marketing Fund ('Marketing Fund') for the purpose of establishing a special fund for promoting the Shopping Center.  The Marketing Fund shall be used by Landlord in its sole discretion to pay the costs and expenses associated with the formulation and carrying out of an ongoing program for the marketing of the Shopping Center, which program may include, without limitation, special events, shows, displays, signs, marquees, decor, seasonal events, institutional advertising for the Shopping Center, promotional literature and other activities within the Shopping Center designed to

-14-



(10/9/02)

attract customers.  In addition, Landlord may use the Marketing Fund to defray the costs of administration of the Marketing Fund including (without limitation) the salary of a marketing administrator and related personnel (whether or not located onsite), rent and insurance. In marketing the Shopping Center, Landlord shall have the right to name Tenant's store in the Shopping Center.

''Section11.2. <u>Tenant's Contribution to Marketing Fund</u>.

"Tenant shall pay to Landlord in each Rental Year of the Term an amount  (the 'Annual Marketing Fund Contribution') determined by multiplying the Marketing Fund Contribution Rate by Tenant's Floor Area.  The Annual Marketing Fund Contribution shall be paid by Tenant in twelve (12) equal monthly installments in advance on the first day of each calendar month of the Term.  The Annual Marketing Fund Contribution shall be adjusted annually, as of the first day of each calendar year during the Term, in the same proportion as the Consumer Price Index for All Urban Consumers (U.S. City Average) of the United States Bureau of Labor Statistics ('Consumer Price Index') most recently reported as of such adjustment date bears to the Consumer Price Index most recently reported as of the January 1 next following the commencement of the Term, all such adjustments to be apportioned for fractional years.

"If during the Term the Consumer Price Index is changed or discontinued, Landlord shall apply a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means shall be utilized in place of the Consumer Price Index as if it had been originally designated in this Lease.

"Until and unless Landlord creates the Marketing Fund, Landlord may elect to pay the amount designated in Section 1.1.L. into the Advertising Participation Fund currently maintained by the Association for the Shopping Center for the purpose of advertising the various Shopping Center tenants' business in the Shopping Center.  In any event, funds received by Landlord as Marketing Fund contributions shall be used for the advertising, promotion and marketing of the Shopping Center and the businesses therein.  At Landlord's request, Tenant shall provide Landlord or the Association with such advertising materials, copy of other information, as may be requested for use in advertising Tenant's business in connection with advertising or marketing for the Shopping Center, at no out-of-pocket cost to Tenant.

"Section 11.3.  <u>Landlord's Contribution to Marketing Fund</u>.

"Each Association Year, Landlord shall contribute to the Marketing Fund an amount equal to five percent (5%) of the aggregate contributions made by the other contributors to the Marketing Fund for such period.

"Section 11.4. <u>Promotion Fund</u>.

"Tenant agrees that at any time hereafter, Landlord shall have the right and option to create a Promotion Fund ('Promotion Fund') for the purpose of establishing a special fund for promoting the Shopping

-15-



(10/9/02)

Center.  The Promotion Fund may be in addition to or in lieu of the
Marketing Fund.

"The Promotion Fund shall be used by Landlord in its sole
discretion to pay the costs and expenses associated with the
formulation and carrying out of an ongoing program for the promotion
of the Shopping Center, which program may include, without limitation,
special events, shows, displays, signs, marquees, decor, seasonal
events, institutional advertising for the Shopping Center, promotional
literature, and other activities within the Shopping Center designed
to attract customers. In addition, Landlord may use the Promotion Fund
to defray the costs of administration of the Promotion Fund including
(without limitation) the salary of a marketing administrator and
related personnel (whether or not located on-site), rent and
insurance.  In promoting the Shopping Center, Landlord shall have the
right to name Tenant's store in the Shopping Center.

"Section 11.5.  Tenant's Contribution to Promotion Fund.

"In the event Landlord establishes a Promotion Fund, Landlord
shall have the right, from time to time, to designate all or a portion
of the amounts specified in Section 1.1.L. as Tenant's Promotion Fund
Contribution Rate.  Tenant shall pay to Landlord in each Rental Year
of the Term an amount  (the 'Annual Promotion Fund Contribution')
determined by multiplying the Promotion Fund Contribution Rate, as
determined by Landlord in accordance with the preceding sentence, by
Tenant's Floor Area.  The Annual Promotion Fund Contribution shall be
paid by Tenant in twelve (12) equal monthly installments in advance on
the first day of each calendar month.  The Annual Promotion Fund
Contribution shall be adjusted annually, as of the first day of each
calendar year during the Term, in that proportion which the Consumer
Price Index for all urban consumers (U.S. City Average) of the United
States Bureau of Labor Statistics ('Consumer Price Index') most
recently reported as of such adjustment date bears to the Consumer
Price Index most recently reported as of the January 1 next following
the commencement of the Term, all such adjustments to be apportioned
for fractional years.

"If during the Term the Consumer Price Index is changed or
discontinued, Landlord shall apply a comparable index, formula or
other means of measurement of the relative purchasing power of the
dollar and such substitute index, formula or other means shall be
utilized in place of the Consumer Price Index as if it had been
originally designated in this Lease.

"In no event will Tenant be required to make aggregate
contributions to the Marketing Fund and the Promotion Fund, in excess
of the contributions Tenant would have been required to make had the
Promotion Fund not been established.

"Section 11.6.  Landlord's Contribution to Promotion Fund.

"Each calendar year, Landlord shall contribute to the Promotion
Fund an amount equal to fifteen percent (15%) of the aggregate
contributions made by the other contributors to the Promotion Fund for
such period."

-16-



(10/9/02)

        **Section 12.1.**  (The printed Section deals with Water, Electricity, Telephone and Sanitary Sewer):

        Delete the words "**mailing** by Landlord to Tenant" in the fifth line of the second paragraph of the printed Section 12.1. and insert in lieu thereof the words "Tenant's receipt".

        Add the following to the end of the printed Section 12.1.:

        "Tenant shall have the right, upon written notice to Landlord, to request the use of test metering in connection with the monitoring of the electricity component for utility services provided to the premises pursuant to Schedule E; provided, however, that such test metering does not violate applicable utility tariffs or regulations at law. Further, it is understood between Landlord and Tenant that such test metering shall be on an isolated basis, not to exceed once per Rental Year for a period not to exceed twenty-one (21) continuous days, and shall not be used as a permanent monthly billing meter or permanent sub-meter.  If such test metering is requested by Tenant, such metering shall be at Tenant's sole cost and expense."

        "If Landlord shall elect to redistribute electricity to the Premises, Landlord warrants that the cost to Tenant for electrical energy used in the Premises will not be greater than the cost would be to Tenant if the energy were supplied directly to Tenant by a public utility or public authority in the area in which the Shopping Center **Area** is located, but in no event will such cost be less than the cost to Landlord to redistribute such service.

        "If Landlord shall elect to redistribute water and sewer to the Premises, Landlord warrants that the cost to Tenant for water and sewer service in the Premises, which is paid directly to Landlord, will not be greater than the cost would be to Tenant if the water and sewer service were supplied directly to Tenant by a public utility or public authority in the area in which the Shopping Center Area is located, but in no event will such cost be less than the cost to Landlord to furnish such service.

        "If any utility to the Premises should become unavailable for a period in excess of seventy-two **(72)** consecutive hours, such unavailability is so extensive that Tenant cannot reasonably operate its business in the Premises, and such unavailability is directly caused by the willful act or negligence of Landlord, all Rental shall abate until utility service to the Premises is restored.

        "In the event Landlord shall redistribute electricity to Tenant, and then Landlord exercises its right to no longer redistribute electricity to the Premises, upon notice from Landlord, Tenant may contract for and purchase electricity directly from the public utility then serving the Shopping Center Area.  Landlord will use reasonable efforts to see that the transition from Landlord to the public utility shall not cause an interruption in the supply of electricity to the Premises.  Should Tenant so purchase its electricity from a public utility, Tenant shall be permitted to continue to use Landlord's risers, wiring and electrical installations serving the Premises prior to the conversion to the extent that the same are available, suitable

-17-



(10/9/02)

and may be safely so used, consistent with the concurrent and anticipated future use by Landlord and other tenants.

"Notwithstanding anything to the contrary contained in this Lease, Landlord warrants that there shall be no duplication of charges contained in this Lease."

Section 12.3.   (The printed Section deals with Fire Protection Sprinkler System):

After the word "work" in the ninth line of the printed Section 12.3., add the words ", which shall be at reasonable and competitive prices".

Insert the word "reasonably" before the word "approved" in the last line of the printed Section 12.3.

Section 12.4.   (The printed Section deals with Discontinuances and Interruptions of Utility Services):

Delete the first two sentences of the printed Section 12.4.

Add the following to the end of the printed Section 12.4.:

"If any utility to the Premises should (i) become unavailable for a period in excess of seventy-two (72) consecutive hours, (ii) such unavailability prevents Tenant from operating its business in the Premises, and (iii) such unavailability is directly caused by the willful act or negligence of Landlord, all Rental shall abate until utility service to the Premises is restored."

Section 13.1.   (The printed Section deals with Indemnities):

Insert the following phrase at the beginning of the first paragraph of the printed Section 13.1.:

"Unless caused by the negligence or willful acts of Landlord, its agents, servants, contractors or employees,"

After the word "invitees" appearing in the eighth line of the printed Section 13.1., insert the parenthetical phrase "(while in the Premises)".

Add the following to the end of the first paragraph of the printed Section 13.1.:

"Notwithstanding anything to the contrary contained herein, Landlord agrees that Tenant's indemnification of Landlord pursuant to the provisions of this Section 13.1. shall not apply to any loss of life, personal injury or contamination of or damage to property or the environment which is a result of any Hazardous Substance which **was** present in the Premises prior to Tenant's occupancy thereof, unless Tenant has acted negligently in connection therewith."

Section 13.2.   (The printed Section deals with Landlord Not Responsible for Acts of Others):

-18-



(10/9/02)

     Add the following to the beginning of the second sentence of the printed Section 13.2. "Except as otherwise set forth herein,"

     **Section 13.3.**  (The printed Section deals with Tenant's Insurance):

     (a)  Delete the words and numbers "Two Million Dollars ($2,000,000" and "Four Million Dollars ($4,000,000", respectively, appearing in clause (a) of the printed Section 13.3., and insert the words and numbers "One Million Dollars ($1,000,000" and "Three Million Dollars ($3,000,000)"in each instance in lieu thereof.

     (b)  Before the first occurrence of the word "replacement" in the second line of the printed Section 13.3.(b), insert the words "eighty percent (80%) of the"; after the word "value" in the second line, insert the language ", provided Tenant shall indemnify and hold harmless Landlord for damage to any portion of the personal property and leasehold improvements not so covered,".

     (b)  and (c)  Add the following to the end of the printed Sections 13.3.(b) and 13.3.(c):

     "Notwithstanding anything to the contrary contained in clauses (b) and (c) of Section 13.3., Tenant may self-insure plate glass and other breakable materials, and boiler and machinery equipment, so long as Tenant agrees not to hold Landlord, its officers, agents, employees, or contractors liable for any losses resulting to such property.  Tenant hereby expressly waives all right of recovery against Landlord, its officers, agents, employees, or contractors for damage which would otherwise be covered by any all-risks insurance on the aforesaid items or the property damage insurance as required under the printed Section 13.3.(b) or the insurance required under the printed Section 13.3.(c)."

     **Section 13.4.**  (The printed Section deals with Tenant's Contractor's Insurance):

     (a)  Delete the words and number "Three Million Dollars ($3,000,000.00)" appearing in clause (a) of the printed Section 13.4., and insert "Two Million Dollars ($2,000,000.00)" in lieu thereof.

     (a)  Delete the words and number "Five Million Dollars ($5,000,000.00)" appearing in clause (a) of the printed Section 13.4., and insert "Three Million Dollars ($3,000,000.00)" in lieu thereof.

     **Section 13.5.**  (The printed Section deals with Policy Requirements):

     Insert the word "reasonable" before the word "approval" appearing in the third line of the printed Section 13.5.

     After the word "policies" in the seventh line of the printed Section 13.5., add the words "on Tenant's trade fixtures, inventory and Tenant's other personal property, name Landlord and/or its designee(s) as additional insured as its interests may appear and, with respect to all-risks property and casualty insurance policies on Tenant's leasehold improvements (excluding Tenant's trade fixtures and

-19-



(10/9/02)

inventory and Tenant's other personal property), name Landlord as an
additional insured as its interests may appear,".

Delete the phrase "and/or its designee(s) as loss payee"
appearing in the seventh and eighth lines of the printed Section **13.5**
and insert in lieu thereof "as an additional insured as its interests
may appear".

After the word "designee" appearing in the twelfth line of the
printed section **13.5.**, add the following: "None of the insurance
which Tenant is required to carry and maintain or cause to be carried
and maintained pursuant to Sections **13.3.** and **13.4.** of this Lease
shall contain any deductible provision except to the extent approved
by Landlord, which approval shall not be unreasonably withheld except
that Landlord may withhold consent to any deductible for general
liability insurance in excess of $5,000.00. Tenant hereby expressly
waives all right of recovery and indemnifies Landlord, its officers,
agents, employees or contractors against damage which would otherwise
be covered by any deductible contained in Tenant's insurance policies
covering the Premises.

Add the following to the end of the printed Section **13.5.**:

"Landlord's right to perform on behalf of Tenant pursuant to the
last sentence of this Section **13.5.** shall be subject to ten (10) days'
notice to Tenant.

"With respect to any insurance proceeds received by Landlord
and/or its designee(s) as loss payee, Landlord agrees to permit such
insurance proceeds to be used for rebuilding of the Premises.

"For all aspects of Tenant's all-risks property and casualty
insurance coverage Tenant shall name Landlord as an additional insured
as its interests may appear."

Section **13.6.**    (The printed Section deals with Increase in
Insurance Premiums):

Add the following to the end of the printed Section **13.6**:

"The Permitted Use as specified in Section **1.1.F.** shall be deemed
not to cause an increase in the rate of Landlord's insurance or to
prevent Landlord from procuring any insurance so long as Tenant
complies with all laws, ordinances, rules and regulations of
governmental authorities now or hereafter in effect and all
recommendations of the Fire Underwriters Rating Bureau or similar
entity selected by Landlord."

Section **13.7.**    (The printed Section deals with Waiver of Right of
Recovery):

Add the following phrase at the beginning of the first sentence
of the printed Section **13.7.**:

"Notwithstanding anything to the contrary contained herein,"

-20-



(10/9/02)

Section 13.8.    (The printed Section deals with Tenant to Pay Proportionate Share of Insurance Costs):

Add the following to the end of the printed Section 13.8.:

"Landlord hereby warrants that eighty percent (80%) of the leases for retail tenants (excluding Anchor Stores) executed concurrently herewith or subsequent hereto shall contain a requirement that the tenant pay a proportionate share of Landlord's insurance costs."

Section 14.1.    (The printed Section deals with Landlord's Obligation to Repair and Reconstruct):

Add the following to the end of the printed Section 14.1.:

"For the purposes of Sections 14.1. and 14.2., 'untenantable' shall be defined to mean damage or destruction of the Premises or Landlord's Building to an extent that such damage or destruction prevents Tenant from conducting its business in the Premises, or substantially impairs its ability to conduct its business in the Premises."

Section 14.2.    (The printed Section deals with Landlord's Option to Terminate Lease):

Add the following to the end of the printed Section 14.2.:

"Landlord shall have the right to terminate this Lease as specified in (a), (b) and (c) of this Section 14.2. only in the event that (i) Landlord elects not to rebuild the Premises and does not commence rebuilding of the Premises within one (1) year from the date of the occurrence of such Casualty, and (ii) Landlord terminates the leases of all other retail tenants located in Landlord's Building who are similarly affected by such Casualty, in which event both parties hereto will be relieved of all obligations under this Lease except those obligations occurring or accruing prior to such termination.

"Tenant shall have the right to terminate this Lease if the Premises are damaged in whole or in part and are thereby rendered untenantable for a period of thirty (30) days or more during the last two (2) years of the Term hereof, by giving Landlord written notice of such termination within thirty (30) days after the occurrence of such Casualty.  In the event Tenant so terminates, both parties hereto shall be relieved of all obligations under this Lease saving and excepting those obligations occurring or accruing prior to such termination."

"If Landlord's Building is damaged by Casualty to the extent of fifty percent (50%) or more ("Major Casualty") and as a result, less than fifty percent (50%) of the tenants in the Shopping Center are open and operating for a ninety (90) consecutive day period following such Major Casualty ("Casualty Co-tenancy Threshold") (provided, however, such ninety (90) day period shall run from the date the Shopping Center is reopened, if applicable), Tenant's Rental (excluding Additional Rental due Landlord by reason of Tenant's default) shall abate during such period that the Shopping Center is closed, and Tenant thereafter shall have the option to either (i)

-21-



(10/9/02)

terminate this Lease by giving Landlord written notice of such termination within thirty (30) days after the satisfaction of the Casualty Co-Tenancy Threshold or (ii) continue to be open and operating in the Shopping Center and pay in lieu of Annual Basic Rental, Annual Percentage Rental and all Additional Rental (other than that Additional Rental due Landlord due to a default by Tenant), six percent (6%) of Gross Sales (payable by the 15th day of each month based upon the preceding month's Gross Sales) until the damage to Landlord's Building caused by the Major Casualty is repaired or restored and the Casualty Co-Tenancy Threshold no longer is satisfied. Notwithstanding the foregoing, if Landlord does not commence within one (1) year reconstruction of the damage to Landlord's Building caused by such Major Casualty, Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination within thirty (30) days of such one (1) year period; and in such event, both parties shall be relieved of all obligations under this Lease saving and excepting those obligations occurring or accruing prior to such termination."

Section 14.4. (The printed Section deals with Insurance Proceeds):

After the word "Landlord" in the last line of the printed Section 14.4., add the words "and shall be applied toward the restoration of the Premises to substantially the same condition as existed prior to such damage".

Section 15.1. (The printed Section deals with Effect of Taking):

Add the following at the end of the printed Section 15.1.:

"Landlord covenants and agrees (a) to use good faith in exercising any power of termination hereunder, and (b) not to terminate this Lease pursuant to the printed Section 15.1. for the sole purpose of replacing Tenant with another tenant in an otherwise ongoing, structurally intact Shopping Center."

Section 16.1. (The printed Section deals with Landlord's Consent Required):

Add the following to the end of the printed Section 16.1.:

"Notwithstanding anything which may be to the contrary in this Section 16.1., provided Tenant is not in material default (provided failure by Tenant to pay any Rental shall be deemed a material default) under any of the terms and conditions of this Lease beyond any applicable notice and cure period, and further provided that Tenant has fully and faithfully performed all of the terms and conditions of this Lease, Tenant shall have the right to assign this Lease to any parent, subsidiary or affiliate corporation of Tenant, or to the surviving corporation in connection with a merger, consolidation or acquisition between Tenant and any of its subsidiaries for any of the then remaining portion of the unexpired Term without Landlord's consent, at any time during the Term of the Lease, provided: (i) the net assets of the assignee corporation shall not be less than the net assets of Tenant at the time of the signing

-22-



(10/9/02)

of this Lease; (ii) such assignee continues to operate the business conducted in the Premises under the same Trade Name, in the same manner as Tenant and pursuant to all of the provisions of this Lease; (iii) such assignee corporation shall assume in writing in form reasonably acceptable to Landlord all of Tenant's obligations under this Lease and Tenant shall provide Landlord with a copy of such assignment; and (iv) Tenant continues to remain liable on this Lease for the performance of all terms, including but not limited to, payment of Rental due under this Lease.   Tenant shall give written notice to Landlord within thirty (30) days of such assignment.

"Notwithstanding anything which may be to the contrary in this Section 16.1., provided Tenant is not in material default (provided failure by Tenant to pay any Rental shall be deemed a material default) under any of the terms and conditions of this Lease beyond any applicable notice and cure period, and further provided that Tenant has fully and faithfully performed all of the terms and conditions of this Lease, Tenant (a) without Landlord's consent, and (b) without giving Landlord the right to terminate this Lease pursuant to Section 16.2, and (c) without any of the following constituting an assignment of this Lease, shall have the right to:  (i) cease to be a publicly held corporation; (ii) make a public offering of its stock on a nationally recognized securities exchange; and (iii) alter the control of its stock; provided, however, that (a) Cache, Inc., or a parent, subsidiary or affiliate corporation of Cache, Inc. shall remain as Tenant under this Lease; (b) the net assets of Cache, Inc., its parent, subsidiary or affiliate shall not be less than the net assets of Tenant at the time of the signing of this Lease; and (c) the operation of the business conducted in the Premises shall be under the same Trade Name, in the same manner as Tenant and pursuant to all of the provisions of this Lease.

"If Landlord's consent is not required hereunder, Tenant shall not be obligated to pay the transfer fee of One Thousand Dollars ($1,000.00) set forth in the printed Section 16.1.(b) (vi) or to pay any amounts set forth in the printed Section 16.1.(b)(x), except for any due but unpaid Rental."

Section 16.2.   (The printed Section deals with Transfer of Corporate Shares):

After the words "Securities Exchange Act of 1934" in the second line of the printed Section 16.2., add the words "or traded over-the-counter".

Add the following to the end of the printed Section 16.2.:

"Notwithstanding anything to the contrary contained in this Section 16.2., any transfers permitted without Landlord's consent under Section 16.1., subject to all of the provisions contained in Section 16.1. with regard to assignments, shall be permitted without Landlord's consent by transfer of stock under Section 16.2."

Section 17.1.   (The printed Section deals with "Event of Default" Defined):

-23-

(10/9/Q2)

(b)  Before the word "The" in the first line of the printed
Section 17.1.(b), insert the subclause designation "(i)" and change
the period at the end of the printed Section 17.1.(b) to a semicolon
and add the following: "or (ii) rejection of this Lease in a
bankruptcy or similar proceeding by Tenant or by operation of law."

(g)  Before the word "notice" in the third line of the printed
Section 17.1.(g), insert the word "written".

Section 17.2.  (The printed Section deals with Remedies):

(a) Delete the words "or without" in the first line of the
printed Section 17.2.(a).

Delete the parenthetical phrase in the fourth through seventh
lines of the printed Section 17.2.(a).

Delete the word and number "five (5)" in the eighth line of the
printed Section 17.2.(a) and insert in lieu thereof the word and
number "fifteen (15)".

(b)  Insert the word "written" before the word "notice" in the
third line of the printed Section 17.2.(b).

(c)  Delete the words "without the necessity of legal
proceedings" in the second and third lines of the printed Section
17.2.(c) and the words "without resort to legal process and" in the
fifth line of the printed Section 17.2.(c).

Delete the last paragraph of the printed Section 17.2. and insert
the following in lieu thereof:

"Any costs and expenses incurred (including, without limitation,
reasonable attorneys' fees) by Landlord or Tenant in enforcing any of
its rights or remedies under this Lease shall be repaid to the party
prevailing in the subject action; provided, however, attorneys' fees
sustained by Landlord in enforcing its rights shall be deemed to be
Additional Rental and shall be fifteen percent (15%) of the principal
indebtedness and interest thereon owed."

"If either party initiates an action against the other to enforce
any of its rights hereunder or defends any action brought by the other
party, which action results in a final judgment against the other
party which is not overturned on appeal, then the prevailing party
shall be entitled to its reasonable fees of outside counsel up to and
at trial and on appeal and reasonable costs expended in such action
from the other party."

Section 17.3.  (The printed Section deals with Damages):

Delete the phrase "named by Landlord" appearing in the fourth
line of the printed Section 17.3.(ii), and insert the phrase "mutually
agreed upon between Landlord and Tenant" in lieu thereof.

Insert a period after the word "termination" in the ninth line of
the second paragraph of the printed Section 17.3. and delete the
remainder of the sentence.

-24-



(10/9/02)

Add the following to the end of the printed Section 17.3.:

"Landlord agrees to use reasonable efforts to relet the Premises so as to mitigate damages."

"Any costs and expenses incurred (including, without limitation, reasonable attorneys' fees) by Landlord or Tenant in enforcing any of its rights or remedies under this Lease shall be repaid to the party prevailing in the subject action; provided, however, attorneys' fees sustained by Landlord in enforcing its rights shall be deemed to be Additional Rental and shall be fifteen percent (15%) of the principal indebtedness and interest thereon owed."

Section 17.4.  (The printed Section deals with Remedies in Event of Bankruptcy or Other Proceeding):

(a) Delete the words "without notice" in the fourteenth line of the printed Section 17.4.(a) and insert in lieu thereof the words "pursuant to an order from a Court of competent jurisdiction".

Section 18.1.  (The printed Section deals with Subordination):

Add the following to the end of the printed Section 18.1.:

"Upon the written request of Tenant, Landlord shall use its reasonable efforts to obtain a non-disturbance agreement from its Mortgagee in favor of the Tenant.  Any fee charged by Landlord's Mortgagee connected with obtaining the non-disturbance agreement shall be borne solely by the Tenant.  Landlord agrees, however, to notify Tenant in the event there is a fee connected therewith, in which event Tenant has the option to proceed with or cancel its request for such non-disturbance."

Section 18.3.  (The printed Section deals with Attornment):

Add the following to the end of the printed Section 18.3.:

"Tenant's obligation to attorn to any future Mortgagees, or any party which shall become Landlord, shall be conditioned upon any such party agreeing to assume all of Landlord's obligations under this Lease from the date of repossession (so long as Tenant is not in default hereunder on such date) through the remainder of the Term, and to recognize Tenant's rights under this Lease."

Section 19.1.  (The printed Section deals with Sending of Notices):

After the word "prepaid" appearing in subsection (i) of the printed Section 19.1., insert the phrase "or upon receipt or refusal if sent by a reputable courier (provided any such courier provides written evidence of delivery)".

Delete the printed Section 19.1.(ii) and insert the following in lieu thereof:

-25-



(10/9/02)

"(ii)  if intended for Tenant, the date on which same shall have been received, rejected or deemed undeliverable following mailing of the same by United States registered or certified mail, return receipt requested, Federal Express or Express Mail, with all postage charges prepaid, addressed to Tenant at the Tenant Notice Address with a copy to the Premises."

Section **20.1.**    (The printed Section deals with Radius Restriction):

Delete the parenthetical phrase appearing in the first and second lines of the printed section 20.1.

Delete the word "or" in the fourth line of the printed Section 20.1. and insert in lieu thereof the word "and".

Add the following to the end of the printed Section **20.1.**:

"Landlord agrees that the Restriction Area shall apply only to stores operating under the Tenant Trade Name or a variation of the Tenant Trade Name."

Section **20.2.**    (The printed Section deals with Estoppel Certificates):

After the word "Landlord," in the sixth line of the printed Section 20.2., add the words "Landlord shall notify Tenant of such failure and, if Tenant fails to provide such certificate within five (5) days after such notification from Landlord,".

Add the following at the end of the printed Section 20.2.:

"Tenant shall have the right to list any exceptions to the statements contained in the Estoppel Certificate."

Section **20.3.**    (The printed Section deals with Inspections and Access by Landlord):

After the word "hours" appearing in the second line of the printed Section 20.3., add the words ", after forty-eight **(48)** hours' written notice to Tenant at the Tenant Notice Address, except for emergencies or where Landlord's daily routine inspections as part of its normal operating procedure do not materially, adversely affect Tenant's routine use of the Premises,".

Section **20.6.**    (The printed Section deals with Successors and Assigns):

After the word "Lease" appearing in the fifth line of the printed Section **20.6.**, change the period to a comma, and add the following language: "or such assigns of Tenant to whom the assignment by Tenant does not require the consent of Landlord pursuant to the provisions of this Lease".

Section **20.13.**    (The printed Section deals with No Option):

-26-



(10/9/02)

Delete the words "and the affixation of the seal of such corporation" in the eleventh and twelfth lines of the printed Section 20.13.

Section 20.20.    (The printed Section deals with Waiver of Certain Rights):

Before the word "counterclaim" appearing in the third line of the second paragraph of the printed Section 20.20., insert the word "non-compulsory" in lieu thereof.

Section 20.23.    (The printed Section deals with Relocation of Premises):

Delete the printed Section 20.23., and insert the following in lieu thereof:

"Section 20.23.    Relocation of Premises.

"In the event of an expansion or renovation of the Shopping Center in the vicinity of the Premises and which specifically include the area of the Premises, Landlord may elect, by giving notice of such election to Tenant, to require Tenant to surrender possession of all or such portion of the Premises and for such period of time (including the remainder of the Term) as Landlord, in its sole discretion, shall deem to be required for such purposes.  Such election shall be exercised not more than once during the Term, except that if any such notice of election shall be withdrawn by Landlord, the same shall be deemed not to have been given.  Landlord's notice of the exercise of such election shall designate (i) the portion of the Premises required for such purposes, (ii) the period of time during which such surrender shall be required, and (iii) the date by which possession of same shall be surrendered by Tenant, which date shall not be earlier than ninety (90) days after the date on which such notice is given.

If Tenant shall be required to surrender possession of all or a portion of the Premises for a period of time which is less than the remainder of the Term, all Rental shall abate as to such portion or all of the Premises required to be surrendered, such abatement to be effective beginning as of the date Tenant is required to surrender such possession and continuing until the date on which Landlord redelivers possession to Tenant.  For purposes of determining the extent of such abatement of Rental, Tenant's Floor Area hereunder shall be deemed to be reduced during the abatement period by the number of square feet contained in the portion of the Premises of which possession is required to be surrendered.  Landlord further agrees, that before Landlord redelivers possession of the portion of the Premises so taken to Tenant, Landlord shall restore the Premises to substantially the same condition as existed prior to such taking.

If Tenant shall be required to surrender possession of all or a portion of the Premises as provided above and such surrender prevents Tenant from conducting its business in the Premises, or substantially impairs its ability to conduct its business in the Premises, then Rental shall completely abate until the date on which Landlord redelivers possession of the Premises to Tenant.

(10/9/02)

If Tenant shall be required to surrender possession of a portion of the Premises for the entire remainder of the Term, this Lease shall terminate as to such portion as of the date on which Tenant is required to surrender possession thereof to Landlord and all Rental shall be proportionately reduced. For purposes of determining the extent of such reduction of Rental, Tenant's Floor Area hereunder shall be deemed to be reduced as of the date of such termination by the number of square feet contained in the portion of the Premises of which possession is required to be surrendered.

If Tenant shall be required to surrender possession of a portion of the Premises, Landlord shall (a) provide any permanent or temporary barriers required by the nature of Landlord's use of such portion, which barriers shall be constructed in such a manner so as to not materially interfere with Tenant's business operations in the Premises; and (b) make such alterations as may be necessary in order to restore the remainder of the Premises to useful condition substantially as the Premises existed prior to such entry.

Landlord hereby agrees to use reasonable efforts to perform any such renovation, expansion or other work in such a manner so as to least affect the operation of Tenant's business in the Premises.

If Tenant shall be required to surrender possession of a portion of the Premises and the remainder of the Premises is rendered unsuitable for the Permitted Use, or if Tenant shall be required to surrender possession of the entire Premises, Landlord shall have the further right to cause Tenant to relocate its business, within ninety (90) days after notice to do so, to another location within the Shopping Center Area, comparable in size and location (with respect to the Common Areas, the Anchor Stores and other Shopping Center tenants in the vicinity of the Premises) to the Premises, mutually agreed upon by Landlord and Tenant. Within sixty (60) days after any such notice shall be given, Landlord and Tenant shall execute and deliver an amendment to this Lease which shall substitute a description of the premises to which Tenant is to be relocated for the description of the Premises contained herein and shall modify Tenant's Floor Area accordingly; otherwise all of the terms and conditions of this Lease shall be applicable to Tenant's occupancy of the new premises.

If the Premises are relocated as provided above ('Relocated Premises), Landlord agrees to reimburse Tenant for the cost of constructing Tenant's store in the Relocated Premises; provided, however, that (a) the Relocated Premises shall be constructed to be substantially equivalent to the Premises including, without limitation, the size, design and building materials, and (b) Tenant shall have obtained Landlord's prior written approval of Tenant's plans and specifications for the Relocated Premises. Tenant shall not be required to vacate the Premises until the Relocated Premises is substantially completed and ready to open for business. Tenant shall not be obligated to reimburse Landlord for the cost of Landlord's review of Tenant's plans and specifications for the Relocated Premises.

If Landlord and Tenant cannot agree on a new location within such sixty (60) days after notice of the exercise by Landlord of its relocation option described in the preceding paragraph, then Landlord

-28-



(10/9/02)

may elect to withdraw its notice requiring Tenant to relocate its business, in which event Tenant shall remain in possession of the Premises and this Lease shall remain in full force and effect.  If Landlord shall not elect to withdraw its notice requiring Tenant to relocate its business, the Term shall terminate on the ninetieth (90th) day after such notice, in which event Landlord agrees to pay to Tenant, provided Tenant is not in material default (provided failure by Tenant to pay any Rental shall be deemed material default) under this Lease beyond any applicable notice and cure period, an amount equivalent to the unamortized value of Tenant's leasehold improvements which were installed in the Premises at Tenant's sole cost and expense, provided Tenant shall have furnished Landlord with the statement referred to in the next succeeding paragraph.  Said amortization shall be determined on the straight-line depreciation method allowed by the Internal Revenue Code of 1986 (as amended) assuming a depreciation period commencing with the placement in service of such leasehold improvements and ending on the date of expiration of the Term determined pursuant to Section 3.1.  Payment of the amount equivalent to the unamortized value of Tenant's leasehold improvements will be made to Tenant within thirty (30) days after Tenant shall have vacated the Premises in accordance with the terms of this Lease, provided that Landlord shall have the right to deduct therefrom any amounts due Landlord from Tenant pursuant to this Lease. For purposes of this Section, 'Tenant's leasehold improvements' shall include partitioning, electrical wiring, plumbing (including plumbing fixtures), painting, wallpaper, storefront and other permanent improvements installed, affixed or attached in or to the Premises, non-attached trade fixtures, electrical fixtures, equipment and apparatus, and any other so called "soft costs", not to exceed Fifteen Thousand Dollars ($15,000), in connection with the initial construction of the Premises, but shall not include (x) Tenant's inventory or stock in trade, or (y) Landlord's fixtures or other improvements installed by or at the expense of Landlord.

In order to give effect to this Section, Tenant shall, at any time after notice of the exercise by Landlord of its relocation option, but prior to the date on which this Lease will terminate pursuant to this Section, furnish to Landlord a statement, signed by an officer of Tenant, setting out in detail the cost of Tenant's leasehold improvements.

If this Lease shall be terminated as to any portion or all of the Premises pursuant to this Section, the rights and obligations of the parties hereunder shall cease as of the date specified herein and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.  No further documentation shall be required to effect the termination of this Lease, but each party agrees that, upon the request of the other party to do so, it shall execute, acknowledge and deliver an appropriate instrument evidencing such termination prepared by or at the expense of the party requesting the same.

"Notwithstanding anything to the contrary contained in this Section 20.23., it is hereby agreed that the provisions herein shall only apply once during the Term."

-29-



OCT-11-2002  16:19       THE ROUSE COMPANY                   4107158257   P.01/01
(10/9/02)

*Add* the following **as** new sections to the Lease:

"Section 21.1.   Termination of Existing Lease Agreement.

*It* is hereby understood and agreed between the parties hereto
that Tenant's existing lease agreement dated November 27,
1991 ('Existing Lease') for premises comprised of 1,475 square feet
('Existing Premises'), shall terminate on the Commencement Date of the
within Lease, It being the intent of the parties hereto that the
within Lease shall supersede and replace the Existing Lease.
Effective on the Commencement Date, both parties shall be relieved of
all liability in connection with the Existing Lease, **except** (a) Tenant
agrees to pay all sums due and owing under the Existing Lease up to
and including the final date on which Tenant operates its business at
the **Existing** Premises, including, without limitation, any and all
year-end adjustment billings relating to **Tenant's** use and occupancy of
the Existing **Premises;** (b) Landlord shall reimburse Tenant **any** credit
due Tenant for year end adjustments relating to Tenant's use and
occupancy of the Existing Premises, if any; **and** (c) Landlord's and
Tenant's obligation to indemnify and hold harmless each other **as**
provided in the Existing Lease shall survive said termination as to
any act, omission or occurrence which *took* place prior to such
termination.   No further doaumentation shall be required to effect the
termination of the Existing Lease."

"Section 21.2.   Financial Disclosure

"**In** addition to the above, if **Landlord** and/or any holder of a
**Mortgage** requires **financial** information from Tenant, and if Tenant **is**
a corporation the stock of which is publicly *owned*, the annual and/or
interim reports of such corporation **as** required by the Securities and
Exchange Commission shall satisfy the foregoing provisions of this
Lease."

"SCHEDULE "F"

Before the word "attributable" in the second line of Section
B.(ii) of Schedule F. add the word "reasonably".

Before the word "estimated" as it appears in the second line of
the second paragraph in Section B. of Schedule F. add the word
"reasonably".

After the word "Tenant" in the penultimate line of Section E. of
Schedule F. add the words "or Landlord".

Add the following to the end of Section B of Schedule "F":

"If Tenant disputes the charge to it for its share of **the cost of**
the maintenance, repair and operation of the HVAC equipment end system
serving the Premises ('HVAC Charge"), Tenant, at its sole cost and
expense, may hire a consultant to review the HVAC Factor used as a
basis in calculating the WAC **Charge**, which consultant is duly
qualified in terms of professional education and experience as to be
competent to determine, as an **expert**, the HVAC Factor for the Premises
as set forth in 'chis Section B of Schedule 'F'.   If Tenant's
consultant's calculations **do** not agree with the *WAC* Factor assigned

-30-

TOTAL P.01

(10/9/0.2)

to Tenant by Landlord, the parties hereto agree that an appraisal shall be made by an independent third party (the 'Umpire') mutually acceptable to Landlord and Tenant, who shall be duly qualified in terms of professional education and experience as to be competent to determine, as an expert, the HVAC Factor for the Premises.  If Landlord and Tenant cannot agree promptly upon an Umpire, then Landlord and Tenant shall promptly arbitrate the HVAC Charge before the American Arbitration Association, in accordance with the rules of said Association, at such offices of said Association as the parties may mutually agree upon, or, in the absence of any such agreement, at such office of said Association in the city where the Shopping Center Area is located.  The appraisal or arbitration, as the case may be, shall be binding on both parties and shall set forth (a) whether the HVAC Charge in effect on the date of Tenant's request for reduction exceeds or is less than the annual amount charged by Landlord, and (b) if so, the amount of such excess or deficiency.  The HVAC Charge shall thereupon be adjusted by the amount of such excess or deficiency. Notwithstanding anything to the contrary contained herein, nothing in this Schedule 'F' shall diminish or alter Tenant's obligations pursuant to this Lease to pay all Rentals for which Tenant is obligated under this Lease during any such period of request and appraisal or arbitration, as the case may be, including without limitation the payment of Annual Basic rental, Annual Percentage Rental, Tenant Utilities and Other Additional Rental which was provided for prior to the commencement of any such period.

"The cost of such appraisal by an Umpire or arbitration shall be shared equally by Landlord and Tenant; provided, that if either party requests an appraisal prior to one (1) year after the effective date of the last preceding appraisal or arbitration, the cost of such appraisal or arbitration shall be paid for by the party requesting an appraisal."

Add the following to the end of the printed Schedule "F":

"Notwithstanding anything to the contrary contained in this Schedule 'F', Landlord represents that it does not assign an HVAC Factor to unleased portions of Landlord's Floor Area."

-31-



(10/9/02)

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease under their respective hands as of the day and year first above written.

ATTEST:                                    CHERRY HILL CENTER, LLC, Landlord

_____                    By: _____
Assistant Secretary                              Vice-President


ATTEST:                                    CACHE', INC., Tenant

_____                    By: _____
Secretary                                        Vice President Finance





NOT TO SCALE

# S C H E D U L E   "A"

TENANT:
**CACHE'**
CENTER:
**CHERRY HILL**

SCHEDULE 'A-1'

BEGINNING at a point along the widened easterly right of way line of Saddonfield Road said point being the point of tangent of a curve connecting said line with the northerly right of way line of New Jersey State Highway Route #38; said point also being 46.23 feet off the centerline of Saddonfield Road and extending thence;

1.   Along said line of Saddonfield Road N19°-20'-20"E a distance Of 211.07 feet to a point and extending thence)

2.   Along same N19°-42'-47"E a distance of 198.02 feet to a point and extending thence)

3.   Along same N20°-59'-30"E a distance of 212.16 feet to a point and extending thence)

4.   Along same N18°-56'-40"E a distance of 153.16 feet to a point and extending thence)

5.   Along rune N17°-27'-30"E a distance of 207.32 feet to a point and extending thence:

6.   Along same N16°-28'-49"E a distance of 14.57 feet to a point and extending thence)

7.   Along same N19°-20'-20"E a distance of 1063.56 feet to a point and extending thence)

8.   Along same S70°-39'-40"E a distance of 1.00 feet to A point and extending thence)

9.   Along same N19°-20'-20"E a distance of 205.00 feet to a point along A line common with land8 now or formerly Suburban Savings and Loan Association and extending thence)

10.   Along Suburban Savings and Loan Association S70°-39'-40"E a distance of 115.00 feet to a point and extending thence)

11.   Along same N57°-14'-16"E a distance of 51.15 feet to a point of curve and extending thence)

12.   Along said curve to the right in an eastwardly direction with a radius of 230.00 feet an arc distance of 211.20 feet to a point and extending thence)

13.   Along same N33°-23'-05"E a distance of 44.60 feet to a point in the widened right of way line of Church Road and extending thence)

14.   Along said line of Church Road S56°-36'-55"E a distance of 121.00 foot to a point and extending thence)

15.   Along same N33°-23'-05"E a distance of 3.00 Foot to a point and extending thence)

16. Along same S56°-36'-55"E a distance of
1151.21 feet to a point md extending thence;

17. N02°-38'-20"E a distance of 14.25 frit
to a point in the original right of wry line of Church
Road raid point bring 24.75 feet off thr centerline
when measured ct right angles thereto and extending
thence;

18. Along raid line S56°-36'-55"E a distance
of 104.72 frrt to a point in the westerly right of way
line of Cherry Bill Drive rad extending thence;

19. Along said Cherry Bill Hall Drive S02°-
38'-20"W a distance of 1420.69 frct to an angle point
in same and utrnding thencrr

20. Along same S38°-38'-20W a distance of
393.97 feet to a point urd extending thence;

21. Along same N51°-21'-40"W a distance of
27.19 feet to a point md extending thence!

22. Along same S45°-10'-09"W a distance of
105.79 feet to a point and extending thence;

23. Along same S38°-38'-20"W a distance of
57.12 feet to a point of curve and extending thence;

24. Along same curving to the left with a
radius of 1048.00 frrt, an arc distance of 104.44 frrt
to a point of reverse curve and utrnding thence;

25. Along same curving to the right with a
radius of 25.00 feet, an arc distance of 2.36 feet to a
point and extending thence;

26. Along same S05°-53'-21"E a distance of
10.01 frat to a point in the northerly right of way
line of New Jersey State Highway Route #38 and extending
thence;

27. Along Route #38 N87°-21'-40"W a distance
of 1010.36 feet to a point and extending thence;

28. N27°-22'-07"W a distance of 30.31 fert
to a point and extending thence;

29. N87°-21'-40"W a distance of 20.17 frct
to a point and extending thence;

30. S02°-38'-20"W a distance of 26.25 frat
to a point and extending thence;

31. N87°-21'-40"W a distance of 336.33 feet
to a point of curve and utrnding thence;

32. Along raid curve to the right with a
radius of 240.00 frct, an arc distance of 171.74 feet
to a point of tangency and extending thence;

33. N46°-21'-40"W a distance of 356.25 feet
to a point of curve and extending thence;

34. Along raid curve to the tight with a
radius of 140.00 feet an arc distance of 160.52 frct to
the point and place of BEGINNING.'

-2-



There shall be excepted from the parcel of land described above, approximately 4 acres which is wned by Strawbridge & Clothier, an approximate 8 acres which is owned by Cherry Hill Properties, Corp. (Macy), an approximate 16 acres which is wned by J. C. Penney Properties, Inc. and an approximate 0.782 acres which is owned by Cherry Hill Towers, Inc. Therefore, wherever the term 'Shopping Center Area' is used, it shall *be deemed* to exclude such 4 acres, 8 acres, 16 acres and 0.782 acres, except with respect to such rights *as may* be granted by the owners thereof to Landlord and to tenants of the Shopping Center Area.

-3-

(10/9/02)

SCHEDULE "E"
UTILITY CONSUMPTION AND PAYMENT SCHEDULE

ANNEXED TO and forming part of the Lease by and between CHERRY HILL CENTER, LLC ("Landlord") and CACHE', INC., a Florida corporation, t/a CACHE', ("Tenant").

Section 12.1. of the above mentioned Lease Agreement provides for the inclusion of this Schedule as the basis for the determination of electricity used by Tenant in the Premises and the payment therefor.

Landlord will furnish to the Premises electrical energy for Tenant's requirements, without specific measurement of or charge for Tenant's consumption of electricity. It is intended that the cost of such electrical energy be included in the Annual Basic Rental reserved under this Lease. Since the use characteristics of Tenant's electrical equipment and fixtures are not yet known, it is not presently possible for Landlord and Tenant to agree upon the component amount to be included in Annual Basic Rental for electrical energy. For that reason the Annual Basic Rental presently set forth in this Lease does not include the component amount for electrical energy and the parties mutually desire to agree upon the method by which the amount of the Annual Basic Rental will be ultimately fixed.

In consideration of the foregoing and of the mutual covenants hereinafter expressed, Landlord and Tenant agree as follows:

1. As soon as possible, Tenant shall furnish Landlord with such information as Landlord or Landlord's electrical engineer may reasonably require in order to estimate the connected load which is used by Tenant's electrical fixtures, appliances and equipment (collectively "Tenant's Electrical Installations") in the Premises. If Tenant fails to furnish Landlord such information, Landlord shall make its estimate based on the best information available to Landlord. Based on such information, Landlord or Landlord's electrical engineer shall make an estimate of the annual total of average monthly charges (the "Electricity Component") which Tenant would otherwise pay to the public utility or public authority furnishing such electrical energy in the area in which the Shopping Center Area is located if such electrical energy were not furnished by Landlord. The Electricity Component shall be added to and become part of the Annual Basic Rental. Landlord shall notify Tenant in writing of the amount of the Electricity Component and if Landlord requests, Tenant agrees to execute an amendment to this Lease, which amendment shall confirm the increase in the Annual Basic Rental presently set forth in this Lease by the amount of the Electricity Component. Failure on the part of Tenant to execute such amendment shall not relieve Tenant from paying Annual Basic Rental, including the Electricity Component, promptly when due.

2. At any time after notice of the Electricity Component is given Tenant, and from time to time, if, in Tenant's judgment, Tenant's Electrical Installations use a lower connected load or lower demand factor or are used for a lesser number of hours than would justify the Electricity Component established by Landlord, or in the event that Landlord no longer furnishes electric service as herein contemplated, Tenant shall be entitled to request a reduction of the portion of the Annual Basic Rental represented by the Electricity Component. If Landlord and Tenant cannot agree upon the amount of such reduction, the parties hereto agree that an appraisal shall

-1-



(10/9/02)

be made by an independent third party (the "Umpire")mutually acceptable to Landlord and Tenant, who shall be duly qualified in terms of professional education and experience as to be competent to determine, as an expert, whether that portion of the Annual Basic Rental represented by the Electricity Component is in excess of that which Tenant would otherwise pay to the public utility or public authority furnishing electrical energy in the area in which the shopping Center *Area* is located if such electrical energy were not furnished by Landlord. If Landlord and Tenant cannot agree promptly upon an Umpire, then Landlord and Tenant shall promptly arbitrate the amount in controversy before the American Arbitration Association, in accordance with the rules of said Association, at such offices of said Association as the parties may mutually agree upon, or, in the absence of any such agreement, at such office of said Association in the city where the Shopping Center Area is located. The appraisal or arbitration, as the case may be, shall be binding on both parties and shall set forth (a) whether that portion of the Annual Basic Rental represented by the Electricity Component in effect on the date **of** Tenant's request for reduction exceeds or is less than the annual amount charged by the public utility or public authority furnishing electrical energy if the same were not furnished by Landlord, and (b) if so, the amount of such excess or deficiency. The Annual Basic Rental shall thereupon be adjusted by the amount of such excess or deficiency. Notwithstanding anything to the contrary contained herein, nothing in this Section 2 shall diminish or alter Tenant's obligations pursuant to this Lease to pay all rentals during any such period of request and appraisal or arbitration, as the case may be, including without limitation the payment of Annual Percentage Rental, all Additional Rental, and that Annual Basic Rental which was provided for prior to the commencement of any such period.

Tenant reciprocally agrees that if, in Landlord's judgment, that portion of the Annual Basic Rental represented by the Electricity Component is lower than would be justified by the connected load or demand factor or number of hours used by Tenant's Electrical Installations, Landlord may apply for an increase in that portion of the Annual Basic Rental represented by the Electricity Component in accordance with the procedure provided for herein.

Any change in the Annual Basic Rental as provided for herein shall become effective as of the first day of the month following the month in which demand for the appraisal was made.

The cost of such appraisal or arbitration shall be shared equally by Landlord and Tenant; provided, that if either party requests an appraisal prior to one year after the effective date of the last preceding appraisal or arbitration, the cost of such appraisal or arbitration shall be paid for by the party requesting an appraisal. In each case, upon completion of an appraisal and, if necessary, arbitration pursuant to this Agreement, the parties agree to amend this Lease to reflect the adjustment or adjustments in Annual Basic Rental.

3. If the filed rate (including fuel adjustment charges and all other charges) charged by the public utility for energy supplied to the Shopping Center Area shall be increased after the date on which the first Electricity Component is determined, the parties agree that the portion of the Annual Basic Rental represented by the Electricity Component shall be increased proportionately. Accordingly, such rental increase shall become effective on the first day of the month following any such rate increase, provided that the cost to Tenant would not be greater than the cost would be to Tenant if the energy was supplied directly to Tenant by a public utility or public authority in the area in which the Shopping Center is located. Upon written notice by Landlord to Tenant specifying such rate increase, this Lease and the Annual Basic Rental will be deemed to have

-2-



(10/9/02)

been amended and increased, respectively, as provided in this paragraph above, and, if so requested by Landlord, Tenant shall execute an amendment to this Lease evidencing said increase.

Landlord shall provide water and sewer service to the Premises.  Tenant shall pay all charges for water and sewer used by it and supplied by Landlord, a public utility or public authority, or any other person, firm or corporation.  In addition to the foregoing, Tenant shall pay to Landlord, as Additional Rental, the annual Water and Sewer Charge set forth in clause O of Section 1.1. (if any), which annual sum shall be paid in twelve (12) equal monthly installments in advance on the first day of each calendar month during the Term, the first such payment to include also any prorated Water and Sewer Charge for the period from the date of the commencement of the Term to the first day of the first full calendar month in the Term.

-3-



(10/9/02)

HVAC - A
SCHEDULE "F"
TENANT HEATING. VENTILATING AND AIR-CONDITIONING SCHEDULE

ANNEXED TO and forming part of the Lease by and between CHERRY HILL CENTER, LLC ("Landlord") and CACHE', INC., a Florida corporation, t/a CACHE', ("Tenant").

Section 12.2. of the above mentioned Lease provides for the inclusion of this Schedule as the basis for establishing the obligations of Landlord and Tenant with regard to the heating, ventilating and air-conditioning equipment and system servicing the Premises and the cost of energy used to provide heating, ventilating and air-conditioning to the Premises.

A. HVAC System:

Landlord and/or others have heretofore installed heating, ventilating and air-conditioning equipment and system serving the Premises and Landlord's Building. Tenant shall have use of Landlord's heating, ventilating and air-conditioning units in the Premises upon Tenant's acceptance of the Premises. Tenant will provide a sheet metal duct system. Landlord will provide and install at least one thermostat in Tenant's Premises, except for small or subdivided spaces which may share a thermostat. Landlord and Tenant shall each operate their respective portions of the facilities for heating, ventilating and air-conditioning the Premises during the Term. Landlord shall maintain, repair and operate such system at its expense, but subject to the payment by Tenant of the charges provided for herein. Upon the expiration or termination of the Term of this Lease Agreement, title to such additions and replacements shall remain in and shall vest solely in Landlord.

B. Tenant's HVAC Charge:

In each calendar month of Landlord's fiscal year (the "Fiscal Year"), Tenant shall pay Landlord, as Additional Rental, Tenant's proportionate share of (i) the cost of energy used in heating, ventilating and air-conditioning Landlord's Floor Area and (ii) the cost of maintenance, repair and operation of such equipment and system as installed or owned by Landlord ("Tenant's HVAC Charge") which shall be determined as follows:

(i)    Landlord shall cause a heating, ventilating and air-conditioning consultant designated by Landlord to review such data and information regarding the mechanical capacity of said equipment and system as such consultant shall deem relevant and, based on such data and information, such consultant shall assign to Tenant an "HVAC Factor" which shall fairly represent the relationship between (x) the mechanical capacity of the equipment and system which is required for heating, ventilating and air-conditioning the Premises and (y) the total mechanical capacity of such equipment and system which is available for heating, ventilating and air-conditioning Landlord's Floor Area; and

(ii)   In each Fiscal Year, the actual cost to Landlord of such energy, operation, maintenance and repair as *is* attributable by Landlord to the heating, ventilating and air-conditioning of Landlord's Floor Area, together with costs and fees of

-1-



(10/9/02)

Landlord's consultant in recalculating HVAC Factors of Tenant and other tenants of Landlord's Building from time to time, shall be multiplied by a fraction, the numerator of which is Tenant's HVAC Factor and the denominator of which is the total of all HVAC Factors assigned to leased Landlord's Floor Area. The product thus obtained shall be the Tenant's HVAC Charge for such Fiscal Year.

Tenant's HVAC Charge for each calendar month shall be paid by Tenant in such amounts as are estimated and billed by Landlord, each such charge being estimated and billed as of the first day of each Fiscal Year. At any time during each Fiscal Year, Landlord may reestimate Tenant's HVAC Charge and adjust Tenant's monthly installments payable during such Fiscal Year to reflect more accurately Tenant's HVAC Charge. Within one hundred twenty (120) days after the termination of each Fiscal Year, Landlord will send Tenant a notice which shall:

(iii)    set forth the amount of Tenant's HVAC Charge based upon Landlords energy bills and maintenance, repair and operation costs for such Fiscal Year; and

(iv)    state that the aggregate of all tenant HVAC Charges paid or payable by all tenants of leased portions of Landlord's Floor Area with respect to such Fiscal Year, as adjusted, does not exceed the actual cost to Landlord of such energy, operation, maintenance and repair as is attributable by Landlord to the heating, ventilating and air-conditioning of Landlord's Floor Area, together with fees and costs of Landlord's consultant in recalculating HVAC Factors of Tenant and other tenants of Landlord's Building from time to time.

Tenant's HVAC Charge paid for such Fiscal Year shall be adjusted between Landlord and Tenant, the parties hereby agreeing that Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall pay Tenant), as the case may be, within fifteen (15) days of such notification to Tenant, the amounts necessary to effect such adjustment. Failure of Landlord to provide the notification called for hereunder within the time prescribed shall not relieve Tenant of its obligations hereunder.

C. HVAC Equipment:

In each Rental Year, Tenant shall pay Landlord annually (in twelve (12) equal monthly installments together with the Annual Basic Rental), as Additional Rental, an amount (the "HVAC Equipment Contribution") determined by multiplying the HVAC Equipment Contribution Rate by Tenant's Floor Area.



-2-

(10/9/02)

Sent to Mall: ___NOV - 5 2002___

Lease Verified: _____

<u>STORAGE AREA LEASE AGREEMENT</u>

NOW - 5 2002

THIS STORAGE AREA LEASE AGREEMENT DATED
by and between CHERRY HILL CENTER, LLC a Maryland limited liability
company ("Landlord") and CACHE', INC., a Florida corporation, t/a
CACHE', ("Tenant").

WHEREAS, Landlord and Tenant have entered into or are about to
enter a Lease ("Lease"), for retail Premises located in the Cherry
Hill Center, in the County of Camden, State of New Jersey ("Present
Premises"), and portions of which Lease are by this reference
incorporated herein and made a part hereof; and

WHEREAS, Tenant desires to lease certain other premises in the
Shopping Center for storage; and

WHEREAS, Landlord is willing to lease the storage area upon
certain terms and conditions as hereinafter set forth.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH, that in consideration
of the Premises and the mutual covenants hereinafter set forth, the
parties hereto agree to the following:

1.   In addition to the Present Premises, Landlord hereby leases to
     Tenant, and Tenant hereby rents from Landlord, storage area in
     the Shopping Center, containing 250 square feet as shown hatched
     on the Schedule A attached hereto and made a part hereof
     ("Storage Area") and of the Lease.

     Tenant has inspected and hereby accepts the Storage Area in its
     present condition as suitable for the purposes of this Storage
     Area Lease Agreement ("Storage Lease").  Tenant further
     acknowledges that Landlord is under no obligation and has made no
     warranties or representations, either for the present time or for
     the future, to provide additional facilities, improvements or
     utility services other than those presently existing in the
     Storage Area.

2.   The Term of this Storage Lease shall commence on the Commencement
     Date of the Lease, and shall terminate on July 31, 2013, subject,
     however, to Landlord's right to relocate this Storage Lease to an
     alternate location of comparable size within the area set forth
     on Schedule B attached hereto, upon sixty (60) days advance
     written notice to Tenant. ~~In the event Landlord elects to~~
     relocate the Storage Area, the Storage Area shall be relocated to
     a mutually acceptable location ~~comparable in size~~ in the Shopping
     Center, based on a good-faith offer containing **up** to three (3)
     alternative locations ~~as~~ available.  In the event that Landlord
     and Tenant cannot agree on an acceptable location within said
     ~~sixty day period, then this Lease shall immediately terminate.~~



-1-

(10/9/02)

3.    The Storage Area shall be used by Tenant solely for storage
      purposes related to the authorized use of the Present Premises
      and for no other purpose whatsoever.

4.    Tenant agrees to pay to Landlord, as rental for said Storage
      Area, the sum of Eight Thousand Seven Hundred Fifty Dollars and
      No Cents ($8,750.00)per annum, payable in monthly installments
      in the same manner as Annual Basic Rental for the Present
      Premises is payable, as set forth in the Lease.  It is understood
      and agreed that the aforementioned rental constitutes the sole
      and complete rental due and payable by Tenant to Landlord for the
      use of said Storage Area, unless otherwise hereinafter expressly
      set forth.  It is further understood and agreed that the
      aforementioned rental for said Storage Area shall not be included
      in Annual Basic Rental due and payable by Tenant for the Present
      Premises in calculating Tenant's liability for Annual Percentage
      Rental pursuant to the Lease.

5.    This Storage Lease may be assigned by Tenant in the same manner
      and to the same assignee, as the Present Premises are assigned by
      Tenant pursuant to the Lease.

6.    It is expressly understood and agreed that all terms, covenants
      and conditions set forth in said Lease with respect to the
      Present Premises (other than the Rental payable for the Present
      Premises), are hereby made a part of this Agreement and shall
      apply with full force and effect to the Storage Area, except
      those terms and conditions which are inconsistent with any terms
      and conditions of this Storage Lease, in which case the terms and
      conditions of this Storage Lease shall prevail.  A default by
      Tenant under the Lease shall constitute a default by Tenant under
      this Storage Lease and a default by Tenant under this Storage
      Lease shall constitute a default by Tenant under the Lease.

      Execution by signature of an authorized officer of Landlord shall
be effective only upon attestation thereof by a corporate Secretary or
Assistant Secretary of Landlord.

-2-



(10/9/02)

     IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Agreement as of the day and year first above written.

ATTEST:

                           CHERRY HILL CENTER, LLC, Landlord

_____
Assistant Secretary

By: _____
               Vice-president

ATTEST:

                           CACHE', INC., Tenant

_____
Secretary

By: _____
               Vice-president Finance

-3-



NOT TO SCALE                                    LOWER LEVEL

## SCHEDULE "A"

TENANT:
CACHE STORAGE
CENTER:
CHERRY HILL MALL



Case 15-10172-MFW    Doc 369-2    Filed 03/27/15    Page 101 of 101